Given the statutory expansion of death-eligible offenses, the inconsistent inclusion of mitigating evidence during the penalty phase, and the allowance of jury consideration of non-statutory aggravators during the penalty phase, the Court of Criminal Appeals should cease making superficial references to *Pulley,* should recognize that the basis for *Pulley* and *Jurek* - "other safeguards" in the Texas system - no longer holds, and should reintroduce comparative proportionality review as a constitutionally required protection against the arbitrary imposition of death sentences.

## Comparative proportionality review has been a central element of United States Supreme Court decisions upholding death penalty statutes.

The Supreme Court has held in numerous instances that comparative review is a necessary element of meaningful appellate review. In *Furman v. Georgia*, 408 U.S. 238 (1972), the Court found that the death penalty as applied was unconstitutional because it was applied in a "wanton and freakish" manner. Specifically, the Court focused on the arbitrary imposition *across* cases; the death penalty was found unconstitutional in regards to its inconsistent application as seen from a comparative perspective. Justice Douglas wrote that the Eighth Amendment requires that "judges . . . see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Id.* at 256. For judges to meet this requirement, they must necessarily look across cases. Justice Brennan likewise found that a "principle inherent in the [Cruel and Unusual Punishment] Clause" is that "the State must not arbitrarily inflict a severe punishment . . . . the State does not respect human dignity when, without reason, it inflicts upon some people a severe

punishment that it does not inflict upon others." *Id.* at 274. Justice Marshall found the death penalty unconstitutional *per se* in part because "capital punishment is imposed discriminatorily against certain identifiable classes of people." *Id.* at 364. In short, each of the concurring justices used language of arbitrariness, inconsistency, selectiveness, disparity across groups—language that necessarily requires judges to review death penalty sentences in a comparative manner, to ensure that its imposition is not arbitrary, selective, or "freakishly imposed."

In upholding the Georgia death penalty statute in *Gregg v. Georgia*, 428 U.S. 153 (1976), the Court focused on procedural safeguards provided by the legislature, such as "standards to guide [the jury's] use of the information" and "statutory aggravating circumstances." *Id.* at 195-97. In particular, the Court focused on the automatic comparative proportionality review by the Georgia Supreme Court: "That court is required by statute to review each sentence of death and determine whether . . . the sentence is disproportionate compared to those sentences imposed in similar cases." *Id.* at 198. The requirements of *Furman* were met by a combination of statutory safeguards against "disproportionate" imposition.

In upholding Florida's death penalty scheme in *Profitt v. Florida*, 428 U.S. 242 (1976), the Court noted that trial judges' decisions are "reviewed to ensure that they are consistent with other sentences imposed in similar circumstances." *Id.* at 253. The Florida court had, on its own, "in effect adopted the type of proportionality review mandated by the Georgia statute." *Id.* at 259. What the Court upheld in *Profitt* was the

entire "system," *both* the statute enacted by the legislature *and* the comparative review conducted by the Florida Supreme Court, which "because of its statewide jurisdiction, can assure consistency, fairness, and rationality in the even-handed operation of the state law." *Id.* at 259-60. Indeed, the Court noted that the Florida court had vacated over one-third of the death sentences that had come before it as proof that such review was meaningful. *Id.* at 259. Judicial proportionality review was thus a central premise under which the constitutionality of the Florida statute was upheld.

In upholding Texas's death penalty scheme in *Jurek v. Texas*, 428 U.S. 262 (1976), despite lack of a statutory requirement for comparative review, the Court found that Texas had ensured "prompt judicial review . . . in a court with statewide jurisdiction," thereby "provid[ing] a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Id.* at 276. Again, the Court used language that implied comparison ("evenhanded" and "consistent") and emphasized that review was done in a court with "statewide jurisdiction," because only high courts can monitor the entire state "system" for arbitrariness. Comparative review was again a necessary and central element to the Court's holding in *Jurek*.

### The United States Supreme Court has Engaged in Proportionality Review

The Supreme Court itself has adopted a comparative approach in capital cases. Numerous decisions examine legislative judgments and jury decisions across jurisdictions, as well as international practices. See *Stanford v. Kentucky*, 492 U.S. 361, 369-73 (1989) (looking across state legislative judgments in determining the

constitutionality of the death penalty as applied to sixteen year olds, in particular because the "language of the Amendment—which proscribes only those punishments that are both 'cruel and unusual'" requires examining "statutes passed by society's elected representatives"); *Tison v. Arizona*, 481 U.S. 137, 152-54 (1987) (finding "state legislatures' judgment as to proportionality in these circumstances relevant to this constitutional inquiry" and examining the number of states authorizing the death penalty for felony murder); *Gregg v. Georgia*, 428 U.S. 153, 180-82 (1976) (listing the states that had enacted new death penalty statutes as the basis for its belief that "capital punishment itself has not been rejected by the elected representatives of the people" and looking to the "actions of juries in many States since *Furman*"); *Thompson v. Oklahoma*, 487 U.S. 815, 824, 831 nn. 31 & 34, 832 (1988) (citing "complete or near unanimity among all 50 States and the District of Columbia in treating a person under 16 as a minor," referring to the fact that "thousands of juries have tried murder cases" and their verdicts lead "to the unambiguous conclusion that the imposition of the death penalty on a 15-year-old offender is now generally abhorrent to the conscience of the community," and citing international practices); *Ford v. Wainwright*, 477 U.S. 399, 408 (1986) (noting that "no State in the Union permits the execution of the insane"); *Coker v. Georgia*, 433 U.S. 584, 595, 596 n.10, 597 (1977) (emphasizing the fact that "Georgia is the sole jurisdiction in the United States at the present time that authorizes the sentence of death when the rape victim is an adult woman," which "obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty," and also citing the relative

rarity of jury imposition of the death sentence as well as the fact that only three out of sixty major nations retain the death penalty for rape where death did not ensue); *Enmund v. Florida*, 458 U.S. 782, 794 (1982) (noting the relevance of finding "only 6 cases out of 362 where a non-triggerman felony murderer was executed" in a survey of court decisions since 1954); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct.2242, 2248-50 (2002) (reviewing how state legislatures have addressed the issue of executing the mentally retarded and concluding "that a national consensus has developed against it"citing that "It is not so much the number of these States that is significant, but the consistency of the direction of change"). In the context of non-capital sentences, the Court adopted a comparative approach in *Solem v. Helm*, 463 U.S. 277, 291-92 (1983) (explicitly laying out a two-tier comparative review process, first comparing "sentences imposed on other criminals in the same jurisdiction" and second comparing "sentences imposed for commission of the same crime in other jurisdictions").

Thus, the Court itself has repeatedly engaged in comparative examinations of legislative practices (of both states and nations) and jury decisions. While *Pulley's* language may suggest that proportionality review is not required, the Court's actual practices speak to a belief that it is a necessary element inherent to meaningful appellate review.

**The Due Process Clause of the Fourteenth Amendment Requires that Texas
Courts Conduct Proportionality Review of Death Sentences in the State.**

Comparative proportionality review of death sentences handed down in Texas is

also required by the Due Process Clause of the Fourteenth Amendment.  While the Court

of Criminal Appeals of Texas has previously refused defendants' claims that due process

requires comparative proportionality review, see, e.g., *Janecka v. State*, 937 S.W. 2nd 456,

474-75 (Tx.Cr.App. 1996); *Anderson v. State*, 932 S.W. 2nd 502, 508-09 (Tx.Cr.App.

1996); *Morris v. State*, 940 S.W. 2nd 610, 615-16 (Tx.Cr.App. 1996), defendant submits

that those decisions rest on an erroneous reading of precedent from the United States

Supreme Court.  Recent Fourteenth Amendment doctrine revises the Court's conclusion

in *Pulley v. Harris*, 465 U.S. 37, 49 (1984), that proportionality review is

"constitutionally superfluous" when other safeguards exist.

