**EXHIBIT A**

## JUDGMENT OF CONVICTION - CAPITAL MURDER
## SENTENCED TO DEATH - INSTITUTIONAL DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS | NO. 2001-CR-1877 | IN THE 399TH DISTRICT COURT |
| VS | | OF |
| MANUEL GARZA | | BEXAR COUNTY, TEXAS |

JUDGE PRESIDING: JUANITA VASQUEZ-GARDNER          DATE OF JUDGMENT:

APPEARANCES   TAMARA BUTLER          APPEARANCES  ED CAMARA

FOR STATE:     BILL PENNINGTON          FOR DEFENSE:  VINCENT CALLAHAN

OFFENSE CONVICTED OF: CAPITAL MURDER - POLICE OFFICER
19.03 (A)(2) PC          DATE OF CONVICTION: 10/24/2002

DEGREE OF OFFENSE:  CAPITAL FELONY          DATE OFFENSE COMMITTED: 2/2/2001

CHARGING INSTRUMENT: INDICTMENT

PLEA TO JURY:  NOT GUILTY

VERDICT OF JURY:                                        FOREPERSON : JULIETTE H. FREDERICK
We, the jury, find the defendant, Manuel Garza, guilty of Capital Murder as charged in the indictment."

VERDICT OF JURY:(PUNISHMENT)

ISSUE NO. 1: Is there a probability that the defendant, Manuel Garza, would commit criminal acts of violence that would constitute a continuing threat to society?  ANSWER: YES

ISSUE NO. 2 : Taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?  ANSWER: NO

FINDING ON SPECIAL ISSUE(S):

DATE SENTENCE IMPOSED:     10/29/2002

SENTENCE OF DEATH
(INSTITUTIONAL DIVISION): DEATH TDCJ-ID
CONCURRENT UNLESS OTHERWISE SPECIFIED:

TIME CREDITED:   633 DAYS                    COSTS: $ 312.25

TOTAL AMOUNT OF                              RESTITUTION TO BE PAID TO:
RESTITUTION/REPARATION: $ 0.00              NAME:
                                            ADDRESS:

On the   10/15/2002     the above numbered and entitled cause was reached and called for trial, and the State appeared by the attorney stated above, and the Defendant and the Defendant's attorney were also present. Thereupon, both sides announced ready for trial, and the Defendant, having been duly arraigned, entered a plea of NOT GUILTY to     CAPITAL MURDER - POLICE OFFICER     . The trial was before a Jury who, after hearing the evidence, the Charge of the Court and the argument of Counsel thereon, rendered a verdict as shown above.

Thereupon, in accordance with the law, a separate sentencing proceeding was conducted. Evidence was submitted, the Jury was charged by the Court as to certain special issues and rendered a verdict as shown above.

NO.___2001-CR-1877_____  _.ATE OF TEXAS VS._____MANUEL GA___A_____

It is, therefore, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant is guilty of the offense stated above as found by the verdict of the jury, and, the punishment is fixed in accordance with the Jury's verdict and as required by the Statutes of the State of Texas at DEATH and the State of Texas do have and recover of said defendant all court costs in this prosecution expended for which execution will issue.

The jury having been discharged and thereupon on the _24TH of October, 2002_____ the Court asked the Defendant whether the Defendant had anything to say why said sentence should not be pronounced upon said Defendant, and the Defendant answered nothing in bar thereof.  Whereupon the Court proceeded, in the presence of said Defendant and the Defendant's attorney, to pronounce sentence upon said Defendant as follows:

It is ORDERED by the Court that the Defendant, who has been adjudged guilty of the offense stated above, be and is hereby sentenced to DEATH.  The Defendant shall be taken by the authorized agent of the State of Texas or by the Sheriff of Bexar County, Texas, and by him safely conveyed and delivered to the Director of the Institutional Division of the Texas Department of Criminal Justice pending receipt of the Mandate from the Court of Criminal Appeals Sitting in Austin, Texas. The Defendant is hereby remanded to the custody of the Sheriff, until such time as the Sheriff can obey the directions of this sentence.

The Court finds that as of the date of sentencing, the defendant has been  in custody on this charge for a period of __633 days_____.

The Court thereupon fully advised the defendant that the Judgment of Conviction and Sentence of DEATH, is subject to Automatic Review.

SIGNED and ENTERED of Record this ___1st__ day of _November_ 2002.

Notice of Appeal:_ Automatic___

_JUANITA VASQUEZ-GARNER_
399TH  DISTRICT COURT
BEXAR COUNTY, TEXAS

Prepared by _9171_

240

**EXHIBIT B**

**STATE OF TEXAS**

**COUNTY OF KERR**

### AFFIDAVIT OF JEFFREY S. MITCHEL

Before me the undersigned authority, on this day personally appeared Jeffrey S. Mitchel who after being by me duly sworn, deposed on his oath and stated as follows:

My name is Jeffrey S. Mitchel. I am a licensed private investigator, licensed by the State of Texas. I am retired from the Texas Department of Public Safety having been a State Police Officer with that department for about 25 years. I currently own and operate J. Mitchel Private Investigations in Kerrville, Texas. I am over the age of 18 and I read, write, and understand the English language. I am capable of making this affidavit.

In July 2002 I was appointed by the 399th District Court in Bexar County, Texas as the defense investigator in the matter of the State of Texas v Manuel Garza, Cause Number 2001-CR-1877.

On August 24, 2002 in the course of this investigation I, along with defense counsel Ed Camera interviewed a witness by the name of Erika Deshawn Henderson. We interviewed her in her home and during the interview she told us what she had seen that was relative to this investigation. Some of the information that she provided was helpful

to the defense of Manuel Garza but when it came time to testify Ms. Henderson testified

differently than when she talked to us on August 24, 2002.  I was available to trial

counsel during all of the trial.  I could have been called to testify in rebuttal to what Ms.

Henderson testified to but I was not called to do so.


**FURTHER AFFIANT SAYETH NOT.**


Jeffrey S. Mitchel

Sworn to and subscribed before me the undersigned authority on this the 19th day of

October 2004.


Jeanne Mitchel

Jeanne Mitchel

Notary, State of Texas

JEANNE MITCHEL
Notary Public, State of Texas
My Commission Expires
September 17, 2005

**EXHIBIT C**



**Correctional**
**Health Care**
**Services**

200 North Comal
Tel 210.270.6260
Fax 210.270.6193

A member of
UNIVERSITY HEALTH SYSTEM
4502 MEDICAL DRIVE
SAN ANTONIO, TEXAS
78229-4493



FILED
DAVID J. GARCIA
DISTRICT CLERK
BEXAR CO. TEXAS

1996 JUN 19  A 9: 52

J. O. Sherman, Ph.D., C.C.H.P.
Director, Juvenile Medical
600 Mission Road
San Antonio, Texas 78210


<u>CONFIDENTIAL</u>


FOR PROFESSIONAL USE ONLY
NOT TO BE RE-DISCLOSED OR RE-RELEASED


<u>TO:</u>   The Honorable Andy Mireles
      Judge Presiding
      73rd Judicial District Court and
      The Juvenile Court
      Bexar County Court House
      San Antonio, Texas       78205

<u>RE:</u>  Psychological Evaluation of <u>Manuel Garza</u>

<u>CAUSE NO.:</u>  96-JUV-00667

<u>SID NO.:</u>  842297

<u>DOB:</u>  08 August 1980

<u>AGE:</u>  15 years

<u>SEX:</u>  Male

<u>EDUCATION:</u>  8th grade (last attended)
          Alternative Middle School,
          Northeast Independent School District

<u>DATES OF EVALUATION:</u>  27 May 1996
                    06 June 1996

<u>METHODS USED:</u>  Interview
          Wechsler Intelligence Scale For Children-Revised
          Wide Range Achievement Test - III
          Aphasia Screening Test
          Trail Making Test
          House-Tree-Person Test
          Kinetic Family Drawing
          Sentence Completion Test
          Rorschach Test

Psychological Evaluation -- Manuel Garza
Page 2

## REFERRAL:

Pursuant to a Court Order for psychological evaluation prior to a "Certification And Transfer Hearing," Manuel Garza was seen in the Bexar County Juvenile Detention Center on the above dates. He was apprised of his rights with regard to psychological testing and as to the purpose of the present evaluation. He indicated that he understood same and that he was willing to proceed. Manuel's involvement with the Juvenile Justice System began in 1993, when he was referred for, "Theft $20-$200." In 1995, he was referred for "Burglary Of A Vehicle, Theft $1,500-$20,000 (2), Violation Of A City Ordinance, Possession Of Marijuana (2), CINS-Other, Burglary Of A Habitation" and "Theft $50-$500." In 1996, he has been referred for "Armed Burglary" and "Possession Of Marijuana."

## BEHAVIORAL OBSERVATIONS AND INTERVIEW:

Manuel Garza is a 15-year-old, right-handed, Hispanic male who wears no glasses and denies any need for same. He denies any history of hearing loss and denies being on any drugs or medications at the present time. He is a slender adolescent who reports his height to be 5'11" and his weight to be 148 pounds. He denies having any tattoos. He has very short black hair and a light moustache. Manuel was soft spoken and related easily with the examiner. He was cooperative and attentive throughout testing, although somewhat oppositional at times during the clinical interview. Rapport and eye contact were good and his thought content was adequate for testing. His motivation level was high and his task involvement and task persistence were strong. Manuel's mood was euthymic with affect appropriate to mood and somewhat restricted in range and intensity.

Manuel reports that he was last enrolled in the 8th grade at the Northeast Independent School District Alternative Middle School and states that approximately two to three weeks prior to the end of the school year he came to the Detention Center. He reports that up until that time he had been doing "pretty well" with the exception of English, and reports that he had been working hard to bring that grade up. He states that he attended Coker, Montgomery and Walzem Elementary Schools; Krueger, Ed White and Garner Middle Schools prior to being sent to the Alternative Middle School. He reports that he likes school especially "that I learn stuff, it will help me in the future" and denies there is anything he dislikes in the academic setting. He describes himself as a "normal" student and reports, "I go with the flow, do what they say." He states that his grades range from 75 to 85. He reports that he failed the 7th grade but denies failing or repeating any other grades. He denies any history of special education or LD placement. He reports that he hopes to complete

Psychological Evaluation -- Manuel Garza
Page 3

BEHAVIORAL OBSERVATIONS AND INTERVIEW (continued):

high school and eventually enter a trade school to learn auto mechanics.

Manuel describes his relationship with his teachers by reporting, "I treat them as they treat me. They give me respect, I give them respect." He describes himself as having been a discipline problem since the 7th grade and reports that he has been suspended from school on eight or ten occasions for "truancy, tardies, not dressing out." He denies ever being expelled from school for disciplinary reasons. However, he reports that he was sent to the Student Reassignment Center for having drug paraphernalia and after being involved in a fight there was sent to the Alternative Middle School.

With regard to friends, Manuel reports, "I don't got too many." He states that he has a few same age and slightly older friends. He denies any gang involvement at the present time because, "that messes up your life," but states that he was previously a member of the "Spanish Gangsters" and reports that his tag was "Filo." He denies having any close friend or confidant and states that he can turn to "nobody" when he has problems. He denies having any desire for same. He reports, however, that he prefers to be with others rather than alone to "hang out, go to the mall, movies, take my girlfriend out to eat." He states when alone he likes to "kick back listen to my music," and reports that drawing is his hobby. He states his only history of employment is having been paid to attend school at Madison High School. He reports that he has a 15-year old girlfriend that he has been seeing for approximately five months. He denies having any children.

Manuel reports that he is currently charged with "armed burglary and possession of marijuana." He states that he was previously placed on probation for "auto theft." He knows that such behavior is wrong, knows right from wrong and understands the possible consequences of such behavior. He also understands the possible consequences of the upcoming Certification and Transfer hearing as well as the roles of the participants therein.

Manuel reports that he was born in San Antonio and states that he has always lived here. He reports that he lives with his 34-year old mother, his 11-year old brother and his 9-year old sister. He states that he also has a 17-year old sister who "moved out to California" and whom he reports lives with her boyfriend's brother. He states that her father is deceased having died of a drug overdose when he, Manuel was fourteen and states that his parents had separated that same year. He describes himself as being closest to "I guess my mom," and reports that he gets along with her "very well, I've gotten closer to her since I got in here, out there I did what I wanted.

Psychological Evaluation -- Manuel Garza
Page 4

## BEHAVIORAL OBSERVATIONS AND INTERVIEW (continued):

I really didn't talk to my mom out there." He denies that there are any problems between them at the present time and reports that he loves his mother and states, "I just hope I go home, let her know I'm willing to change, I want her to see that." He denies there is anything he would want to change about his mother. He states that his father had always been the primary disciplinarian and states that he believes that he was abused by him in the past and reports, "Sometimes he was doing drugs, take out his temper on me."

Manuel denies any health problems in his family. He states that his father abused either cocaine or heroin. He denies any history of mental illness or mental retardation in his family. He describes his own health by reporting, "seems to be very good." He reports that he was hospitalized as a baby for surgery on his eyes and at approximately age thirteen to remove a growth from a bone in his right foot. He denies any other history of hospitalization for physical, mental or emotional reasons. He denies being under a doctor's care or receiving any medications at the present time. Manuel denies ever seeing a psychiatrist or psychologist and denies any history of psychotropic medication. He denies ever participating in psychological testing and reports no history of individual or family counseling or therapy.

Manuel reports that he suffered a head injury when he was involved in "a car wreck in a stolen car," and states that he was unconscious briefly and points to a scar on his forehead at the hairline. He denies any sequelae as a result of that injury. He also states that he has a bee bee in his head above his left ear because he and a friend were "playing war with bee bee guns." He denies any other history of head injuries and reports no history of convulsions, epilepsy, ulcers or asthma. He states that he is allergic to pollen but denies any food or medication allergies. He denies any history of frequent headaches and reports no problems related to eating, sleeping and eliminating. He is oriented as to person, place and time. Judgement is poor. Hallucinations and delusions are denied and not evidenced. He reports that he uses marijuana and alcohol, and denies the use of any other drugs. He describes himself as being sexually active since the age of fifteen and denies any history of venereal disease or sexual abuse. He states that if he were to impregnate a girl he would, "stand tall, do it all, take responsibility."

With regard to his feelings at the present time, Manuel reports, "I just want to hurry up with my time, I feel alright." He denies feeling nervous but then states that he is especially nervous "if something's gonna go down, if somebody wants to fight me." He states that his biggest worry is "not knowing what they're gonna do to me," and that his biggest fear is "that there

Psychological Evaluation -- Manuel Garza
Page 5

## BEHAVIORAL OBSERVATIONS AND INTERVIEW (continued):

is people out there using drugs."  He states that he feels
depressed once or twice a week and reports that when he feels
depressed, "I shed some tears, sleep."  Suicidal ideation is
denied and not evidenced.  He states that if someone makes him
angry, "I turn away," and reports that he has been involved in
three fights during the past year.  When offered three wishes he
replies, "Go home, for God to lead me the right path and to live
a long happy life."

Manuel describes himself as, "very easy to get along with, lots
of potential."  He states that his teachers would report, "I was
a well working student" and states that his mother would say, "I
want to change, I've told her there's hope for me.  She knows I'm
gonna change and live a better life."  Manuel reports that he
presently feels "nothing" for himself and then adds that he feels
that he is wasting his time in Detention.  He states that he
likes himself especially because, "I could do things easily, easy
for me to catch on to things."  He denies there is anything he
dislikes about himself but states the thing he would like to
change about himself is "my attitude."  He describes his attitude
by reporting, "don't tell me, I know what I'm doing.  I do what I
want."  He states if he could be an animal he would like to be a
bald eagle because, "It's beauty, I like that.  I'd like to soar
around looking at people, having people look at me."

## INTELLECTUAL FUNCTIONING:

Manuel's overall level of functioning is measured on a Wechsler
Scale fell at the upper extreme of the Low Average (80-89) Range
of Intelligence, with a Full-Scale Wechsler Intelligence Quotient
of 89, a Verbal Score of 84 and a Performance Score of 96.

On the Wide Range Achievement Test, Manuel attained a Reading
Grade of High School at the 45th Percentile with a Standard Score
of 98, a Spelling Grade of 6 at the 25th Percentile with a
Standard Score of 90, and an Arithmetic Grade of 6 at the 25th
Percentile with a Standard Score of 90.  The Aphasia Screening
Test was remarkable for one math error.  Simple sequencing of
numbers was slightly beyond expectation, while shifting of dual
conceptual set simultaneously was within expectation on the Trail
Making Test.

## PERSONALITY:

Manuel presents as a soft spoken, generally cooperative and
attentive adolescent who may be trying to present himself in a
very positive light.  He reports that other people "tell me that
I'm turning my way and it's good for my future," my mind "is set
in the future and to become a good citizen for me and family,"

Psychological Evaluation -- Manuel Garza
Page 6

## PERSONALITY (continued):

and I feel "that guns are not a thing needed as a teenager, it only leads to trouble and jail." He also avoids assuming responsibility for his actions and states that he sees himself as "a victim of society because I had lots of friends I wanted to be like" and what gets him into trouble "is the influence I would be around and I'm going to change those friends I had." Manuel's responses suggest that Manuel may lack coping skills and may experience difficulty meeting the demands of daily life and may experience problems with control and in interpersonal relationships. Feeling uncomfortable around emotions he attempts to avoid emotional stimuli which may lead to some social isolation. His feelings have an unpredictable effect upon his thought processes and he may experience some confusion regarding his feelings. He tends to have inaccurate perceptions of himself and others, and sees himself in a less favorable light when comparing to peers. He exhibits little interest in others and does not express common drives for emotional closeness. He guards his personal space and feels awkward in close relationships and his relationships can be expected to be shallow and superficial and he may be viewed by others as being distant or aloof. In addition, he probably does not anticipate positive interactions among people as a routine event which can only exacerbate interpersonal difficulties.

## IMPRESSIONS:

AXIS I:     Conduct Disorder, Adolescent Onset (312.80).
            Alcohol Abuse (305.00).
            Cannabis Abuse (305.20).

AXIS II:    No Axis II Diagnosis At The Present Time (V71.09).


