**EXHIBIT D**

IN THE TEXAS COURT OF CRIMINAL APPEALS
74467

AND

IN THE DISTRICT COURT OF BEXAR COUNTY, TEXAS
399th JUDICIAL DISTRICT

EX PARTE MANUEL GARZA          §          2001-CR-1877

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

*Recitation of Facts and Testimony at Writ Hearing*

On March 24, 2008, following preliminary matters, evidence commenced in the 11.071 writ hearing. The Applicant called his paternal uncle, Raul Gonzales, Jr. (R.R. v. 2, p. 20) Manuel's father's name was Fernando Garza, also known as Fernie. Maria Garza, married to Fernie Gonzales, was Manuel's mother. Manuel and his older sister, Corrina, went by the mother's maiden name of Garza. (R.R. v. 2, p. 21) Raul and Fernie's mother passed away when they were very young; Raul was seven years of age and Fernie was five years of age. (R.R. v. 2, p. 22) Because their father was not able to care for them, he placed them at the Mexican Baptist Children's Home for one year. (R.R. v. 2, p. 23) After that year, Raul's father remarried and his new stepmother had six children. Between his family and the new family, there were many people living under one roof. Everyone maintained a close relationship with each other. Slowly Raul and Fernie slid into a life of crime, initially for the purpose of supporting the large family. Fernie also used and dealt drugs. (R.R. v. 2, p. 24)

1

Intermittently, they would go to prison.  When he was 16 years of age, Raul took custody of Fernie.  (R.R. v. 2, p. 25)  Shortly thereafter, Fernie met Maria when they were very young, and soon they were married.  (R.R. v. 2, p. 26)  Corrina was born first and Manuel was born one year later.  The other two children came later.  Raul testified that Fernie was very physically abusive to Manuel.

Manuel and Corrina had the responsibility of caring for their younger siblings.  (R.R. v. 2, p. 27)  Raul testified that he frequently saw bruises on Maria.  Fernie never allowed Maria to come out of her bedroom when people were visiting the home.  Fernie would only allow Maria to come out to say a quick "hello" to Raul and his wife. She would then have to return to the bedroom.  Maria was required to keep her gaze down and never have face to face contact with anyone. If she did, Fernie would beat her when everyone left.  (R.R. v. 2, p. 28)

Fernie would make Manuel stand in a corner for hours at a time.  He was never allowed to go outside and play, or associate with anyone, i.e., he was not allowed to have friends.  Manuel was only allowed to feed the dogs, clean the house, wash the dishes. If he failed in any of these chores, Fernie would "spank" him very hard.[1]  (R.R. v. 2, p. 29)  Raul would frequently tell Fernie that this was not the proper way to raise his children.  Raul was told that it was none of his concern.  When Fernie would go to prison, Raul did not go to the

---

[1] At this early juncture, Raul was utilizing the word "spanking" but it will become apparent as his testimony developed that this was a euphemism for being beaten with a belt.

house as much, but he knew the children were happier. (R.R. v. 2, p. 30)  When Fernie

would be released, they were happy initially, but then things would go back to the way it was

before. (R.R. v. 2, p. 31)

Manuel had no "learning lessons" other than stealing to support himself.  Raul

believes that someone spoke to him about the jury trial back in 2002.  Raul was available and

wanted to testify, however, no one returned to talk to him about testifying. He believed his

testimony was not needed. After looking at his affidavit that was filed in 2004, Raul said that

no attorney ever spoke to him.[2]  (R.R. v. p. 32) Raul testified that it was Ann Matthews, the

mitigation specialist, who spoke to him prior to the jury trial and again as the writ was being

prepared. She was the person who requested the affidavit that was filed with the writ. (R.R.

v. 2, p. 33)

Raul was passed for cross-examination questioning.  (R.R. v. 2, p. 32). Raul testified

that he lived with Manuel for two years when Manuel was four or five years of age.  When

not living with Fernie's family, Raul would visit the home weekly.  Raul, however, would

usually visit his brother on a daily basis.   Raul did not feel the need to visit as much when

Fernie was in prison because he knew Maria was treating the children better. (R.R. v. 2, p.

35)   When Fernie was beating the children, he would never let Raul see them. It was no

different from Fernie making Maria hide in the bedroom when people would visit, especially

---

[2]Vincent D.  Callahan, (Callahan), testified that he spoke to the uncle, also reflected in his
voucher.

if he she had bruises.  Raul only saw Fernie actually hit Maria once.  (R.R. v. 2, p. 36)

At this point in time, the State ran through the crimes that Raul had committed.  This was not something that hurt the Applicant's case, nor did it affect Raul's credibility because this was part and parcel of why he was called to testify.  (R.R. v. 2, p. 39)

On redirect examination, Raul continued on with details of Manuel's life.  Manuel was 14 or 15 when Fernie died.  (R.R. v. 2, p. 41) The "bruising" from the "spanking" that was testified to earlier, was elaborated as actually being red marks that would turn into welts from being beaten with a belt. (R.R. v. 2, p. 42) Manuel would be beaten if he did not do something as simple as house chores.  (R.R. v. 2, p. 44)

Next, the Applicant called Dr. Jack Ferrell, Ph.D., the psychologist appointed by Callahan, the first chair attorney. Dr. Ferrell went through his qualifications.  (R.R. v. 2, p. 45) He was appointed on July 23, 2002.  He was asked by Manuel's attorney to perform an evaluation as to Manuel's status and condition at the time of the offense and at the time of trial.  He was to be available to answer questions with respect to any other positions that might be affected by a forensic determination. (R.R. v. 2, p. 46) While interviewing Manuel, Dr. Ferrell testified that his answers kept going far afield from the questions being asked. (R.R. v. 2, p. 47) The attorneys requested that he not prepare a report, so he only maintained his notes.  Dr. Ferrell saw Manuel on August 9, 2002.  He had brief contacts with the attorneys between August and October. On October 21, 2002, he received information that

the State had previously provided the defense.[3]  This information reflected incidents of

October and November 1995 incidents.  He had no more contact with anyone until October

28, 2002. The trial was on-going and he was given some records to review.  This consisted

of referral information, elements of evaluations and orders of the court.[4]  (R.R. v. 2, p. 48)

There was also school data and jail disciplinary records.  It was Dr. Ferrell's impression that

the whole point of his testifying was to "future danger."  Dr. Ferrell testified that Callahan

had concerns about one statement within the school records that had been flagged by

counsel.[5]  Dr. Ferrell did not think that Manuel had a history of violence or a tendency to act

in a violent manner in the future.  He informed Callahan of this.[6]   (R.R. v. 2, p. 49)

Specifically, contained within the school records was one piece of information.  At this

juncture, the trial court did not allow further inquiry based on hearsay.  (R.R. v. 2, p. 50)

During the trial, Dr. Ferrell went downstairs to the cafeteria to review the records.  He

thought that both trial attorneys informed him that he would not be testifying.[7] Dr. Ferrell

---

[3]Presumably, this was the 404b notice, as testified to later by Callahan.

[4]Most of this information was juvenile record documents.

[5]Elaborated in detail later in the hearing, through both Dr. Ferrell and Dr. Katherine Dr. Allen, Dr. Ferrell's affidavit went into details about what he explained to Callahan about this statement, how he could explain it to the jury, and that he would testify favorably to the defense on the issue of future danger. (R.R. v. 2, p. 53)

[6]With a greater bias and no notes to refresh his memory as Dr. Ferrell had, Callahan testified that Dr. Ferrell told him that Manuel was a future danger. (R.R. v. 4, p. 10)

[7]Ed Camara does not believe he spoke to Dr. Ferrell during the trial. (R.R. v. 2, p. 71)

testified that he reviewed the documents for about one hour and spent 30 to 45 minutes discussing their content with the attorneys. (R.R. v. 2, p. 51) Dr. Ferrell's opinion was that Manuel's criminal record did not show a propensity for violence or significant disturbance. While in the juvenile justice system, Manuel received psychological evaluations every year. Based on the information that was contained in those documents, he felt his opinion at the time of trial was valid. Going back to the school records and the comment that had been flagged by the attorneys, Dr. Ferrell testified, at the writ hearing, that this comment was out of context and inconsistent with the rest of Manuel's records. He felt he could easily have explained this to the jury. Manuel was in 7th grade; it was 1993; it was many years earlier. It was the unsubstantiated opinion of one person who did not appear to have any psychological training.[8]  (R.R. v. 2, p. 53)

Dr. Ferrell was aware of the "weapon" incident. Initially he was confused because the State referred to it as an unlawfully carrying charge, however, Dr. Ferrell was thinking of it in the context of the gun being present during the burglary of a habitation. Manuel always denied that the weapon was his. Dr. Ferrell discussed some fighting incidents at an alternative placement center, explaining that this was not of concern because that behavior is typical of juveniles at alternative placement facilities. Again, Dr. Ferrell testified that all of this could be explained and the rest of the documentary evidence indicated Manuel had

---

[8]Dr. Allen will later go into greater detail on this same issue, ultimately forming the same opinion. (R.R. v. 3, p. 8)

good relationships with no violence.  With reference to the other petty offenses, Dr. Ferrell

testified that Manuel was open and direct with him. He showed no compulsions, aggressions,

or psychopathy. (R.R. v. 2, p. 53) Dr. Ferrell again testified that he informed the attorneys

of all of this. Dr. Ferrell reminded the court that he was relying heavily on his notes and that

five ½ years ago, he would have testified on the issues much better. (R.R. v. 2, p. 54)

On recross-examination, the State implied that Dr. Ferrell was not aware of the

weapon issue, however, a review of his previous direct examination indicated that he was

aware of the weapon, but believed that the context of the weapon incident could be explained

to the jury.   (R.R. v. 2, p. 55)  Dr. Ferrell was fully aware of the 1996 Burglary of a

Habitation incident. (R.R. v. 2, p. 56)  Dr. Ferrell reminded the State that when he saw the

weapon incident, he went back through all the records to make sure there were no other

weapon offenses.  Although he used reports for corroboration of his opinions, he was not

provided contact information for any other family members.  (R.R. v. 2, p. 57) Dr. Ferrell

agreed that if Manuel gave him incorrect information about his life, then his opinion could

be tainted.[9]   In response to not having family history information, Dr. Ferrell testified that

he did try to get with the attorneys on this matter. Dr. Ferrell testified that it is typical for

Hispanic males to not talk about abuse by their parents. It is a closed thing, called a

---

[9]However, Ann Matthews had obtained family history which did corroborate the
information contained in the documentary evidence, at the time of the jury trial. It was Callahan
that chose not to utilize it. As will be seen from Dr. Allen's testimony, her opinion was similar
to Dr. Ferrell's.  The information that Dr. Allen had was in the possession of the defense team at
the time of the trial.

"convoluted family dynamic." However, Manuel did seem to be direct and straight forward on all other issues. Dr. Ferrell was not present during any trial testimony. He only met with the attorneys in the cafeteria during the trial. (R.R. v. 2, p. 61)

The Applicant next called Edward Camara, the second chair trial attorney. (R.R. v. 2, p. 63) Camara testified that Raymond Fuchs was the original first chair attorney. A short time before trial, Fuchs withdrew from the case and Callahan was appointed to replace him. (R.R. v. 2, p. 64) Camara was upset about this appointment because, although he was friends with Callahan, he did not feel Callahan was reliable, as far as doing the necessary work.[10] Camara was aware that Callahan had a good reputation, but he had also heard things about his trial work as well as knowing him. At this point, the trial was only 30 days away. (R.R. v. 2, p. 64) Camara immediately filed a motion with the trial court expressing his concerns. Camara also explained that they were not ready and there had been no discovery. Apparently, Fuchs represented to the trial court that Camara was ready to proceed. Camara requested a continuance, which was denied. (R.R. v. 2, p. 66) Camara then filed a writ of mandamus to the 4th Court, which was not granted.

While preparing for trial, Camara was assigned the guilt/innocence phase of the trial and Callahan was to work on punishment. It was Callahan who had filed the motion getting Dr. Ferrell appointed. The time of this was 2002 and Camara did not know that mitigation was a real concern for trial. The only difference in his mind between a capital murder and a

---

[10]They had worked on a capital previously.