**The recent *Honda* and *TXO* cases require proportionality review in the
assessment of punitive damages and, moreover, make it clear
that comparative proportionality review under the Fourteenth Amendment
applies to criminal as well as civil cases.**

In each of the above cases, the appellant referred to *Honda Motor Company, Ltd.*

*v. Oberg*, 512 U.S. 415 (1994), in which the United States Supreme Court held that the

Due Process Clause requires appellate review of jury awards of punitive damages in civil

cases.  In each case, however, the Texas Court argued that "the Supreme Court did not

say anything in *Honda* about what form of appellate review due process requires."

*Janecka*, 937 S.W. 2nd 475.  Moreover, the Texas Court asserted that because *Honda*

59

dealt with civil procedures, it could have little bearing on criminal proceedings.  See, e.g., *Anderson*, 932 S.W. 2nd 508.  In fact, the Texas Court even suggested that proportionality review might not be protective enough in capital cases: "The due process principles governing the imposition of a sentence of death are distinct and more onerous than those governing the imposition of a civil judgment."  *Id.* at 509.   In other words, proportionality review may be appropriate in some civil judgments, but is not sufficient in capital cases.  To support its point, the Texas Court referred to *In re Winship*, 397 U.S. 358 (1970) (higher standard of proof required in criminal trials by Due Process Clause), and *Gardner v. Florida*, 430 U.S. 349 (1977) (death is different).

What the Texas Court fails to recognize is that the *Honda* Court was not writing on a blank slate.  For the Texas Court to claim that *Honda* leaves "open" the issue of comparative review ignores *Honda's* reference to the Supreme Court's previous decisions, including *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), as the basis for its presumption that the Due Process Clause imposes a limit on punitive damages.  *Honda*, 512 U.S. 420.  The *Honda* Court stated that it would address "the question of what procedures are necessary to ensure that punitive damages are not imposed in an arbitrary manner," and then noted that "*TXO* strongly emphasize[d] the importance of the procedural component of the Due Process Clause."  *Honda*, 512 U.S. 420.  In order to grasp the Supreme Court's understanding of procedural protection against excessive punitive damages awards in *Honda*, therefore, it is necessary to understand the Court's reasoning in *TXO*, which the Texas Court fails to mention.

60

The Supreme Court in *TXO* explicitly discusses comparative proportionality review in both the civil and criminal contexts. While the Texas Court may be able to claim that *Honda* makes no direct statement about proportionality review, it can make no such claim in *TXO*. In fact, the Court in *TXO* came to the exact opposite conclusion from the Texas Criminal Court of Appeals. It hesitated on the issue of using a comparative approach to civil judgments, but found that "it is a relatively straightforward task to draw intra-jurisdictional and inter-jurisdictional comparisons on such matters as the definition of first-degree murder, see in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed. 2nd  555 (1991), or the penalty imposed on nonviolent repeat offenders. See *Solem v. Helm*, 463 U.S. 277, 318, 103 S.Ct. 3001, 3024 (1983) *TXO*, 509 U.S. at 457. In other words, the Supreme Court, while ambivalent in *TXO* toward the use of comparative proportionality review in the civil context, found it perfectly appropriate in the criminal context. The Texas Court's suggestion that comparative proportionality review is less fitting in capital cases than it is in civil cases thus contradicts the Supreme Court's own assessment in *TXO*.

Finally, the Texas Court's reference to *In re Winship* suggests that employing proportionality review in capital cases is like employing a standard of preponderance of the evidence rather than proof beyond a reasonable doubt in criminal proceedings. Such an inference is clearly a mis-characterization. By requesting that the Texas Court conduct proportionality review, the Applicant is asking for more procedural protection, not less. Similarly, the Texas Court's reference to *Gardner v. Florida* suggests that

proportionality review would reduce, rather than heighten, procedural protection in capital cases. But no defendant would likely request that proportionality review be introduced in lieu of some other element of appellate review. Rather, proportionality review is required as an additional safeguard. Thus, the Texas Court's references to *In re Winship* and *Gardner* mis-characterize the Applicant's requests for proportionality review as reducing, rather than increasing, the level of procedural protection in capital cases.

### Under *Honda, TXO,* and subsequent cases, proportionality review is no longer "superfluous," as under *Pulley,* but is rather an essential component of any constitutionally imposed punishment.

When the *Pulley* Court characterized proportionality review as 'constitutionally superfluous", it did so in the context of the "other safeguards in the Texas statute." *Pulley v. Harris*, 465 U.S. 37, 49 (1984). Those other safeguards have failed to provide protection against arbitrary imposition of the death penalty. Two recent Supreme Court decisions again address the issue of excessive punitive damages and the Due Process Clause. These cases clearly show that proportionality review is no longer considered "superfluous," but is rather an inherent element of the Court's determination as to whether a punishment is unconstitutionally excessive or disproportionate. In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court again addressed the issue of excessive punitive damages and the Due Process Clause and explicitly noted that the case should "help to illuminate" its previous decisions such as *Honda. Id.* at 568. The Court held that the punitive award assessed against BMW was grossly excessive and

cited three central reasons for its decision: "the degree of reprehensibility of [BMW's] nondisclosure; the disparity between the harm . . . and [Gore's] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575. That is, in addition to other procedural safeguards such as mitigating circumstances (i.e., "the degree of reprehensibility") and traditional proportionality review (i.e., "the disparity between the harm . . . and [award]"), the Court adopted comparative proportionality review in making its determination. The Court then proceeded to compare the punitive damages award and the civil and criminal penalties that could have been imposed for "comparable misconduct," and found that the $2 million sanction imposed on BMW is "substantially greater" than the statutory fines available in Alabama and elsewhere for similar misfeasance." *Id.* at 583-84. The Court's methodology in *BMW* thus eliminates any doubt it may have previously expressed as to the usefulness of comparative review in determining whether punitive damages are excessive or disproportionate; comparative review—even when other safeguards are present—is an essential component of its determination.

Even more recently, the Court employed comparative analysis in *United States v. Bajakajian*, 524 U.S. 321 (1998), in which the Court held that a forfeiture of the entire $357,144 that respondent was carrying when he failed to report, as required by federal law, that he was transporting more than $10,000 in currency, would violate the Eighth Amendment's Excessive Fines Clause. In determining that such a forfeiture would be grossly disproportionate, the Court compared Bajakajian with the offenders for whom the

statute was originally intended: "Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." *Id.* at 338. In fact, the Court specifically notes that "respondent's culpability relative to other potential violators of the reporting provision . . . is small indeed." *Id.* at 339 n.14. Comparative proportionality review has thus become fused with the Court's traditional review of proportionality of punishment to the offense.

### The prohibition against "Cruel or Unusual Punishments" in Section 13 of Article I of the Texas Constitution by its own language demands comparative proportionality review.

Whereas the Eighth Amendment of the United States Constitution prohibits cruel and unusual punishments, the Texas Constitution prohibits cruel OR unusual punishments. Tx. Const. art. I, § 13. In enacting this slightly different provision, Texas deliberately chose to afford its citizens greater constitutional protections than those provided under the federal constitution. Specifically, the language of the provision requires that Texas courts examine and review punishments comparatively. Obviously, something can only be deemed "unusual" in relation to other things which are usual. The express constitutional provision of section 13 thus requires the Court of Criminal Appeals to prohibit those death sentences that are unusual when compared with other sentences; such a requirement can only be met by conducting proportionality review.