Manuel Garza is a 15-year old adolescent male of at least low average to average intellectual ability with no noted learning deficits. There is no evidence of a thought disorder or major affective disturbance. He is believed to be mature and sophisticated in that he is culpable and responsible for his conduct and able to assist his attorney in his defense.

Respectfully,

Judith E. Kniker, M.G.

Judith E. Kniker, M.A.
Psychometrist

J.O. Sherman, Ph.D., C.C.H.P.
Psychologist

JOS:JEK:cmc

cc:  File
     Probation Officer

DISCRETIONARY TRANSFER HEARING REPORT

ON

DAVID J. GARCIA
DISTRICT CLERK
MANUEL FERNANDO GARZA BEXAR CO. TEXAS
FILE NO.: 842297
1996 JUN 20 A 11: 04
BY

CAROL W. SAWTELLE
PROBATION OFFICER
BEXAR COUNTY JUVENILE PROBATION DEPARTMENT
BY_____

As ordered by the Court, this report will serve as a social evaluation and investigation of the child, his circumstances and the circumstances of the alleged offense.

REASON FOR PRESENCE BEFORE THE COURT: Manuel Fernando Garza appears before the Court on a Petition for Waiver of Jurisdiction and Discretionary Transfer to Criminal Court. The allegation in the Petition is Burglary of a Habitation.

On February 29, 1996, at approximately 10:35 a.m., Manuel Fernando Garza along with two co-actors, Tristan Lewis and Robert Sanders, were found inside the home located at 7331 Glen Manor. A neighbor, Candelario Arguella, made a statement that she and her husband were returning from home from breakfast at about 10:00 a.m. when she noticed three teens walking down the street looking suspicious. The street is a dead end. She saw the boys walk up to the house at 7331 Glen Manor and ring the doorbell five or six times. One of them then knocked on the door very hard. When no one came to the door, one of them went to the window. She then saw two of the teenagers jump over the fence while a third one stood by the side of the house as a lookout. Soon the third one went over the back fence also and she noticed the front porch light come on. At this point, Mrs. Arguella phoned 911 and held on the line until Sheriff's officers arrived. The officers found all three actors inside the house. Manuel was found hiding in the first bedroom on the left hand side crouched down behind the back end of a waterbed. Also found at the foot of the waterbed between the mattress and the frame was a chrome Colt Cobra .38 special with six live rounds. In the hallway, a pillow case was found containing items taken from the residence which included a VCR, a Super Nintendo, approximately eight Nintendo cartridges, and a coin collection. The owner of the residence, Cecil Wright, was phoned at his place of employment and notified of the burglary. He came home and identified the stolen items. He also stated that the gun found at the end of the waterbed did not belong to him.

According to William Tristan Denelle Lewis' statement, he admitted that the three actors had entered the residence without permission. He stated that Manuel initially tried to pry open the door with a screwdriver. When this did not work, Robert Sanders actually pried it open with a crowbar. These tools were found in the garage of the residence. Tristan went on to state that Robert grabbed the pillow case from a bed and put the VCR in it. Tristan grabbed the Super Nintendo and placed it in the pillow case. As the actors were preparing to leave the residence, they heard the police arrive. Tristan stated that the three actors entered the home "looking for money or anything worth money."

SOCIAL EVALUATION AND INVESTIGATION:

The Child's Circumstances: Manuel was born to Maria Garza and Manuel Gonzalez on August 8, 1980, in San Antonio, Texas. He is fifteen years old. He was the second of four children born to this couple. His parents had been together for approximately two years when he was born. However, they were not legally married. Manual and his older sister, Corina, have the last name Garza which was his mother's maiden name. His two younger siblings, Laurie Ann and Jimmy, both carry the last name Gonzalez.

DISCRETIONARY TRANSFER HEARING REPORT
MANUEL FERNANDO GARZA, FILE NO.: 842297                    **Page 2**

Manuel's father is deceased. He died in May 1994 from an overdose on heroin, approximately two months after being released from prison where he had been sentenced in 1992.

According to Mrs. Gonzalez, Manuel's birth and development were normal. He is five feet ten inches tall, and weighs one hundred and forty pounds. He has brown hair and brown eyes. Mrs. Gonzalez states that Manuel was always a good child, very respectful, and helpful around the house. He interacted well with his siblings. Mrs. Gonzales also recalls Manuel had two dogs as pets. He took care of the dogs and was playful with them.

At the time of this referral, Manuel was residing with his mother, his older sister, Corina, and his two younger siblings, Jimmy and Laurie Ann.

Mrs. Gonzalez states that she nor Manuel's father completed high school. Because of her lack of education, she has encouraged Manuel to finish school. She has emphasized the importance of education in order to get a good job to support one's family. Mrs. Gonzalez states that she remained at home with her children during their formative years. She began working part-time approximately four years ago and took on a full-time job approximately six months ago.

**The Family**: Manuel is the second child born to Manuel Fernando Gonzalez and Maria G. Garza. His mother, Maria Gonzalez, is thirty-four years old and was born on November 29, 1961. She completed the ninth grade. She is employed at Service Merchandise and earns minimum wage. His father, Manuel Fernando Gonzalez, would be thirty-four years old. His date of birth was October 29, 1961. He died from a heroin overdose in May 1994. He was thirty-two years old. He had been in prison for two years for Possession of Stolen Property. Mrs. Gonzalez states that her husband had been a substance abuser throughout their marriage. In addition, he had been physically abusive towards her. Manuel and his older sister, Corina, often observed her with bruises and were aware of the abuse. She was never hospitalized. She denies that the children were ever abused by her husband. He completed the eleventh grade.

Manuel has three siblings. He has one older sister, Corina Garza, who was born on May 6, 1979. She is seventeen years old. She has dropped out of high school. However, she is currently residing in California with her boyfriend's family and is attempting to finish high school. Manuel has two younger siblings: Jimmy Gonzalez who was born on October 9, 1984, and Laurie Ann Gonzalez who was born on September 19, 1987. They attend Serna Elementary School.

Mrs. Gonzales has been living with her boyfriend, Mark Barton, for the last six months. He is 33 years old and was born on October 26, 1960. He has two sons from a previous marriage but they do not live with him. Mrs. Gonzales states that Mr. Barton is a kind person and he is not abusive.

Mrs. Gonzalez states that Manuel was deeply saddened by his father's death. His father had been gone for two years while in prison. Mrs. Gonzalez took her children to visit their father on a regular basis while he was in prison. Two months after being released, he overdosed on heroin. Manuel had seen his father every weekend after he was released from prison. Mrs. Gonzalez decided not to go back to her husband after his release from prison as a result of the domestic violence she had endured during their marriage. The trauma of the separation as well as the overdose did have a significant impact on Manuel as can be noted by the extent of his involvement with this Department beginning in February, 1995. Mrs. Gonzalez states that Manuel has never been physically abusive towards her. He was always respectful as a young child. She began experiencing serious problems with Manuel about two years ago. His attitude was more passive than confrontive or aggressive. Manuel states that he believes his substance abuse played a part in his attitude and his delinquent conduct.

DISCRETIONARY TRANSFER HEARING REPORT                                  **Page 3**
MANUEL FERNANDO GARZA, FILE NO.: 842297

**Schooling**: As the family moved frequently, Manuel attended numerous schools. Manuel states that he attended four different elementary schools: Miller's Point, Coker, Montgomery, El Dorado, and Walzem. He attended three different junior high schools: Krueger, Ed White, and Garner. He began the 1995-96 school year at Ed White Middle School. Following a move, he was transferred to Garner Middle School. According to the records of the North East Independent School District, Manuel enrolled at Ed White Middle School on August 14, 1995. He withdrew on October 24, 1995. During that time, he was absent eleven days. He did not enroll at Garner Middle School until November 16, 1995. He was sent home on five different occasions with a total of eleven days missed. In addition, he was absent six more days. He was sent to the Student Reassignment Center (SRC) on February 22, 1996, and remained there until March 1, 1996. He was then transferred to the Alternative Middle School due to misbehavior at the Student Reassignment Center. He enrolled at the Alternative Middle School on March 6, 1996. He accumulated fourteen more absences while there. Jim Wingate, visiting teacher, made two home visits to speak with Manuel and his parent. When his attendance did not improve, a truancy charge was filed in Judge Keith Baker's Court. Manuel was scheduled for Court on April 18, 1996. Manuel's mother appeared, but Manuel did not. Mrs. Gonzalez was fined $200.00. According to Mr. Wingate, Manuel was not present as his mother stated he was on runaway status. The last grade he completed was seventh.

According to Harry Green, Administrator at Pupil Personnel, North East Independent School District, Manuel was originally sent to the Student Reassignment Center for cursing out a teacher at Garner Middle School. His placement at SRC was terminated on March 1, 1996, and he was referred to the Alternative Middle School due to a fight with another student that occurred on February 27, 1996.

Also, he was charged with a felony outside the school's jurisdiction on February 29, 1996, but it occurred during school hours. In addition, Mr. Green states that Manuel was found in possession of drug paraphanalia at the Alternative Middle School on April 15, 1996, and was suspended for three days as a result.

Manuel's transcripts from elementary schools shows an overall average of a "B" grade. He was retained in the sixth grade pending summer school. He did attend summer school and was placed in the seventh grade for the 1993-94 school year. However, he was retained at the end of his seventh grade year and completed it during the 1994-95 school year. He was promoted from the seventh to the eighth grade following the 1994-95 school year.

**Onset of Problems**: Manuel states that he began having problems while attending Ed White Middle School. His initial discipline encounter was when a notebook of his was confiscated by a teacher that was found to have gang graffiti. Manuel admits that he was a member of the Kings gang at that time and was sent to the Student Reassignment Center as a result of the gang graffiti in the notebook. He later switched to the SG 13 gang (Spanish Gangsters). Manuel states that he began smoking marijuana and drinking alcohol when he was thirteen years old. Manuel also attributes the death of his father to some of his "acting out" behavior. He feels that he may have been drawn to the delinquent lifestyle as a result of his father's absence as well as his death.

**Child's Attitude**: Manuel has been in the Bexar County Juvenile Detention Center since his last referral on April 19, 1996, for Possession of Marijuana. While in Detention, Manuel has demonstrated a cooperative attitude. He seems genuinely interested in improving himself by attending school, participating in counseling, and meeting with the Chaplain as well as attending chapel services. He wrote a letter entitled "Plan of Action" which states that he has learned his lesson and wants an opportunity to prove himself. The fact that he took the time to write the note indicates a willingness to make some changes.

DISCRETIONARY TRANSFER HEARING REPORT                    Page 4
MANUEL FERNANDO GARZA, FILE NO.: 842297

However, while Manuel was on probation and living at home, he was non-compliant with probation conditions. Manuel was placed on probation on September 18, 1995. Manuel was re-referred on six separate occasions. Following the second re-referral, he was placed on maximum supervision and instructed to report to the probation officer every Monday after school. He reported fairly consistently for about two months. Several appointment letters were sent to his residence reminding him of his appointments. These letters were disregarded and Manuel did not report. He also failed to attend the Victim Impact Panel that he was ordered to attend on December 5, 1995. He was assigned to perform his community service at Garner Middle School under the supervision of Mr. Shannon, the Assistant Principal. Manuel did not comply with his community service assignment and never completed the fifty hours he was assigned to do. Manuel was ordered to pay $1,627.94 in monetary restitution to three different complainants. To date, he has not made a single payment.

VICTIM IMPACT STATEMENT: The Victim Impact Statement was never returned to this Department from Cecil Wright, nor did he respond to phone messages.  He was called to the scene at the time of the incident and there does not appear to be any property loss.

PSYCHOLOGICAL EVALUATION: The results were not available at the time this report was written.

PREVIOUS INVOLVEMENT IN THE JUVENILE JUSTICE SYSTEM: Manuel has been involved in the Juvenile Justice System. The following is his referral history:

| Date | Allegation | Disposition |
|------|-----------|-------------|
| 11-11-93 | Theft $20-200/Shoplifting | I.A.-Sole Sanction Completed satisfactorily |
| 02-20-95 | Burglary of a Habitation | Pending |
| 04-03-95 | Burglary of a Vehicle | Probation (09-18-95) |
| 04-03-95 | Theft $1500-$20,000 | Non-suit |
| 05-06-95 | Theft $1500-$20,000/Vehicle | Probation (09-18-95) |
| 05-06-95 | Violation of City Ordinance | Information only |
| 08-24-95 | Possession of Marijuana u/2 | No Action by DA (12-27-95) |
| 07-26-95 | CINS - Other | Pending |
| 11-09-95 | Burglary of a Habitation | Pending |
| 11-18-95 | Possession of Marijuana u/2 | Pending |
| 12-14-95 | Theft $50-500 | Pending |
| 02-20-96 | Theft $1500-$20,000 | Pending |
| 02-29-96 | Burglary of a Habitation | Pending C&T Hearing 06-24-96 |
| 04-19-96 | Possession of Marijuana u/2 | Pending |

In summary, Manuel has fourteen referrals to this Department including the present one; seven misdemeanors and seven felonies.

He was on Informal Adjustment-Sole Sanction following his initial referral for Theft $20-$200/Shoplifting. He was placed on probation on September 18, 1995, for Burglary of a Vehicle and Theft $1500-$20,000/Vehicle. A charge of Theft $1500-$20,000 was non-suited.

Manuel had three misdemeanor re-referrals prior to his adjudication. A Violation of City Ordinance is for information only; the District Attorney's Office took no action on a Possession of Marijuana u/2 ounces charge; and a CINS-Other is still pending.

Following his adjudication on September 18, 1995, Manuel was re-referred seven more times to this Department. Of the seven re-referrals, four are felonies and three are misdemeanors, and all are still pending.

DISCRETIONARY TRANSFER HEARING REPORT
MANUEL FERNANDO GARZA, FILE NO.: 842297                                    **Page 5**

**DISCRETIONARY TRANSFER HEARING INVESTIGATION (54.02 (b) TEXAS FAMILY CODE):**

(1)   "Whether the alleged offense was against person or property with greater weight in favor of transfer given to offense against person";

> The alleged offense was against property. Manuel is accused of entering an individual's home without his permission in an attempt to take items not belonging to him.

(2)   "The sophistication and maturity of the child";

> Manuel appears mature and sophisticated in the sense of understanding what he is charged with and the legal proceedings he is faced with. He seems able to assist his attorney in his own defense. In some ways, Manuel appears more mature and sophisticated than the average fifteen year old. He has been involved in the Juvenile Justice System since November, 1993. At that time, he was thirteen years old. He was involved with a gang. He has used marijuana and alcohol since he was thirteen years old.

(3)   "The record and previous history of the child";

> Manuel has fourteen referrals to this Department including the present one; seven misdemeanors and seven felonies.

> He was on Informal Adjustment-Sole Sanction following his initial referral for Theft $20-$200/Shoplifting. He was placed on probation on September 18, 1995, for Burglary of a Vehicle and Theft $1500-$20,000/Vehicle. A charge of Theft $1500-$20,000 was non-suited.

> Manuel had three misdemeanor re-referrals prior to his adjudication. A Violation of City Ordinance is for information only; the District Attorney's Office took no action on a Possession of Marijuana u/2 ounces charge; and a CINS-Other is still pending.

> Following his adjudication on September 18, 1995, Manuel was re-referred seven more times to this Department. Of the seven re-referrals, four are felonies and three are misdemeanors, and all are still pending.

(4)   "The prospect of adequate protection of the public and the likelihood of rehabilitation of the child by the use of the procedures, services and facilities currently available to the Juvenile Court";

> If the charge were found to be True in the Juvenile Court System, Manuel could be committed to the Texas Youth Commission until his twenty-first birthday. If he were found to be in possession of a firearm at the time of the offense, he could remain in the Texas Youth Commission a minimum of twelve months. He could then be paroled until his twenty-first birthday. If he were given probation, he could be under the jurisdiction of the Juvenile Probation Department until his eighteenth birthday. While on probation, he could be supervised by the Intensive Supervision Program. Under that program, he would be seen at least three times a week. Or he could be placed outside the home in a residential treatment facility.

> Considering the circumstances of the alleged offense as well as the background of the youth, the resources available to the Juvenile Court appear sufficient to adequately rehabilitate the child and protect the community if he were committed to the Texas Youth Commission.

DISCRETIONARY TRANSFER HEARING REPORT
MANUEL FERNANDO GARZA, FILE NO.: 842297                           Page 6

RECOMMENDATION: Manuel Fernando Garza appears before the Court for a
Discretionary Transfer Hearing on the charge of Burglary of a Habitation.

To summarize the Discretionary Transfer Investigation:

1.  The alleged offense was against property;
2.  Manuel demonstrates maturity and sophistication in his behavior;
3.  Manuel has a prior history with this Department;
4.  The protection of the public and the rehabilitation of the child by
    the procedures, services and facilities currently available to the
    Juvenile Court are sufficient.

Therefore, it is recommended by this officer to the Court that the Motion
contained in the Petition for Waiver of Jurisdiction and Discretionary Transfer
to Criminal Court be denied and that the case be handled in the Juvenile Court.

Respectfully submitted,


_Carol Sawtelle_
Carol W. Sawtelle
Probation Officer

_Lea Harris_
Lea Harris
Northeast Field Unit Supervisor


CWS/pmc
06-18-96

### ADMINISTRATIVE REVIEW

#### ON

#### MANUEL GARZA
#### FILE NUMBER 842297

I have reviewed this case thoroughly and I concur with the recommendation in this matter.


Jose E. Castillo
Chief Juvenile Probation Officer

GARZA, MANUEL

11-11-93   REFERRAL #1:  Manuel is a thirteen year old hispanic male
           who was referred by the San Antonio Police Department on
           a charge of Theft 20/200.  According to the police
           report, Manuel allegedly went into the Target store on
           Walzem Road, concealed two items in a book bag and
           attempted to exit the store without paying.  This alleged
           incident took place November 11, 1993 at 1645 hours.

11-22-93   PHONE CONTACT:  P.O. phoned; no answer.

11-29-93   PHONE CONTACT:  P.O. phoned residence and spoke with
           Manuel.  P.O. left a message for Mrs. Gonzales to phone
           P.O.

12-03-93   PHONE CONTACT:  P.O. phoned Ms. Gonzales and an initial
           appointment is scheduled for December 13, 1993 at 9:00
           a.m.