8

murder trial was the voir dire process. (R.R. v. 2, p. 67)  Camara said that they never talked about punishment.  Callahan said not to worry about it because he had filed a motion to get the psychologist appointed.  (R.R. v. 2, p. 69) This was the full extent of punishment preparation. Jeff Mitchell, their court-appointed investigator, mentioned mitigation. Camara, at that point in time, did not know what a mitigation specialist was.  Mitchell suggested a mitigation specialist be appointed. (R.R. v. 2, p. 70)  Camara filed a motion independent of Callahan.  Because he was assigned the preparation on the guilt/innocence phase, Callahan was not working on that either.  (R.R. v. 2, p. 71) Callahan never met with Dr. Ferrell, pretrial, although Camara did.  Camara does not recall Dr. Ferrell being present during the trial, although Dr. Ferrell had thought both attorneys were present with him in the cafeteria. (R.R. v. 2, p. 50) There were no strategical meetings with Dr. Ferrell and Callahan.  (R.R. v. 2, p. 72) Feeling frustrated during the punishment phase of the trial, Camara took over much of the cross examination of the State's punishment witnesses because Callahan was not asking many, if any, questions.  (R.R. v. 2, p. 73)

Camara was aware that Ann Matthews, the mitigation specialist, had interviewed Manuel's family and close friends. She obtained the school records. However, Camara and Matthews did not get along because she was always asking to get paid.  At some point prior to trial, he terminated her services. (R.R. v. 2, p. 74) Camara did not get another mitigation specialist appointed and neither did Callahan. Camara testified that they just "let it go - dropped that ball." Camara said that he did not know how important mitigation was. No

9

punishment or mitigation strategy was ever developed.  (R.R. v. 2, p. 75)

Camara testified that he was not up on capital murder continuing legal education seminars.[11] The first capital murder seminar Camara attended was not until July of 2003, "...but that was too late for Manuel." (R.R. v. 2, p. 76) Camara testified that Callahan did not believe in mitigation type evidence and did not want to develop it.[12]  (R.R. v. 2, p. 76)

Camara testified that in preparation for trial, he interviewed the State's eyewitness, Erica Henderson.  Henderson was the only witness that actually saw the event.  Camara testified that he recorded his interview.[13] (R.R. v. 2, p. 77) The problem with Henderson was that on direct examination at the jury trial, she testified that she did not think the shooting was an accident.  While being previously interviewed by Camara, she told him that upon thinking about the shooting from that point of view, it was possible the shooting could have been an accident. Henderson told Camara that the State had never asked her that opinion before. At trial, when asked about this prior inconsistent statement, Henderson only testified that Camara implied to her that it was an accident. She was never allowed to testify about her statement to Camara that she believed it could have been an accident.  The trial court would not, at trial, nor at this hearing, allow any evidence to support the prior inconsistent

---

[11]When appointed by the court, the legislation requiring capital murder seminars to be eligible to accept appointments, was not in effect yet.  However, it was by the time of trial.

[12]This was later substantiated by Callahan. (R.R. v. 4, pgs. 20-27)

[13]At the time of this hearing, Camara was able to locate the actual tapes, but he did have the transcription of the interview. However, these tapes were later located and are available.

10

statement. The trial court held that the testimony of Camara, where he had implied to Henderson that the shooting was an accident during their interview, was sufficient for impeachment purposes. Applicant wanted this additional evidence for impeachment of Henderson's prior sworn testimony which was in direct conflict to her statement to Camara. (R.R. v. 2, p. 79)

Camara was passed for cross-examination. (R.R. v. 2, p. 90) He testified that he met with Dr. Ferrell but Callahan never did. (R.R. v. 2, p. 90) Camara explained that he did not understand mitigation and was not present with Callahan and Dr. Ferrell on the day of trial. (R.R. v. 2, p. 91) Camara testified that Matthews told him which family members the defense team needed to speak with. (R.R. v. 2, p. 92) Camara informed Callahan of this information because he was in charge of punishment witnesses. Callahan did not seem to be in agreement with Matthews' assessment of the value of these witnesses.[14] Camara did not disagree with Callahan's assessment because he did not understand mitigation development. Camara said that they did not know who to call to testify because "we did not investigate mitigation" and were not paying attention to any of Matthews' recommendations. Therefore, there was no investigation for mitigation witnesses. (R.R. v. 2, p. 93) Camara testified that he trusted Jeff Mitchell, but he was only the investigator for the guilt innocence phase of the trial.[15]

---

[14]The main witness at issue for Matthews' purposes was Raul Gonzales.

[15]There was no reason why Mitchell could not have continued on in Matthew's absence, except that Callahan would not have allowed it.

11

Camara also testified that he was not listening to Matthew's recommendations because she would not stop requesting to be paid. (R.R. v. 2, p. 94) Therefore, he terminated her services. (R.R. v. 2, p. 95)  Camara did not inform the trial court of his problems with Matthews because in his mind, mitigation was not that "big a deal," testifying that he was only "kind of" familiar with the special issues in a capital murder trial. (R.R. v. 2, p. 99) Camara did speak to Manuel's mother and sister Corrina. He never spoke with Manuel about mitigation; neither did Callahan. Only a few minutes before their testimony, were Manuel's mother and sister spoken with.  Further, he was not certain if Manuel's entire criminal history was reviewed.  (R.R. v. 2, p. 98)

On redirect examination, Camara testified that his idea of "mitigation" development was to call family members to ask the jury for mercy in an attempt to invoke sympathy. Callahan concurred with this. (R.R. v. 4, p. 23 - writ record; v. 33, pgs. 83-85 - trial record - closing statement - see infra at page 52) In the previous capital murder jury trial that Camara had with Callahan, this was all they presented as their punishment evidence. Camara's testimony completed and the hearing recommenced on March 31, 2008. (R.R. v. 3)

Prior to testimony, the Applicant presented a motion objecting to the show of force by the San Antonio Police Officers Association, present in great numbers in the courtroom, in full uniform.  (R.R. v. 3, p. 6) They were not present at the prior hearing, however, they learned of this hearing the night before and quickly coordinated their presence. The argument

12

was that this type of show was for intimidation purposes. There were potential lay witnesses testifying at the hearing for the Applicant. Staring at a sea of police officers would potentially intimidate someone which could cause a change in testimony. Further, this show could intimidate the trial court in her potential findings and conclusions because she would be seeking their support should she ever get an opponent for the bench in the future. This motion was denied. (R.R. v. 3, p. 7)

Dr. Katherine Dr. Allen, Ph.D., was called to testify. She had been exempted from the rule and had observed all of the testimony received at this point. (R.R. v. 3, p. 8) She was appointed two ½ years ago. She reviewed the individual probation records of October of 1995. She reviewed Manuel's handwritten plan of action dated May 22, 1996. She reviewed the Bexar County Juvenile Information System Child Face Sheet and Referral Summaries, dated September of 1997. (R.R. v. 3, p. 9) Dr. Allen reviewed the discretionary transfer hearing report dated June of 1996. She reviewed Dr. J.O. Sherman's psychological evaluation also dated June of 1996. There were also strategies for juvenile supervision interviews dated October of 1995. Dr. Allen was also provided the time line of events and summary of facts of Manuel's life and childhood developed by the mitigation specialist. Finally, Dr. Allen reviewed the report of Dr. Susana Rosin, which was the initial psychologist that was sent to evaluate Manuel for purposes of this writ. Dr. Allen created a report and affidavit in October of 2004. Dr. Allen was specifically requested to review the documents provided to Dr. Ferrell by Callahan back in 2002. (R.R. v. 2, p. 9) She was requested to

13

review the documents with a view to whether she agreed with Dr. Ferrell's opinions formed in 2002 and how details of Manuel's life could have been presented to the jury.[16]

Dr. Allen explained that evaluators examine a repertoire of behavior, i.e., was the person's development normal or troubled. If it was troubled, was there community intervention, IQ tests, reviews of academic progress and psychiatric diagnoses? Dr. Allen takes the documents and combines them with the family background history and social dynamics. Dr. Allen testified that an evaluator wants to know about each parent and how they came to be together and how they functioned as a family. Manuel's parents were very young when they married. Maria, Manuel's mother, was 14 years of age. Fernie was two years older. Maria had Corrina when she was 16 and Manuel when she was 17. Four or Five years later, the other two children came along. (R.R. v. 3, p. 13) There were many people living in the household in the early years. Dr. Allen testified at great length about the troubled and difficult childhood that Fernie had, which was corroborated by Raul, Fernie's brother. (R.R. v. 3, pgs. 13, 14) All male siblings in Fernie's family went to prison. Maria had a brother who also went to prison. Prison was very standard on both sides of the family. It was a cultural norm for them. Fernie did not know how to discipline the children and was extremely controlling of Maria, never allowing her any outside contact with others. (R.R.

---

[16]Dr. Allen was asked to base her affidavit on the information at the time of trial because Manuel, after so many years in prison, would be different now and current information on Manuel could skew the opinion that was formed in 2002. (R.R. v. 3, p. 12)

14

v. 3, p. 14)   Dr. Allen testified that when young children observe abuse of this kind in the home, whether it is upon them or others, it is called "child abuse by proxy."   When the children see the other adult protector being battered, there is a level of fear and intimidation present every day of their life.  However, in Manuel's situation, the children were abused as well. There was also a reference to molestation by Fernie on one of the children. (R.R. v. 3, p. 15)

Fernie's discipline was off in terms of functionality.  It was one sided which is the most "pernicious" kind of child rearing discipline.  Fernie was fully engaged in criminal activity.  He was using and selling drugs.  His life was all about crime and incarceration and moving and running from those in authority and those who might want to cause him trouble. When Fernie was not incarcerated, he was an inconsistent disciplinarian.  Dr. Allen testified that there are four variables of discipline that is important for children:

1. Firm and consistent. (This is the best)

2. Inconsistent and firm.

3. Consistent and permissive.

4. Inconsistent and rigid - applicable to Fernie.

Dr. Allen testified that number four was the worst kind of discipline.  Fernie could be rigid and extreme with his abuse and then, at times, permissive. (R.R. v. 3, p. 16) Dr. Allen testified that permissiveness is not good but it is better than being inconsistent. This kind of

parenting affects what Dr. Allen called the "internal focus of control."[17] Manuel's internal controls could not be learned from his parents. Fernie's children had to develop this on their own and children generally mimic what they see at home. (R.R. v. 3, p. 17) One of the things Manuel observed was stealing to support the family. This behavior was normalized. Manuel could not easily have gone in a different direction.   Maria had a better sense and intuition about discipline. However, with Fernie's extreme humiliations, she too overloaded and depressed to make much difference. She could be inconsistent as well. (R.R. v. 3, p. 18) Dr. Allen testified that even with parental abuse, children can still idolize that parent. It is called a "trauma bond."[18]  (R.R. v. 3, p. 19)

Dr. Allen then discussed the effect that Fernie's death had on Manuel.  It was a life altering event.  Even to this day, Manuel was not emotionally recovered. Prior to his father's death, Manuel would shoplift a little, but after the death, the criminal behavior escalated. Also, Manuel had deep disappointments with his mother and her actions after Fernie died. He felt left alone as the head of the household. He felt he had to earn a living.  In honor of his father, he pursued the same career. Also, it was only one he knew. (R.R. v. 3, p. 20) This pursuit of career caused truancy at school and finally Manuel moved out of the home. Manuel would come and go from the home.  By this time, he was only 14 years of age.  After the

---

[17]Dr. Allen went into great detail as to the meaning of "internal focus of control."

[18]Dr. Allen will testify later that the DSM IV is looking to be revised around 2012 to take into consideration trauma in the evaluation process. (R.R. v. 3, p. 81)

death of his father, Manuel began stealing cars and breaking and entering in earnest. Dr. Allen testified that this is referred to as a "pedigree or a genogram."

Manuel was very disappointed and angry with his mother. (R.R. v. 3, p. 21) He has never forgiven her for not safeguarding an heirloom, i.e., a motorcycle, that was important to Fernie and was supposed to be Manuel's. Further, there were speculations about Maria being involved with other men. Even if this was untrue, it would have a profound effect on someone so young. All of this had some bearing on Manuel's behaviors.

After the father's death, Manuel was the oldest boy, so it was his place to take over. (R.R. v. 3, p. 22) When Fernie was alive and not in prison, he was very controlling and did not allow Manuel to have friends. Right before his death, Manuel found some friends. At this point in time, Manuel was 13 years of age going on 14. One friend in particular, named Ronald, was the "leader" type and taught Manuel how to be better at stealing cars. This was in addition to what Manuel had learned at home. Eventually, Manuel began to operate on his own. During this time, Manuel attempted to maintain a real job. However, to support the family, they would never pay enough and would not last long.[19]

When an adolescent engages in high risk activities such as stealing, it can bring on a high, which, in the adolescent brain, leaves an imprint: "what fires together, wires together."