In upholding Florida's death penalty statute, the United States Supreme Court referred expressly to *State v. Dixon*, 283 So. 2nd 1, 10 (1973) - *superseded by Statute/Rule* as stated in *Lowery v. State*, 375 So. 2nd 1075 (Fla. App. 4 Dist., June 13, 1979) and *State v. Dene*, 533 S. 2nd 265 (Fla. Sept. 1, 1988)

"The Supreme Court of Florida reviews each death sentence to ensure that similar results are reached in similar cases." *Profitt v. Florida*, 428 U.S. 242, 251 (1976).  The Florida Supreme Court described its proportionality review process in *Porter v. State*, 564 So. 2nd 1060, 1064 (Fla. 1990): "Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases."   A year later, the Florida court laid out the state constitutional basis for proportionality review. First, the Court looks at Article I, § 17 of the Florida Constitution, which—like Article I, § 13 of the Texas Constitution—prohibits "cruel or unusual punishment."   *Tillman v. State*, 591 So. 2nd 167, 169 (Fla. 1991).   The *Tillman* court noted that the use of "or" indicates that "alternatives were intended" and concluded that an express prohibition against unusual punishments required the court to review cases to ensure similar treatment.  *Id.* at 169 n.2.   The Court also cited Article I, § 9 of the Florida Constitution, providing that "no person shall be deprived of life, liberty or property without due process of law," and *Porter* for the proposition that death is "uniquely irrevocable" and therefore requires more judicial scrutiny than lesser penalties.   *Id.* at 169.   Finally, the Court referred to its own mandatory, exclusive jurisdiction over death appeals, granted by

Article V, § 3(b)(1): "The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction." *Id.* at 169. Under the Texas State Constitution, the Texas Court of Criminal Appeals likewise has special jurisdiction of death penalty cases. Tex. Const. art. V, § 5(b). The Texas Court of Criminal Appeals should therefore establish comparative proportionality review as a practice necessary to carry out the mandate for uniform death penalty law inherent in the constitutional grant of special jurisdiction.

Legislatures and courts in Texas' sister states therefore continue to require comparative proportionality review as an important procedural protection against arbitrariness in the imposition of the death penalty. The Texas Court of Criminal Appeals, given the expansion in death-eligible categories and the introduction of non-statutory aggravators, should likewise introduce proportionality review as a check against arbitrariness in the Texas system.

## GROUND FOR REVIEW NUMBER NINE

The Statutory "Penry" Special Issue in Article 37.071 is Unconstitutional Under Both State and Federal Constitutions Because it Fails to Place the Burden of Proof on the State Regarding Aggravating Evidence, in violation of the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution.

## ARGUMENTS AND AUTHORITIES

Effective September 1, 1991, a jury which has convicted a defendant of capital murder, in which the State is seeking the death penalty, shall be charged as follows:

Article 37.071, Sec. 2

> (e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
>
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>
> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:
>
>> (1) shall answer the issue "yes" or "no";
>>
>> (2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree.

This statute is unconstitutional because it impermissibly shifts the burden of proof on mitigation to the Defendant in violation of Article 1, Section 10 of the Texas

Constitution.  The statute requires the jury to consider, along with mitigating evidence, the "moral culpability of the defendant."   That is, the jury that has just found the defendant had no defense to the charge of capital murder and that he was guilty of that offense, beyond a reasonable doubt.

The statute then demands that the defense produce "sufficient" mitigation (while considering this same "moral culpability") to warrant a sentence of life imprisonment. The mitigating evidence must be "sufficient" to overcome "moral culpability" that has already been established in the minds of the jurors.  In death penalty deliberations, "moral culpability" is not evidence, it is a finding that the jury has already made.  The statute places an unfair, undue and unconstitutional emphasis on the finding that the jury has already made.  The Defendant, if he is to save his life, must now offer evidence that is somehow greater than the finding of moral culpability beyond a reasonable doubt.[6]

Aside from impermissibly shifting the burden of proof to the Defendant, the statute provides no other guidance to the jury that is called upon to make this life and death decision.  As a result, the death penalty is imposed in a wanton and freakish manner in violation of the Defendant's rights to due process and  protection from cruel and unusual

---

[6]Applicant claims that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed. 2nd 435 (2000) would overrule prior case law and hold that: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." See *U.S. v Doggett*, 230 F. 3rd 160 (5th Cir. 2000)

punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and cruel **or** unusual punishment under Article I §13 of the Texas Constitution.

This impermissible shift of the burden to the Defendant is made more unconscionable by the language of Article 37.071(2)(f) which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless 10 or more jurors agree. The Defense, according to the instructions to the jury, must not only then offer "sufficient" mitigating evidence to not only overcome the "moral culpability" that has already been established in the eyes of the jury, but further that 10 or more of those jurors must be convinced of the sufficiency of that evidence.

The infirmities in the statute discussed above are also in violation of State Constitutional Law. Under the "due course of the law" provision of the Texas Constitution, Article I §10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane v. State*, 254 S.W. 2nd 136 (Tx.Cr.App. 1953). When the burden of proof is shifted to the Defendant, the State's burden has essentially been reduced. See e.g., *Cobarrubio v. State*, 675 S.W. 2nd 749 (Tx.Cr.App. 1983) overruled in part, *Lawrence v. State*, 700 S.W. 2nd 208 (Tx.Cr. App. 1985), and *Elliott v. State*, 858 S.W. 2nd 478, 487-488 (Tx.Cr.App. 1993). Such a punishment, based on a reduced burden, is not in accordance with Texas law and is unconstitutional.

## GROUND FOR REVIEW NUMBER TEN

The Texas Capital Sentencing Statute's Failure to Inform the Jury

that a Single Holdout Juror on any Special Issue Would Result

in an Automatic Life Sentence Violates the Eighth and Fourteenth Amendments to

the United States Constitution

## ARGUMENT AND AUTHORITIES

The Texas capital sentencing statutes provide that a deadlocked jury -- even based on a single holdout juror -- during the capital sentencing phase requires the trial court to automatically sentence the Defendant to life. See Article 37.071, sec. 2(g). However, the jury cannot be informed of this provision of the law. See Article 37.071, sec. 2(a). Applicant's jury was, thus, not so instructed about Texas' "one holdout juror" rule. This creates an impermissible risk of arbitrary imposition of the death penalty by placing a false dilemma before the jury. Jurors should be provided with clarifying instructions with regard to the failure of jurors to agree upon answers to special issues.

The "10-12 Rule"

Article 37.071(2)(d)(2) requires the trial court to charge the jury that it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree. The trial court is also required by Article 37.071(2)(f)(2) to charge the jury that it may not

answer the issue submitted under Subsection (e) "no" unless it agrees unanimously and it may not answer "yes" unless ten or more jurors agree. Under Article 37.071(2)(e) and 37.071(2)(f)(1), the jurors "shall" answer each interrogatory either "yes" or "no." In the event that the jury is unable to answer any issue, either because it was unable to secure unanimity for a "yes" answer or ten votes for a "no" answer pursuant to the issues submitted under Subsection (b), or because it was unable to secure unanimity for a "no" answer or ten votes for a "yes" answer pursuant to the issue submitted under Subsection (e), Article 37.071(2)(g) requires the Court to sentence the defendant to life in prison. This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e).

Article 37.071 (2)(a) prohibits the trial court, either attorney, and the defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

Death is different not only in severity but also in kind from all other punishments. The Eighth and Fourteenth Amendments to the United States Constitution demand additional procedural safeguards in capital trials. See generally, *Furman v. Georgia*, 408

U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976); See *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)(holding that "death is qualitatively different"). The effect of this is that legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty, and the right of each defendant to individualized sentencing.[7] The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness, and denies defendants their right to individualized sentencing.

### The "10-12 Rule" Creates an Impermissible Risk of Arbitrariness

The requirement that a death sentence not be imposed arbitrarily is derived from the "Eight Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985)(quoting *Woodson v. North Carolina*, 428 U.S. at 305 (1976)). It was chiefly the concern that decisions of life and death were being arbitrarily made that led the Supreme Court,

---

[7] It is precisely this difficulty that caused Justice Blackmun to conclude that the entire enterprise of seeking to make the death penalty constitutionally acceptable was flawed. In his dissent from the Court's denial of a petition to grant a writ of certiorari, Blackmun declared: "From this day forward, I no longer shall tinker with the machinery of death . . . . It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies." *Callins v. Collins*, 510 U.S. 1141, 1145 (1994)(Blackmun, J. dissenting).

in 1972, to declare the death penalty in violation of the Eighth and Fourteenth Amendments to the Constitution.   See generally, *Furman v. Georgia*, 408 U.S. 238 (1972).   In capital cases, therefore, the Court is committed to ensuring that there is sufficient process to "guarantee, as much as is humanly possible, that the sentence was not imposed out of whim . . . or mistake."   *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982)(overruled on other grounds).