12-15-93   PHONE CONTACT:  P.O. phoned; no answer.

01-15-94   PHONE CONTACT:  P.O. phoned; no answer.

02-04-94   CORRESPONDENCE:  P.O. mailed letter notifying Manuel of
           scheduled appointment on February 23, 1994 at 3:30 p.m.

02-23-94   INITIAL APPOINTMENT:  Manuel is a thirteen year old
           hispanic male who attended initial appointment
           accompanied by his mother.  Manuel was read his rights,
           grievance procedure and other pertinent forms.  Manuel
           agreed to and was placed on I.A. Sole Sanction with the
           requirement that he attend SOP beginning February 28,
           1994 at 4:30 p.m.  Manuel accepted responsibility for
           shoplifting stating he was just being "stupid".  Manuel
           also agreed to phone P.O. as directed.

02-28-94   REPORTING:  Manuel attended SOP class #1.

03-07-94   REPORTING:  Manuel attended SOP class #2.

03-14-94   REPORTING:  Manuel attended SOP class #3.

03-21-94   REPORTING:  Manuel successfully completed the SOP.

03-28-94   REPORTING:  Manuel reported as directed; no reported
           problems.  P.O. informed Manuel his case would be closed.

04-20-94   <u>CLOSING SUMMARY:</u>  Manuel is a thirteen year old hispanic
male, who was referred on November 11, 1993, on a charge
of Theft $20/200.   Manuel was placed on I.A. Sole
Sanction on February 23, 1994, with the requirement he
attend the SOP program beginning 2-28-94.   Manuel
successfully completed the SOP on 3-21-94.   As a result
of Manuel successfully completing the SOP class as well
as following all other terms of his I.A. Sole Sanction
contract, P.O. is submitting his case for closure at this
time.


David Norman
Probation Officer

Richard G. Garcia
Director-Diversion Unit

DN/pam
July 11, 1994

GARZA, MANUEL

05-06-95      REFERRAL:  Manuel was referred to the department by SAPD for Theft
              $1,500/20,000 (vehicle). According to police reports, complainant's
              heard her engine start and went to investigate.  When she got
              outside, she observed Manuel in her vehicle without permission
              attempting to drive away.  She ran to her vehicle which was in the
              middle of the street to question Manuel. He got out of the vehicle
              of the street to question Manuel.  He got out of the vehicle and
              fled eastbound on Cedar Valley on foot.  A description was
              announced.   An officer  located  an  individual  matching  the
              description of Manuel at Apple Valley and Hazel Valley.  The
              complainant was taken to the scene where she identified Manuel.

07-13-95      P.O. assigned case by Richard G. Garcia on July 13, 1995.

08-22-95      CORRESPONDENCE:  Letter was sent scheduling appointment for 9-06-95
              at 10:00 a.m.

08-24-95      REFERRAL #5:  Manuel was referred to the department by NEISD at 2:15
              p.m. for Possession of Marijuana.  Manuel is alleged to have been in
              possession of marijuana.  According to the reports, Manuel bought a
              dime bag of marijuana from an individual for $7.00.  The incident
              occurred at Ed White Middle School.

09-06-95      OFFICE VISIT:    Manuel and mother were present.   They were
              interviewed by P.O. Julio Frausto and consent for PDR was secured.

GARZA, MANUEL
SID NO. 220262

09-18-95   <u>COURT APPEARANCE/RECEIVING SUMMARY:</u> The child appeared before the
73rd D.C. Also present were the child's mother, Maria Gonzales,
appointed attorney, Dick Ryman, A.D.A., John Reed, and P.O., Rebecca
Lazo. The child stipulated to a charge of Burglary of a Vehicle and
Theft $1500/$20,000. Another charge of Attempted Theft of a Vehicle
was non-suited. Master Pat Garza found the child to have engaged in
Delinquent Conduct and placed him on probation until his eighteenth
birthday under custody of the C.P.O., but in the physical custody of
his mother. The child was ordered to complete 50 hours of CSR, to
attend the Victim Impact Panel, and to pay court costs.

09-20-95   CASE RECEIVED AT THIS UNIT AND ASSIGNED TO CAROL SAWTELLE.

<u>ATTEMPTED PHONE CONTACT:</u> This supervisor tried to call the family at
599-2265, but there was no answer.

Lea Harris
Northeast Unit Supervisor
lh/09-20-95

GARZA, MANUEL
SID NO. 220262

09-20-95    <u>PHONE CONTACT/APPOINTMENT</u>:   Spoke with Manuel's mother, Mrs. Gonzalez, and scheduled an appointment for 9/21 at 8:00 a.m.

09-21-95    <u>OFFICE VISIT</u>:   Met with Manuel and his mother, Mrs. Gonzalez. Reveiwed the probation conditions and the expectations of this department.  Another appointment was scheduled for 10/05 at 4:00 p.m. at which time the SJS survey will be conducted and the IPP will be developed.

09-29-95    <u>CORRESPONDENCE</u>:   School records requested from Ed White Middle School.

           CWS/09-29-95

GARZA, MANUEL
SID NO. 220262

09-20-95   <u>PHONE CONTACT/APPOINTMENT</u>:   Spoke with Manuel's mother, Mrs.
Gonzalez, and scheduled an appointment for 9/21 at 8:00 a.m.

09-21-95   <u>OFFICE VISIT</u>:   Met with Manuel and his mother, Mrs. Gonzalez.
Reveiwed the probation conditions and the expectations of this
department. Another appointment was scheduled for 10/05 at 4:00
p.m. at which time the SJS survey will be conducted and the IPP will
be developed.

09-29-95   <u>CORRESPONDENCE</u>:   School records requested from Ed White Middle
School.

           CWS/09-29-95

10-05-95   <u>FAILURE TO REPORT</u>:   Manuel and his mother did not come in as
scheduled. I phoned the residence and spoke to Manuel's mother, Ms.
Gonzales. She said she just returned from out of town and Manuel is
not home. Appointment reset to 10/20/95 at 4:00 p.m.

10-20-95   <u>OFFICE VISIT</u>:   Manuel and his mother reported. Initially met with
Manuel alone to conduct the SJS survey. His responses place him in
the SI category of supervision.

           Then, met with Manuel and his mother and developed an IPP. A copy
was given to Manuel. He is to attend the Victim Impact Panel on
December 5th. He was reminded that he and his mother are to attend
and he is not to miss it. Manuel was also given Carolyn McElroy's
phone number and told to call to schedule an appointment. He is to
complete 50 hours.

           Manuel is currently enrolled at Ed White Middle School. He is
fifteen years old and looks the same. He is repeating the 8th grade
due to excessive truancies last year.

           Reviewed with Manuel and his mother the non-arrest CINS/Fighting
charge received. We discussed the consequences of this kind of
behavior. I told Manuel that no action would be taken at this time.
The offense occurred on July 26, 1995.

           Next appointment scheduled for 11/8.

11-08-95   <u>COLLATERAL</u>:   Detective Cortez, Badge #649, from the Bexar County
Sheriff's Department phoned inquiring about Manuel's whereabouts.
He is suspected in several burglaries. I gave him the home address
I have. He will attempt to make contact with him.

           <u>SCHOOL CONTACT</u>:   Mrs. Harris, attendance clerk at Ed White Middle
School, said Manuel withdrew on 10/24/95. She does not have a new
address and school records have not been requested from the new
school.

           <u>FAILURE TO REPORT</u>:   Manuel did not report. I phoned his residence
and received a recording that the number was disconnected.

11-09-95   <u>REFERRAL #7</u>:   Manuel was re-referred on a charge of Burglary of a
Habitation. He and one co-actor were observed prying open a windon
and entering the house located at 6531 Echo Forest. They were later
observed fleeing the scene. A discription was provided. The
officer located Manuel and his co-actor. Manuel was found in
possession of a flat blade screwdriver and personal checks belonging
to the complainant.

GARZA, MANUEL
SID NO. 220262

<u>FAILURE TO REPORT</u>:  Manuel did not report.  I phoned his residence and received a recording that the number was disconnected.

11-09-95   <u>REFERRAL #7</u>:  Manuel was re-referred on a charge of Burglary of a Habitation.  He and one co-actor were observed prying open a windon and entering the house located at 6531 Echo Forest.  They were later observed fleeing the scene.  A discription was provided.  The officer located Manuel and his co-actor.  Manuel was found in possession of a flat blade screwdriver and personal checks belonging to the complainant.

11-09-95   Manuel was transported to the Bexar County Detention Center where he was later released to his mother with an appointment set for 11/13.

11-13-95   <u>OFFICE VISIT</u>:   Met with Manuel and his mother.   Reviewed his referral.  Manuel does not deny his involvement.  He seemed very non-chalant.  His mother cried throughout the interview.  Money is very tight now and she is struggling at a minimum wage job.  She also receives SSI for Manuel as his father is deceased.  The family recently moved to a two bedroom apartment.  They were living with Mrs. Gonzales' mother.  It is worth noting that their are four children and one adult living in the apartment.  I instructed Manuel to report weekly, on Monday's.  He has not enrolled yet as he owes on a book at Ed White before he can enroll at Garner.  Ms. Garza plans to take care of this tomorrow.  Next appointment 11/20.

CWS/11-13-95

11-22-95   <u>OFFICE VISIT</u>:  Manuel reported.  He said he attended only one day of school this week which was today.  He did not stay the entire day because he said he was not feeling well.

Discussed with him his recent referral and pending court for Motion to Modify Disposition.   IPP reviewed and upgraded  to maximum supervision.  Manuel was instructed to report weekly, every Monday after school.

Manuel brought with him an application to work at the Galaxy Theatre.  He was assisted in filling it out.  He said when he leaves here he will go by the Galaxy Theatre to drop off the application and try to interview with the manager.

11-27-95   <u>OFFICE VISIT</u>:  Manuel reported.  He said he went to school today.  He stayed home all weekend except Saturday when he went to a movie.  He reports no problems for the past week.

12-04-95   <u>FAILURE TO REPORT</u>:  Manuel did not report or call.

12-05-95   <u>FAILURE TO ATTEND VICTIM IMPACT PANEL</u>:  Manuel did not attend the Victim Impact Panel this evening as scheduled.

GARZA, MANUEL
SID NO. 220262

12-06-95    CSR/COLLATERAL:   Received confirmation that Manuel will be doing
            CSR at Garner Middle School.

12-11-95    OFFICE VISIT:  Manuel reported.  He has not found a job.  He states
            no problems at home at this time.  He is attending school.

12-18-95    OFFICE VISIT:  Manuel reported.  He is doing okay.

12-26-95    OFFICE VISIT:   Manuel reported.   He states he quit CSR at Garner
            Middle School because he did not get along with the head janitor.
            He also states he plans to work with a friend this week doing yard
            work.

01-01-96    HOLIDAY

01-08-96    FAILURE TO REPORT:  Manuel did not report as instructed.

01-16-96    OFFICE VISIT:  Manuel arrived at 5:00 p.m.  Said he went to school
            today.  He seemed hyper.  He states he has been staying at home most
            of the time.

01-23-96    OFFICE VISIT:  Manuel reported.  He is still looking for a job.  He
            ocassionally does yard work.  He is attending school.

01-30-96    OFFICE VISIT:  Manuel reported.  He continues to do okay.

02-05-96    FAILURE TO REPORT:  Manuel did not report.

02-08-96    SCHOOL VISIT:   Met with Mr. Shannon at Garner Middle School.   He
            states Manuel is doing better with both attendance and behavior.
            Met with Manuel in the cafeteria as it was lunch time.  Reminded him
            to report next Monday.

02-12-96    FAILURE TO REPORT:  Manuel did not report.

02-21-96    CORRESPONDENCE: As Manuel has not reported in three weeks, a letter
            was sent scheduling an office visit for 2/27 at 4:15 p.m.

02-27-96    FAILURE TO REPORT:  Manuel did not report as instructed.

02-28-96    CORRESPONDENCE:  Letter sent scheduling office visit for 3/5 at 4:30
            p.m.

            SCHOOL CONTACT:   Spoke to Mr. Shannon, assistant principal, who
            advises  that Manuel has been placed at the Student Reassignment
            Center (SRC) due to an incident on 2/22 when he cursed at a teacher.

02-29-96    REFERRAL:   Manuel was referred by the Bexar County Sheriff's
            Department on a charge of Burglary Habitation.  Manuel and two co-
            actors were observed inside the home located at 7331 Glen Manor.
            One of the actors told the officer they entered the location through

GARZA, MANUEL
SID NO. 220262

the rear garage door and used a crowbar to pry open the door from the garage to the residence. The arresting officers also noted that Manuel was in possession of a handgun (Colt Cobra .38 caliber along with six bullets and a western lockblade knife. Manuel was transported to BCJD. He was later released and told to report to his probation officer on March 5, 1996 at 4:30 p.m.

03-05-96   <u>FAILURE TO REPORT</u>: Manuel did not report or call.

03-11-96   <u>FAILURE TO REPORT</u>: Manuel did not report or call.

03-14-96   <u>COLLATERAL</u>: Officer Franzon, undercover repeat offenders program officer, called inquiring about Manuel. He is concerned Manuel is going to hurt someone or get hurt. I explained that Motion to Modify have been requested and now waiting for a court date.

     <u>D.A. CONTACT</u>: Spoke with Karen Maasen in D.A.'s office. She states the petition was sent to the District Clerk but have not been filed yet.

03-18-96   <u>FAILURE TO REPORT</u>: Manuel did not report.

03-25-96   <u>FAILURE TO REPORT</u>: Manuel did not report.

     <u>SCHOOL VISIT</u>: Mrs. Hinsch, counselor, informed me that Manuel was not in school today. She says his attendance is poor.

04-01-96   <u>FAILURE TO REPORT</u>: Manuel did not report.

04-10-96   <u>LEGAL DOCUMENTATION</u>: Warrant requested.

04-19-96   <u>REFERRAL</u>: Manuel was referred on a charge of Possession of Marijuana. Detention Intake Probation Officer checked computer and found a C&T hearing is set for June 24, 1996. Also, probation officer had requested warrant for his arrest. Therefore, Manuel was detained.

04-21-96   <u>DETENTION HEARING</u> (Sunday): Manuel went before referee Carol Weir. Mrs. Weir found probable cause and ordered the youth detained.

04-22-96   <u>ELECTRONIC MONITORING PACKET FAXED</u>: Probation officer does not recommend E.M.

04-25-96   <u>DETENTION VISIT</u>: Met with Manuel in detention. Discussed his pending charges and nature of Certification & Transfer Hearing. He seemed to understand and asked if he could post bond once transferred.

04-30-96   <u>DETENTION HEARING/VISIT</u>: Maria Gonzalez, Manuel's mother, was present. She signed Medical Consent form. She said she visited Manuel last night. He had a swolen lip due to a fight he got in to.

GARZA, MANUEL
SID NO. 220262

She said he told her he regrets the problems he gas gotten into. She inquired about Job Corps and whether he is eligible. I explained the guidelines to her. I also explained to her that Manuel is pending a C&T hearing and the serious nature of such.

Referee Hernandez ordered Manuel detained. Manuel became very angry at this decision but was able to calm down before returning to his MOD.

05-03-96    <u>DETENTION VISIT</u>:  Met with Manuel in detention. He asked if he could be released on electronic monitoring. I told him he was not approved.

05-07-96    <u>DETENTION HEARING</u>:  Manuel, his mother, and probation officer, Carol Sawtelle, went before referee Hervey. Manuel was detained.

Referee Hervey asked probation officer to contact District Clerk and request another attorney be appointed as Dick Ryman is pending major surgery. Manuel states he has talked to Mr. Ryman who told him same.

Spoke with Bebe who said Ward Elmendorf, 226-4384, will be appointed to take Mr. Ryman's place.

<u>PHONE/ATTORNEY</u>:  Spoke with Mr. Elmendorf and advised him of his appointment and informed him of next detention hearing.

05-14-96    <u>DETENTION HEARING (BEFORE JUDGE)</u>:  Manuel, his attorney, Ward Elmendorf, his mother, Maria Gonzalez, and probation officer, Carol Sawtelle, went before Judge Andy Mireles. Manuel was detained due to inadequate supervision at home and he has previously been adjudicated for a delinquent act.

05-17-96    <u>TRANSFER TO WACKENHUT</u>:  Jacob Trevino phoned and advised Manuel is being transferred to Wackenhut. His detention hearings will be on Thursday.

GARZA, MANUEL
SID NO. 220262

05-21-96    DETENTION HEARING:  Manuel, his attorney, Ward Elmendorf, mother
            Maria Gonzales, and probation officer Carol Sawtelle went before
            referee Irma Hernandez.  Manuel was detained.

            Referee asked probation officer to talk with Manuel and his mother
            and re-evaluate possibility of electronic monitoring.

            Spoke with detention counselor, Jean Cook, regarding Manuel's
            progress in counseling.  He states that Manuel has been cagey about
            several topics:  his father's death, the behavior that got him into
            trouble, and his relationship with his mother.

            Ms. Gonzales states that she is living with her boyfriend and her
            two smaller children.  Her daughter is now living in California.
            They reside in a two-bedroom apartment.  Mrs. Gonzales is working at
            Service Merchandise five days a week.  Her boyfriend is unemployed
            at this time and will be home during the day to supervise Manuel.
            Mr. Barton, boyfriend, states he and Manuel get along okay.

05-22-96    SCHOOL CONTACT:  Spoke with NEISD visiting teacher, Jim Wingate.
            The following is an outline of Manuel's attendance for the 1995-96
            school year.  He enrolled at Ed White on 8/14/95 (first day of
            school).  He withdrew on 10-24-95 as he moved.  He had accumulated
            eleven absences at Ed White.  He did not re-enroll until 11-16-95
            when he enrolled at Garner Middle School.  He was sent home on five
            different ocassions for a total of eleven days.  He was placed at
            the Student Reassignment Center (SRC) from February 22-March 1,
            1996.  While at SRC, Manuel was in a fight.  As a result, he was
            sent to the Alternative Middle School (AMS).  He enrolled at AMS on
            March 6, 1996.  While at AMS, Manuel accrued numerous absences and
            Truancy charges were filed on him.  His mother appeared in JP Court
            on April 18, 1996 without Manuel as he was on runaway status.  Mrs.
            Garza was fined $200.00 by Judge Keith Baker.