_____

[19]Later, Manuel's life plan was again referenced. He wanted to have a normal life, with a job and a family. Manuel got involved with a young woman who already had a child and he wanted to take care of her and get a real job. Manuel also wrote that he did not want any part of violence or guns, desiring normalcy. (R.R. v. 3, p. 35)

(R.R. v. 3, p. 23) The adolescent brain is the key to this because at ages 14-17, the brain is "very, very" dynamic in its formation. [20] When engaging in high risk behaviors, which can be frightening as well as exciting, Manuel's brain literally got imprinted or entrained to feel that risk and want that rush. Dr. Allen explained it was not like a drug high, but more like a runner's high. Manuel hated to get caught so his solution was to run away. This instinct also became imprinted on his adolescent brain. Manuel did not fight back. He never prepared to engage or confront someone.[21]

Dr. Allen testified that all of the TYC information indicated that Manuel was not a violent youth. He did not act out, however, he still needed psychological help. Dr. Allen explained that in her career, males with Manuel's background develop a lot of anger and act out, reeking havoc. This type of behavior is generally referred to as a conduct disorder. Manuel did not have those problems, although Dr. Sherman's 1997 probation report gave Manuel a conduct disorder diagnosis. Dr. Allen vehemently disagreed with this uncorroborated assessment. Manuel was depressed over those years and this can cause some behaviors that are the "form of expressing depression." (R.R. v. 3, p. 25) Going over the criteria for conduct disorder, Dr. Allen testified that Manuel did not the criteria. Dr. Allen

---

[20]Such was the reasoning behind *Roper v. Simmons*, preventing executions of children who committed the crime under age 18. (543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed. 2nd 1)(2005)

[21]In the reports, there was an incident where an older woman saw Manuel in the process of stealing a car. When she told him to stop, he responded "yes, ma'am," and ran away.

stated that one must meet three of the criteria. Burglary is one.   Stealing without confrontation on nontrivial value items was a second.  Manuel had both of those. There was no third criteria applicable to Manual, although Dr. Sherman said Manuel had conduct disorder.  Dr. Allen did not believe that Manuel could be put into any of the criteria that deal with an angry young person acting out his anger.[22]

Dr. Allen was asked to explain why Dr. Sherman gave a diagnosis of conduct disorder.  She explained that he did not document his reasoning.  He did not perform a 5 scale/5 axis diagnostic.[23]   Sherman did not do a complete diagnosis. Dr. Allen testified that she has been diagnosing for 30 years and she does not believe that Manuel meets conduct disorder criteria. (R.R. v. 3, p. 28) Dr. Allen explained that many times when a young person is in trouble with the law, many evaluators will find a bias. "We will just kind of see him in some of the criteria sets when they really had not done that yet because their behavior is so troubling."[24] Evaluators can have preconceived ideas and biases that they might not be aware of which causes an over-diagnosis.

Diagnosing a child with conduct disorder is an alert that the child is not developing

---

[22] The State will later try to trip Dr. Allen up on this, however, she was able to psychologically explain everything that the State presented to her. (R.R. v. 3, p. 65)

[23]For purposes of some brevity, Dr. Allen explained this explained this as mood, thoughts, behavior axis.  It was explained in great detail on pages 26-27.

[24]Dr. Allen also explained that meeting with a defendant can bring on more biases than reading cold records. (R.R. v. 3, p. 28)

properly. However, once that is done, all the attention becomes focused on behavior and no attention is focused on thoughts and feelings. If you look at diagnostic criteria on conduct disorder, there is not one that has to do with trauma, anxiety, depression, phobias or obsessions. Violence is not necessarily a prerequisite to having a conduct disorder.

There are difficult and separate criteria for stealing and confronting a victim and stealing and not confronting a victim. Manuel was passive with no confrontation issues. Within the context of predicting a child's future violence, Dr. Allen discussed a 30-year study on future danger that came up with factors that predispose a young person to be violent. This study discussed risk versus protective factors. (R.R. v. 3, p. 30) Protective factors, explained later in her testimony, deal with a child's own constitution that mitigates toward nonviolence. This "remarkable" study was done in 1995, being a marker in the juvenile justice literature. A "re-up" study was done in 2001, which brought variables into the analysis. So, if you look at someone like Manuel, and you look at his absence or presence of protective factors, whether he had all of them, none of them, few of them, or most of them, the results are predicted values with scientific predictive powers. (R.R. v. 3, p. 31) In Manuel's case, using both studies, Manuel had many risk factors and few protective factors. Some of the variables are environment and constitutional. This means whether the young person is of average or low intelligence; experienced a brain injury or not; was exposed to perinatal substance abuse or not. In her affidavit filed with the writ, Dr. Allen listed the factors that applied to Manuel. Environmental risk factors were very prominent, but the constitutional factors were not.

Therefore, Manuel had a risk for violence as an adolescent but did not manifest that violence. This was an important distinction for Manuel. [25]

Obviously, a conviction for capital murder is a violent event. Manuel has been in prison continuously. The structure of prison can also have an effect on propensity for violence. It usually lessens the propensity because the person "ages out." Another reason for the lessening of a propensity for violence in general is the structure of a prison system. (R.R. v. 3, p. 35)

Prior to testifying, Dr. Allen had been made aware of a few issues that had occurred while Manuel has been in TDC. One of these incidents dealt with a typewriter "shank" found in his cell. However, the reports indicate he was not using it in any threatening manner. (R.R. v. 3, p. 36) Dr. Allen did not want to speculate but it was possible Manuel felt he needed it for protection. However, this would not be something that would change her opinion about Manuel. Ultimately, Manuel had no control over his choices because of the influences of his parents. Not discounting the reason why we were present in court, Dr. Allen said that if we were to look at Manuel's life before this happened, especially with Fernie no longer in his life, Manuel had a chance of outgrowing that part of his behavior as he got older and could have had a responsible, crime-free life. (R.R. v. 3, p. 41)

On cross examination, Dr. Allen explained that Manuel is a "runner." Confronting

---

[25] Acknowledging the extreme complicated nature of this type of analysis, Dr. Allen explains in detail at pages 31-34.

someone to kill that person would be anomalous for him. Trying to get away from a police officer would make much more sense in light of Manuel's history of turning and running instead of confronting to fight. (R.R. v. 3, p. 45) It was her clinical, professional opinion that for Manual to act out violently in the future would be surprising.

The State then turned to conduct disorder. (R.R. v. 3, p. 50) One cannot get a diagnosis of adult antisocial personality disorder unless they also had conduct disorder. However, you can have conduct disorder and grow out of it, not becoming antisocial. Dr. Allen repeated her major and extreme disagreement with Dr. Sherman's diagnosis. The State then walked Dr. Allen through the many criterions for conduct disorder. (R.R. v. 3, pgs. 52-54) When given the opportunity, Dr. Allen pointed out that what was important was the criteria Manuel did not qualify on over the ones that he did. The State inquired as to the criteria of running away from home. Dr. Allen did not consider Manuel's leaving home at 14 as running away. His mother did not call the police. CPS was never involved. It was more the situation of Manuel emancipating himself. Moving out at a very early age was a cultural norm in that family. (R.R. v. 3, p. 60) Running away from the halfway house was also not considered by Dr. Allen as a criteria for Manuel, explaining that we do not know why he did so. It could be the circumstance at that halfway house were untenable. Dr. Allen reminded the State of the scandalous circumstance that was revealed only a few years earlier at TYC. Dr. Allen would want more facts before she gave an opinion on that. (R.R. v. 3, p. 65) Next, the State references the criteria of early sexual behavior, citing page 96 of DSM

22

IV. Dr. Allen pointed out that you need to evaluate that section in connection with another section in the DSM IV that requires the evaluator to take into account cultural norms. In Manuel's culture, early sexual behavior was considered normal. (R.R. v. 3, p. 61) These "cultural" diversities between societal groups was why the DSM IV was revised. (DSM IV R) All the drinking, smoking, stealing and sexual activity was very acceptable in the culture that Manuel was raised. None of this behavior would have been considered "acting out." (R.R. v. 3, p. 63)

The State next discussed a "gang" reference in the documentation. Dr. Allen responded that there was a gang reference in Manuel's records around the age of 13, then it never surfaced again. Dr. Allen inquired of the mother and she said it was four or five boys that "kind of declared themselves to be a gang." There was no gang dress or any other signifiers of gang activity. If there had actually been gang activity, the records would have contained those references. Again, the fighting at the alternative placement center was referenced. Just as Farrell felt this was not an important issue because that is the kind of thing that happens at those types of facilities, (R.R. v. 2, p. 52), Dr. Allen felt that juvenile boy fighting also to be an unremarkable fact, as this is typical behavior across cultural groups. (R.R. v. 3, p. 65)

The State next asked about the "rush" from criminal activities, discussed earlier. Dr. Allen explained that "fight or flight" is partially a neurological response. Manuel established an imprint on his brain to run. (R.R. v. 3, p. 67) This is not like a drug high, in that it would

not lead to riskier behavior. Manuel had his limits and he was very consistent within those limits. Further, by now, Manuel has "aged out" within the structure of prison. (R.R. v. 3, p. 68) Dr. Allen discussed that Manuel's drinking and use of marijuana was not a major part of who Manuel was, notwithstanding that this activity would not be a conduct disorder criteria based on the cultural norm analysis. (R.R. v. 3, p. 70) The State discussed an incident at prison where Manuel exposed himself while masturbating. Dr. Allen says the criteria for conduct disorder refers to "unwanted sexual activity." Masturbation is not considered "unwanted sexual activity." It is more like exhibitionism, which is very typical in prison. (R.R. v. 3, p. 71)

On redirect examination, Dr. Allen explained that the conduct disorder criteria cannot be viewed in a vacuum. That is why the DSM IV was revised (DSM IV R) to add in cultural and environmental factors. (R.R. v. 3, p. 76) At this point, Dr. Allen went into a detailed diatribe of the problems encountered when thinking of the DSM IV as a "bible" for diagnosis.[26]

The State inquired as to whether it matters at all if a person, committing crimes, is aware that he is breaking the law. Dr. Allen explained that there is such a thing as a "criminal subculture." This is when law abiding behavior can get someone within that criminal

---

[26]In the interest of relative brevity, the problematic issues that Dr. Allen has with relying too extensively on the DSM IV are not necessarily relevant for the purposes of these proposed findings, but can be read at v. 3, pgs. 76-79. However, on page 78, Dr. Allen does discuss some of these problems with respect to Manuel.

subculture into trouble; just as criminal behavior can get someone into trouble when they do not live in a criminal subculture. Manuel knew stealing was against the law, but in his world, it was more acceptable than being law abiding. He wanted more for himself, but the criminal subculture made it almost impossible. It was precisely the need to recognize these extreme cultural differences that brought about the necessity for the revision of the DSM IV in 2000 resulting in the DSM IV R. Adding in "trauma" to the analysis will be part of the 2012 revision. (R.R. v. 3, p. 81)

Dr. Allen reiterated that when Manuel was scared, he would flee because he could not think things through. He could not remember lessons, if any, learned from the past. Just like a young child, he would run.  With structure and maturity, the culture of the general population can help him limit himself.  Although Dr. Ferrell's and Dr.  Allen's opinions about Manuel's propensity for future violence were essentially the same, the State felt the need to point out that two doctors looking at the same person can have differing opinions. (R.R. v. 3, p. 83)

On April 23, 2008, defense rested and the State called the first chair attorney, Vincent D.  Callahan. (R.R. v. 4)  Prior to this, however, the Applicant informed the court of certain preliminary matters dealing with the violation of the Rule. Applicant filed a motion alleging that the State had informed Callahan of the substance of Camara's testimony knowing that it would convince Callahan to testify. (R.R. v. 4, p. 4) Enrico Valadez said that he "ran into" Callahan in the hall and Callahan asked what had happened in the hearing and inquired.