The Texas death penalty statute affirmatively creates confusion in the minds of the jurors.   Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another.   This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer.   The statute clearly provides that in the event of a non-answer, the defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured

confusion, but it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

It is true that State legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some information from jury instructions.   See *California v. Ramos*, 463 U.S. 992, 1001 (1983)(holding that the Court generally "defer[s] to the State's choice of substantive factors relevant to the penalty determination").   However, that discretion is bounded by the requirements of due process.   See, e.g., *Simmons v. South Carolina*, 512 U.S. 154, 175 (1994); *Ramdass v. Virginia*, 530 U.S. 156, 195 (2000); *Shafer v. South Carolina*, 532 U.S 36, 39 (2001); *Kelly v. South Carolina*, 534 U.S. 246, 248 (2002).

In *Ramos*, the Court permitted a jury instruction regarding the State Governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest.   *Ramos*, 463 U.S. at 1001-06.   Despite being prompted to apply *Ramos* in the case of *Caldwell v. Mississippi*, the Court refused, holding that when the State argues that automatic appellate review is meant to determine whether the death penalty is appropriate in a given case, this information not only inaccurately depicts the role of the appellate court, but more importantly it serves an illegitimate State purpose by diminishing the ability of jurors to feel the gravity of their task. *Caldwell v. Mississippi*, 472 U.S. 320, 336-41 (1985).

The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the three issues, this provides an incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed. This situation is unique to capital sentencing juries. During the guilt/innocence phase of a criminal trial, it is strictly correct to inform the jury that unanimity is required for either a verdict of guilt or acquittal. Although anything short of unanimity will lead to a mistrial, and thus might lead the defendant to be released as though he were acquitted, he may still be retried and is thus unable to claim numerous basic constitutional protections such as that of double jeopardy. Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the defendant is identical in both. *See Padgett v. State*, 717 S.W. 2nd 55, 58 (Tx. Cr.App. 1986) (holding that "a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer"). Thus, instructing the jury that ten or more of them must agree upon a "life" answer in order to sentence the defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an

incorrect statement of the law.   So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence.   The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors must be removed.

This is not a case prior to 1981.   Under Texas' former capital sentencing statute, if a jury failed to respond to any of the three special issues the result was a complete mistrial, requiring a new trial not just on sentencing but on guilt as well.   See *Eads v. State*, 598 S.W. 2nd 304, 308 (Tx.Cr.App. 1980).   Under such a scheme, setting aside the other arguments proffered here, an instruction that ten or more jurors are required for a life sentence would be just as unobjectionable as an instruction that unanimity is required for death, a finding of guilty, or an acquittal.   Presumably in response to *Eads* and the additional costs and difficulties that such a situation would pose, the Texas legislature in 1981 amended the death penalty statute, inserting the default sentence of life in the event of a non-answer.   It was at this time that the legislature also added the infirm language that is now in Article 37.071(2)(a), prohibiting jurors from being informed of this default result.   It is clear that the legislature wished to change the sentencing reality of defendants without informing jurors of this change.   In doing so, however, the legislative change made the old instructions inaccurate depictions of the law.

76

The principle behind *Caldwell* is that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors, or upon a restrictive sentencing statute.

Assuming arguendo that the Texas statute does not provide the jury with the type of inaccurate and illegitimate information prohibited by a traditional reading of *Caldwell*, new empirical data suggests that such a reading of *Caldwell* is entirely inadequate to ensure that capital jurors feel the "truly awesome responsibility" placed upon them. *McGautha v. California*, 402 U.S. 183, 208 (1971). One recent study by the Capital Jury Project concluded that "many death penalty jurors seek, and manage to find, ways to deny their personal moral responsibility for the sentencing decision." Joseph L. Hoffman, "Where's the Buck? – Juror Misperception of Sentencing Responsibility in Death Penalty Cases," 70 Ind. L. J. 1137, 1157 (Fall 1995). Given that jurors hardly need to have inaccurate information provided to them in order for them to deflect responsibility, the Caldwell rule itself should be read in light of the empirically supported premise that "death penalty jurors will take advantage of any available opportunity to *mislead themselves* about the extent of their responsibility for the sentencing decision." *Id.* If we are to give any meaning to Justice Harlan's concern that death penalty jurors be required to individually feel this terrific weight upon their shoulders, courts must inform jurors

that just as each of them is required to vote for death in order for that punishment to take place, each has the power to give the defendant life unilaterally.

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them, and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers, and a life sentence follows from another, a reasonable juror might conclude that the only way to get either of these punishments is to answer the questions posed to them. See *California v. Brown*, 479 U.S. 538, 541 (1987)(quoting *Francis v. Franklin*, 471 U.S. 316 (1985)(holding that the constitutional sufficiency of capital sentencing instructions is determined by "what a reasonable juror could have understood the charge as meaning"). This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant. Given that each of the jurors has already found the defendant guilty of a capital offense, none of these options would look desirable to a juror who honestly

believes that a life sentence in warranted.  Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether unacceptable third option will result.

In *Simmons*, the Court prohibited just this sort of unfairness, holding that "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Simmons*, 512 U.S. at 171. The Texas statute instructs jurors that at least ten of them must agree in order for a life sentence to be imposed and yet prohibits jurors from learning that only one vote is actually required for a life sentence.  It is precisely because jurors are left to speculate when capital juries are not informed of the consequences of a deadlock that several states have declared the practice to be in violation of Eight Amendment protections as found in *Gregg v. Georgia*, 428 U.S. 153 (1976).  *See, e.g., Louisiana v. Williams*, 392 So. 2nd 619, 634-35 (1980)(holding that "by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action"; *New Jersey v. Ramseur*, 106 N.J. 123, 314 (1987)(stating that "the jury must be told, in effect, that the law recognizes deadlock as a

permissible result, an outcome allowed by the statute, a legal trial verdict that by law results in imprisonment rather than death").

While this confusion might pressure voters to change their position in order to avoid the unknown third option, it might lead to an even more basic misunderstanding. Because jurors are told that each question must be answered, and voting ballots do not include an option for non-answer, a reasonable juror following the instructions might believe that a non-answer is not only undesirable, but is in fact impermissible. Such a juror might believe that because he or she is unable to secure the ten votes required to give the answer that that juror wishes the jury to give, and because some answer either way must be given, that juror is in fact obliged to vote with the others and sentence the defendant to death. Although the law is clear that a death sentence may never be mandatory, and individual jurors must always be free to vote for life, such a belief would reasonably follow from the instructions mandated by the Texas sentencing scheme. In fact, jurors often mistakenly believe that they are required by law to impose death.[8] One

---

[8] See generally, Garvey, Stephen P., Sheri Lynn Johnson, and Paul Marcus, "Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases," 85 Cornell L. Rev. 627 (March 2000). In addition to this mistaken belief, one study also found that "[a]bout half the jurors incorrectly believe that a mitigating factor must be proved beyond a reasonable doubt. Less than a third of jurors understand that mitigating factors need only be proved to the juror's personal satisfaction. The great majority of jurors – in excess of sixty percent in both life and death cases – erroneously believe that jurors must agree unanimously for a mitigating circumstance to support a vote against death." Eisenberg, Theodore, and Martin T. Wells, "Deadly Confusion: Juror Instructions in Capital Cases,"

study found that when jurors asked for clarification and were simply referred back to the original instructions, rather than being disavowed of their false belief they became *more likely* to mistakenly believe that the evidence required them to vote for death.[9]  This is precisely what the Texas statute would have judges do when jurors ask questions regarding the implications of a non-answer.  The Texas statutory scheme creates a set of instructions that lead jurors to have false beliefs regarding their sentencing options, prohibits them from learning their true options, and then operates in a fashion that solidifies their pro-death leanings.