05-30-96    DETENTION HEARING:  Manuel, his mother, and probation officer, Carol
            Sawtelle, went before referee Hervey.  Manuel was detained.

06-06-96    DETENTION HEARING/VISIT:  Manuel appeared before referee Hervey
            accompanied by his mother and probation officer, Carol Sawtelle.
            Manuel was ordered detained.

06-12-96    LEGAL DOCUMENTATION:  Manuel was served the summons for Court.

06-13-96    DETENTION HEARING:  Manuel requests hearing before Judge Mireles.

06-17-96    DETENTION HEARING BEFORE THE COURT:  Manuel, his mother, Maria
            Gonzales, his attorney, Ward Elmendorf, and probation officer, Carol
            Sawtelle, went before Judge Mireles.  Judge Mireles denied request
            for electronic monitoring and ordered Manuel detained.

            LEGAL DOCUMENTATION:  Mrs. Gonzales was served the summons for court
            set for 06-24-96.

06-24-96    COURT/DISPOSITION:  Manuel appeared before Judge Mireles accompanied
            by his mother, Maria Gonzales, his attorney, Ward Elmendorf,
            probation officer, Carol Sawtelle, and ADA Angus McGinty.  Manuel
            stipulated to the charge of Armed Burglary.  ADA McGinty announced
            the Burglary Habitation (11-09-95), Possession of Marijuana (11-18-
            95), and Possession of Marijuana (04-19-96) will be non-suited.
            Judge Mireles ordered Manuel committed to the Texas Youth
            Commission.

GARZA, MANUEL
SID NO. 220262

08-04-97   <u>LEGAL DOCUMENTATION</u>:   Received summons for Court on 96-JUV-0720, Possession of Marijuana (04-19-96).

08-04-97   <u>ATTORNEY CONTACT</u>:   Spoke with Ward Elmendorf who says this case was to be non-suited back on 06-24-96.  He will speak with the District Attorney and call me back.

08-13-97   <u>COLLATERAL/D.A.</u>:   Terry, paralegal, phoned and said 96-JUV-00720 will be non-suited.

08-25-97   <u>COURT/NON-SUIT</u>:   Lisa Tatum, ADA, announced the case is non-suited.

09-03-97   <u>CLOSING SUMMARY</u>:   On June 24, 1996, Manuel Garza stipulated to the charge of Armed Burglary (02-29-96).  He was committed to the Texas Youth Commission.  The District Attorney announced the following charges would be non-suited:  Burglary Habitation (11-09-95), Possession of Marijuana (11-18-95) and Possession of Marijuana (04-19-96).

Manuel had a prior history with this Department.  He was placed on probation until his eighteenth birthday on September 18, 1995 for the charges of Burglary of a Vehicle (04-03-95) and Theft $1,500 to 20,000 (05-06-95).  While on probation, Manuel failed to comply with the terms of his probation.

As he was committed to the Texas Youth Commission on June 24, 1996, this case is submitted for closing.

_Carol Sawtelle_

Carol Sawtelle
Probation Officer

Lea Harris
Unit Supervisor

cws/09-03-97

There are four sections to the SJS Interview:
  A. General Information
  B. Objective History
  C. Interview Behavior
  D. Interviewer Impressions

The above sequence (A to D) should be used with each juvenile.

A **Scoring Guide** is included for many items to provide criteria and assistance in scoring.

### Instructions for General Information Section (43 Items)

A semi-structured interview with suggested questions has been developed to elicit general information. Use a comfortable natural, wording appropriate for yourself and the juvenile when asking questions. If the juvenile presents some interesting information requiring follow-up, you are encouraged to follow through before going back to the structured sequence. For each item, you must choose only one alternative. If you can't choose an alternative, don't rate the item.

Each portion of the General Information Section is headed by one or two open-ended questions which may provide material for rating specific items. If the suggested questions fail to elicit sufficient information, continue to inquire in a different or more direct manner unless you see the word -STOP-. "-STOP-" means to discontinue inquiry except to repeat or clarify the question. For some items, A and B questions are included. Some B questions are asterisked (*) as a reminder to specifically inquire about this issue.

### Instructions for Objective History Items (10 Items)

These items follow the General Information Section. The information can probably be obtained quite rapidly with direct questions.

### Instructions for Interview Behavior Ratings (4 Items)

These ratings are based on the juvenile's behavior during the interview.

### Instructions for Interviewer Impressions (7 Items)

These ratings should reflect your impression of the importance of each factor contributing to the juvenile's difficulties. On this section you must rate at least one factor as "highly significant (a)" and at least one as "not significant (e)".

### Instructions for Scoring

Mark correct responses in appropriate box. Use ballpoint pen and press firmly. Do not write in margins except to record responses.

JUVENILE NAME _Manuel Garza_

AGENT NAME _CWS_

DATE OF INTERVIEW _10-20-95_

© Copyright 1991 SJS Systems, Inc.

S1

# SJS SYSTEMS, INC.

**1B.** How did you decide to ...?

Purpose for committing current offense
a. emotional reasons (e.g. anger, sex)
b. material (monetary) reasons
c. both emotional and material reasons

    *a.* - *possession or usage of drugs*
        - *assault (not for robbery)*
    *b.* - *prostitution, drug sales, theft*
    *c.* - *stealing primarily for peer*
        *acceptance*
        - *stealing for revenge*
        - *joy riding*

**2A.** Could you tell me more about the circumstances that led up to this offense?
**2B.** How did you get caught?

    Acceptance of responsibility for current difficulties
a. admits committing and doesn't attempt excuses
b. admits committing, but emphasizes excuses
c. denies committing

    *b.* - *"I would never have done it if I hadn't been drinking."*
        - *"My friends get me in trouble."*

(Questions 3 to 8) count all criminal and status offenses which led to an arrest. Include serious traffic offenses (e.g. drunk driving, hit and run).

**3A.** Have you been in trouble before? (List arrests and discuss individually)
**\*3B.** What else have you been arrested for?

    Offense pattern
a. nothing prior to current offense
b. mainly status offenses
c. no consistent pattern
d. mainly criminal offenses

    *b. Don't use (b) if client has more than one criminal offense.*

| Offense | Planned | Drinking | Alone |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**4A.** In these offenses, have you ever been armed or hurt someone?
**\*4B.** Did you ever threaten anyone during an offense?

    Offense(s) involving armed, assaultive, or threatening behavior?
a. yes
b. no

---

c. impulsive

    *a.* - *Dec...  to commit an offense, then drinks to build courage*
        - *Possession of drugs*
    *c.* - *Gets drunk and into fight*
        - *Sees open car with package and suddenly decides to steal package*

**6.** Were you with someone when you got in trouble?

    Offenses were generally committed
a. alone
b. no consistent pattern
c. with accomplices

**7.** Were you drinking or on drugs when you got in trouble?

    Offenses committed while drinking or on drugs
a. never
b. 50% or less
c. over 50%

**8.** Have you ever been arrested for offenses against your family, like stealing or runaway?

    Offenses directed toward the family
a. never
b. sometimes
c. usually

    *c.* - *most of legal trouble involved stealing from family, assault on family members, runaways from home*

## SCHOOL ADJUSTMENT

Now I'd like to ask some things about your background. What was the last grade you completed in school?
(9 to 13) refer to entire school history, not just current semester)

**9A.** Do(did) you have any problems with schoolwork?
**9B.** Do(did) you ever receive special help in school?

    Academic performance
a. no problems
b. problems primarily due to lack of intellectual capacity
c. other achievement problems

    *If juvenile has both a lack of capacity and other achievement problems, use choice "b".*
    *c.* - *problems due to lack of interest*
        - *dyslexia*
        - *dropouts*

**10.** Do(did) you go to class regularly?

    School attendance
a. no truancy
b. minor truancy
c. extensive truancy

    *b.* - *1 to 5 times per year (not necessarily full days)*



Associates' substance usage

b. somet

c. frequent or abusive

    *a. - couple of times in their lifetime*
       *or less*
    *c. - weekly or more frequently*



**11.** Generally, do(did) you get your homework assign-ments done?

    **A**

Completes assignments
a. generally no problem
b. major problems

**12.** How do(did) you generally get along with your teachers and principals?

    **A**

Relationship to school staff
a. no problem
b. authority problems

**13.** Do(did) you have any other problems in school?

School discipline
a. no major problems
b. serious problems

    b. Extortion
       Concealed weapons
       Fighting

**B**

**14.** How far do you plan to go in school?

Educational goal
a. post high school training
b. high school diploma
c. GED
d. no further education

**B**

    *a. - Academic or technical degree*
       *program*

**15.** Do(did) you like school?

Attitude toward school
a. generally positive
b. neutral or mixed
c. generally negative

**B**

*Accept juvenile's view*

## INTERPERSONAL RELATIONSHIPS

Let's talk about friends. How do you get along with your friends?

**16.** Do you like to hang out with a group, or one or two friends at a time?

**A**

Pattern of associates
a. prefers individual friends
b. mixed
c. prefers groups

**17.** Have your friends been in trouble?

Associates
a. essentially not in legal trouble
b. mixed
c. mostly in legal trouble

**A**

*Don't count marijuana use (by itself) as legal trouble.*
*a - Don't use "A" if juvenile.*

**19A.** How much drinking and drugs do you do?
**19B.** (For clients who score b or c, ask) How do you get money to pay for it?

**B**

Juvenile's substance usage
a. rarely
b. sometimes
c. frequent or abusive

    *a. - couple of times in his/her*
       *lifetime or less*
    *c. - weekly or more frequently*

**20.** How do your parents feel about your friends?

Parental view of friends
a. approve
b. mixed or neutral
c. disapprove

**B**

**21.** When you're with your friends, who generally decides what to do (where to go, etc.)

Leadership
a. friends usually decide
b. mixed
c. juvenile usually decides

**B**

    *Agent impression*

**22A.** Do you have a closest friend?
**22B.** What do you like best about him/her? -STOP-

Relationship with closest friend
a. talk (share feelings) or help each other
b. do things together (less emphasis on talking or sharing feelings)
c. has none

**A**

    *a. - "We do things for each other"*
    *- "We're like brothers (sisters)"*
    *b. - "He likes the same activities I*
       *do."*

## FEELINGS

I'd like to go from talking about friends to talking about your feelings.

**23A.** What kinds of things get you feeling down (depressed)?
**23B.** What do you do when you're feeling blue?

When depressed
a. seeks someone to talk to about the problem or tries to figure it out
b. seeks an activity to distract self
c. drinks or uses drugs
d. isolates him/herself
e. denies getting depressed

**B, C**

    *b. - "I forget about them"*
    *- watch T.V.; listen to music*
    *- shoot pool*
    *- play video games*
    *d. - "I pray"*
    *- sleep*

Self mutilation



b. no

a. - homemade tatoos
b. - professionally done tatoo



**25A. Have you ever thought seriously about killing yourself?**
**25B. (If juvenile says yes to above) Have you ever tried it?**

Suicide
a. never seriously contemplated it
b. had definite thoughts
c. attempted it

**26A. What do you do when you're feeling angry with people?**
**\*26B. Have you ever hurt anyone when you were angry?**

In handling anger
a. physically aggressive toward people
b. avoids expression
c. trouble expressing anger appropriately
d. responds appropriately



*Physical aggression problems should take precedence over other choices. Use all sources of information including offenses*
b. - *denies getting angry*
c. - *breaks things*
- *"I yell at people"*
d. - *constructively confronts the person who's making them angry*

**27A. Can you describe your personality?**
**27B. What do you like and dislike about yourself? -STOP-**

Self description
a. emphasizes strength
b. emphasizes inadequacy
c. can't describe self

*If both positive and negative statements are given choose the one emphasized the most. If they have equal emphasis, choose the one given first. Choice "c" is for juveniles who lack the ability to describe themselves.*
- *"I'm OK" (and can't elaborate)*
- *"I'm a nice person"*
- *"I get into too much trouble"*



**28. In general, do you tend to trust or mistrust people? -STOP-**

Outlook toward people
a. basically trusting
b. mixed or complex view
c. basically mistrusting



b. *A complex view of people (e.g., trusts people in some situations but not in others)*
- *"I trust people too much"*
- *"takes a while to get to know them"*

**FAMILY ATTITUDES**
(Interviewers should <u>ask their own questions</u> to obtain <u>general information regarding family structure:</u> parents, step-parents, siblings, etc. <u>before</u> asking question 29.)

**29A. Are you living at home?**
**\*29B. How many different houses or apartments have you lived in?**



Changes in family residence
a. 0 to 4
b. 5 to 9
c. 10 or more

---

If not, use perso... e juvenile identifies as parent figures.

**30A. How do you get along with your mother?**
**30B. How do you feel about her?**

Present <u>feelings</u> toward mother
a. close
b. mixed or neutral
c. hostile



a. - *loving, affectionate*
b. - *"We get along" (without implication of closeness)*

**31A. Since about age 12, if you did something wrong how did your mother handle it?**
**31B. What kind of punishment did she use?**

Type of discipline mother used (<u>since age 12</u>)
a. verbal or privilege withdrawal
b. permissive (generally let juvenile do as he/she pleased)
c. physical



*If the juvenile didn't live with mother or mother figure during at least part of their adolescent years, do not rate Item 31.*
a. - *"She told my father"*

**32A. How do(did) you get along with your father?**
**32B. How do you feel about him?**

Present <u>feelings</u> toward father
a. close
b. mixed or neutral
c. hostile



a. - *loving, affectionate*
b. - *"We get along" (without implication of closeness)*

**33A. Since about age 12, if you did something wrong how did your father handle it?**
**33B. What kind of discipline did he use?**

Type of discipline father used (<u>since age 12</u>)
a. verbal or privilege withdrawal
b. permissive (generally let juvenile do as he/she pleased)
c. physical



*If juvenile didn't live with father or father figure during at least part of their adolescent years, do not rate Item 33.*

**34A. Were you ever abused by your parents?**
**34B. Did they ever go overboard on punishment? -STOP-**

Parental abuse
a. yes
b. no



**35A. Were you ever abused by anyone else?**
**\*35B. Were you ever abused sexually?**

Non-parental abuse
a. yes
b. no
a. - *include prostitution*





Parental view (prior to 10

a. good kid (normal)
b. problem child
c. parents differed

   a. - no special problem
      - like anybody else
   b. - "parents always complaining
      about me"
      - "gave them lots of trouble"
      - seen as "strange kid"
      - hyper



37. How would you describe yourself during that time (prior to age 10)?

Self description (prior to age 10)
a. good kid (normal)
b. problem kid



38. Would you describe your early childhood (prior to age 10) as happy or unhappy? -STOP-

General attitude toward childhood
a. happy
b. not happy

   Accept juvenile's view

39. If you could change anything about your early childhood, what would you change (prior to age 10)?

Satisfaction with childhood
a. basically satisfied (little change)
b. dissatisfied with material aspect
c. dissatisfied with family
d. dissatisfied with self

40. Can you describe your father's personality? (If answer is unclear, ask juvenile to describe another person they know well.)

Personality description
a. multifaceted
b. superficial

   This item measures the juvenile's ability to describe
   attributes or explain behavior. "Superficial"
   indicates difficulty perceiving depth in personality
   and not just an evasion of the question. One
   complex statement is sufficient for an "a".
   a. - "sensitive to others"
      - "Dad was strict because that's
      the way he was brought up."
   b. - "no-good drunk"
      - "mean"
      - "kind"

## PLANS AND PROBLEMS

I'd like to get some idea of what you see ahead of you.

41. Aside from trouble with the law, what is the biggest problem in your life now? -STOP-

View of important problem area
a. personal issues
b. relationships
c. education
d. vocational/financial
e. no big problems presently

   a. - drinking or drugs, "get my head
      together"
   b. - "Try to get along better with

42A. What goals do you have for the future?
*42B. How do you expect to accomplish your goals? -STOP-

Future goals
a. short-term goals (most goals can be fulfilled within
   about 6 months)
b. long-term goals



   At issue in this question is whether juvenile can
   articulate goals, not whether they are likely to
   achieve these goals.
   a. - "No goals, live day to day"

43. How will being on supervision (institution or field) affect your life? -STOP-

Expectation about supervision
a. no effect
b. counseling or program help
c. will keep them out of trouble
d. negative
e. mixed or unclear

## OBJECTIVE HISTORY

44. Age of earliest arrest:
a. 12 or below
b. 13 - 14
c. 15 - 16
d. 17+



   Include serious traffic offenses (e.g., drunk
   driving, hit and run)

45. Number of arrests for criminal (non status) offenses:
a. none
b. 1 - 3
c. 4 - 7
d. 8+



   Include current offense

46. Number of arrests for status offenses:
a. none
b. 1 - 4
c. 5+

   Include current offense

47. Number of placements in correctional institutions:
a. none
b. 1
c. 2 or more



   Include current commitment in total.
   Exclude detentions prior to adjudication.



b. 0 months or less
c. 2 month to 12 mon...
d. over 12 months

49. Medical history: (Note all applicable choices)
    a. drug/alcohol treatment
    b. serious head injuries
    c. psychological/psychiatric treatment
    d. none of the above

    a. Exclude evaluation
    b. - skull fractures
       - head injuries which required
         treatment (beyond X-ray)
    c. Exclude evaluations and drug
       treatment; include family therapy

 (box with "C")

50. Did juvenile ever receive special education or remedial
    help for learning deficiencies?
    a. yes
    b. no

    Exclude language problems in non-English
    speaker

(box with "B")

51. Did juvenile ever receive special help for emotional or
    behavioral problems in school?
    a. yes
    b. no

    Exclude speech therapy

(box with "A")

52. Did any parent have a history of: (Note all applicable
    choices)
    a. being on welfare
    b. criminal behavior
    c. psychiatric hospitalization
    d. suicide attempts
    e. drinking and drug problems
    f. none of the above

    Includes step and adoptive parents

(box with "C,E")

53. Have siblings (include step and half sibs) ever been
    arrested?
    a. none
    b. some
    c. most
    d. not applicable

(box with "A")

### INTERVIEW BEHAVIOR

Please rate the following behaviors as observed during the
interview. Use "b" for the average offender. Use "a" and
"c" for distinct differences from average.