Based on what Valadez told him, Callahan decided he would testify, notwithstanding that for some time prior to the hearing, Callahan was informing both sides that he would "gut" whichever side called him to the stand.   The trial court ruled that the Rule had not been violated and wanted the defense to make any further inquiry on credibility issues in cross-examination. (R.R. v. 4, p. 6)

The State called Callahan to the stand. He testified that he spent three hours preparing for the punishment phase of the trial and 10 hours in preparation for guilt innocence. Callahan testified that he gave Camara the guilt innocence phase of the trial, and he took pretrial motions, suppression hearings, and the punishment phase of the trial. (R.R. v. 4, p. 8) Callahan was in charge of voir dire, however, he split that responsibility. (R.R. v. 4, p. 10) Callahan testified that Dr. Ferrell told him that he would testify that Manuel was a future danger. This is completely counter to Dr. Ferrell's testimony, who had the benefit of his notes to refresh his memory.[27]   Callahan testified that he only sent the 404b notice and discovery from the State to Dr. Ferrell. He only called three people to testify at punishment. He did not subpoena anyone because he did not want to turn them into reluctant witnesses. However, the only people Callahan was referring to were members of Manuel's family. (R.R. v. 4, p. 11) Raul Gonzales testified at the writ hearing, had he been contacted he would

---

[27]Dr. Ferrell had no motivation or bias to shade the truth.  Much of Callahan's testimony reflects an inability to remember very important details about this trial. Callahan's memory only seems to work when remembering "petty" things Camara allegedly said to Callahan.  Callahan used this as an excuse to accuse Camara of lying in this hearing.

have testified. (R.R. v. 2, p. 33)

Quickly, the State passed Callahan for cross-examination. (R.R. v. 4, p. 12) Callahan immediately denied that counsel for Applicant had informed him on several occasions that Camara would testify in the probable manner that he did. He said that he only knew because Valadez told him. Callahan said, as opposed to the State's representation, that he went by Valadez's office in the appellate section of the District Attorney's office and inquired of him what was happening in the hearing. (R.R. v. 4, p. 13) Callahan acknowledged that he had told both the State and the defense that he would "gut" whichever side called him to testify. Deciding that he would not "gut" the State, Callahan said that Valadez gave him a general summary of what had been testified to by Camara, i.e., that he, Callahan, had abandoned punishment.

Callahan was shown a photograph of Applicant's counsel's cellular phone screen which indicated a text message sent to that phone from Callahan's phone on March 25, 2008, the day following Camara's testimony. (DX A; R.R. v. 4, p. 14) Specifically, the text read: "Heard Ed gutted me and threw me under the bus. I will testify for State. Ed brought this, not me. I warned you." After reading the text, Callahan was asked how he can "gut" both sides without being willing to be untruthful as to one side. Callahan agreed that you cannot hurt both sides; that the truth would obviously lie only on one side. His explanation was that he would "just speak about the case that would have hurt the [Applicant's] case." (R.R. v.4, p. 15) As to this issue, the State redirected questions to Callahan.

During argument on the issue of whether the Rule had been violated, the State argued that Callahan was only given information about the testimony because Callahan was not going to testify.  Applicant responded that the State knew that in telling Callahan what Camara had testified to, this would cause Callahan to change his mind about testifying, violating the Rule.  It is standard procedure that when a witness might testify, they are not to be given any information about prior testimony in case they are called to testify.  ON this issue, the trial court denied the motion and refused to strike the testimony of Callahan.[28] (R.R. v. 4, p. 17)

Recross examination on substantive issues resumed.  Callahan testified that he did not have the mitigation specialist appointed; she was on the case when he was appointed.  He did not want to use her because he had never heard of her and she wanted to get "paid all the time."  He never made an attempt to speak to her or respond to her letters.  Callahan testified that he never spoke to Raul Gonzales.  Raul Gonzales' affidavit indicated that he only spoke to Matthews pretrial.  Callahan's voucher indicated that he did speak to him.  (DX D) Whichever is the truth, Callahan took no steps to reach out to inform him of the need for his testimony at trial.  (R.R. v. 4, p. 19)  Callahan testified that he only spoke to the family members who showed up, subpoenaing no one.  Callahan was asked to review his voucher to indicate the times he conferred with members of Manuel's family.  Page 6 of the voucher,

---

[28]Considering the testimony that was to come from Callahan, this did not hurt the Applicant's case.

(DX - D), indicated that on October 17, 2002, he conferred with the "client's mother and uncle." (R.R. v. 4, p. 20) Callahan testified that he also spoke with them during a break in the jury trial, as he walked down the hall.  Callahan said he explained that "under 37.071, the defendant's background, mental capacity, character and family difficulties, troubled youth and things like that come in." This would seem to indicate that Callahan was aware of what could be developed.  However, calling Corrina and Maria was the only way he chose to develop this evidence, notwithstanding that Dr. Ferrell stated he could explain the one problem in the school records and that he would testify that Manuel would not pose a "future danger." Obviously, Callahan, without benefits of notes, testified differently.[29]  Callahan remembered that the uncle testified, which he did not. (R.R. v. 4, p. 21)  Callahan was asked if he was aware that the *Wiggins* case required more development of mitigating evidence.[30] His response was that after he received discovery from the State, he requested Dr. Ferrell examine Manuel's mental health, acknowledging that this was standard even before the opinion in *Wiggins*.  (R.R. v. 4, p. 22) Callahan acknowledged that he only developed Manuel's troubled youth through his sister Corrina, with a view toward eliciting her opinion that Manuel would not be a future danger.  Callahan testified that he wanted the family for the purpose of asking for mercy as well.  (R.R. v. 4, p. 23) Callahan was asked if he recalled

---

[29]In many areas of this hearing, Callahan could not remember what would seem to be important areas of the trial, while remembering relatively inconsequential areas, such as remarks of Camara.

[30]*Wiggins v. Smith,* 539 U.S. 510, 537 (2003)

conversations he had between himself and Applicant's counsel referencing the school records. (R.R. v. 4, p. 24) Callahan claimed not to remember these conversations.

On redirect examination, the State inquired if Dr. Ferrell ever asked for additional information. Callahan responded that he was given all that the defense had.[31] (R.R. v. 4, p. 25) Callahan testified that he does not ever rely on psychological expertise on how to proceed.[32] Callahan testified that, in his experience, mitigation experts are not effective. (However, he has never utilized them properly and has never obtained anything but a death penalty in any of his death penalty jury trials.) Incredibly, Callahan testified that some judges do not allow this testimony.[33] Referencing back to Callahan's voucher, Callahan discussed that his voucher was not reflective of all time put in on the case, such as walking down the hall while talking to family members. However, the voucher does appear to be reflective of the time spent with Dr. Ferrell, because Callahan's testimony of communications concurred with Dr. Ferrell's notes about contact with the attorneys. (R.R. v. 4, p. 27) Callahan testified

---

[31]Dr. Ferrell had testified that he tried to get hold of the attorney but was unable to do so. Just as the trial court had earlier opined that she did not think anyone could ever tell Callahan what to do, it is doubtful that Callahan would have listened to anything Dr. Ferrell had to say anyway.

[32]This statement begs the question as to whether Callahan actually heard what Dr. Ferrell told him about Manuel's lack of future danger propensity.

[33]However, if someone has a Ph.D. in a psychiatric field, the testimony is going to be allowed. It is not the standard procedure for the mitigation specialist to testify. Their work is performed in pre-trial mitigation evidence investigation.

that he was answering questions truthfully. Not remembering major aspects and details of the

punishment phase, Callahan claimed that because Camara wanted to be appointed first chair,

six years ago, he was bitter and was willing to commit perjury about Callahan

ineffectiveness. However, Camara did not only testify to Callahan's ineffectiveness, but to

his own as well. Over objection, Callahan was allowed to speculate as to Camara's

unexpressed thoughts. Notwithstanding all the important details that Callahan had no

memory of, or remembered differently from the memorialized notations of his doctor, he

remembered being "scolded" by Camara during the voir dire process. Callahan claimed that

this was because he wanted to focus on punishment issues and Camara wanted to focus on

guilt innocence issues. This would seem an accurate statement because Camara was very up

front about his lack of understanding about the importance of the punishment phase of the

trial. (R.R. v. 4, p. 28) Callahan had wanted "psychologically soft" people for the jury. (R.R.

v. 4, p. 29) Interestingly, with reference to Camara and his comments to Callahan during trial,

he now remembers the issue of the school records, notwithstanding that he had no memory

of that issue earlier in his testimony. (R.R. v. 4, p. 24) Callahan also remembered when

Camara insultingly called him a "third chair" while disagreeing with him over the school

records.[34] (R.R. v. 4, p. 31)

---

[34] Although claiming that it was Camara who was testifying from animosity, Callahan
certainly appeared to be possessing quite a bit of animosity toward Camara. This anger caused
Callahan to remember minutiae of details of arguments between himself and Camara, while not
remembering vital aspects of the actual trial and the mitigation evidence.

31

With reference to DX D, Callahan's voucher, it indicated that he had a telephone call with Dr. Ferrell on July 19, 2002, lasting ½ hour. On July 22, 2002, he sent a letter to Dr. Ferrell that took 15 minutes to prepare. Another letter was sent in October and finally, Callahan conferred with Dr. Ferrell for 30 minutes during trial.[35]  (R.R. v. 4, p. 32)

Back on recross examination, Callahan testified that he keeps himself well read on the law, reading it as it develops. Applicant inquired if he was aware of the *Wiggins* opinion. (See FN 30),  and its discussion of the necessity for the better development of mitigation evidence in capital murder jury trials.  Callahan answered, "well, that was the argument." Callahan stated that in interpreting *Wiggins*, some say you have to use an actual expert, but he believed that *Wiggins* only required the development of potentially mitigating information from the defendant's background.[36]  "It did not say, 'in my opinion,' that you needed an expert to do that."  Callahan was asked if he was aware if most capital murder attorneys use psychological experts for mitigation development, and he responded, "No, I was not aware of that." (R.R. v. 4, p. 33) Callahan did acknowledge that most jurors consider family member testimony to be biased but it never occurred to him to elicit this information through an unbiased expert. (R.R. v. 4, p. 34)  Callahan stated that he has never been found to be

---

[35]Except for the few minutes that Callahan spoke to family members, this would appear to be the sum total of his preparation for punishment.

[36]Since the creation of the special issues, this minimal amount has always been required. *Wiggins* required more. The Seventy-Second Texas Legislature amended article 37.071 of the Code of Criminal Procedure to provide for instructions concerning mitigating evidence in capital cases. See TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon Supp. 1992).

ineffective in a capital murder case. He was asked about his appellate work. Applicant asked him about the Diana Morin opinion, which was issued on April 2, 2008. Callahan was the appellate attorney on this case. Morin had been charged with capital murder, although the State was not seeking the death penalty. Morin had been convicted of murder. Callahan claimed to be aware of the opinion, but as of April 23, 2008, he had not yet read it. (R.R. v. 4, p. 34, DX E, not requested to be admitted as it was a Court of Criminal Appeals decision.) Callahan claimed not to know what the opinion said, although he was aware that he had been held to be ineffective in his appellate capacity. Objecting to this testimony, Applicant responded that this goes to Callahan's apparent habit of not keeping up with the law, or if he disagreed with the precepts and requirements of the law, he chooses to ignore it. This was part of the dicta in *Morin*[37] and it was the alleged claim of the Applicant with reference to Callahan's apparent ignoring of the requirements of *Wiggins*.[38]

---

[37]*Ex parte Morin*, 2008 WL 902143 (Tex.Crim.App)(unpublished)

[38]One would think that if an opinion was issued holding you ineffective, you would want to read it as soon as possible to know what was said, so it would not happen again.

## CONCLUSIONS OF LAW

*Trial Counsel's Failure To Adequately Investigate And Present Evidence That Would Have Resulted In A Sentence Less Than Death and Failure to Explain the State's Future Danger Evidence in Violation of Manuel Garza's Sixth Amendment Right To The Effective Assistance Of Counsel.*

Callahan testified that it was a foregone conclusion that his client was going to be convicted. This would seem to bring on the sense that proper preparation for punishment was essential. Callahan's apparent disdain for "mitigation type" evidence prevented him from complying with the requirements of *Wiggins* in developing the mitigating evidence. Dr. Ferrell testified from his doctor's notations that he informed Callahan that he could have easily explained the one issue contained in the school records and that otherwise he would have testified favorably to the defense on the issue of future danger. Callahan conveniently remembered this differently, without benefit of notes. Callahan's memory of the jury trial, in other areas was also faulty, remembering that Raul Gonzales testified when he had not. The sum total of defense mitigation evidence came from Applicant's sister, Corrina, and his mother Maria. Callahan had acknowledged that jurors consider this evidence to be biased. Further, Corrina and Maria could only testify to the existence of the abuse within their family structure. They also did so on a very limited basis, providing nothing more than generalities. They also had no expertise in how this generalized abuse would translate to Applicant's development and propensity for future violent acts. Much of Callahan's failure emanates from his disdain for mitigation evidence and refusal to follow the requirements of the case

34

law interpreting the statutory sections applicable to death penalty cases.