Commenting on the prohibition on informing juries of the effect of a deadlock, Judge Clinton was likely correct when he stated in his dissent in *Sattiewhite v. Texas* that "[i]t seems apparent to me that the purpose . . . is to act as a kind of inverted 'dynamite' charge.  The Legislature did not want jurors to know that failure to reach a punishment verdict – a hung jury – would not result in the State incurring the additional expense of a retrial." *Sattiewhite v. Texas*, 786 S.W. 2nd 271, 292 (Tx.Cr.App. 1989).  The converse of this is that the Texas legislature did want to foster the false belief of jurors that a non-answer would require the additional expense of a retrial.  Even when it is true that a hung jury will result in a costly retrial, the Constitution does not permit judges to refer to the

---

79 Cornell L. Rev. 1 (Nov. 1993).

[9] 85 Cornell L. Rev. at 639.

additional expenses when they urge deadlocked juries to try to come to a verdict. See *United States v. Taylor*, 530 F. 2nd 49, 52 (5th Cir. 1976). In the event that such costs do not in fact exist, as is the case under the Texas statute, it is all the more clear that the Constitution cannot permit the legislature to benefit from that misperception by prohibiting judges and lawyers from correcting the mistaken beliefs of jurors.

The inaccurate and illegitimate instructions provided to Texas capital sentencing juries creates an unacceptable risk that decisions are being made arbitrarily or by mistake. While it is true that uncertainty about the consequences of a non-answer might lead a lone holdout for a life sentence to join the other jurors voting for death, it is equally true that this confusion might lead at least one of the three holdouts for death to join the nine other jurors voting for life. See, e.g., *Jones v. U.S.*, 527 U.S. 373, 394 (1999)(stating that the petitioner could not demonstrate prejudice because "[i]t is just as likely that the jurors, loathe to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence"). With regard to the Texas statute, while this point might be correct, it fails to prevent serious constitutional infirmities for two reasons. First, because the statute provides defendants with the exact same sentence regardless of whether they receive one vote for life or ten, the State itself is not prejudiced when votes for death are changed into votes for life for the sake of obtaining the ten vote minimum. The defendant, however, suffers a tremendous wrong when holdouts for life switch their

82

votes to death out of confusion or a feeling of obligation. **Thus, only the defendant, and not the State, could suffer harm from such confusion.** Even if the State did have an interest in keeping life sentences that derive from a verdict distinct from life sentences that derive by default, that interest is vastly overshadowed by the defendant's interest. (emphasis added) See *Lowenfield v. Phelps*, 484 U.S. 231, 252 (stating that when the substantive outcome of a deadlock is identical to that of a life verdict, "the State's interest in a verdict . . . [is] relatively weak, whereas the defendant's interest in preserving the integrity of a dissenting vote [is] correspondingly strong"). Stated simply, while the defendant never needs to have a voter change his or her vote out of confusion, the State, because death may only be imposed through a unanimous verdict, does. Thus, while it might be true that it would be difficult to determine whether a particular defendant was prejudiced, it is beyond dispute that the system as a whole can only prejudice the defendant.

Additionally, it is eminently clear that when confusion regarding the outcome of a deadlock leads jurors to change their votes in either direction simply for the sake of a verdict, those decisions regarding life and death are being made arbitrarily. In cases in which the jury does not quickly, and without dispute, come to agreement on the appropriate punishment, the two most important factors remaining for a decision are the general confusion of the jurors caused by misinformation, and the initial disposition of

the jury regarding whether or not to impose death.  If nine jurors find sufficient mitigation to warrant a life sentence, at least one of the three jurors holding out for death will be likely to switch over solely out of uncertainty regarding the consequences of a non-answer or due to a mistaken belief that an answer must be reached at all costs.  If eleven jurors vote for death and one finds that the mitigating evidence warrants life, that juror might be swayed to vote for death for identical reasons.   When jury instructions misinform jurors and purposefully prevent clarification, and verdicts are rendered out of such confusion, it is clear that those instructions "introduce[] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Beck v. Alabama*, 447 U.S. 625, 643 (1980)(overruled on other grounds - 485 So. 2nd 1201, Ala., 1984))

### The "10-12 Rule" Denies the Defendant's Right to Individualized Sentencing

The Constitution requires that States balance the obligation to minimize the risk of arbitrariness with the need for individualized sentencing.   "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting death." *Woodson*, 428 U.S. at 304.  In furtherance of this demand, the Court held in *Lockett* that "[T]he sentencer . . . [can] not be precluded from considering, as a

84

mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Later cases have clarified that such mitigating evidence need only be proven by a preponderance of the evidence. See *Walton v. Arizona*, 497 U.S. 639, 649-50 (1990)(overruled on other grounds - *Ring v. Arizona*, 536 U.S. 584, 621, 122 S.Ct. 2428, 2450 (2002), the Supreme Court holding that the Arizona statute pursuant to which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determined the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty, violated the Sixth Amendment right to a jury trial in capital prosecutions.)   More importantly, the Court has unequivocally held, and the Texas statute clearly states under Article 37.071(2)(f)(3), that a single juror must be permitted to consider and weigh mitigating evidence unilaterally, regardless of whether any other jurors accept the evidence as mitigation. See *McKoy v. North Carolina*, 494 U.S. 433, 435 (1990); *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988).

Although the capital sentencing jury resembles juries that sit in the guilt/innocence phase of capital and non-capital trials, its role is distinct. All juries have historically been expected "to secure unanimity by comparison of views, and by arguments among the jurors themselves." *Jones*, 527 U.S. at 382 (quoting *Allen v. United States*, 164 U.S. 492,

501 (1896).  The capital sentencing jury, however, is charged more precisely with the

duty to "express the conscience of the community on the ultimate question of life or

death."  *Lowenfield*, 484 U.S. at 238.  Because extraordinary protections are

constitutionally required to ensure against unwarranted impositions of death, the Texas

sentencing scheme, like the Louisiana statute, creates "a situation unique to the capital

trial that a single juror, by persisting in a sentencing recommendation at variance with all

of his fellow jurors, may alone cause imposition of a life sentence."  *State v. Loyd*, 459

So. 2nd 498, 503 (La. 1984).  The requirement of individualized sentencing in capital trials

means not simply that defendants must be judged based upon their own character, but that

they must be judged as such by individual jurors charged with considering the evidence

and asked to make determinations of life and death.  This clearly follows from the Court's

demands that each individual juror be capable of considering mitigating evidence that that

juror alone finds to exist simply by a preponderance of the evidence.

Members of a capital sentencing jury sit through the court's instructions, take an

oath, and pass through the extraordinary process of death qualification.  More than any

other jury that sits in a courtroom, we can be confident in our presumption that such

jurors are unbiased, impartial, and capable of deliberation.  It cannot be correct, therefore,

to say that informing jurors of the effects of a deadlock would act as an "open invitation

for the jury to avoid its responsibility and to disagree."  *Davis v. State*, 782 S.W. 2nd 211,

86

221 (Tx.Cr.App. 1992)(quoting *Justus v. Commonwealth*, 266 S.E 2nd 87, 92 (Va. 1980).

Rather, when a juror decides that sufficient mitigation exists to warrant a life sentence,

and wishes to stick to that position despite the fact that it will prevent the jury from

reaching a verdict, he does not violate some abstract duty to "secure unanimity" or to not

"disagree."  It is true that under the Texas sentencing statute, a juror would be abdicating

his or her responsibility were he or she to not answer one of the questions.  "The issues

are framed in a manner which permits them to be answered either affirmatively or

negatively, and it is the purpose of the deliberative process to resolve juror vacillation."

*Nobles v. State*, 843 S.W. 2nd 503, 510 (Tx.Cr.App. 1992).  Once deliberation has taken

place, vacillation has been resolved, and each juror has settled upon his or her answer to

the three special issues, however, surely the failure of those votes to meet the numerical

requirements of the "10-12 Rule" cannot be considered a violation of the jury's duty.  On

the contrary, as the Supreme Court of New Jersey held in *Ramseur*, and as is equally true

under Texas's statutory scheme, "A capital jury does not 'avoid its responsibility' by

disagreeing – genuine disagreement is a statutorily permissible conclusion of its

deliberations." *Ramseur*, 106 N.J. at 311.