 (box with "B")

54. Grooming and dress:
    a. Below average
    b. Average
    c. Above average

(box with "B")

55. Comprehension:
    a. Below average
    b. Average
    c. Above average

(box with "A")

56. Affect:
    a. Depressed (sluggish)
    b. Average
    c. Animated (hyper)

 (box with "B")

57. Self revealing:
    a. Evasive
    b. Average
    c. Very open

### INTERVIEWER IMPRESSIONS

Please rate the significance of each factor as it contributes
to the juvenile's legal difficulties. Each juvenile must
receive at least one score of "a" and one score of "c"

    a = Highly significant
    b = Significant
    c = Somewhat significant
    d = Minor significance
    e = Not significant

58. Social inadequacy
     (box with "E")

    Refers to the juvenile's social skills and ability to
    understand the motives and concerns of people.
    They are easily led by others and highly immature
    socially.

59. School inadequacy
    (box with "E")

    Refers to juvenile's ability to learn and perform
    basic academic skills (reading, writing, arithmetic).

60. Criminal orientation
     (box with "A")

    Refers to whether criminal behavior is an
    acceptable, common part of their life. They
    identify with criminal friends, would like to be a
    successful criminal, and are frequently motivated by
    monetary gain.

61. Emotional factors
     (box with "C")

    Refers to degree of emotional, drug, or alcohol
    problems in the juvenile's life.

62. Family history problems
     (box with "E")

    Refers to parental family problems or acting out
    against family members.

63. Isolated situational - temporary circumstances
    (box with "E")

    Refers to some unusual or temporary circumstance
    in the juvenile's life, which is unlikely to be
    repeated. (If juvenile is unlikely to get in more
    legal trouble, score item 63 as "a".)

64. Interpersonal manipulation
     (box with "E")

    Refers to juveniles who use others to gain their
    own ends. Frequently, they try to manipulate, or
    take advantage of others.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A | 2 | | | | | | | (a 3) | b 3 |
| A | 36 | | | (a 2) | b 2 | (a 2) | b 2 | | |
| H | 1 | | (a 1) | | | | | | |
| A | 25 | (a 1) | c 1 | | | | | b 2 | (a 2) |
| A | 11 | | | | | | | b 3 | (a 3) |
| C | 49 | | | | | | | a 3 (c 2) | d 3 |
| A | 37 | | | (a 1) | b 1 | (a 1) | b 1 | | |
| A | 12 | | | (a 2) | b 2 | (a 2) | b 2 | | |
| B | 50 | | | a 3 | (b 3) | (b 2) | a 3 | | |
| A | 26 | (a 3) | b 2 | b 2 | | d 1 | | (a 3) | b 2 |
| A | 38 | | | | | | | b 2 | (a 1) |
| B | 2 | | | | a 1 | | | | |
| A | 51 | | | | | | | (a 1) | b 1 |
| B | 13 | | | | | a 3 | (b 3) | | |
| A | 39 | b 1 | | | c 2 | | | c 3 | (a 2) |
| C,E | 52 | a 1 | b 1 | a 1 | | f 1 | b 1 | (c 1 d 1 / e 3) | |
| B | 14 | | | d 1 | a 1 | a 2 | c,d 1 | | |
| D | 3 | (d 2) | c 1 | | | a 3 | c 1 (d 2) | c 2 | |
| A | 27 | (a 2) | c 1 | c 3 | (a 3) | | | | |
| A | 53 | c 1 | | b 2 | | (a 1) | | | |
| B | 15 | | | a 1 | (b 1) | a 1 | c 3 | | |
| B | 40 | | | (b) | a 3 | | | | |
| A | 28 | | | (a 2) | c 1 | | c 1 | | |
| B | 54 | c 1 | | | c 1 | | | | c 1 |
| A | 16 | b 1 | | (a 2) | b 1 | | | c 2 | (a 1) |
| B | 55 | | | a 3 | (b 1) c 3 | | | | |
| A | 56 | | (a 1) | (a 1) | | | | (a 1) | |
| D | 4 | a 3 | (b 3) | | | | | a 3 | (b 3) |
| B | 29 | | | a 1 | c 2 | | | c 2 | a 1 |
| B | 57 | | c 1 | | | | | | |
| D | 41 | | | e 1 | a 1 | | | | |
| A | 17 | c 2 | b 1 | | | (a 2) b 1 | c 3 | | |

P. 2

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | No. | |
|---|---|---|---|---|---|---|---|---|---|
| (a 2) | b 2 / c 1 | • | (a 1) | c 2 | b 2 • | | | 5 | |
| (c 3) | a 3 / b 1 | | | | | (c 3) | a 3 | 18 | |
| | | | | | | c 1 | a 1 | 30 | B H |
| | | a 2 | (b 2) | | | | | 42 | E |
| c 3 | (ab 2) | | (b 3) | c 1 | c 3 | (ab 2) | | 19 | |
| | | | | | b 1 | | | 6 | |
| c 1 | | | | | | | c 1 | 31 | H |
| a 1 | e 1 | | | | | | ae 1 | 43 | D |
| (e 2) | | a 3 / b 1 | d 2 / (e 3) | | | | | 58 | E |
| | | a 1 | c 2 | a 1 | (b 1) | c 1 | a 2 | 7 | |
| | | c 1 | | a 2 | c 3 | c 1 | a 2 | 20 | r |
| | | ab 2 / c 1 | (de 2) | (e 2) | | | | 59 | E |
| | | a 3 | (b 3) / c 1 | | | | | 21 | b |
| | c 1 | | c 1 | | | b 3 | (a 3) | 8 | |
| (a 3) / b 1 | c 1 / de 3 | c 1 | | d 2 / e 3 | (a 3) / b 2 | bc 1 | | 60 | A |
| | | | | | c 1 | | | 32 | B |
| a 1 | c 1 | | | d 3 | a 2 | | c 1 | 44 | B |
| | a 1 | | | | | a 3 / b 1 | (c 2) / de 3 | 61 | C |
| | | b 2 | (a 2) | | | | | 22 | H |
| | a 2 | | a 2 | | | a 2 / b 1 | cd 1 | 62 | E |
| | b 2 | | d 1 | b 2 | (cd 3) | | b 2 | 45 | G |
| c 3 | | b 3 | (a 1) / c 3 | (a 3) | | c 3 | | 9 | |
| | | | | a 3 / b 1 | (e 3) | | | 63 | E |
| (a 1) | | b 1 | | (a 1) | c 1 | c 3 | (a 3) | 46 | H |
| a 2 / b 2 | d 1 / (e 2) | (e 2) | d 1 | | | | (e 2) | 64 | E |
| | a 1 | | | | | a 3 | (b 3) | 34 | B |
| c 1 | (a 1) | | | (a 3) | b 2 | c 1 | | 47 | A |
| | | d 2 | a 1 | | | (c 2) | a 1 | 23 | B |
| | | | | | | a 1 | (b 1) | 35 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| a 1 | e 1 | | | | | | ae 1 | 43 | H |
| (e 2) | | a 3 b 1 | d 2 (e 3) | | | | | 58 | D( |
| | | a 1 | c 2 | a 1 | (b 1) | c 1 | a 2 | 7 | E |
| | | c 1 | | a 2 | c 3 | c 1 | a 2 | 20 | E |
| | | ab 2 c 1 | (de 2) | (e 2) | | | | 59 | E |
| | | a 3 | (b 3) c 1 | | | | | 21 | B |
| | c 1 | | c 1 | | | b 3 | (a 3) | 8 | H |
| (a 3) b 1 | c 1 de 3 | c 1 | | d 2 e 3 | (a 3) b 2 | bc 1 | | 60 | A |
| | | | | | c 1 | | | 32 | A |
| a 1 | c 1 | | | d 3 | a 2 | | c 1 | 44 | B |
| | a 1 | | | | | a 3 b 1 | (c 2) de 3 | 61 | C |
| | | b 2 | (a 2) | | | | | 22 | H |
| | a 2 | | a 2 | | | a 2 b 1 | cd 1 | 62 | E |
| | b 2 | | d 1 | b 2 | (cd 3) | | b 2 | 45 | G |
| c 3 | | b 3 | (a 1) c 3 | (a 3) | | c 3 | | 9 | H |
| | | | | a 3 b 1 | (e 3) | | | 63 | E |
| (a 1) | | b 1 | | (a 1) | c 1 | c 3 | (a 3) | 46 | H |
| a 2 b 2 | d 1 (e 2) | (e 2) | d 1 | | | | (e 2) | 64 | E |
| | a 1 | | | | | a 3 | (b 3) | 34 | B |
| c 1 | (a 1) | | | (a 3) | b 2 | c 1 | | 47 | A |
| | | d 2 | a 1 | | | (c 2) | a 1 | 23 | B |
| | | | | | | a 1 | (b 1) | 35 | B |
| c 1 | | | | (ab 1) | c 2 | c 1 | (a 1) | 10 | H |

```
P. 2    11 | 5     2 | 14    13 | 10    5 | 17
P. 1   + 8 |+ 5   +13 |+ 8   +14 |+ 5  +14 |+12
        19         15         27         19
      + 50       + 50       + 50       + 50
       69  - 10   65 - 22    77 - 15    69 - 29

Total  LS  59    ES  43    SI  62    CC  40
```

## INDIVIDUAL PROBATION PLAN

DATE: __10-06-95__

SID NUMBER: ___220262___         CHILD'S NAME: __Manuel Garza__

PROBATION DATE: __09-18-95__         DATE PROBATION TERMINATES: __08-08-98__

**LEVEL OF SUPERVISION**:

INTENSIVE ( ) MAXIMUM ( ) RESIDENTIAL ( ) REGULAR (X) MINIMUM ( ) ADMINISTRATIVE ( )

1st Level of Supervision (12) _____   REFERRAL/CHANGE IN IPP _11-9-95 Burghdoly_

2nd Level of Supervision (10) _____   REFERRAL/CHANGE IN IPP _11-18-95 Persmeyn_

3rd Level of Supervision  (8) _____   REFERRAL/CHANGE IN IPP _____


I.P.P. Prepared By: _Carol Sautelle_          Reviewed by _Rla Harris_
                    Probation Officer                      Northeast Unit Supervisor

---

I.  **PROBATION REQUIREMENTS**:

    A.  Reporting Schedule: _Twice a month in person; quarterly home & school visit_

    B.  Curfew: _____

    C.  Special Conditions: _50 hrs. CSR, Victim Impact Panel_

    _____

    _____

II.  **IDENTIFYING CHILD'S NEEDS**:

    A.  Academic: _Attend school and obey all rules_

    B.  Employment: _____

    C.  Vocational: _Wants to find a job_

    D.  Other Needs (Health, counseling, substance abuse assessment/treatment, pro-
active social skills, Teen Parenting Classes, a Volunteer In Probation, job
skills, placement, support group, housing, etc.): _____

    _____

    _____

    _____

    _____

III.  **IDENTIFY CHILD'S STRENGTHS**:

    1. _helpful_

    2. _cooks_

    3. _friendly_

IV.  **FAMILY SUPPORT SYSTEM/PLAN OF SERVICE**: Identify support system available to child.
(Parents, extended family, significant other, school staff, etc.)

    _none_

County Juvenile Probation Department

## PRE-DISPOSITION REPORT

(Confidential Information for Professional Use Only)

Name: Manuel Garza
Address: 4227 Sungate Apt. #205   SAT   78217        Phone: 599-2265
Name of Parents: Maria Gonzalez (mother)
Address: 4227 Sungate Apt. #205   SAT   78217        Phone: 599-2265
Guardian:
Address: _____   Phone: _____

LEGAL STATUS:
SID # 220262     Detained: Yes____  No X

Original Court Date: Sept. 18, 1995   Judge: Andy Mireles   Court # 73rd D.C.

Pending Allegations: Date 04-02-95   Offense Att. Theft $750/20,000 (Vehicle)
                     Date 05-06-95   Offense Theft $1,500/20,000 (Vehicle)
                     Date_____   Offense_____
Prior Juvenile Record: Yes X  No___        Prior Disposition: Yes____ No X
Victim Impact:              Yes____ No X    Type of Prior Disposition:
Restitution Requested: Yes____ No X          CINS____ Delinquent Conduct____
   Victim:_____
   Amount Requested:_____

IDENTIFICATION:
Date of Birth: 08-08-80  Age: 15  Place of Birth: San Antonio, Texas
Sex: M X  F___  Race: H   U.S.Citizen: X  Resident Alien:___ Undocumented:___
Health: Good X  Fair____ Poor____   Social Security #:_____

SOCIAL HISTORY:
Substance Abuse History:              School: Ed White M.S.      Grade: 8th
   None____                          Educational Program:
   Minimum drug use____                 Regular X  Alternative X  Spec.Ed.___
   Uses drugs,                          Other Ed.Program_____
      not a severe problem X                 Attending School: Yes X No___
   severe problem___                        Truancy Record: Yes X No___
Drug(s) of choice:                              Suspended: Yes X No___
   marijuana                                     Expelled: Yes___ No X
   alcohol
Prescribed Medication(s):            Residing with:  Both Parents____
   none                                              Mother Only X
Psychological Evaluation:                            Father Only____
   Date_____ No X                  Step-parent & Parent____
Psychiatric Evaluation:                        Foster Family____
   Date_____ No X                          Relatives____
Educational Assessment:                          Institution____
   Yes____ No X                                       Other____
Prior D.P.R.S. Involvement:
   Yes____ No X
Prior Social Services:               Number of Siblings: 3
   Yes____ No X
Gang Member: Yes____ No X            Religious Preference: Catholic
Name of Gang:_____
   Gang Name:_____

<u>REASON FOR PRESENCE BEFORE THE COURT:</u>  Manuel Garza appears before the Honorable Court via an Original Petition alleging the child has Engaged in Delinquent Conduct, to wit: Attempted Theft $750/20,000 (Vehicle) and Theft $1,500/20,000 (Vehicle).

According to SAPD reports, Manuel and cohorts attempted to steal a vehicle on April 3, 1995, the complainant called police after suspects tried to take his vehicle.  The steering column was broken on the vehicle.  A description of suspects was broadcasted and Manuel and his companions were apprehended and transported to the Juvenile Probation Department.

On May 6, 1995, at 5:15 a.m., Manuel was referred to the department by SAPD for Theft $1,500/20,000 (vehicle).  According to police report, the complainant heard her engine start and she went to investigate.  When she got outside, she observed Manuel in her vehicle attempting to drive away.  She ran to her vehicle which was in the middle of the street to question Manuel.  He got out of the vehicle and fled eastbound on Cedar Valley on foot.  A description was announced.  An officer located an individual matching the description at Apple Valley and Hazel Valley. The complainant was taken to the scene where the complainant identified Manuel Garza.

<u>PRIOR JUVENILE RECORD:</u>

11-11-93 Theft $20/200 Shoplifting-closed satisfactory.
08-24-95 Possession of Marijuana U/2-pending.

<u>JUVENILE'S SUBSTANCE ABUSE:</u>  Manuel admits to using alcohol and marijuana but feels it is not a problem.  Manuel was referred on one occasion for Possession of Marijuana.

<u>HEALTH STATUS:</u>  Manuel appears to be in good health.

<u>FAMILY HISTORY:</u>  The family is currently living with Mrs. Gonzales' mother at 4227 Sungate Apt. #205, San Antonio, Texas  78217.

<u>Child:</u>  Manuel Garza was born on August 08, 1980, in San Antonio, Texas.

<u>Natural Mother:</u>  Maria Gonzales was born on November 29, 1961, in San Antonio, Texas.  She has an eleventh grade education.  She is currently employed with 50% Off Stores as a clerk.  She is a widow.

<u>Natural Father:</u>  Manuel Garza was born on October 29, 1961.  Prior to his death, he was incarcerated.

<u>Sister:</u>  Corinna Garza was born on May 6, 1979, in San Antonio, Texas.  She is a tenth grader at Roosevelt High School.

<u>Brother:</u>  Jimmy Gonzales was born on October 9, 1984, in San Antonio, Texas.  He is a fourth grader at Clear Spring Elementary School.

<u>Sister:</u>  Lorie Ann Gonzales was born on September 19, 1987, in San Antonio, Texas.  She is a second grader at Clear Spring Elementary School.

<u>PEER ASSOCIATIONS:</u>  Manuel denies any gang affiliation. Mrs. Gonzales states she does not have any problem with Manuel's peers.

<u>BEHAVIORAL PROBLEMS:</u>  Mrs. Gonzales states she doesn't have a problem with Manuel at home only at school.

PRIOR INTERVENTIONS:   Initially Manuel was referred to this department on a charge of Theft $20/200 on November 11, 1993.  Manuel was placed on the District Attorney's Assisted Diversion Program on November 11, 1993.   His case was closed satisfactory on April 20, 1994.  Due to Manuel's re-referral on April 3, 1995, Manuel's case was transferred to the Diversion Unit Court Officer for further action.

SUMMARY OF PSYCHOLOGICAL/PSYCHIATRIC EVALUATION (S):  None.

FINANCIAL ASSESSMENT:  Mrs. Gonzales reports a monthly income of $1,300.  It is requested that court costs and fees be waived.

EDUCATIONAL ASSESSMENT:  Manuel is enrolled at Ed White Middle School as an eighth grader.  He states he will be attending the Alternative School for one week before returning to Ed White.  He states he had a truancy problem and was also suspended.

RATIONALE FOR RECOMMENDATION:  It appears that Manuel is in need of departmental intervention and therefore supervision may be beneficial.

RECOMMENDATION:   Should Manuel Garza be found to have Engaged in Delinquent Conduct, it is respectfully recommended that he be placed on probation for a period of one year, in the custody of his mother, Maria Gonzales.  It is also recommended that Manuel perform 50 hours of Community Service Restitution, attend the Victim Impact Panel, and attend substance abuse counseling.