To establish a claim of ineffective assistance of counsel, a defendant must show: (1) deficient performance by counsel, with performance being measured against an "objective standard of reasonableness" under "prevailing professional norms" and, (2) counsel's deficient performance prejudiced the defendant by depriving him of "a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).  Under *Strickland*:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

Applicant must therefore demonstrate that "counsel's errors were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate,* 71 F.3d 1204, 1210 (6th Cir.1995).  Substantively discussed in the original 11.071 writ dealing with the lack of unanimity required on the response to special issue number two, a single hold-out juror during the punishment phase would have resulted in a life sentence.  See TEX. CODE CRIM. PRO. Art. 37.071(e). Therefore, the   prejudice analysis regarding errors in the sentencing phase must inquire only whether there was a reasonable probability that a single juror's mind could have been changed had counsel performed effectively.  As the Supreme Court recently opined in *Wiggins v. Smith,* 539 U.S. 510, 537 (2003), the "prejudice" prong is satisfied if "there is a reasonable probability that at least one juror would have struck a different balance."

35

*Failure to Investigate and Present Mitigation Evidence, Failure to Explain Notation in School Records that were Admitted into Evidence.*

Ann Matthews, the mitigation specialist, performed an investigation of Manuel Garza's familial background, his school history and criminal history. Callahan reviewed the school records and was aware of a negative notation made about Manuel in the 7th grade, from a nonqualified person. This notation was flagged for Dr. Ferrell's attention. Dr. Ferrell informed Callahan that he was able to explain this as being inconsequential in the nature of the statement and was able to explain the lack of qualifications of the person making this statement, along with the contextual issues surrounding the statement. These school records were admitted into evidence with no explanation provided to the jury of what their content actually meant.

At the writ hearing, Dr. Ferrell testified that he was of the opinion that Applicant would not pose a future danger to society. Dr. Katherine Dr. Allen, appointed by writ counsel, testified in much greater detail about that issue. Dr. Ferrell testified that he would have been able to testify more fully five ½ years ago, at the time of trial, and was relying heavily on his notes for purposes of his testimony at the hearing. This testimony consisted of detailed analysis of Applicant's dysfunctional family characterized by crime, incarceration, running from authorities, and physical and emotional abuse. The discipline structure was completely dysfunctional. While a child, Applicant was not able to maintain a constant school attendance due to the family's constant running from authorities and others who

36

would do his family harm.  After the death of his father, at age 14, Applicant was required to take on the family business of stealing to support the family, which brought about almost total truancy.  This "taking on of the family business" was explained in the testimony of Dr. Allen, providing many psychological details as to why Applicant had no choice in the matter. It was further explained that notwithstanding the physical and emotional abuse reaped upon him by his father, there was a need to "honor" his father.

Dr. Allen testified extensively as to the neurological and psychological development of Manuel's adolescent brain as it related to his "flight" habit.  This development essentially imprinted onto Manuel's brain the "flight" response to any situation, preventing a confrontational response.   The jury was deprived of all of this type of analytical psychological evidence.   At the guilt innocence phase of the trial, the jury was provided a "self defense" charge, but was denied the disciplinary records of the complainant, which evidenced a pattern on his part to treat more harshly suspects who attempted to evade his arrest.  Therefore, there was not much evidence as to Manuel's attempt to flee the situation. This was due to the abuse of discretion on the trial court's part.[39]  At the punishment phase, however, within the context of the phenomenon of  "residual doubt," this psychological evidence of Manuel's inability to do anything but flee a situation could have caused a lack

---

[39]Camara provided much of this evidence in his bill of exception, so it was preserved for review, although this issue, being denied by the Court of Criminal Appeals,  was not pursued in a Petition for Certiorari to the United States Supreme Court.

of unanimity on the answer to special issue number one, dealing with future danger.[40]  With

reference to special issue number two dealing with mitigation, the flight evidence is part and

parcel of the evidence of the neurological and psychological development of Manuel's

adolescent brain, in the context of the extreme abuse he experienced through his father.

Further, Dr. Allen discussed the "criminal subculture" and the necessity to view Manuel's

life and decisions in cultural terms, as required by the DSM IV R.

*Assessing Prejudice*

The evidence presented at the punishment phase of the trial by the State consisted of

the standard recitation of the prior criminal history, including the juvenile records, and any

problems that Manuel might have had in school.  This evidence was the subject of analysis

by both Dr. Ferrell and Dr. Allen.  At trial, in response to the State's evidence, the defense

presented Corrina and Maria.  In essence, they recounted some of the instances of abuse.

However, this was such a difficult subject for them, they were unable to fully describe it for

the jury.  The State's evidence, with reference to Manuel's choices to engage in a criminal

lifestyle, was never explained in psychological terms to the jury.  Throughout the voir dire,

the State repeatedly explained to the jurors that even the most innocuous of events can be

---

[40]Specifically troubling was the trial court's denial, at the guilt innocence phase, of
the complainant's police disciplinary records.  Preserved in a bill of exception, these
records indicate that the complainant had a habit of running after, catching, and then
treating harshly, suspects who attempt to run from him. Although he was convicted, when
combining this type of information with the "flight imprint" testimony that the jury also
never heard, the result would likely have been very different as Manuel was never a
confrontational person.

considered as evidence of potential "future violence" by a juror. With that hovering in the back of their minds, the jurors heard of burglary of habitations, stealing cars, and drug use. They did not have the benefit of a psychological and neurological analysis as to why this evidence would not indicate a propensity for future violence. They did not hear that a criminal subculture invariably requires that certain choices be made. They did hear that the cultural norms of Manuel's development accepted criminal activity and drug use as "normal." All of this evidence, elicited in detail at the writ hearing, should have been presented to the jury as an explanation and insight into Manuel.

There have been two recent opinions issued by the United States Supreme Court that discuss a trial counsel's failure to investigate potentially mitigating evidence in capital cases and failure to present potentially mitigating evidence. Utilizing the standards required by *Strickland v. Washington,* 466 U.S. 668 (1984), *Wiggins v. Smith,* 539 U.S. 510 (2003) and *Williams v. Taylor,* 529 U.S. 362 (2000) discuss are more procedural in their analysis of proper presentment of mitigation evidence, in terms of obtaining a hearing in federal court. However, within this procedural discussion of State writ requirements, both cases also discuss the *Strickland* standard of review when a trial counsel fails to investigate potentially mitigating circumstances of their client's background and history. In the case at bar, the evidence elicited in the writ hearing indicated that there had been an investigation into this life history, with a recommendation by the mitigation specialist that the attorneys needed to talk to Raul Gonzales, the uncle of Manuel. The mitigation specialist believed that Mr.

Gonzales would be able to provide the jury a more illuminating picture of the abuse Manuel experienced at the hands of his father. Both attorneys testified that they did not get along with the mitigation specialist and ignored her recommendations, eventually terminating her services. No other investigation into mitigation evidence was performed. The testimony of Raul Gonzales, at the writ hearing, portrayed a horrible picture of beatings, humiliations and other abuse, reaped upon not only Manuel, but his mother as well. The jury was never provided with this level of detail about Manuel's life history. Corrina and Maria provided a brief look into their lives, with the general tenor of their testimony being to invoke sympathy. Both attorneys testified at the writ hearing that this was the primary purpose of Corrina and Maria's testimony, acknowledging that jurors consider this evidence to be biased.

Dr. Ferrell's testimony at the writ hearing indicated that he would have been able to develop the lack of violent propensities in Manuel through the use of the State's own criminal history records. Further he would have been able to explain away the problems in Manuel's school records.[41] Dr. Allen's testimony was more extensive than Dr. Ferrell's testimony because he was relying primarily on his notes made in 2002. Dr. Allen's review was much more recent, occurring in 2004 and then again in 2008 in preparation for the writ hearing. This testimony was specifically discussed in the factual recitation above. Manuel's

---

[41]The strategy for the admission of these school records by defense counsel, especially at the punishment phase of the trial, while providing the jury with no explanation to the problems that the attorneys had flagged for review, could never be explained.

life history had similarities to the *Wiggins* case, discussed infra.

Subsequent to the filing of the writ in the instant case, the opinion in the Gabriel Gonzales case was issued. See *Ex parte Gonzales*, 204 S.W. 3rd 391 (Tx.Cr.App. 2006) In *Gonzales*, the convicting court recommended that relief be denied. The Court of Criminal Appeals, however, held that the defense counsel was ineffective with reference to investigating mitigating evidence. Discussing that the Texas capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances, it instead asks the jurors to answer a mitigation issue. The Court of Criminal Appeals adapted the Supreme Court's *Strickland* prejudice test into the *Gonzales* test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. This was as opposed to the standard review of whether there was reasonable probability sufficient to undermine confidence in the outcome. In *Gonzales*, the defense counsel did not even inquire of Gonzales's family members as to the existence of possible mitigating testimony, wrongfully relying on their client's representations that there was none. Making Applicant's facts worse, defense counsel had been told by the mitigation specialist that Raul Gonzales can provide much more detailed information about the abuse on Manuel. Defense counsel chose not to discuss it with Raul Gonzales. Defense counsel testified at the writ hearing that he allowed the jury to hear whatever Corrina and Maria had told him, with no further inquiry. Acknowledging the existence of the *Wiggins* case, defense counsel, in apparent disagreement with its requirements, felt that the simplistic form of

41

asking for sympathy while recounting a minimal amount of abuse, was sufficient to meet

*Wiggin's* requirements. In *Gonzales,* as in Applicant's case, the defense attorney spoke to

the mother once before trial and the sister once during trial. In Applicant's case, there was

a cursory interview, as indicated by Callahan's voucher, of the mother on one occasion prior

to trial and only a cursory conversation that allegedly took place while walking down the

hall, during trial. This conversation was not indicated in the voucher. As opposed to

*Gonzales,* where it never occurred to the defense counsel to inquire on the issue of abuse

when the family members were not forthcoming with it, in Manuel's case, Corrina and Maria

made small references to it. This should have sparked something in the defense counsel's

mind to more fully investigate it, especially in light of the information received from

Matthews. Callahan was aware that Dr. Ferrell had the ability to delve into the "troubled

childhood" of his client. Callahan never provided this information to Dr. Ferrell during the

pendency of the trial. Dr. Ferrell was provided with some information of this during trial and

reviewed it quickly while sitting the courthouse cafeteria. Even that cursory level of review

allowed Dr. Ferrell to be confident in his opinion that he could explain the problematic

statements for the jury, while educating them on the psychological aspects and inevitabilities

brought on by Manuel's upbringing. Certainly, a greater degree of information could only

have made his opinion that much more detailed and stronger, as Dr. Allen's was. As

explained by Dr. Ferrell, people who are the victims of abuse, especially within the Hispanic

community, are reticent to speak of it, especially in that specific household's subculture. It

is a "closed thing," called a "convoluted family dynamic."  (R.R. v.2, p. 61)  At the writ hearing, in response to not having family history information, Dr. Ferrell testified that he did try to get with the attorneys on this matter, but had no success.

In *Gonzales,* the applicant's counsel was forthcoming about his failure to not pursue a strategical or tactical decision to develop mitigating evidence.  In Applicant's writ hearing, Camara testified that there were no strategical conversations between himself and Callahan on the issue of punishment, because Callahan had no use for this type of evidence. Failing to explain this dichotomy with evidence of his own mitigation development, Callahan merely said that Camara was lying about it all because he was bitter about not being the first chair attorney when Raymond Fuchs withdrew.

Even at Gonzales' punishment phase, his sister testified to more specifics than was elicited from Corrina.  (See infra at page 50) Corrina used only very general terms, i.e., "abuse," in reference to her father's behavior, providing no specifics as to what Manuel had to endure.  Further, Corrina never asked about anything other than the general information of her father and uncles going to prison. Of course, the State, through cross-examination of Corrina, was able to go through, yet again, Manuel's criminal history.

Distinct from the facts of *Gonzales*, was that in the Gonzales trial, the attorney failed to present mitigation evidence because he failed to investigate its existence.  More insidious in the case at bar, is that this mitigating evidence was known. Choosing to ignore any development, it was elicited in the same superficial manner as it was in *Gonzales*.  Which is

43

worse - failing to inquire, or choosing to ignore, for no other reason than disdain for mitigating evidence? In the face of known mitigating evidence, while choosing to ignore it and refusing to investigate it, defense counsel's failures, in the instant case, amounted to an intentional ineffective assistance of counsel.

Developments in the law, such as the *Wiggins* decision, of which Callahan was fully aware, have made it necessary to **consider** mitigating evidence in preparation for the trial of a capital case. Callahan testified at the writ hearing that he did not believe that mitigating evidence was worth utilizing, believing it was of little value. With *Wiggins* in place at the time of this trial, in light of the fact that Callahan was aware of some abuse in the family, an objective standard of reasonable performance for defense counsel in this capital case would have required him to more fully inquire into the specifics of abuse.