Indeed, *McKoy* and *Mills* together stand for the principle that setting up barriers to

prevent the jury from disagreeing can itself be constitutionally prohibited.  This is

precisely the case with the "10-12 Rule," the substantive effect of which is that it

87

prohibits individual jurors from having a "meaningful opportunity" to judge the defendant on the basis of mitigation by creating the appearance that while each juror may introduce and weigh mitigating evidence unilaterally, a minimum of ten jurors are required to pass judgment on such factors.[10]   This was exactly what the Court was concerned about in *McKoy* when it held that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 494 U.S. at 442-43.  It is not enough for Texas to inform the jury that they "need not agree on what particular evidence supports an affirmative finding on the issue [of mitigation]," Article 37.071(2)(f)(3), if the effect of the entire instruction is that ten or more jurors must agree upon an affirmative finding in order to give effect to the finding of any one juror.  Each juror must be capable of giving effect to mitigating evidence when determining the appropriate punishment, and thus only one juror, not ten, must be sufficient under Article 37.071(2)(f)(2) to answer "yes" to the mitigation issue present by 37.071(2)(e)(1).  By instructing the jury that ten jurors are required in order to

---

[10] In *Roberts v. Louisiana*, the Supreme Court invalidated Louisiana's mandatory death penalty scheme on the grounds that it "afford[ed] no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." *Roberts v. Louisiana*, 428 U.S. 325, 333-34 (1976).  That the sentencer must have a "meaningful opportunity" to consider mitigating factors suggests that not only may legislatures not actively prohibit such consideration, but they also must also take positive steps to foster it when necessary.

give a "yes" answer, the Texas statute violates the principles underlying *Mills* and *McKoy* by preventing individual jurors from having a meaningful opportunity to consider mitigating factors.

### The "10-12 Rule" Denies the Defendant's Right to a Fair and Impartial Jury

As discussed above, the "10-12 Rule" operates by necessarily creating confusion in the minds of the jurors, and then prohibiting them from having their confusion clarified. This was earlier discussed within the context of the additional Eighth Amendment safeguards required to reduce the risk of arbitrary and unreliable sentences. An additional problem created by such confusion is that it permits jurors with misconceptions about the law formed prior to the trial and outside of the courtroom to introduce such ideas into deliberations.

It is beyond dispute that capital juries are often dominated by misconceptions regarding the state of the law, their role as jurors, and the definition of key concepts such as mitigation. As discussed above, a reasonable juror who conscientiously attempts to understand the Texas sentencing statute might be led to believe that just as a sentence of death may not be imposed unless the jury is unanimous with regard to all three special issues, a sentence of life may not be imposed unless at least ten jurors agree with respect to at least one of the three special issues. Not only does this mistaken belief raise an Eighth Amendment problem with regard to arbitrariness and reliability, but the possibility

that jurors might draw upon their preconceived notions to resolve such a situation raises Sixth Amendment concerns.

The right to an impartial jury has long been recognized as fundamental. See, e.g. *Lockhart v. McCree*, 476 U.S. 162 (1986). This is particularly crucial in capital cases, where the Constitution demands that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon v. Illinois*, 391 U.S. 510, 523 n. 20 (1968) (overruled on other grounds). To protect this right, courts are obliged to take reasonable steps to ensure the impartiality of a jury. It is for this reason that voir dire is made available to both parties, the judge is equipped with the power to strike jurors for cause, each party is granted a certain number of peremptory challenges, and jury instructions are fashioned to clarify the jury's role and impress upon them the importance of their task and the oath to which they have sworn.

By manufacturing confusion in the minds of the jury and preventing the court or the attorneys from correcting it, the "10-12 Rule" creates fertile ground for jurors to draw upon their own biases and preconceived notions when arriving at a verdict. This is particularly dangerous when jurors are confused about their sentencing options and the results of their sentencing decisions. The concept of a hung jury is widely understood to be a disfavored result. In most trials, a hung jury leads to a mistrial, and most people understand that a mistrial will either lead to a costly retrial or to the dropping of charges.

90

While neither of these undesirable outcomes will result in the case of capital sentencing under the Texas statute, jurors are required to be kept in the dark with regard to that materially relevant fact.  The "10-12 Rule" effectively forces the jury to wonder what would happen were they are unable to answer the special issues, possibly leads them to believe that an unacceptable third alternative other than life and death would follow, and then leaves them to draw upon their own preconceived notions in coming to a verdict.  While the concept of a mistrial might be distasteful to a holdout, and is certainly disfavored by the court, during the guilt/innocence phase of a criminal trial, it is surely all the more unacceptable to a juror in a capital sentencing proceeding who has already found the defendant guilty of a capital offense.  The risk that jurors will enter the courtroom with that misconception is too great to allow them to continue deliberating in the dark.

To ensure that capital juries do not rely upon their biases regarding hung juries during deliberations, jurors must either have their misperceptions corrected, or they must be examined for bias during voir dire.  Because of the additional Eighth Amendment problems with forcing jurors to deliberate using false information, this Court should declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury of the effects of a deadlock.  The Court should protect the right to a fair and impartial jury by informing the jury that if they are unable to reach the minimum number

91

of votes required to give an answer to any one of the special issues, they are permitted to return the ballot without any answer. In the event that the jury is unable to answer any of the three special issues, the court will sentence the defendant to life imprisonment as if he had been sentenced by the jury itself.

Should this Court not wish to protect the defendant's right to a fair and impartial jury by invalidating Article 37.071(2)(a), the Court should permit the attorneys, at voir dire, to discover what potential jurors believe would happen in the event of a non-answer. See *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)(holding that voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored"). Not only is such questioning permitted by the Texas statute on the grounds that it would not involve informing prospective jurors of the actual consequences of a non-answer, but it is clearly in line with the central holding in *Turner v. Murray* that the risk of juror bias must be considered "in light of the ease with which that risk could have been minimized." *Turner v. Murray*, 476 U.S. 28, 36 (1986) (overruled on other grounds). In *Turner*, the Court held that because of the complete finality of the death penalty, and the risk that racial prejudice would infect jury deliberations, the trial judge failed to protect the defendant's right to an impartial jury by not permitting the lawyers to question prospective jurors on their racial prejudice. *Id.* Similarly, because of the finality of the death penalty, and the risk that preconceived

notions regarding the effects of a hung jury will improperly infiltrate jury deliberations, the right to an impartial jury must be protected at the very least by granting attorneys the right to question jurors about their beliefs.  While defendants may not have an absolute right to voir dire potential jurors regarding their beliefs about deadlocked juries, when the legislature has barred all other means of bringing such biases to light and correcting them it becomes imperative that defendants be equipped with the tools to confront those who sit in judgment upon them.

In *King v. Lynaugh*, the Fifth Circuit sitting en banc reversed an earlier decision by a three judge panel which concluded that for Texas to deny a defendant the opportunity to present information about parole eligibility is, therefore, to limit his decision to bring to the sentencer's consideration relevant information and circumstances that might cause the jury to decline capital punishment.  *King v. Lynaugh*, 828 F. 2nd 257, 264 (5th Cir. 1987). In his dissent from the en banc ruling, Judge Rubin wrote: "It is precisely because Texas courts refuse to give accurate, corrective instructions that voir dire about potential jurors' understandings of parole law becomes necessary."  *King v. Lynaugh*, 850 F.2d 1055, 1067 (1988).  An essential feature of the Court's holding in that case was that trial judges can use their discretion in determining how to restrict voir dire and fashion jury instructions, relying upon "immediate perceptions," *Rosales-Lopez*, 451 U.S. 188-89, and the "demeanor" of the jury, *Ristaino v. Ross*, 424 U.S. 589, 595, 96 S.Ct. 1017, 47 L.Ed.

93

2nd 2584.   The present case is distinguishable from *King*, however, in that it is the legislature, and not the trial judge, that has decided not to issue accurate, corrective instructions to the jury regarding deadlock.   Whereas the trial judge maintains the freedom to instruct the jury on parole or to allow the attorneys to voir dire the jury with regard to their beliefs on parole, the "10-12 Rule" expressly restricts the judge's discretionary powers with regard to instructing the jury on the law of deadlock.   Thus, even if *King* is correct in instances in which it is the courts which make the decision to not give clarifying instructions, when the legislature makes such a decision as in the case here, it is the duty of the courts to protect the right to an impartial jury by providing additional safeguards through the process of voir dire.   That duty derives from the unique advantages that the trial judge has over the legislature to ensure a fair and impartial jury on a case by case basis.