CARMEN WEBBER
PROBATION OFFICER

RICHARD G. GARCIA
SUPERVISOR-DIVERSION UNIT


CW/pam
September 11, 1995

V.   COURT ORDERED S̲A̲⎽⎽ ⎽O̲N̲S̲:̲

| GOALS | STEPS TO BE TAKEN TO ACHIEVE GOAL | TO BE COMPLETED BY | STATUS AS OF |
|---|---|---|---|
| 50 hrs. CSR | Contact CSR to make arrangements for site placement | 12/30/95 | |
| Victim Impact Panel | | ~~January, 1996~~ Dec. 5, 1995 | |

VI.   I̲N̲D̲I̲V̲I̲D̲U̲A̲L̲ ̲G̲O̲A̲L̲S̲ ̲A̲N̲D̲ ̲O̲B̲J̲E̲C̲T̲I̲V̲E̲S̲ ̲(̲B̲A̲S̲E̲D̲ ̲O̲N̲ ̲N̲E̲E̲D̲S̲)̲:̲

| GOALS | STEPS TO BE TAKEN TO ACHIEVE GOAL | TO BE COMPLETED BY | STATUS AS OF |
|---|---|---|---|
| Wants to find job | Will apply at Burger King & Galaxy Theatre | | applied at Church's |

VII.   Q̲U̲A̲R̲T̲E̲R̲L̲Y̲ ̲R̲E̲P̲O̲R̲T̲S̲ ̲O̲F̲ ̲T̲H̲E̲ ̲I̲N̲D̲I̲V̲I̲D̲U̲A̲L̲ ̲P̲R̲O̲B̲A̲T̲I̲O̲N̲ ̲P̲L̲A̲N̲:̲ Indicate unachieved goals. State reasons. Identify steps necessary to achieve unaccomplished goals.

CASE STAFFING/CONFERENCE WITH OFFICER & SUPERVISOR _____

1st Review: Due to re-referrals, level of supervision increased to Max.
11-27-95

2nd Review: No Change
2-27-96

3rd Review: no change. Manuel is in Detention pending CST.
2-27-96

4th Review:

_Manuel Garza_                    _____
Child's Signature                         Parent's Signature

_____

# Plan of action   5-21-96

What I want to get in the future.
Finish high school and recieve my
diploma. I would also like to enter
job training so for the future
to come I would have a good
pay roll. I would want to
move into a good community
Because the community I was
in wasn't doing me any good.
I was influenced by my friends
into doing wrong. The way I
would be able to finish high school
is to set my mind on my future life.
And I would want that to become
a nice beauitful scene for me and
my family. In order to become a
good citizen is to obey the rules
and regulation given by my mother
and probation officer. I want and
am willing to change my ways in
life, because I realize what I've
done in the past was wrong and
know that now I have to pay
the consequies for them.

I would the judge & court to
give me one chance and I would
show them & let them know
that I've made a big chang in
my life. Now that I'm behindd
bars I found out who were my
friends were, and who were just
users. And know that I know who
were there for the fame I
would have to choose friends
who want thing for their futer
as much as me. I realize that
I was just choosing the wrong
crowd and made me feel stupid
because I had got caught trying
to show off and to get known, but
after all that had happend I would
have to chang. The reason why
I changed is because I dont
want to spend the rest of my
life in and out of jail. Now
that I've had time to think of
my past and future I would
really appreciate for my probation
officer to recomend me to be—

released On a moniture, until my court Date, June 24 1996. I know that it would be hard for Mrs. Douthele to consider but "I'm betting you know from the heart I wont mess this up for me if I'm released. I'm begging you all to make this happen for me this is all I have to look forward to in my last time in the Real world with my family and my girlfriend I appricate you taking your time reading this, and I'll pray for the day I get released to my mother to live free for a little while until my court date. Thank you.

Sincearly,
Manuel Yaiza

**EXHIBIT D**

**AFFIDAVIT**

**STATE OF TEXAS**                          §
                                                          §
**COUNTY OF BEXAR**                     §

BEFORE ME, the undersigned authority, on this day personally appeared JACK G. FERRELL, JR., known to me to be the person whose name is subscribed below, who being first by me duly sworn did depose and say:

"My name is Jack G. Ferrell, Jr. I am over the age of eighteen and competent to make this affidavit."

"On or about July 23, 2002, I was appointed to conduct a psychological evaluation on Manuel F. Garza, SID #0697564 in Cause No. 2001-CR-1877, State of Texas v. Manuel F. Garza. I am now, and was then, a TSBEP licensed psychologist."

"That examination included a clinical interview and mental status examination as well as the review of documents and records provided to me by the attorneys of record. These included his pertinent criminal justice history, school and other records. It was my understanding that I would perhaps be called to testify with respect to matters pertaining to Mr. Garza' potential 'future dangerousness'. "

"Criminal justice records did not reflect, to me, a history of violence nor a tendency to act in a violent manner. His clinical evaluation did not suggest any such traits as being reflective of a violent nature. One entry in a school record did reflect problems which were not resolved and constituted, for that employee, a poor prognosis. I did not necessarily concur, but had no further information to support my opinion. I would have testified at the trial that he did not present as a future threat or danger to himself or others, based upon my limited evaluation. I could not attest to the weight that the school report would given."

"I was not called to testify in this matter and my involvement was terminated on or about 10-28-02.

"Further, affiant sayeth not."

_Jack G. Ferrell, Jr., Ph.D._

SWORN TO AND SUBSCRIBED before me on this 21st day of October, 2004

JANE R HOSEK
Notary Public
State of Texas
My Commission Expires
February 15, 2007

_Jane R. Hosek_
Notary Public in and for the State of Texas

**EXHIBIT E**

*Susana A. Rosin, Ph.D.*
*Clinical Psychologist*
*3730 Kirby Drive, Suite 825*
*Houston, Texas 77098*
*Tel: (713 )523-0000*

## Psychological Evaluation

**Name:**            Manuel Garza
**Date of Birth:**   8/08/1980
**Date of Evaluation:** 5/21/2004
**Referred by:**     Ms. Suzanne Kramer
                     Attorney at Law

**Tests Administered:**
Wechsler Adult Intelligence Scale-III
Wide Range Achievement Test-3
Benton Visual Retention Test
Trail Making A & B from the Halstead-Reitan Neuropsychological Test Battery
Clinical Interview
Review of collateral information provided by Ms. Ann Matthews

**Background Information:**

Mr. Garza was born on 8/8/1980 when his mother, Maria, was seventeen years old. Mrs. Garza reportedly married Mr. Garza's father, Ferdie Gonzales, when she was eighteen years old, or approximately a year following Mr. Garza's birth. However, Mrs. Garza had apparently left home, and been living with Mr. Gonzales from the age of fourteen. Mrs. Maria Garza and Mr. Ferdie Gonzales subsequently had two additional children, Eric and Lorie Ann, who were born in 1983 and 1985, respectively. It is known that Mr. Garza's father abused drugs, and overdosed on more than one occasion. Mr. Gonzales eventually died of a drug overdose in May of 1994 when Mr. Garza was thirteen years old.

Available records indicate that Mr. Garza experienced a very unstable childhood. His family, for example, moved often as his father was reportedly in and out of prison for various offenses during Mr. Garza's formative years. Mr. Garza attended three elementary and two junior high schools. He reported to the examiner that he dropped out of high school in the 10th grade, and eventually obtained a G.E.D. at age twenty. Mr. Garza further reported to the examiner that he attempted to hold down several jobs during his late teens and early twenties that included construction, and being a short order cook.

Garza, Manuel
Page 2

Other collateral sources, which were confirmed by Mr. Garza during his interview, report that Mr. Garza began to smoke marijuana and experiment with drugs at around age thirteen. According to Mr. Garza, his own biological father introduced him to cigarettes and alcohol prior to his death in 1994. In addition, several close relatives belonged to gangs, and introduced Mr. Garza to illegal activities from an early age.

Mr. Garza reportedly began to engage in illegal activities in his early teens. In 1993, Mr. Garza joined a gang, the Spanish Gangsters. Around this time, Mr. Garza also began to be caught committing different illegal acts that included possession of marijuana, auto theft and burglary. Mr. Garza was eventually arrested and sent to TYC boot camp for two years. However, upon his release at age seventeen, he apparently became reacquainted with old friends and relatives, under whose influence he began to, once again, commit various crimes. Mr. Garza was sent back to TYC in 1997, and then to a halfway house from where he ran away. He was eventually apprehended and sent to TYC again until his release in June of 1998. Mr. Garza then appears to have made an effort to hold a job at a restaurant for a period of time, but was eventually caught participating in a high speed chase in 1999, and sent to the county jail for six months. Mr. Garza was released in June of 2000 at which time he, again, attempted to maintain a job at a restaurant, obtained his G.E.D., and purchased a car. Mr. Garza also renewed a romantic relationship with his long-time girlfriend, April Flores. On a separate affidavit, Ms. Flores described Mr. Garza as a good friend/ provider, and a caring boyfriend with whom she could share her problems. She further stated that Mr. Garza had expressed plans to obtain a more secure job, rent an apartment and be married in the near future. It appears, however, that Mr. Garza once again came upon the influence of old friends, quit his job, and began to sell drugs to supplement his income.

The incident that led to Mr. Garza's eventual conviction for capital murder occurred on 2/02/2001 when Mr. Garza was waiting outside a friend's house, and was stopped for questioning by a police officer. Mr. Garza explained that he became afraid of being arrested, and instinctively ran away from the officer. A chase apparently ensued which dead-ended near a fence, and culminated with the officer making an attempt to arrest Mr. Garza. Mr. Garza reported that a struggle then ensued during which he believes that the officer's gun was accidentally discharged, and the officer killed. Mr. Garza repeatedly stated during his 5-21-04 interview that he never intended to harm the officer, but was by then very frightened and simply trying to not be shot by the officer. Mr. Garza added that he has been subsequently told that his fingerprints were never found on the officer's weapon. He further claimed to have no recollection of touching or discharging the weapon.

Garza, Manuel
Page 3

**Clinical Observations:**

Mr. Garza was evaluated on 5-21-2004 during a three-hour session at the Allan B. Polunsky Unit in Livingston Texas where he is currently on Death Row. Mr. Garza was very cooperative toward the examiner, and put forth effort to complete all tasks presented. Mr. Garza also appeared very candid in his responses to questions and efforts to provide details. Furthermore, this examiner did not detect efforts at malingering or "faking bad" throughout his test protocol.

**Test Results:**

Mr. Garza obtained a WAIS-III Full Scale IQ score of 91 (27th percentile, Average range). Furthermore, he obtained a Verbal IQ score of 87 (upper end of the Low Average range, 19th percentile), and a Performance IQ score of 97 (35th percentile, Average range). Mr. Garza scored closer to average on those cognitive tasks that tap into visual attention to detail, comprehension of situations, logical reasoning, mental computation, processing speed, and non-verbal reasoning. In contrast, he exhibited relative weaknesses on those WAIS-III subtests that tap into expressive language/oral fluency, auditory processing of information, and general fund of knowledge. Although Mr. Garza did not obtain a significant difference between verbal and non-verbal cognitive areas, he appeared relatively stronger in performance areas. Therefore, from a career standpoint, Mr. Garza would appear better suited for occupations that emphasize these visual-perceptual-motor areas, i.e., auto mechanics, air conditioning technician, plumber, etc.

Mr. Garza's individual scaled scores on the current WAIS-III administration are listed as follows for the purposes of peer review and comparison:

| Verbal Tests | Scaled Scores* |
|---|---|
| Vocabulary | 7 |
| Similarities | 10 |
| Arithmetic | 9 |
| Digit Span | 6 |
| Information | 6 |
| Comprehension | 9 |

Garza, Manuel
Page  4

| Performance Tests | Scaled Scores* |
|---|---|
| Picture Completion | 12 |
| Digit Symbol-Coding | 9 |
| Block Design | 9 |
| Matrix Reasoning | 11 |
| Picture Arrangement | 8 |

*Mean scaled score equals 10. One standard deviation equals 3.

Mr. Garza obtained WRAT-3 achievement scores that were generally commensurate with his reported educational level. Mr. Garza, for example, scored at the 42nd and 47th percentiles respectively on the WRAT-3 Reading and Spelling subtests. He scored relatively lower, or at a seventh grade equivalency level (18th percentile), on the WRAT-3 Arithmetic subtest. Mr. Garza, for example, was able to correctly spell words such as "institute", "educate", "suggestion", "equipment" and "museum". Although the WRAT-3 Reading subtest only provides an estimate of the individual's reading recognition (ability to decode words), Mr. Garza was able to sound out words such as "quarantine", "urge", "deteriorate", and "audacious". It should be underscored, however, that the WRAT-3 does not provide a measure or estimate of reading comprehension per se. With respect to his numerical or computational abilities, Mr. Garza was able to complete double digit additions, subtractions, multiplications, divisions, as well as several fractions and percentages.

Mr. Garza's WRAT-3 scores are also listed as follows:

| Subtest | Standard Score* | Percentile | Grade Score |
|---|---|---|---|
| Reading | 97 | 42 | High School |
| Spelling | 99 | 47 | High School |
| Arithmetic | 86 | 18 | 7th Grade |

*Mean standard score equals 100. One standard deviation equals 15.

Mr. Garza was also administered the Benton Visual Retention Test and Trail Making A and B subtests of the Halstead Reitan Neuropsychological Test Battery. Consistent with his estimated IQ scores, Mr. Garza obtained a Correct Score of 8 and an

Garza, Manuel
Page 5


Error Score of 2 on the Benton Visual Retention Test. These scores are considered average or normal for his age group. Likewise, Mr. Garza's performance on the Trial Making A and B subtests appeared in-keeping with the rest of his cognitive profile. Mr. Garza, for instance, did not display any errors on his completion of the Trial Making A and only one error on the Trial Making B. The Trial Making A and B are considered to be a screening instrument for frontal lobe impairment.

**Summary:**

Mr. Garza is a young man of overall average intellectual abilities and achievement scores that are in-keeping with his reported educational level. Both his intellectual abilities and level of cooperation during the evaluation are considered strengths.

Although the death of a police officer is a very serious offense, Mr. Garza's accounts of how this tragic death occurred warrant further investigation. For example, it might be important to investigate whether Mr. Garza's recollections of the crime scene match the evidence found. Mr. Garza vehemently stated repeatedly that the officer's death had been a terrible accident, and he had never intended to hurt the officer, i.e., his assertion is that he became frightened, feared arrest and foolishly ran away. Mr. Garza also claims that the weapon was accidentally discharged as he and the officer struggled. At that point in time, Mr. Garza claimed that the only thought in his mind had been to not be shot by the officer. Mr. Garza repeatedly stated that he never intended to shoot, hurt or kill the officer.

It is also noteworthy that Mr. Garza does not have a prior history of violent crimes, and made several, albeit failed, attempts at turning his life around during his late teens/early twenties. While this examiner is not a sociologist, it is recommended to have someone with expertise in this area make a thorough assessment of how Mr. Garza's early formative experiences and environment contributed to his difficulties maintaining gains made while at TYC. It appears, from the available records, that Mr. Garza typically performed well while at TYC, only to eventually return to the prior criminal activities once he came under the negative influence of his friends and relatives.
Likewise, Mr. Garza appears to have adjusted very well to the structure and routine set forth at the Polunsky Unit. His records do not indicate that he has experienced serious disciplinary problems while in Death Row.

Garza, Manuel
Page 6

It is very possible then that, had the tragic death of the police officer not occurred and under more positive environmental influences, Mr. Garza would have had the ability and desire to learn a trade, and could have then become a more useful member of society.

This information is true and correct to the best of my knowledge. I have been a licensed psychologist in the State of Texas since 1985, personally conducted all the assessments and reviewed all the records included in this report. My license is current and in good standing with the Texas State Board of Examiners' of Psychologists. A copy of my Curriculum Vitae has been included for the Court's review.

Respectfully submitted,

Susana Aceituno Rosin, Ph.D.
Licensed Psychologist
Texas License 2-2995

Signed and sworn to me this ___19___ day of __October___ 2004.

Notary Public * State of Texas

My commission expires ___10-29-04___

**EXHIBIT F**

# STATEMENT OF
# KATE ALLEN, PH.D.

This information is true and correct to the best of my knowledge. I have been a licensed clinical social worker in the State of Texas since 1987, personally reviewed all the records included in this report. My license is current and in good standing with the Texas State Board of Examiners of Social Workers. A copy of my Curriculum Vitae has been included for the Court's Review.

Respectfully submitted,

*Kate Allen, Ph.D.*

Kate Allen, Ph.D., LMSW-ACP
Texas License 06459

Signed and sworn to me this ___20th___ day of October, 2004.

*Ann Watson* ANN Watson
Notary Public*State of Texas

My commission expires ___8-22-2006___

# Mitigation Affidavit in the Case of State of Texas v. Manuel Garza at the Request of Suzanne Kramer, Defendant's Attorney Developed by Kate Allen, Ph.D.

## October 19, 2004

At the request of Suzanne Kramer, attorney for Manuel Garza, I am presenting material and statements I would testify to if I had been called to support the mitigation phase of Mr. Garza's capital murder trial.

I will review the defendant's life as it sheds light on how he came to be in the physical altercation with Officer Riojas on 2-2-01. The forces and influences on his development, especially as he began a life of crimes against property, will be explained. Finally, I will focus on the nature of Mr. Garza's personality, behavioral patterns, and typical responses to life. In this manner, I describe and justify why Mr. Garza, while having learned and engaged in a criminal life at an early age, is nevertheless not at all the picture of one who deserves capital punishment. In this way, it will be clear that had a thorough, professional, and literature-based mitigation been presented through the use of an expert witness, the jury may have decided differently on his punishment at this trial.

Documents available and reviewed for this report include the following:
- Individual Probation Plan (dated 10-06-95)
- Manuel Garza's handwritten Plan of Action (dated 5-22-96)
- Bexar County Juvenile Information System
  Child Face Sheet/Referral Summary (dated 9-25-97)
- Discretionary Transfer Hearing Report (dated 6-18-96)
- Psychological Evaluation by J. O. Sherman, Ph.D.
  (dated 6-6-96)
- Strategies for Juvenile Supervision Interview (dated 10-20-95)
- Probation Reports from 11-11-93 through 9-03-97
- Timeline of Life Events of Manuel Garza developed by
  Mitigation Specialist, Ann Matthews
- Interview notes on all the major actors in Manuel Garza's life
- Phone interview with Mitigation Specialist, Ann Matthews
- Scholarly literature review in the areas of juvenile crime, gang involvement, associated neighborhoods/communities, Latino crime/gang/drug involvement, family and culture.