The question decided in *Wiggins* was whether trial counsel could make a strategical decision not to present mitigation evidence without having first investigated their client's social history. In the case at bar, Callahan had a predisposition against mitigating evidence such that it influenced his decision to not make any further investigations of the relatively minimal and superficial information he possessed. Further, the Wiggins attorney made a strategic decision to focus on proving his client not guilty. Callahan testified that it was a foregone conclusion that Applicant would be convicted. (R.R. v. 4, p. 29 - writ hearing) In the face of that opinion, what could be the strategic reasoning to choose to ignore Dr. Ferrell's opinions and the mitigation specialist recommendations on which person in the

44

family provided the more pertinent and detailed evidence of abuse in the family. Similar to

*Wiggins*, Callahan's "strategic" decision was supported by a very limited investigation into

Applicant's background. Callahan had Dr. Ferrell, a psychologist appointed, but had never

provided the doctor with any social history information. Dr. Ferrell was provided, on the

date of his supposed testimony, with the 404b notice, school records and juvenile documents.

Engaging in only one hour of review, Dr. Ferrell was able to review enough information to

know that Manuel's history was not tantamount to posing a future danger. Dr. Ferrell had

interviewed Applicant. However, it is typical that a full disclosure of information, especially

abuse, is generally not forthcoming. Dr. Ferrell did testify that, for the most part, Manuel

was direct. In any event, Dr. Ferrell attempted to obtain more familial information, but that

was not forthcoming from counsel. As the trial court said of Mr. Callahan's personality,

during the motion to strike his testimony for violation of the Rule, she doubted that anyone

can ever tell Callahan to do anything he does not want to do. (R.R. v. 4,p. 6) Callahan did not

want to entertain the notion of investigating the mitigating evidence. In *Wiggins*, it was held

that defense counsel's decision to forego a complete social history investigation fell short of

the objective standard of reasonableness through the performance prong of *Strickland*. Even

so, in *Wiggins*, it was trial counsel's decision to forego this to focus more on the guilt

innocence phase. After losing that, it became the defense counsel's strategical decision to

focus on residual doubt at punishment. In the case a bar, there were no strategical decisions.

It was a disdain for mitigation evidence in general that prevented Callahan from developing

it. The State cannot genuinely rely upon Callahan's representation that Dr. Ferrell told him he would testify that Manuel was a future danger. Dr. Ferrell relied upon his notes and his notes reflect the exact opposite to be true. Dr. Ferrell had no motive to be untruthful about this particular opinion. In fact, if for some unknown reason Dr. Ferrell did change his testimony for the hearing, how could he psychologically back it up as a valid opinion? Further, Callahan had very little memory about much of the trial, except as to statements Camara made in passing, some six years ago, that insulted Callahan's obvious delicate sensibilities. It is well known that the prevailing professional norms required Callahan to be part of a social history investigation. Simply because there was one performed in this case is irrelevant when the first chair trial attorney refused to even acknowledge its existence.

*Wiggins* discusses that important areas for mitigation investigation should include "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins,* 524. Of course, attorneys are not required to obtain the impossible in investigation, but to discover all reasonably available mitigating evidence. Callahan testified that he was well aware of the *Wiggins* case which would also mean that he was well area of the ABA guidelines discussed within the body of the case. Voicing his disagreement with the *Wiggins'* opinion, Callahan made the conscious decision to interpret the requirements of *Wiggins* and the ABA in his own way. Just as Callahan was held ineffective in his appellate capacity for ignoring the law with respect to lesser included offenses, so did Callahan ignore

46

the requirements of mitigation evidence here. (See *Ex parte Morin*, 2008 WL 902143 (Tx.Cr.App)(unpublished, issued on April 2, 2008.) Despite *Wiggins*, Callahan made the conscious decision to abandon the investigation of Applicant's background after only obtaining a fairly minimal amount of information from only a few people refusing even to interview Raul Gonzales, possibly because it was Ann Matthews that recommended it.

In additional to the decision of *Ex parte Gonzales*, a Court of Criminal Appeals case where relief was granted in 2006, discussed supra, there have been 5th circuit cases decided since Manuel's trial. *Lewis v. Dretke*, 355 F. 3rd 364, 367 (5th Cir. 2003) discussed that defense counsel has the duty to perform a "'reasonably substantial, independent investigation' into potential mitigating circumstances." Determining whether a counsel's performance was effective, several factors are looked to: What did trial counsel do when preparing for sentencing; what type of mitigating evidence could have been obtained through sufficient investigation, especially in light of any initial information defense counsel was aware of, and what could have been expected to come from those leads had they been investigated? In Applicant's case, Camara was not allowed to perform any substantive work on sentencing. Callahan's voucher indicates a mere three hours of work, which, when considering his testimony of the work he actually did, seem to be stretching the truth. Callahan was in possession of initial information from Corrina and Maria, from a very short phone call, as to abuse in the family. Ann Matthews had performed a social history, which included the school records, juvenile records and interviews with other family members, such

47

as Raul Gonzales. Although Callahan eventually obtained much of this information from the State, he refused to consider developing the mitigating evidence or even to develop evidence that would help explain some of the documentary evidence simply because he had a myopic view of its value. Unless one is blind, the potentiality of this evidence should have been apparent. The focus of *Lewis v. Dretke* was not whether counsel should have presented a mitigation case, but whether the evidence obtained through the investigation supported the trial counsel's decision not to introduce the mitigating evidence. 355 F. 3rd 367-368, citing *Wiggins* at 2536. Through the decisions of *Wiggins*, *Lewis* and *Gonzales*, most examples of ineffective assistance, with reference to what was, or could have been done with the mitigation issues, either through investigation or failure to investigate, have been analyzed. A limited investigation into mitigating evidence may be reasonable only if counsel has a basis for believing that further investigation would be counterproductive or fruitless. *See Wiggins,* 2537. However, the opinion that further investigation would be counterproductive must be based upon something other than a general disdain for mitigation evidence in general, as was the basis for Callahan's decision here.

It is fairly obvious that a social history investigation must come from more sources than just the defendant. "[T]he sole source of mitigating factors cannot properly be that information which a defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Coleman v. Mitchell,* 268 F. 3rd 417, 450 (6th Cir. 2001). In the case at bar, Callahan limited Dr. Ferrell's

initial information to his interview with Manuel, not providing any further information until

the date of trial, at which point Callahan seemed to ignore any opinion Dr. Ferrell may have

had to offer.  Again citing the American Bar Association guidelines, "[t]he investigation for

preparation of the sentencing phase should be conducted regardless of any initial assertion

by the client that mitigation is not to be offered." American Bar Association, Guidelines for

the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989).  In

the case at bar, however, the assertion that mitigation evidence was not to be offered did not

come from the Applicant.  It came from the first chair attorney in charge of  punishment

preparation.

_____In light of the aforesaid recitation and analysis, *Strickland*, viewed through *Wiggins*,

*Lewis* and *Gonzales*, requires reviewing courts to "conduct an objective review of their

performance, measured for 'reasonableness under prevailing professional norms,' which

includes a context-dependent consideration of the conduct as seen 'from counsel's

perspective at the time.'" *Wiggins,* at 511.  In the case at bar, Callahan refused to investigate

mitigating evidence, notwithstanding that he was aware it existed.  He blatantly provided his

opinion that he believes this evidence to be of little value, choosing to ignore *Wiggins*, which

was in effect at the time of the jury trial. A preliminary investigation and social history had

been performed by the mitigation specialist and this information was categorically ignored,

due to a dislike of mitigation evidence and a dislike of the person who obtained the

information.  Indeed, once Ms. Matthews' services were terminated, no other mitigation

specialist was sought to be appointed. Callahan testified that he put on the stand those family members who showed up, having only spoken to them on a previous occasion for just moments. A review of the questioning of Corrina is evidence of this:

> On page 40 of Volume 33 of the jury trial, Manuel's sister, Corrina Garza was called to testify. She testified that her father was not such a good father. (R.R. jury trial, v. 33, p. 40, line 13) Corrina described him as physically abusive to her mother, and verbally abuse to herself. (Id, p. 41) She testified that the abuse took place in the form of punishment and that Manuel was treated fairly the same. (Id) Then Corrina went through what her father did for a living, skimming over the extensive criminal lifestyle, but mentioning that he did go to prison on several occasions. When he came back from prison the second time, he did not come back to live with the family which made her happy so that he would no longer be abusive. There was mention of Manuel being a good student. There was mention of her mother, Maria, working at McDonald's while the father was in prison. (Id., p. 44) Corrina discussed that at some point in time, Manuel started stealing cars. (Id.) Defense counsel inquired as to her opinion why he started to do that to which she replied that they did not have much money. Even after getting caught, Manuel continued to steal cars. Defense counsel inquired as to why she though he did so and her response was that Manuel did not have any male figures in his life. There was

a mention of the mother's brother having also been to prison. (Id., p. 45) Corrina was asked if they believed that this had any influence over Manuel to which responded that she believed it did. Corrina testified to all the men on the father's side who had gone to prison, and whether that had an influence over Manuel to which she only responded yes. Finally, Corrina was asked about the death of their father and that it affected Manuel very hard. Manuel was in custody during that time. Corrina was asked if Manuel was peaceful during those time periods, to which she responded yes. (Id., p. 46) Defense counsel then asked Corrina if she had an opinion as to if Manuel was placed in prison for the rest of his life would he not be a future danger to society. Her response was that he would not be a danger to society.

This was the full extent of information elicited from Corrina. Of course, the State, during their cross examination, was provided the opportunity to again go through all of Applicant's criminal history. As we now know, there was no psychological expert to put the facts of Applicant's background in perspective with the criminal history to explain why all this combined to show that Applicant had no propensity for future violence. Further expert testimony would also have provided information to explain why the Applicant's personal moral blameworthiness was lessened. Even Callahan mentioned the "evolving standard of decency" during his closing arguments, which seemed to indicate that he acknowledged that as times moves forward, so does the evolution of how these types of cases are to be tried.

However, Callahan seems to be stuck in the days of old with a reluctance to comply with the new requirements of the developing case law. Even before *Wiggins* was decided, there were capital murder jury trials where *Wiggins*-type mitigation evidence was developed and introduced, producing life sentences in some cases. See eg. *State of Texas v. Zavala*, 2001 WL 651211, Tex.App.-San Antonio, June 13, 2001 (unpublished) where evidence was presented through Dr. Ferrell which included a detailed history of Zavala's social history, including evidence that his mother would use him as a drug "mule" when he was but a child, never teaching him anything about right and wrong or how to make proper choices. This evidence led directly to an answer of "yes" on special issue number two, which led to a life sentence instead of the death penalty. A review of both counsel's closing statements also illustrates the problems inevitably encountered by this jury, when they were asked to answer the special issues in such a manner, having been provided no evidence or guidance, except through the State's witnesses. (R.R. v. 33, p. 80)

> MR. CALLAHAN:  Counsel, ladies and gentlemen of the jury, again I
> appreciate your time. In the jury selection process, several of you were asked
> about whether or not you thought that the law -- and you agreed with the
> concept of the law contains an evolving standard of decency and some of you
> said yes, but I ain't part of it. Perhaps I'm here to stand and invite you to
> become part of an evolving standard of decency. In answering these questions
> I would hope that you would give a reasoned, moral response and not an

automatic response. Even now as you sit here, you should not have made up your mind and not do that until you deliberate, all 12 of you together. From a moral point of view, and I don't wish to antagonize anyone, but many of you came to the jury selection process understanding the Old Testament point of view of an eye for an eye. Three thousand years ago the words of David in the Psalms -- and I won't read the whole part of Psalm 139 to you which contains a part of the movement that all men are special, combined right with bad men should be punished. And I'll show it to you. You formed my inmost being; you knit me in my mother's womb. I praise you. So wonderfully you made me; wonderful are all your works. My very self you knew. My bones were not hidden from you when I was being made in secret. Fashioned as in the depth of the earth, your eyes foresaw my action. In your book they're all written down; my days were shaped before one came to be. And now we move to the other side where perhaps some of you -- and I hope you wouldn't be emotional or vengeful about your decision. We're not here about vengeance. How precious to me are your designs, oh God! How vast the sum of them! Were I to count, they would outnumber the sands. To finish I would need eternity. If only you would destroy the wicked, oh God! And the bloodthirsty would depart from me! Deceitfully they invoke your name, your foes swear a faithless oath. Do I not hate, Lord, those who hate you; Those who rise against

53

you, do I not loathe?  With fierce hatred I hate them; enemies I count as my

own. That's about 3000 years ago; 2000 years in the idea of the evolving

standard of decency we move to these words from Matthew. You are the salt

of the earth.  But if the salt loses its taste, with what can it be seasoned?  It is

no longer good for anything, but to be thrown out and trampled under foot.