### The "10-12 Rule" Prevents the Defendant from Receiving Effective Assistance of Counsel

It is a fundamental principle in death penalty jurisprudence that "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a

defendant shall live or die by a jury of people who may never before have made a sentencing decision." *Gregg*, 428 U.S. at 190. This is so clear that the Fifth Circuit in *Burley v. Cabana* declared that it was ineffective assistance of counsel in violation of the Sixth Amendment for the trial lawyer to not "inform the trial court of sentencing alternatives . . . ." *Burley v. Cabana*, 818 F. 2nd 414, 418 (5th Cir., 1987).

If it is ineffective assistance of counsel to not inform the judge of his sentencing alternatives, it would surely be ineffective assistance of counsel to not inform a sentencing jury of its sentencing alternatives. Yet this is precisely what the "10-12 Rule" does by preventing attorneys from informing the jury of the true state of the law. A reasonable defense attorney would surely inform each juror that not only is it that juror's right, but it is in fact that juror's duty, to individually weigh the evidence presented and make a determination for life or death on the basis of that individual's conscience. Such a statement would accurately describe the role of the capital juror, and would provide the jury with information materially relevant to their sentencing responsibilities. Arguendo, by preventing an attorney from informing the jury of the true state of the law when such information is essential to the capital juror's role is to deny the defendant with his right to adequate counsel. This is equally true when counsel is prevented from conducting voir dire in order to intelligently utilize counsel's peremptory strikes to remove prospective

jurors harboring devastating misunderstandings of the consequences of deadlock under the Texas death penalty.

Under the Texas sentencing statute the societal cost justification for pressuring juries to return a verdict is similarly absent. Thus, the only possible State interest that could balance against the strong State and private interests that jurors not be coerced, that defendants be tried by a fair and impartial jury, and that determinations of punishment be reliable and non-arbitrary is that capital juries are meant to speak to the conscience of the community.

While it is true that capital juries are meant to represent the community, two reasons exist for why this value cannot outweigh the risk of coercion, bias, and arbitrariness that is created by not informing the jury that they have the option to not answer a question, and that the effect of that non-answer is a life sentence. First, in order for the jury to enter a verdict of death under the Texas scheme, all twelve members of the jury must agree on all three special issues. Thus, while the purpose of the jury is to express the collective conscience of the community, just as each community is made up of individuals each jury is made up of individuals. What we are really looking for is not a jury that as a unit is asked to speak the singular voice of the community, but rather we are asking twelve representative individuals to each speak his or her own voice, and through

that we hope to discern the collective conscience of the community.[11]   It is a mistake, therefore, to consider that the State's interest in having the jury speak the conscience of the community conflicts with the State's interests in not coercing the jury, providing a fair and impartial jury, and limiting the risk for arbitrary and unreliable decisions.   Those interests are one and the same, for if any member of the jury feels undue pressure to change his vote in order for the jury to come to a verdict, the State's interest in having the jury speak the conscience of the community is frustrated.   It is only when each member of the jury is left entirely free to weigh the evidence presented, is permitted to unilaterally introduce and consider mitigation, and is fully informed of the individual, awesome responsibility that he or she bears in making this decision between life and death that the conscience of the community will be expressed.   The Court must allow for the very real

---

[11] This statement of representativeness should not be taken to be an admission that capital juries are representative of the community.  The process of death qualification leads to the removal for cause of conscientious objectors to the death penalty despite the fact that they are no less members of the community than anyone else, as well as individuals with qualms about the death penalty who are stricken through the use of peremptory challenges.  Numerous studies have shown that those individuals who remain are more prone to support the death penalty than the average member of society, and are also more likely to convict the defendant either because of their personal beliefs, or because the extremely time-intensive process of death qualification focuses jurors not upon the guilt or innocence of the defendant, but rather upon what penalty he deserves once his guilt has been reached.

possibility that a non-verdict is itself an expression of the community's truly divided conscience with respect to the issue of whether an individual should live or die.

Even if the State's interest in a verdict does stand in opposition to the other interests that the State and the individual defendant might hold, the entire body of capital punishment jurisprudence speaks to the overriding nature of our need to protect against unwarranted impositions of death. The State always has an interest in reaching a verdict and having the jury speak the voice of the community. That interest has not been allowed to supercede the defendant's right to a fair and impartial jury, to not be subjected to cruel and unusual punishment, or to not receive the equal protection of the law. Article 37.071, sec. 2(a), violates the Eighth and Fourteenth Amendments to the United States Constitution. See *State v. Williams*, 392 So. 2nd 619, 631 (La. 1980) (on rehearing); *State v. Ramseur*, 524 A. 2nd 188, 284 (N.J. 1987); *Kubat v. Theiret*, 867 F. 2nd 351, 369-73 (7th Cir.), cert. denied,. 493 U.S. 874 (1989); *Andres v. United States*, 333 U.S. 740, 752, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) (federal capital case). See also *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed. 2nd 231(1985) (Eighth Amendment violation if capital sentencing jury not informed of relevant state sentencing law); *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed. 2nd 435 (1989) ("To establish a *Caldwell* violation, the Defendant necessarily must show that the [instructions] to the jury improperly described local law.").

## GROUND FOR REVIEW NUMBER ELEVEN

Juror's inability to Predict Future Dangerousness

Tex. C. Crim. P. Art. 37.071(2)(b)(1)  requires a jury during the penalty phase of a capital trial to answer the following question:

> "Whether there is a probability that the defendant
>
> would commit criminal acts of violence that would
>
> constitute a continuing threat to society"

The ability to accurately predict whether or not a person would commit criminal acts of violence is not commonly found within the ability of the lay people on the jury. The probability that a person will commit future violence is not a prediction that even the psychiatric community can make, particularly in the long run.[12] The unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession.  See, e.g., American Psychiatric Association, Clinical Aspects of the Violent Individual 27-28 (1974); Cocozza & Steadman, The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence, 29 Rutgers L.Rev. 1084, 1094-1101 (1976); Diamond, The Psychiatric Prediction of Dangerousness, 123 U.Pa.L.Rev. 439 (1974); Ennis & Litwack, Psychiatry and the Presumption of Expertise:

---

[12] To be distinguished from the ability of psychologists and psychiatrists to explain a troubled childhood for purposes of mitigation.

99

Flipping Coins In the Courtroom, 62 Calif.L.Rev. 693 (1974); Schlesinger, The

Prediction of Dangerousness in Juveniles: A Replication, 24 Crime & Delinquency 40, 47

(1978); Steadman & Cocozza, Psychiatry, Dangerousness and the Repetitively Violent

Offender, 69 J.Crim.L. & C. 226, 229-231 (1978); Wenk, Robison, & Smith, Can

Violence Be Predicted?, 18 Crime & Delinquency 393, 401 (1972); Preventive Detention:

An Empirical Analysis, 6 Harv.Civ.Rights--Civ.Lib.L.Rev. 289 (1971), cited by *Schall v.*

*Martin*, 467 U.S. 253, 294, 104 S.Ct. 2403, 2425 (1984); See also the Amicus Brief of

the American Psychiatric Association (APA) *in Barefoot v. Estelle*, (1983)(superseded by

Statute as stated in *U.S. v. Monroe*, 974 F. Supp. 1472 (N.D. Ga. 1997)   The APA, in its

brief, said that the primary finding of the task force was that judgments concerning the

long-run potential for future violence and the dangerousness of a given individual are

"fundamentally of very low reliability," adding that the state of the art regarding

predictions of violence is very unsatisfactory.

The unreliability of long term predictions of future dangerousness is acknowledged

even today by those who take the position that there is some ability to predict

dangerousness.  "Using modern assessment tools, however, there is a growing body of

data to suggest that psychiatrists can, in fact, predict violence more accurately than many

believe–**at least in the short term**.  Ken Hausman, "Predicting Violence Risk Possible

but Complex" *Psychiatric News*, Vol 36, Number 13 (2001).   These predictions of

violence, even if more accurate than in the past, come in a civil setting where a determination is made about possible civil commitment, not in the context of a capital murder case where the issue is whether someone is going to live or die, not will their civil liberties be limited for a short period of time.