## Manuel Garza's Early Life and Development

Manuel Garza was the born on August 8, 1980, the second child of teenage parents. His sister, Corina was born when their mother, Maria, was 16 years old. Two other children were born when Maria was 20 and 23. Maria met Manuel's father, Fernie

Gonzales, when she was 14 (in the 8th grade) and moved in with him with they both were 15 years old. Maria had been the self-described "black sheep" of her family, born to a single mother and a father she never met. She was largely raised by strict grandparents, whom she feels greatly resented her. According to Manuel's paternal aunt, Sonia Gonzales, Fernie's father (Manuel's grandfather) was very abusive to the children, had affairs while he was married, and at one point put all his 7 children in the Baptist Children's Home.

Maria and Fernie married after Manuel's birth. By all accounts of family members, children, and siblings, Fernie had a very strong belief about his role as father and husband. He was in total control of Maria, treating her as if she were his child. Indeed, Maria is reported to have viewed Fernie as a father figure. Manuel's father was very jealous and emotionally and physically abusive. His mother was held as a virtual prisoner, in isolation, in the home. Fernie was also at liberty to have frequent affairs. He was a very strict disciplinarian, being quite physically abusive to the two older children (Corina and Manuel). However, Fernie engaged in the type of discipline regarded as the most pernicious in child development: erratic involvement, sometimes permissive and then, arbitrarily, rigid and abusive. Consistent- and-firm or consistent-and-lax, even consistently rigid are all parental styles that yield better functioning adults than that used by Fernie: permissive, absent, then rigid and violent. Since Fernie was a long-time chronic drug abuser, this parental style would have been natural.

Maria states that the Corina and Manuel both saw their father physically and emotionally abuse her. They also witnessed consistent drug use by their parents and friends of their parents in the home. Familial drug and crime involvement—including chronic use of cocaine and heroin, stealing to support their habits, involvement in drug sales, and the threats and instability involved in that lifestyle were the childhood environment that surrounded Manuel's development.

In fact, when Fernie was not in jail or prison for his drug-based crimes, he was engaged in crime in order to support the family. When he was incarcerated, Maria went on welfare to survive. She states she never received help from Fernie's family when he was incarcerated. Whether Manuel's father was in or out of prison, the family was not just financially unstable; they were forced to move often to escape threats from rival dealers and gang members, as well as to stay ahead of the law. Manuel went to a total of 7 elementary and middle schools due to the family's lifestyle. After Fernie's death, Maria and her boyfriend obtained a 2-bedroom apartment for the two adults and 4 children.

Given Patterns of Manuel Garza's Childhood and Critical Losses

For Manuel, drugs, stealing, running, and being locked up were just a way of life. His mother was weak and subordinate to his father. [Sonia, Fernie's sister, stated that as of 2002, Maria still used cocaine. She also sated that Maria knew about Fernie's drug activities, but he denied it and made attempts to hide his criminal activity.] Manuel's father was his only role model—that is, if you don't count virtually all the males on both

sides of his family for two generations back who had been incarcerated; or the many others in all the neighborhoods he had lived in. These facts were backed up by the friends and family members (eight in all) interviewed by the mitigation specialist.

The eldest child, Corina, is said to be the least crime-oriented person in the family. She was aware of the drug use in the home and realized it was not appropriate when she reached middle school. She had her own first child at age 16. Corina states that it was she who was left to raise Manuel, one year her junior. When her father was in the home and was abusive, her mother was emotionally not available to discipline the children (and otherwise being forced to give over that task to her husband). He of course, was in and out of that role as his drug use and stealing binges would allow. When Manuel's father was serving time, Maria would sometimes be home less because she worked off and on and then "went out" at night. Corina states that her mother just did not put much effort into parenting.

Prominently mentioned in Manuel's handwritten "Plan of Action" before he was first incarcerated in TYC at age 15 was his wish to escape these types of neighborhoods and "the life." He wrote, "What I want to get in the future. Finish high school and receive my diploma. I would also like to enter job training so for the future to come I would have a good pay roll. I would want to move into a good community because the community I was in wasn't doing me any good. . . The reason why I've changed is because I don't want to spend the rest of my life in and out of jail."

Manuel did look to his father for guidance and nurturance. Corina states that Fernie valued the male children more than his female children and would spend the time he had at home with the boys. Her recollection was that the home was much less abusive when her father was in jail or prison. But Manuel tended to be depressed during those times. When he was in elementary school, his father overdosed and had to be resuscitated. Manuel would be 13 years old when Fernie's second overdose resulted in his death. [Fernie's sister and his father believe that the "Mexican Mafia" put rat poison in it and that Maria's sister arranged it.]

The father's death came just 2 months after his release from a 2-year incarceration. During that time, Maria had taken up with Fernie's best friend. They officially separated when Fernie was paroled. At the time of his impending parole, Corina accused her father of having sexually abused her when she was 7 years old. Though there was some question as to her motive for the accusation (her mother wanted her to say it so Fernie could not come home and interfere with her new relationship), Manuel was always adversely affected by what was happening to his father. As a child, he was always disturbed when his father was in prison, and he clung to him when he was paroled. After his last incarceration, he was paroled to his father's house.

Significant childhood losses in Manuel Garza's life include the loss of stability as the family frequently fled their homes, the loss of his father's companionship when Fernie went to prison, the loss of his mother's guidance and discipline (she often failed to show up for probation meetings and would often cry throughout them), and finally, the

permanent loss of his father upon his death on May 9, 1994, when he was 13. Significant in a symbolic sense, is the story of the loss of his inheritance—his father's motorcycle. Fernie had asked his father to keep his cherished motorcycle for his children, should something happen to him. When his death came (at age 32), Maria called her father-in-law and asked to get it for the children. After she received it, however, she sold it instead.

<u>The Dynamics of the Defendant's Early Involvement with Criminal Activity</u>

It makes perfect sense to expect this defendant to act on his continual closeness to crime when he became a teenager. It was, after all, the way in which his and many of the fathers in his neighborhood and his extended family made a living and provided for their families. During his father's last incarceration, Manuel met an older kid who introduced him to stealing cars, breaking into houses, and high-speed chases. Manuel found that when he was with Ronald and they were engaged in high risk behaviors, he felt a "rush." Without doubt, that "rush" was the result of the body's natural fight-or-flight biochemical responses. During that crucial period of brain development for Manuel, his introduction and repeated involvement in high-risk criminal activities likely formed an "imprint" upon his nervous system. That is, at the very time when he should have been developing internal controls for the anxiety he felt about his life and the happenings around him in his family or at school, Manuel was learning (physically and emotionally) to divert that anxiety into a high-stakes behavior that completely overwhelmed the possibility of feeling that anxiety. With all his physiological systems in the mobilized fight-or-flight mode, those scary feelings—the states that made him feel not stronger in life, but rather more vulnerable—was converted into a "rush." At the same time, he was receiving powerful tutoring in how to be a man and in control of his life. This had not only a functional payoff psychologically for Manuel, it also had a physiological payoff.

What is important to note, however, is that although Manuel was learning to control his dysphoric emotions through risky criminal activity, he was *not*, as so often happens, learning to be personally violent. In fact, Manuel's criminal, family, and relationship history is devoid of physical violence. In his school history, he was noted to have engaged in two unremarkable fights during his entire school attendance. This, itself, is of great importance in looking at reliable patterns of Manuel's functioning.

But just as personal violence was not a part of Manuel's coping style, he was learning to hone his criminal skills, particularly those of car theft. His first two attempts at auto theft were targets of "family connections." Manuel wanted nothing to do with drug abuse or drug dealing. He also wasn't known for being fond of weapons. However, he felt he was gaining respect in becoming a man for his ability to overcome his fear and attempt to steal others' cars. [It is interesting to note that at the same time, he tried to communicate his interest in becoming trained to be an auto mechanic. He was proud when he was able to buy his first car when he reunited with his girlfriend, April, and tried to go straight after his juvenile incarcerations.]

Manuel was also learning how to steal from others' homes. Though he had a long history of school truancy, the defendant's first adjudication was for stealing Dickies at a Target store. Turning 13 years old (while his father was locked up) was apparently a significant milestone for him—he states he smoked his first marijuana cigarette on his 13th birthday. His father gave him his first beer. It is also said that he joined the "Spanish Gangsters" shortly before his 13th birthday. [Although I looked for indicators of his formal gang involvement, it seems that after making the signifier of joining this gang, Manuel had no meaningful involvement. He seemed to work toward becoming independent in criminal activity. He stated in his psychological evaluation of 6-6-96 that he was no longer a member of a gang because, "that messes up your life."]

When Manuel was interviewed for his trial, he stated that he stole from the practical standpoint that his family was poor and that stealing was the only way he could have the things the kids around him said were important. He was able to verbalize that stealing and then being incarcerated were facts of life that were acceptable in his family. He saw the behaviors of other family members were criminal and they were regularly incarcerated, including his own father. As Manuel was growing up, this was just the life was. He noted that incarceration was not frowned on, but rather was something of a rite of passage. Although he was charged with possession of marijuana three times, he believes he did not have a dependency on pot or alcohol. And he was not interested in doing "hard drugs" at all.

Of particular importance is the defendant's reliance on running away when confronted during his commission of crimes. Though police recovered a gun a few feet from him during one house burglary (which the owner denied was his) and noted his possession of a screwdriver in another burglary, Manuel consistently reacted to being caught or confronted by physically running away. His mother states that Manuel would flee from crimes and was a runaway while on probation because he feared incarceration. That pattern of fleeing includes an incident at age 14 when an elderly woman yelled at him to get out of her car, and his response to her was, "Yes, ma'm," and fled without confrontation. It was also his response resulting in a couple of high-speed car chases, before he was 13 years old and again at age 19. And it was his response with Officer Riojas confronted him at the apartment on the night of February 2, 2001 when he was 20 years old. When Manuel was interviewed by Dr. Sherman for his psychological evaluation in 1996, he stated, "I feel that guns are not a thing needed as a teenager, it only leads to trouble and jail." The history shows that Manuel Garza was not violent and did not use weapons during a criminal history that spanned his adolescence and adulthood.

Redeeming Personality Traits

Throughout time and across several reporters, the stable personality traits manifested by the defendant are remarkable when considered in the light of his criminal past and his adjudication for capital punishment. When interviewed, Manuel's mother stated that he was "a good kid," "made good grades," "was respectful and helped around the house." Maria's brother, Louis, said Manuel was a good kid, did his chores, and was dependable. One young woman who was a former girlfriend reported that he was

"always nice and polite around her." He never spoke of committing crimes. April Flores, who met Manuel when she was 14 and was his longstanding girlfriend, described him in this way: she could tell him her troubles, he gave her advice and helpful; he was sensitive, a good friend, he made her feel good, when she had a problem, she wanted Manuel's support. April had a child by another man while Manuel was in TYC. He took on the child as it was his, and would include her in his plans and stay with her child while she was working. He planned to marry her, was a good provider, and he wanted April and her child to get out of the projects.

Dr. Sherman, the psychologist who interviewed and tested Manuel Garza on two occasions, described him in this way: "His motivation level (to participate in the evaluation) was high and his task involvement and task persistence were strong. . . Manuel presents as a soft-spoken, generally cooperative and attentive adolescent . . ."

Dr. Susana Rosin, a psychologist who tested him in preparation for his trial, noted that he was bright, pleasant, polite, cooperative, not malingering, artistic, thoughtful and considerate.

Carol Sawtelle, the probation officer who prepared the defendant's Discretionary Transfer Hearing Report (dated 6-18-96) wrote, "While in Detention, Manuel has demonstrated a cooperative attitude. He seems genuinely interested in improving himself by attending school, participating in counseling, and meeting with the Chaplain as well as attending chapel services." She also wrote in the Individual Probation Plan that Manuel was "helpful and friendly." He wrote a letter entitled "Plan of Action" which states that he has learned his lesson and wants an opportunity to prove himself. The fact that he took the time to write the note indicates a willingness to make some changes."

<u>The Failure to Recognize and Respond to Manuel's Emotional Distress</u>

These are not the behavioral traits of someone who is a menace to society such that the only solution is capital punishment. In fact, in the only diagnostic report I was able to review, the diagnosis of Conduct Disorder was given without the requisite meeting of the criteria. The evaluator, who represents the Correctional Health Care Services in San Antonio, based his diagnosis solely on the fact that Manuel had broken the law of stealing. They must be the presence of at least 3 of some 15 criteria before the pernicious diagnosis of Conduct Disorder can be made. In the defendant's history—and according to the facts presented by the evaluator himself—Manuel met just two of the criteria: *has broken into someone else's house, building, or car* and *is often truant from school, beginning before age 13 years*. Other categories of serious behavior problems, including 7 kinds of "aggression to people and animals," 2 kinds of "destruction of property," 2 additional kinds of "deceitfulness or theft," and 2 additional kinds of "serious violations of rules" almost always are justified in cases of valid Conduct Disorder. In the psychiatric field, it is known that it is very common for a child who is diagnosed with Conduct Disorder to later develop antisocial personality disorder. Manuel Garza did not then and does not now—by all reports—manifest these kinds of serious personality disturbances.

Of interest to note is that the psychologist also diagnosed Manuel with alcohol abuse and marijuana abuse. Manuel denies abuse and no other probation report nor the data reported in the psych evaluation substantiates these diagnoses. And, although Manuel's father's death was mentioned, no other reference to depression or grief was made. In fact, the evaluator noted that Manuel was <u>not</u> depressed, although other indicators and others' reports suggest the presence of such. For example, numerous family members mentioned how hard Manuel took his father's death. Maria said that Manuel was depressed and that is when he started staying out and skipping school, that he was "deeply saddened" by his father's death. She took the children to visit their father on a regular basis while he was in prison. Manuel had seen his father every weekend after he was released from prison. Carole Sawtelle writes, "The trauma of (his parents') separation as well as the overdose did nave a significant impact on Manuel as can be noted by the extent of his involvement with this Department beginning in February, 1995. The counselor during his 1996 probation reported that he couldn't talk about his father's death. The interviewer for his 10-20-95 Strategies for Supervision noted that he appeared depressed. The interview also noted that Manuel was likely to "seek out an activity to distract self" and "drink or use drugs" when he is feeling depressed. A year and a half after his father's death, Manuel answered that he was "close" to his father. Corina remembers this as the point in his life when his movement into crime started. His maternal uncle noted how sad he was.

In Dr. Sherman's own report he devoted exactly one sentence to mentioning the father's death. Further, he stated that Manuel "I don't got (sic) too many (friends)." "States that he can turn to nobody when he has problems. He denies having any desire for same. . . He denies feeling nervous but then states that he is especially nervous 'if something's gonna go down, if somebody wants to fight me.' He states his biggest fear is 'that there is (sic) people out there using drugs.' He states he feels depressed once or twice a week and that when he feels depressed, 'I shed some tears, sleep.'" He denied suicidal ideation. When offered three wishes, he replies, 'Go home, for God to lead me in the right path and to live a long and happy life.'" When asked what his mother would say about him, he states, 'I want to change, I've told her there is hope for me.' Manuel reports that he presently feels 'nothing' for himself. Dr. Sherman notes that Manuel "feel(ing) uncomfortable around emotions (sic) he attempts to avoid emotional stimuli which may lead to some social isolation. He feelings have an unpredictable effect upon his thought processes and he may experience some confusion regarding his feelings. . . He sees himself in a less favorable light when comparing to peers."

In addition to these statements reported by Dr. Sherman, other widely accepted behavioral indicators of childhood and adolescent depression are also present: refuses to take part in school events, grades may drop or truancy may begin or increase; changes in sleep patterns (more sleep); difficulty maintaining relationships (may start spending time with new friends known for being troubled and rejected); low self-esteem; and beginning or increases in acting out behaviors such as drug/alcohol use, stealing.

Overdiagnoses of these pernicious labels and underdiagnosis of affective states such as depression and anxiety is practice well-documented in the scholarly literature as more likely to occur in the case of young minority males who have broken rules or been aggressive.

## Manuel Garza's Aspirations and Attempts to Get Out of a Criminal Lifestyle

Up to this point, I have given an explanation of how the defendant was directed very early into a life of crime. However, Manuel was not only exposed to the culture of Latino gangs, drugs, and poverty. He was also receiving messages—though meager and dissonant—that he should stay in school, get job training, and provide for his family. As his mother stated, Manuel knew that crime was wrong, but he couldn't resist the rush and the paved path. His history, as told by friends and family members, suggests there were routinely periods of "going straight" after his incarcerations, followed by falling back into the well-worn routine of stealing. Manuel says he aspired to a legitimate life, as he wrote in 1996 "a nice, beautiful scene for me and my family. In order to become a good citizen is (sic) to obey the rules and regulations given by my mother and probation officer. I want and am willing to change my ways in life because I realize what I've done in the past was wrong and know that now I have to pay the consequences for them. . . . I was just chasing the wrong crowd and (sic) made me feel stupid because I had got caught trying to show off and to get known, but after all that has happened I would have to change." He stated in the interview with the mitigation specialist, he could stay straight for 3 or 3 months after release from incarceration. But those straight jobs consisted of Wendy's, Jim's, Texas Road House, Paisano's, etc. [Manuel had hoped to get "good job training" as an auto mechanic, but no one or no program ever presented him with the path to that outcome.] Invariably, he would get back with his old neighborhood buddies and return to the same crimes.

## How Imprisonment Affected Manuel Garza

April Flores stated that Manuel had trouble adjusting to getting out of incarceration. A reading of his choices shows exactly this. It seems that he does well in adjusting to incarceration but not so well to being "out there," as he would describe the free life. Indeed, during the 2+ years of his incarceration on death row, I am told he has not had significant disciplinary write-ups.

On the other hand, the literature states that the absence of multi-systemic interventions, including intense family counseling, renders juvenile incarceration of little deterrence. When there exists months-long intensive parent and family therapy to teach parents how to enforce rules, protect kids from bad influences, and support kids' development, other, cheaper interventions may have a chance of helping.

## How the Defendant Attempted to Move into A Productive Adulthood

But friends and family members confirm April Flores' recollection that after his last 6 months in county jail when he was 20 years old, he was happier than ever and looking forward to marrying April and having his own family. He had succeeded in getting his GED while in the custody of the county, and was ready to become an adult. Corina remembers that the last time he was released, she thought he would make it. He was working, had bought his first car, and was trying to get an apartment with April.