You are the light of the world.  A city you set on a mountain cannot be hidden.

Nor do they light a lamp and then put it under a bushel basket.  It is set on a

lamp stand where it gives light to all in the house.  Just so your light, your

light, must shine before others, that they may see your good deeds and glorify

your heavenly Father.   It is relevant not because the community has an

expectation of you, the community looks to you for justice and mercy.  And if

you're going to give a reasoned, moral response then consider your morality,

your Judeo-Christian history. Four hundred years ago as we move along the

evolving standard of decency, we get to what might be called a  secular point

of view expressed somewhat callously by Hamlet who says, you know, there's

nothing good or bad but thinking makes it so.  Back.  Or since no man hath a

lot of what he leaves, what is it to leave the times.  Life is worthless, it's -- if

you see that as an evolving, well, so be it.   In giving a reasoned moral

response, I invite you to think about -- about the next eight things in terms of

reason, not in terms of morality.  Do not make your decision based on fear, as

was given to you in voir dire by the prosecution who told you about

probabilities of escape, probabilities of windows being left open. Do not let

fear be your guide. There's no cars to steal in prison. There's no guns in

prison. You've seen behavior in the courtroom. He has not presented a threat

to you or to anyone else in this room. Probability. I asked some of you what

is the meaning of the word probability in voir dire. And Mr. Pennington is

correct. It is not certitude, because anybody who says they can predict the

future is a fool. And it certainly doesn't mean possibility because why don't we

just go take a coin in the back room, flip it, and see if it comes up heads, he

lives; if it's tails, he dies. The formula for 50/50 is there's two events, it could

be heads or tails. There's one possibility, one divided by two, it's a 50/50

percent chance, a 50/50 probability that it will come up heads. Where is the

mathematics? Where is the theorem? Where is the science demonstrated to

you in this case to show that a probability is more than a coin toss? It doesn't

exist. And don't answer that question number 1 yes because it doesn't exist. As

bad as it may anger you, don't answer that question based on probability that

it's more likely than not because it hasn't been demonstrated to you. Take 50

years of the next life if you use actuarial tables. He's 22, people die at 72, the

bottom number would be 50, they would have to get 50 on top to be a hundred

percent. Where is that mathematics? It's not there. Don't answer Special Issue

55

Number 1 yes. A man who is not loved is incorrigible. Well, you have seen at the punishment phase that he is loved and, therefore, he's not worthless and is potentially rehabilitatable. The death penalty, we talked about in voir dire is deterrent or is it not? Well, it will deter that fellow for sure. Well, that's for true, but -- and by analogy I'd like you to look at a picture that came out during our voir dire. And you see there a fellow who drove his car into the water. And my point is that every time a flash flood rains in San Antonio, you get some fellow who drives into the water, some woman. And it doesn't matter. No matter what happens, people keep driving into the water and either drowning or ruining their cars. If you can't deter a person from the little things, how in the world can you deter them on the big things? Deterrence is false. Use your common sense. It cannot be a motivation for you in deciding the questions. The things you ought to think about is -- in punishment -- assessing punishment is rehabilitation or deterrence, if you think it's a reality, or retribution. You ought not to think about revenge because if that was true, then the officers who caught him should have just shot him when they caught him. That's not the kind of society we live in. We have evolved beyond that to this point. Recall, please, again at the guilt/innocence phase that the evidence shows that Manuel Garza did not plan to kill a policeman. He is not an assassin. What we have here perhaps is a case of machismo gone awry.

56

And a person ought not to die just for that. Consider the evidence presented at punishment phase that when -- part of it through their exhibit, when Manuel Garza was incarcerated in a total lock down situation, like Texas Youth Council, or at the state jail facility, that he was a good inmate. He can -- he will not be a threat to society when he's locked up. And you know, if there was evidence to the contrary, they would have presented it to you, but they didn't. So in answering Special Issue Number 1 a continuing threat to society, the evidence shows that when he is locked up, he's not. And logic would suggest that you would answer the question no, as hard as that may be. Lastly, since you are not about revenge, our community looks to you for judgment, for whether or not you can evolve, whether we can evolve as a community. Or do we do the ever repeating downward cycle of death and then another death and then another death. And we teach that, that's the way we move. How is it logical that we teach our community, particularly our children, that executing somebody is a good punishment for that fellow who killed another fellow? Where is the logic in that? Does our community need to be stuck there? No, it doesn't. It needs to be evolved. And it -- it's painful. If you come back with answers such that Mr. Garza doesn't die, it would be a great number of people quite upset. That may be called growth pains, but I invite you to evolve.

At this point, Camara provided his closing remarks. (R.R. v. 33, p. 85)

Have you ever been in a situation -- put in a situation where either you've got to say something, you've got to talk, you've got to make a point and you know what you want to say, you know what you want to accomplish, but you have no earthly idea how to do it? What I want to do is struggle through this. I have about 20 minutes. I know some of you could care less what I have to say, but I got 20 minutes for you to listen and I hope you listen with an open mind. And if I ain't making sense, well, you don't have to believe what I say. If you don't want to do or think like I do, you don't have to. But I'd like to say a few things and I want to say it to people who have open ears, open minds, open hearts. What -- what we've got here is a kid that started out without a real break in this world. People, his mother, other people in his family cared for him, he cared for them. But so often as it happens, things just don't work the way they're supposed to. There is no grand scheme. There is no plan for people to follow. I think most of you, if not all of you, have had children, raised children, been close to children were raised, if not raised them yourself. So often, so often we don't know what to do. We just go from day-to-day. And fortunately, most of us make the right decisions. Most of us, one way or another, either with help, either with control, either with someone loving, someone caring, but most of us make the right decisions most of the time. But you know, it's just luck if you're put in a position where you can do those

things. And it's real luck of the other kind if you're put in a position where you can't just go along and things happen correctly. We've got a guy, a young boy at the age of 12, 13, probably before that because I want -- I want to read through a few inserts from some of these records, but a boy who loved his father, loved his mother, probably like most of us idolized his father, but his father was a drug addict. His father was a drug dealer. His father went to prison when he was 12 years old. They still love him. But that is the most important man in his life during those formative years is his father. And if his father makes mistakes, if his father does things wrong, it's not going to only affect the father. Those sins of the fathers affect the sons. And so the boy becomes a criminal like his dad. And when his dad is gone, his uncle is a criminal. His three, four other brothers of his dad, all criminals. So the boy, he  starts living the way he's supposed to live in that family. And  he starts committing crimes. He takes a car here and there. He breaks into a house and takes property. He doesn't have any money maybe so he figures that's an easy way to get it. He steals things and sells them. He steals things and sells them. He steals things and trades them. With no thought of what he's doing, no idea of where he's going, no idea what it's going to -- what's going to happen. No idea where that road is leading. And no one to tell him. People step in, the authorities finally step in. They try to help him. But every time he gets a little

59

bit of help he's kicked back out into the real world without that structure, without that structured environment, without the structure to keep him in line. And when you read these things, when you hear about these things, they say, they say in the records, the psychologists, the people that talk to him, the people that counsel and try to help, they say when he's in that structured environment, he can follow the rules. He follows the rules. He develops. That's why it didn't work. Because once he's released from the structure he goes back to the old weaknesses, the old subculture that he grew up in. The way he's supposed to live where he lives. The way his friends and family lives when he does that. This is 13 years old, 14 years old, 15 years old, 16 years old. It continues, it continues, and it continues. What happens? Every single crime is a property crime. It goes from one to the next, stealing a car, breaking into a house, stealing peoples' property. Going on joy rides in cars that they hot wire. It's always property related. And what is even more telling than that is every time, every time that he gets confronted, he runs. He flees. He tries to get away. They even put him in a police car and lock him down and he flees. Some -- his friend opens the door and he runs away. The danger, the future danger of this young man, the future danger is he won't stick around to face the music. That's the danger. There is no future danger here that he's going to become an aggressive person, that he's going to go into any society

60

and hurt people. He's always running. He's always trying to get away. He's always trying to get back to where that conduct was right. His dad gets out of prison. His dad comes home. He's happy. He's going to develop a new relationship with his father. And what happens? The man kills himself with poison, drugs. What do you think that would do to a 13-year-old boy? You have two things to look at. You have two things. Two decisions, two questions, two special issues, as lawyers like to say. One is future dangerousness. Look at that. The history of this young man, the history of whatever his crimes were not crimes of danger. He was not dangerous except he was too stupid to follow the rules. If you think even that, if you think that's a danger and there's -- and the State will argue, they've been arguing that since the beginning, that's why we're here. They think, and they'll make a good presentation for you, they got all this high-fi, high tech stuff and so forth, they'll make a presentation that he's dangerous. He's dangerous by default. That's what it is. It's dangerous by default. Just by being in that situation, just by creating those situations it creates danger. That's their basic argument. That's the logic of their argument. Well, where do we get the real dangerous people? It's not the people that are doing this type of crime. It's not the people that are running, fleeing, trying to get away, hiding. This guy, the only thing he ever left of himself was fingerprints. He was even too stupid to wear

gloves. That's the type of criminal this guy -- where -- why do you think a person would do that? Why? Why? Why? Wouldn't he learn? No, he doesn't learn because it's okay to steal. You don't have to hide it. That's my job. That's where I come from. That's my family. It's okay. You're 13, you're 14, you're 15. He does it. He doesn't care. It's reckless abandon. You heard it. You heard it. You heard the people up here. You heard them one after another. I think they told you, 63 people testified up here. Sixty-three people. And what did they talk about? Stealing cars, burglaries, stealing property. One after another. The police talk about it. The victims talk about it. Everyone, he always stole their property. He would break into their homes, break into their cars and steal whatever he could. And then the police would come later. If he ever confronted a policeman, he would run. If he ever confronted a homeowner, he would run. He ran from Mrs. Dettloff. He was polite and then ran. So that one after another after another. The evidence you have heard points to nondanger. They're nondangerous crimes. The State would like you to think that if someone breaks a window, that's violence. It is to the window. But is that what we're talking about when we're talking about taking someone and executing him? Is that what we're talking about? Is that what we're really worried about in this country is that kind of future dangerousness? That someone might break into your home and steal your

62

property so we're going to kill him? And then if you go past that, if you get --

even if you feel that way, even if you make that decision, and I know, I know

some of you feel that way and you have a right to, but once you get past that,

if you look -- even then look at the other evidence. Look at the evidence and

I'm going to talk to you about some of this evidence. The records from the --

the records from the Texas Youth Commission. Look at these things. Look

at them. They're up here. They've been admitted into evidence. Manuel is

cooperative in rehabilitation as long as in a secure environment. Easily

influenced, desires acceptance. Manuel began associating with a gang at 13

years old. Began using marijuana and alcohol at 13 years of age. Substance

abuse since 13 years old. Father involved in criminal activity and drug abuse

when Manuel was younger, formative years. Dad absent from home for two

years while in prison while Manuel was 10 to 12 years old. Father was

physically abusive towards Manuel's mother. Manuel's father was incarcerated

on two separate occasions, taking him away from the family for extended

periods of time. Father was abusive towards Mom. Mom said -- Mother said

he never abused the kids; however, Manuel claims he was abused on occasion

by his father when his father was stoned. Identification of the problems. This

is the individual case assessment by the Texas Youth Commission. They say,

talking about his mother, she's interested in his well-being. Manuel claims he

gets along all right with his mother's boyfriend but that he is not involved in

his discipline. His natural father is incarcerated. Did not have much to do with

him. Manuel began to develop a relationship with his father after his release

from prison. This relationship was quickly terminated when his father died

from an overdose of heroin. This was a devastating loss for Manuel and

certainly contributed to his criminal behavior. And talks about the influence

that his father had on him. His mother has little tolerance for his behavior and

does not want him living with her. This was the Marlin Orientation and

Assessment Unit, the Texas Youth Commission that you heard about from the

State earlier on when they had Mr. DeLeon on the stand. It says Manuel grew

up in chronic poverty, and his probation officer noted that Manuel has had a

chaotic home life that lacks supervision and discipline. His father not only had

a history of criminal behavior, but also a history of substance abuse and

violence. That's what the kid lived through. And then -- and then you see this,

his school records. We put those in evidence. His school records. But there's

one page in those school records. I have a copy of it but it's over there. The

school records that shows the history of this kid. On October '87 withdrew,

moving to Converse. October '89, withdrew, Montgomery Elementary.