> "Despite the pervasiveness of violence risk assessment in mental health law, research continues to indicate that the unaided abilities of mental health professionals to perform this task are modest at best". *MacArthur Research Network on Mental Health and the Law,* "Executive Summary," at 1.
>
> ( April, 2001).

The consideration for the jury must necessarily be a long-term consideration as a defendant who is given a life sentence will not be eligible for parole for 40 calendar years. The ability to make such long-term predictions is rendered more unreliable by the propensity of a person to commit violence to "age out" as he grows older. The State will often make the argument that the Defendant is a "future danger" to prison society because he has an anti-social personality. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)states: at page 648:

> Anti-social Personality Disorder has a chronic course but may become less evident or remit as the individual grows

101

older, particularly by the fourth decade of life.  Although this remission tends to be particularly evident with respect to engaging in criminal behavior, three is likely to be a decrease in the full spectrum of antisocial behaviors and substance abuse. (DSM-IV) at 648.

The jurors are not instructed to consider either the unreliability of long-term predictions nor the "aging-out" effect noted by the DSM-IV.  This makes the application of the Texas Death Penalty statute both arbitrary and capricious.  It further denies this Defendant a fair trial and due process of law.

The Eighth Amendment to the United States Constitution  requires a greater degree of accuracy and fact-finding than would be true in a noncapital case.  *Gilmore v. Taylor,* 508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed. 2nd 306 (1993) and *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976).    This Court and the Court of Criminal Appeals is bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the valid purposes of Art. 37.071 are constitutionally accomplished.  *Ellason v. State,* 815 S.W.  2nd 656 (Tx.Cr.App. 1991).

The Eighth Amendment's prohibition of "cruel and unusual punishment" must be interpreted in light of "evolving standards of decency". *Atkins v. Virginia,* 122 S.Ct. 2242 (2002).  It is settled law that the 5th Amendment's broad guarantee of "due process" must

102

be interpreted in light of evolving standards of fairness and ordered liberty.  See, e.g.,
*Planned v. C Parenthood of Southeastern Pennsylvania,* 505 U.S. 833, 846-851 (1992);
*Rochin v. California,* 342 U.S. 165, 171-172 (1952).

As was discussed supra, at page 51, Ground of Review Number Eight, Art.
37.071 of the Texas Rules of Criminal Procedure sets out a sentencing scheme that is
incomprehensible to the jury in violation of the guarantees of due process contained in
the 5th Amendment to the United States Constitution and made applicable to the States by
the 14th Amendment of the United States Constitution. It also fails to adequately narrow
the class of persons eligible for the death penalty in violation of the 8th Amendment to the
United States Constitution that bans the imposition of cruel and unusual punishment.  It
arbitrarily allows for the introduction of non-statutory aggravating offenses (extraneous,
unadjudicated offenses) utilizing  relaxed standards and procedures all in violation of the
5th, 6th, 8th and 14th Amendments to the United States Constitution and it fails to require
that the indictment allege all of the elements of a capital offense when the State is seeking
the death penalty; in violation of the 5th, 6th, 8th and 14th Amendments to the United States
Constitution.   Further, it allows the jury to consider those non-statutory aggravating
offenses that permit the arbitrary and capricious imposition of a sentence of death.

The Texas Death Penalty scheme denies basic protections to defendants in capital
trials in Texas.  This denial and its impact on fairness and due process is magnified by the

extent to which the State will go to "win" a death verdict.   Tactics that are customarily

used include the offering to the court and jury "predictions" by witnesses who's own "..

scientific community virtually unanimously agree that psychiatric testimony on future

dangerousness is, to put it bluntly, unreliable and unscientific." *Flores v. Johnson*, 210

F.3d 456, 463 (2000).

### GROUND FOR REVIEW NUMBER TWELVE

The Death Penalty, at Least as Presently Administered in Texas is

Cruel and Unusual Punishment Under the Eighth and Fourteenth

Amendments to the United States Constitution and

Article 1, Section 13 of the Texas Constitution.

### ARGUMENT AND AUTHORITIES

The Texas Constitution should be interpreted in a more expansive manner than the

federal constitution.   See *Parrish v. State*, 869 S.W. 2nd 352 (Tx.Cr.App. 1994);

*Richardson v. State*, 865 S.W. 2nd 944 (Tx.Cr.App. 1993); *Heitman v. State*, 815 S.W. 2nd

681 (Tx.Cr.App. 1993)

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel <u>or</u>

unusual punishments," while the United States Constitution proscribes "cruel and unusual

punishments," See Tex. Const. Art. I, Sec. 13. Obviously, the Texas Constitution, based

104

on its plain language, was intended to offer broader protection than the United States Constitution.

Recently the United States Supreme Court stayed an execution for an evaluation of the method used in Texas for executions. The June 29, 2004 order by U.S. District Judge Vanessa Gilmore made David Ray Harris the 2nd condemned prisoner to get a reprieve from his execution date. In the Harris case, Judge Gilmore issued a temporary restraining order blocking the execution in response to his lawyers' arguments that the drugs used for lethal injection cause excruciating pain in violation of the constitutional prohibition of cruel and unusual punishment. The Judge ordered a hearing within 10 days on Harris' request for an order that would prevent his execution until another hearing on whether to permanently prohibit his execution by injection could be held. This case is currently being appealed to the 5th Circuit. Gilmore's decision is one of the first in Texas on the constitutionality of the formula used in lethal injections since the U.S. Supreme Court ruled that an Alabama man could challenge lethal injection on the grounds that it could cause extreme pain before death. [13] When one considers the decision of *Atkins v. Virginia,* 536 U.S.

---

[13]Gilmore rejected a similar argument in the Harris case in April, before the Supreme Court decision, but the 5th Circuit Court reversed her decision, citing the new Supreme Court guidelines. Harris' attorneys argued that 1 of the 3 chemicals, pancuronium bromide, paralyzes the inmate and prevents him from showing agony caused by potassium chloride. The attorneys noted that Texas already outlaws the use of the same chemicals for euthanizing animals because they are considered inhumane.

304, and the oral arguments being heard in *Simmons v. Missouri*, as to whether the evolving standards of decency should allow for the continued executions of someone who was seventeen years old at the time of the offense, it is clear that the death penalty is a macabre and freakish punishment, and should no longer be utilized as being violative of the United States and Texas Constitutions.

In conclusion, the Applicant argues that this court must reconsider the Texas Death Penalty Sentencing Procedure (Art. 37.071) in light of all the preceding arguments and, respectfully, requests that relief be granted, reversing the Applicant's sentence of death.

## PRAYER

Applicant requests that this court set this matter for an evidentiary hearing pursuant to the provisions of Art. 11.071 Sec. 6(a) and (a), and thereafter, in accordance with the law, file findings of facts and conclusions of law recommending that Applicant's judgment of conviction and sentence of death be set aside.

Respectfully Submitted,

_____

Suzanne Kramer
127 Lewis Street
San Antonio, Texas 78212
(210) 226-2161
(210) 226-2201 - Telefax

## AFFIDAVIT

STATE OF TEXAS

COUNTY OF BEXAR

BEFORE ME, the undersigned authority, personally appeared, **SUZANNE KRAMER,** ATTORNEY AT LAW FOR APPLICANT MANUEL GARZA, who, being by me first duly sworn did depose and state upon his oath as follows:

I am the attorney for Manuel Garza, Applicant in this Writ of Habeas Corpus filed pursuant to Article 11.071, Texas Code of Criminal Procedure, and I have prepared and reviewed all of the Grounds of Error contained within the Writ of Habeas Corpus and the information contained therein are true and correct to the best of my knowledge.

_____
Suzanne Kramer

SUBSCRIBED AND SWORN TO BEFORE ME, on this 25th day of October, 2004, which witness my hand and official seal of office.

_____
NOTARY PUBLIC In and For
The State of Texas

107

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing Writ of

Habeas Cropus, was mailed to Alan Battaglia, Assistant District Attorney, 300 Dolorosa,

San Antonio, Texas 78205 and to the Office of The Attorney General, P. O. Box 12548,

Austin, Texas 78711 on this the 25th day of October, 2004.

_____

Suzanne Kramer

108