Manuel's aunt, Sonia, states that she did not see Fernie's children after his death until the last three weeks before February 2, 2001. She says that she saw Manuel 3 times in those weeks, that he was working and she thought he was doing well. His mother had kicked him out of her house and he was living with friends. He had endured what he felt was his mother's rejection before (when she chose to get involved with his father's best friend and kept him from being able to have his father in the house; then again when she sold the motorcycle). Manuel was reaching out to his father's family. He went to visit his paternal grandfather.

## How the Past was Prologue to the Tragedy of February 2, 2001

Against the backdrop of several stints in prison, a 20 ½ year old Manuel Garza had an encounter with Officer Riojas 10 days before the tragic killing. Manuel had been riding in a car that Riojas had stopped for a marijuana search. On February 2, 2001 the defendant and a friend were picking up dates at a apartment when Officer Riojas called for Manuel to show his ID. Unarmed, Manuel produced a false ID and engaged in a physical altercation with the officer. Manuel tried to get loose so he could run—as was his usual response—but the officer caught up with him. In the ensuing scuffle, Officer Riojas was shot and died. Manuel then fled, taking the officer's gun with him. Arriving at a friend's house, he vomited. Later he was caught trying to see the weapon.

## Manuel Garza's Profile as a Violent Personality/Offender

The scholarly literature is replete with studies that describe and attempt to predict who will become violent and commit crimes of violence. The most recognized set of criteria is the U.S. Justice Department's *Risk and Protective Factors for Serious, Violent, and Chronic Juvenile Offenders—A Summary of 30 Years' Research (June 1995)*. Within this Justice Department Model are chronicled the Risk Factors for Violence and Delinquency in the Community, as well as Protective Factors that Inhibit Violence and Delinquency in the Community. From Conception to Age 6, Manuel Garza's childhood meets 4 of the 7 criteria: *family history of criminal behavior and substance abuse; family management problems; family conflict; and parental attitudes favorable toward, and parental involvement in, crime and substance abuse.* In the category of Age 6 through Adolescence, Manuel Garza's childhood meets 9 of the 15 associated factors: *community disorganization and low neighborhood attachment, transitions and mobility, availability of firearms, family management problems, family conflict, parental attitudes favorable toward, and parental involvement in, crime and substance abuse; lack of commitment to school, association with peers who engage in delinquency and violence; and favorable attitudes towards delinquent and violent behaviors* (although it was be more accurate to

describe Manuel's attitude here as ambivalent to criminal behaviors and non-supportive of violent behaviors). Of importance is that all of these variables except Manuel's lack of commitment to school and some acceptance of delinquency, all the other forces were beyond his control. And, of course, it should be said that even these attitudes were constructed by those in charge of his childhood.

When looking at the Justice Department's Model of Protective Factors, it can be said that Manuel Garza benefited from only 2 of 14 protective factors, namely, *a resilient temperament* and *early, effective interventions* (though I would strongly argue that the juvenile justice interventions were less than effective). Specifically, Manuel was deprived of the following protective factors: *the following actors bonding to the defendant in providing positive role models: family members, youth leaders, friends; the following cultural factors transmitted by the above: healthy beliefs, clear standards for pro-social behavior; promotion of non-violence; and the promotion of abstinence from drugs.*

From C. S. Widom (January, 2000 *National Institute of Justice Journal*) in <u>Childhood Victimization</u>, the following statistics are relevant:

|  | **Abused/Neglected** | **Controls** |
| --- | --- | --- |
| **Criminal Arrest** | **56.5%** | **42.5%** |
| **Arrest for Violent Crime** | **21.0%** | **15.6%** |

From T. P. Thornberry (December, 1994, *National Criminal Justice Resources and Statistics, U. S. Department of Justice*) in <u>Violent Families and Youth Violence, Fact Sheet # 21</u>, three types of violence exposure were studied to see how each one, and cumulatively, affected the rates of serious youth violence.

The three types of violence are:

- **Spouse Abuse**
- **Abuse of Children**
- **Climate of Violence and Hostility**

*If no family violence =*    *38%*
*If one type of violence*    *=*    *60%*
*If two types of violence*    *=*    *73%*
*If three types of violence =*    *78%*

In these analyses, Manuel was not blessed.

In the arena of psychopathology, J. Reid Meloy, Ph.D. (*Violence Risk and Threat Assessment*, Specialized Training Services, San Diego, 2000) has researched <u>Individual Psychological Factors</u> that can predict violent crimes. Of the 7 categories, 3 are not chosen and 4 may be said to be learned/chosen characteristics. Two of the non-chosen characteristics were applicable to Manuel: being male and being in the age range of 15-25 years old. Only one of the other categories pertained to him: fear and/or anger problems. It is notable that although I can find the presence of fear as a motivating factor, no one describes Manuel as a particularly angry man.

Meloy also delineated 7 <u>Social/Environmental Factors</u>, of which 3 apply to Manuel's life: *violence in family of origin; adolescent peer group violence; economic instability or poverty*. Again, these factors present in the lifestyle chosen for Manuel by his parents.

In R.D. Hare's famous *Psychopathy Checklist*, utilized in every major study of the personality characteristics associated with criminal behavior (published by Multi-Health Systems, Toronto Canada, 1991), 20 attributes are noted to be present in the psychopath. Of those 20, arguably, Manuel presents with 2-3: *juvenile delinquency; failure to accept responsibility for own actions* (this is arguable, but since he usually connected his behaviors to being with the wrong people, many in the field would accept this criteria); *and revocation of conditional release (escapes/losses of freedom)* (Manuel did escape from an Austin half-way house in 1997 (at age 17). Of importance is to note the complete absence of descriptors of "manipulation" in any and all of his evaluations.

In summary, the defendant failed to rate in a significantly negative manner in the most often used, literature-based criteria for criminal mindsets. And in those areas where he does qualify on the criteria, those criteria are overwhelmingly conditions imposed on him by the social conditions of his life at an early age. He demonstrated that when he was incarcerated, away from those influences, he was able to control his own behavior. Certainly, the use of these predictors indicates that Manuel is not a constitutionally violent individual.

<u>The Role of Subculture in Shaping an Adolescent's Choice Perception</u>

Finally, the case of Manuel Garza begs the question of how pernicious cultural pathology can be to the development of a child. At the intersection of poverty, racism, and the frailty of masculinity there exists a cultural context that, when viewed from within, purports to help the family survive what it sees as overwhelming obstacles in the "majority" society. However, when viewed from the powerful lens of the criminal justice system—culminating in the charge of capital punishment—such a subculture ensures continuous incarcerations and finally death.

*Culture* refers to a system of shared meaning, similar experiences, rules for living, a world view, and a commonly held sense of purpose in life. There is a so-called "drug" subculture. There is a Latino culture. There is a poverty and crime subculture. These are powerful crucibles for engendering the task of raising children and giving direction to

12

their parents.  In the urban neighborhood in which drugs and crime are used to counteract the forces of poverty and despair, there are always three functions that must be satisfied: competition for scarce resources, protection, and belonging.  Manuel Garza managed to become an essentially non-violent, even "decent" criminal who specialized in stealing others' property in the place of working a legitimate job, as he was striving to find his way into adulthood.  Even considering his history of felonies and misdemeanors, even the tragic incident during which Officer Riojas was killed, Manuel Garza is not the type of criminal for which the death penalty was designed.

**EXHIBIT G**

## SWORN AFFADAVIT OF RAUL GONZALES

STATE OF TEXAS                            §

COUNTY OF BEXAR                           §

I am Raul Gonzales Jr.; I live at 174 Bayville, San Antonio, Texas _78776_.
My date of birth is _2-1-59_____.

I can read and write the English language.

Manuel Garza is my nephew.  I have known Manuel since his birth.  His father
was my younger brother.  I lived in the same household with his father when we were
growing up and for a time when Manuel was a young child.

When we were young our mother passed away, our father remarried and left us
with the Children's Home for several years.  When we were old enough to leave,
Manuel's father Fernando and I lived together, we both married while we were living
together.  I was very close to my brother and I saw his relationship with his wife and his
older children.  The younger children were born while I was locked up and I did not get
to know them as well.

When Manuel was growing up, I saw his father being very abusive to him.  He
would make him stand in the corner for hours at a time and would be rigidly strict with
Manuel and his older sister Corina.  For example, at one family gathering at my father's
house, all of the cousins were outside playing basketball and having fun.  Manuel had to
set on the floor next to Fernie for numerous hours and be perfectly quiet.  I saw him beat
Manuel.  I tried to tell Fernie that that was not the way to raise his children, but he did not
change.  He was trying to hard to teach his children disipline.  I know he beat his wife in
front of the children.

We were in and out of prison quite a bit during the years that Manuel was growing up. All of the men in our family committed crimes and went to prison. Manuel's father went to prison for burglary and car theft. He was good at stealing cars. He liked to have nice things, but we did not have the education to get good jobs and make money to buy the things he wanted. He would steal a car he liked and change the VIN numbers and license plates. Fernie would drive the stolen cars for quite a while before he got another. Everyone thought he was making a good living to afford such nice things. This was Manuel's introduction to crime. He learned how he could have nice things by stealing them. Fernie went to prison several times while Manuel was growing up.

Manuel's father also sold drugs often. Manuel saw he and his friends using and selling drugs in the house all the time. They would have the stuff on the coffee table right in front of the children and be cutting and bagging it or using some.

The last time he was released from prison, he was paroled to our father's house because Manuel's mother was living with another man. Manuel's mother, Maria made up a story that Fernie had molested Corina so that he could not be paroled to their home. Fernie was very upset over the trouble in his family and not being with his children and wife. He overdosed and died. The story was a complete lie, but it cost Manuel his father.

Manuel's mother was young when they started having children; she was unable to protect Manuel from his father. She too was using drugs and when Fernie was not in the home she would have other boyfriends. I think that was confusing to Manuel. He wanted to be the man of the house and take care of things while his father was gone.

When Fernie was locked up, Maria would not bring the kids around the family much. She stayed in close contact with my sister Sonia, and once or twice my wife would see her around town with her new boyfriends. She would have the children call my father if they needed anything. Sometimes Manuel would call Sonia and get her to come and get him so he could visit us.

Knowing our family structure and how Manuel was raised, I do not think he had a choice about what he did with his life. Manuel's father died when he was about 14, and he had to help support his family. The only way he could make enough money to help his mother was to start stealing. He followed in his father's business of stealing cars. Manuel was never told not to commit crimes; he was shown how to do it well. He wanted his father to love him and he admired his father.

I was locked up several times. I finally learned how to make a good living as a plumber and have stayed out of prison for a long time. It was hard to change, but finally I grew out of that way of life. My wife stayed with me threw the whole thing. Now, I have a good family, my children are doing well in school and my wife and I both have good jobs. I think Fernie wanted to have the same things, but it broke his heart to be aqused of something so terrible.

The way we were is a hard life. It is especially hard to leave that life. Now, Manuel's younger brother Jimmy is in the same kinds of trouble. I have tried to tell him it is time to change. He will have to be in trouble for a while, then he too will realize that he should be different. Our family will break the chains, and get above the way we were raised and the learned to survive young.

I think Manuel would have out grown stealing and being locked up, like I did, and get a good job and have a family. He said he wanted to marry April Loza; I think that was his first step toward having a legitimate lifestyle. I know that he tried to have a regular job several times, but he said he could not make enough money and provide for his family the way he wanted to like that. He wanted to change, but did not have time.

If Manuel had not been a thief, that police officer would not have questioned him and he would not be on death row now. He told me the next day that he was scared that the policeman was going to kill him. Manuel did not want to go back to jail so he ran from the police.

When Manuel was getting ready for trial, his mitigation specialist came and talked to the family. She spoke with me and we talked about that I could testify and tell the jury how it was for Manuel growing up. I wanted to help tell the jury that Manuel is not a danger; he was just doing the business he was taught. His defense attorneys never called me and I have never talked to anyone except the mitigation specialist.

I hope telling Manuel's story will help him; he is a good and caring boy. He was always well behaved and loving to his family and friends.

These statements are true and accurate to the best of my knowledge.

Sworn to and signed by the Affiant on this the ꞏꞏꞏ 2 2 ꞏꞏꞏ day of October 2004.

Raul Gonzales

Sworn to and subscribed before me by the said Raul Gonzales on this the  22  day of October 2004.



Notary Public in and for the State at Large

My Commission expires  3 -29- 08

**EXHIBIT H**

# Affidavit

State of Texas                          §

County of Bexar                         §

My name is Ann Matthews.  I have a Bachelors of Arts degree in Social Studies with a specialization in Psychology from Sul Ross State University, and have been a Mitigation Specialist in Texas since 2001.

I am the Mitigation Specialist for Manuel Garza.  As the Mitigation Specialist, I have spent numerous hours interviewing Mr. Garza.  I have also interviewed family, friends, and witnesses; collected and reviewed records pertaining to many aspects of his life, development, criminal career, and prosecution.  I was also the Mitigation Specialist for his trial where I provided much of this information to the defense.

At the trial level, it was quite apparent that the defense team should be prepared for a verdict of guilty of capital murder.  To that end, I tried to get the attorneys to prepare and meet with the mitigation witnesses I recommended.  They would not review the sentencing information.  Mr. Callahan never returned any of my calls or letters.  In fact, I never met him until about a year after the trial.  Mr. Camara said it would be a waste of time to meet with the mitigation witnesses.  Mr. Camara that the county could not pay for committee meetings to talk to the mitigation witnesses, so he did not.  He proved to be very difficult to work with and I ultimately made a record of the difficulties and asked to be removed from the case.

One particular witness that I thought was important to the case was Manuel Garza's paternal uncle Raul Gonzales Jr.  Mr. Gonzales had been present for much of Mr. Garza's development and had seen first hand how his life was molded.  I am certain that hearing such insight to where Mr. Garza was coming from would have opened the jurors' eyes and may have prevented him from having a death conviction.  Mr. Camara was not interested in meeting Mr. Gonzales, and never even tried to hear his story.  I am attaching two references to Mr. Gonzales that I sent to Mr. Camara and Mr. Callahan before trial.

Instead of preparing for the sentencing on Mr. Garza's trial, Mr. Camara took me on a "wild goose chase" to Georgetown to meet a client that could not use mitigation.  He told me it was a retained case, that needed mitigation and he wanted to discuss Mr. Garza's case on the way there.  I was never paid for my time that day; he never discussed Mr. Garza's case in any real detail.  Upon returning from that trip, the working relationship to benefit Mr. Garza was completely ineffective.  I felt that I was doing more harm than good toward saving Mr. Garza's life at the trial level and it would be better to step down and come back to the case with different attorneys.

I was released from the case prior to trial starting. Mr. Camara's secretary/girlfriend insisted that I had not done any work on preparing mitigation. The trial judge asked me to turn over my file so she could verify the work. She kept the folder in her courts office until the trial was over. I do not know who had access to that confidential work product.

These statements are true and accurate to the best of my knowledge and research.

Sworn to and signed by the affiant on this the 20th day of October 2004.

Ann Matthews

Sworn to and subscribed before me by the said Ann Matthews on this the 20 day of October 2004.

Notary Public in and for the State at Large
My Commission expires 3-29-08

**EXHIBIT I**

# Ann Matthews Mitigation & Support Services

P.O. Box 2206                                          Telephone (830) 562-3368
Bandera, Texas 78003                                   annmmatthews@hotmail.com

September 3, 2002

Ed Camera
126 Main Plaza ste.1
San Antonio, Texas 78205

Re:  State v. Manuel Garza

Dear Mr. Camera,

    After interviewing family and friends of Manuel Garza, and reviewing research relating to his history; the following is what I believe will be useful in mitigation.  You will find a listing of possible mitigation themes in the interview notes from Manuel.  These will be supported by the literature that is included, and by testimony of various family members.  The possible testimony sections of each interview will support the themes.  You could highlight the themes on Manuel's interview in different colors and then subsequently highlight supporting information on each theme within the other interviews.  The supporting literature may not be introducible without an expert, but should be helpful for your knowledge.  If you want the research introduced we can locate someone to testify, or you might request that the psychologist do so.  Also, on the interview for Manuel is a list of suggested witnesses.  This list should be rather self-explanatory, except for Uncle Raul Garza.  Raul has been to prison several times, he is very aware of what causes young men to get in that situation, and the difficulties Manuel faced.  He would be a great witness if not for his background, he is articulate, and bright.  He may not be accepted well by the jury, but it could be interesting to show the other side of the story.

Based on the simplicity of the family I did not prepare a genogram; if you care to have one for the file just let me know.

Of course, the mitigation on this case primarily relates to Manuel's prior record. I have no evidence of any violent tendencies within this young man. His record put him on the hood of that car, and his nature made him run.

If you have any questions please contact me. I will prepare bills and address that shortly.

Sincerely,

Ann Matthews

**EXHIBIT J**

# Ann M. Matthews

P.O. Box 2206
Bandera, Texas 78003

Telephone (830) 562-3368
annmmatthews@hotmail.com

September 17, 2002

Edward Camera
126 Main Plaza suit 1
San Antonio, Texas 78205

RE: State of Texas v. Manuel Garza

Dear Mr. Camera,

    I received you letter releasing me from the Manuel Garza case on Friday, thank you. At this point, I have sent you all the information and records that have come in on the case. If more records and files arrive, I will forward them to you. I want to reiterate the suggested plans of mitigating the sentencing in the case.

    If Manuel is found guilty of a lesser-included charge in the first phase of the case, I will highly recommend using the following witnesses in the mitigation case.

1. Corrina Garza
2. Maria Gonzales
3. A mental health professional to testify to the effects of living in the crime based, neglectful household, with the sporadic parental rigidity.

In the event of a guilty verdict on capital murder, the following witnesses should be beneficial.

1. Corrina Garza
2. Raul Gonzales Jr.
3. A mental health professional to testify to the effects of living in the crime based, neglectful household, with the sporadic parental rigidity
4. TYC or TDC representative to testify to Manuel's previous incarcerated experiences, and the expectations of a life sentence. He will be able to function and be a productive citizen in prison.

    If you need assistance locating witnesses I will be glad to help, or John Niland has quite a list of appropriate witnesses.

    Thank you for your help. Best wishes and good luck.

Sincerely,

Ann Matthews