October '89, entered Walzem Elementary. 11-91, withdrew from Walzem

Elementary. 11-92, withdrew from Krueger to White Middle School. 2-15-94,

entered AMS, another middle school. 4-11-94, withdrew back to White Middle School. 10-23-95, student withdrew from Ed White. 11-16-95, student transferred from Ed White, entered Garner Middle School. 3-4-96, withdrew from Garner Middle School. 4-96, withdrawn from AMS Middle School, going to juvenile detention center. That's it. What have we got? I want you to look at the medical records from the Bexar County jail when he went into jail. There are some very telling factors here. Let me read these to you. On February 4th, 2001, the day he's arrested. He's seen by the nurses and doctors and screened. On February 5th he's seen by the Bexar County staff, anxiety and depression. Has -- he has -- inmates taunting him. He has SI, which I believe is suicidal ideations. He -- on 2-6, February 6, two days later, seen in an MTO – I don't know what that is -- area per his request. The RO -- I think that's the registered orderly -- indicated Garza is crying uncontrollably. Remember -- remember that inmate that reported him, that he was screaming help, help, he's trying to kill me, he's crying uncontrollably. Spoke of Garza, he began crying about his case. States he's being haunted by the deceased officer. Garza begins scanning the surroundings and shaking and crying. . States he can't go back upstairs because he's afraid. He can't sleep and has loss of appetite. Once again, Garza states he's being haunted by the deceased officer. I feel his presence. Crying and shaking. He's scanning the

65

environment. He has a sleep disturbance and fear. Afraid. Has sleep

disturbances, he's in fear, he's afraid. He's showing remorse, is what the nurse

says, for observation -- scheduled for -- and they put him on medication to

help with depression. The next day it continues. Is feeling very badly about

what happened to the police officer. He did not mean for this to happen. It

was an accident. He had absolutely no intentions of killing anyone. He's only

20 years old. He wants everyone who will listen to him to know how he feels,

to know that he is sorry, to know it was a terrible accident. He asks this M.C.

-- that's the word for it, I guess -- what my thoughts were about him.

Continues to repeat about how sorry he is and how it was an accident.

Requests reading and writing material. He's having flashbacks about this

officer and the night it happened. Wants to speak with the chaplain as well.

States one was supposed to see him today. Crying, very emotional, shaking,

depressed, appears very remorseful. Appears very depressed and remorseful

about what has occurred. Denies this; however, he's very depressed. Will

leave a message for the chaplain. And it goes on and on. Showing remorse

and the nightmares and the fears and the horror that he went through that

incident. Look at the evidence. Don't just -- look at the evidence and analyze

it. Think about what has been shown to you. Think about it and make

decisions based on the evidence, not on his ideas of emotion. And they speak

to you about what -- justice and so forth. But how -- how far -- how far have

we come to -- how far have we come to say that justice is a taking of the life?

Put him in prison for the rest of his life. That's justice. You know --

THE COURT: Wrap it up, Mr. Camara.

MR. CAMARA: I'll wrap it up, Your Honor. You know, most people -- it's

just -- most people find it hard to do what's right. I think we all find it hard to

do what's right, even though we want to. But it's not -- it's not hard to do

what's right, it's just -- it's just -- it's hard to figure out, it's hard to figure out

what's right. What's the right thing to do. That's the difficulty, to figure out

what is the right thing to do. But when you figure it out, when you decide,

when you figure out and you know what's right after you make that decision,

it becomes hard not to do what's right. Look at the evidence. Figure out

what's right. And that's easy to do what's right. (R.R. v. 33, p.53)

The closing arguments of Callahan had little to do with the actualities of Manuel's life

and could not have had any force and effect on influencing the jurors to answer the special

issues in any specific way favorable to the Applicant. Camara's closing argument was more

insightful and obviously more intuitive of the issues surrounding the details of Manuel's life.

However, without the evidence to back up the general conclusory statements he was making

to the jury, they would also have little force and effect. Camara testified that it was Callahan

who shut down all mitigation evidence preparation, because he did not believe in that kind of evidence. This left Camara little choice but to make a last ditch effort to explain, as best as he could in light of the complete lack of factual and psychological evidence, what the jurors should do with the special issues. In both the *Gonzales* case, mentioned supra at pages 41-49, and Applicant's case, there were similar failures to investigate. *Gonzales* represents a complete failure to inquire. The Gonzales attorney admitted that it was negligence on his part to so fail to inquire. However, in Applicant's case, defense counsel Callahan basically testified that he did not like this type of evidence, thought it was not useful and therefore, chose to ignore its known existence. The minimal questioning of Corrina evidenced how little value Callahan actually placed on the abuse evidence that could have been elicited. This general bias against mitigating evidence permeated Callahan's dealings with Dr. Ferrell. He never had a strategical discussion with Dr. Ferrell. Nor was Callahan even able to correctly remember that Dr. Ferrell told him he would testify that Manuel was not a future danger. It is possible that Callahan was so pre-disposed against the use of mitigating evidence that he actually heard Dr. Ferrell say that Manuel was a future danger, when in fact Dr. Ferrell said the opposite. Had there been more strategical meetings, maybe Callahan might have understood this. Clearly, Callahan's performance did not meet objective standards of reasonable performance, resulting in profound prejudice. Even though Camara attempted to assuage the problems in his closing statements, having no decision making power in the punishment phase of the trial, he was left with no ability to alter the ineffective

assistance of his first chair counsel.

Though *Strickland* does not require trial counsel to present mitigating evidence at sentencing in every case, "[i]t is axiomatic—particularly since *Wiggins*—that such a decision cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke,* 355 F.3d 364, 368 (5th Cir. 2003). Considering the testimony of Dr. Ferrell and Dr. Allen, there was a large amount of mitigating evidence available and much could have been done with it. The factual information about Applicant's life and history could have been explained in psychological and neurological terms. Although the jury was superficially aware that Applicant was raised in a dysfunctional family, had defense placed that into the context of psychological analysis, the jury would have had a better understanding of why Applicant was the way he was and why he made the decisions he did. This certainly could have aided in the review of whether they wanted to lessen Applicant's moral culpability or to consider him to be a future danger, especially when the "flight" imprint testimony is considered. The jury was aware that the majority of Applicant's prior criminal history dealt with property crimes and they did glean some mention that Manuel would run when confronted. However, defense counsel left it at that. This was not sufficient. This type of evidence must be explained for a juror so that he or she will know what it really means, and not what the State would have it mean, in the black and white vacuous prism that the State wants all of their evidence viewed through. Painfully obvious was the error by Callahan in

69

failing to allow Dr. Ferrell to testify to the influence the abuse the Applicant experienced had on his neurological and psychological development, especially in light of the fact that his brain was still in an adolescent stage of development. (See FN 20, - *Roper v. Simmons*) The evidence that could have been presented to the jury was elicited during the writ hearing and it puts a whole different perspective on Manuel's life and behavior when explained in psychological and neurological terms.

 *Gonzales* created a different standard of review from *Strickland,* based on a complete failure to investigate, rather than a failure to present, mitigating evidence. It is arguable that both apply in the case at bar. Under *Strickland,* an applicant must show that there was a reasonable probability that the jury would have reached a different decision absent counsel's unprofessional errors. *Strickland,* 466 U.S. at 694 (1984). This showing must be sufficient to undermine confidence in the outcome of the proceeding. *Strickland,* 466 U.S. at 693. To pass a *Strickland* review, an applicant must show a reasonable probability that the result would have been different but for the ineffective assistance of counsel. A reasonable probability is not the same standard as a "preponderance of the evidence." *Id.* at 693-94. In essence, it is a lesser burden upon the applicant to show an unfair result due to counsel's errors. *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed. 2nd 360(2005) is a recent Supreme Court case, cited in *Ex parte Gonzales,* 204 S.W. 3rd 401 and FN 5, where family members were on and off the stand in brief fashion. As was discussed earlier, (pages 12, 29, 54), applicable in *Rompilla,* the purpose of this testimony was mainly for residual doubt

considerations and for a request for mercy. This was very similar to what was elicited in

Applicant's case. As opposed to the facts in the case at bar, in *Rompilla,* post-conviction

investigation located evidence that had not been previously discovered. Failing to discover

this evidence and present it to the jury was deemed a violation of *Strickland.* In the case at

bar, Callahan was already cursorily aware of the parental abuse and drug abuse. Had he

delved into that further, in conjunction with the help of a psychologist, the evidence of the

extreme criminal subculture would have made itself apparent. Further, the neurological

evidence of developmental problems someone experiences when subjected to this type of

life, would also have been made apparent for the jury. Again, the Applicant asks, which is

more insidious: a complete negligence in locating the evidence, or a conscious decision to

ignore the evidence and any further evidentiary developments that further investigation

would have provided?

In the case at bar, the testimony of Corrina and Maria, along with the closing remarks

of Callahan and Camara, was nothing more than a plea for mercy. There was no substantive

evidence provided by the defense to support this request, i.e., that Manuel would not be a

future danger, or that his personal moral blameworthiness was not sufficient to justify the

death penalty. See *Rompilla.* 545 U.S. 376. Although jurors are want to be very forgiving,

it has long been a belief that people who commit criminal acts who come from the type of

criminal background that Applicant does, evidencing extreme disadvantage, are less culpable

than defendants "who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989).[42]

In assessing prejudice, both the severity of the aggravating evidence and the nature of the

crime are relevant. In the case at bar, the prejudice analysis is favorably affected by the lack

of a serious criminal history on Manuel's part. Manuel was involved in a burglary of

habitation incident. One of the people involved had a weapon, which Manuel steadfastly

denied he was aware of. Further, Manuel maintained his usual fashion of running away from

the scene of that crime. The rest of Manuel's criminal history involved property crimes. The

psychological testimony that could have been presented to the jury through Dr. Ferrell could

easily have explained these property crimes in the context of Manuel's personal experiences

growing up in the culture that he did.[43] Based upon all the information that was available as

to Manuel's background, it should have been obvious that Manuel "has the kind of troubled

history we have declared relevant to assessing a defendant's moral culpability." *Wiggins,*

535. In this case, there can no doubt that the overwhelming evidence available for mitigation

would have influenced the answers of one, perhaps more, jurors.[44]

---

[42]Abrogated by *Atkins v. Virginia* on the issue that execution of the mentally retarded constituted cruel and unusual punishment, in violation of the 8th Amendment. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed. 2nd 335.

[43]In preparation for the writ hearing, applicant's attorney requested a classification expert to research any disciplinary problems that people, who used to be on death row, but are now in general population, are having. Although the decision was made not to elicit this testimony, it was an interesting study to compare these people, who were previously deemed to be a future danger, by a jury, to people who have always been in general population.

[44]In the case at bar, there was a strategical meeting between the investigator and counsel as to whether to pursue the testimony of jurors to show whether they would have been

Both Dr. Ferrell and Dr. Allen discussed this unbreakable pattern of Manuel's to run from trouble. Dr. Allen provided extensive neurological "imprinting" testimony for the proposition that it would be next to impossible for Manuel to respond in any other fashion but fleeing from a stressful situation. None of the ineffective errors made by defense counsel should be viewed in a vacuum, as the State would have it. It is the cumulative and symbiotic effect of these errors that require reversal. The standard remains that analysis of ineffective assistance claims be reviewed through the prism of the trial as a whole. *See, e.g., Darden v. Wainwright*, 447 U.S. 168, 184 (1986) citing *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *Kyles v. Whitley*, 514 U.S. 419 (1995).

## REQUEST FOR RELIEF TO BE GRANTED

Manuel Garza was denied his due process rights to a fundamentally fair trial to which he was entitled under the Sixth and Fourteenth Amendments to the United States Constitution. Over and above the substantive issues discussed on direct appeal, but not petitioned to the United States Supreme Court, the ineffective assistance of counsel reaped inescapable prejudice requiring relief be granted.

---

influenced. Because the San Antonio Police Officer's Association was so profoundly involved in a show of intimidation, it was felt that no juror would be able to withstand being questioned by the State in the face of an ocean police officers looking angrily upon them. Obviously, under a different set of circumstances, this could be more potentially advantageous.

73

Respectfully submitted,

_____

Suzanne Kramer

101 Stumberg

San Antonio, Texas 78204

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served on the 399th Judicial Court via electronic mail and the United States Postal Service on this the _____ day of August, 2008.

_____

Suzanne Kramer

**EXHIBIT E**