UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

2012 JAN 26  PM 4: 28

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| MANUEL GARZA, JR.,<br>　　　　Petitioner<br><br>V.<br><br>NATHANIEL QUARTERMAN,<br>Director, Texas Department of<br>Criminal Justice, Correctional<br>Institutions Division,<br>　　　　Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. SA-09-CA-528-OG |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

MICHAEL C. GROSS
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
MANUEL GARZA, JR.

## <u>TABLE OF CONTENTS</u>

PAGE

I.      CONFINEMENT AND RESTRAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     HISTORY OF PRIOR STATE COURT PROCEEDINGS . . . . . . . . . . . . . . . . . . 2

        A.      TRIAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      STATE HABEAS CORPUS PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 3

III.    PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599 . . . . . . . 4

IV.     STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES . . . . . . . 5

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VI.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                THE PETITIONER'S RIGHTS TO DUE PROCESS AND A
                FAIR TRIAL, GUARANTEED BY THE SIXTH AND
                FOURTEENTH AMENDMENTS OF THE UNITED STATES
                CONSTITUTION, WERE VIOLATED WHEN THE TRIAL
                JUDGE REMOVED THE PETITIONER'S FIRST CHAIR
                COURT APPOINTED ATTORNEY IMMEDIATELY
                BEFORE TRIAL COMMENCED.

                ARGUMENT AND AUTHORITIES
                IN SUPPORT OF CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ii

CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

THE PETITIONER'S RIGHT TO CROSS-EXAMINATION, GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE REFUSED TO ALLOW A WITNESS TO TESTIFY THAT THE SHOOTING IN THIS CASE WAS AN ACCIDENT.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

THE PETITIONER'S TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    The standard for ineffective assistance . . . . . . . . . . . . . . . . . . . . . . . 54
    Failure to submit veniremen to death penalty questions . . . . . . . . . 59
    Failure to investigate/present mitigating evidence . . . . . . . . . . . . . 73
    Failure to call investigator as witness . . . . . . . . . . . . . . . . . . . . . . . 103
    Failure to introduce hospital records into evidence . . . . . . . . . . . 105

CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

THE PETITIONER'S RIGHT TO DUE PROCESS, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE REVERSIBLY ERRED IN REFUSING TO ALLOW THE APPELLANT TO INTRODUCE EVIDENCE OF THE COMPLAINANT'S CHARACTER FOR VIOLENCE.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

CLAIM V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    THE AGGRAVATING FACTORS EMPLOYED IN THE
    TEXAS CAPITAL SENTENCING SCHEME ARE VAGUE
    AND DO NOT PROPERLY CHANNEL THE JURY'S
    DISCRETION IN VIOLATION OF THE EIGHTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

CLAIM VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

    THE DUE PROCESS CLAUSE OF THE FOURTEENTH
    AMENDMENT TO THE UNITED STATES CONSTITUTION
    REQUIRES A REVIEWING COURT TO ENGAGE IN A
    PROPORTIONALITY REVIEW IN DEATH PENALTY
    CASES.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

CLAIM VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

    THE STATUTORY PENRY SPECIAL ISSUE IN ARTICLE
    37.071 FAILS TO PLACE THE BURDEN OF PROOF
    REGARDING AGGRAVATING EVIDENCE ON THE
    STATE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH,
    AND FOURTEENTH AMENDMENTS OF THE UNITED
    STATES CONSTITUTION.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

CLAIM VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

    THE TEXAS CAPITAL SENTENCING STATUTE
    VIOLATES THE EIGHTH AND FOURTEENTH
    AMENDMENTS OF THE UNITED STATES
    CONSTITUTION IN THAT IT FAILS TO INFORM THE
    JURY THAT A SINGLE HOLDOUT JUROR ON ANY
    SPECIAL ISSUE RESULTS IN AN AUTOMATIC LIFE
    SENTENCE.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

CLAIM IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

    JUROR'S INABILITY TO PREDICT FUTURE
    DANGEROUSNESS.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

VII.  THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e)
     SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT . . . . . 164

VIII. PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

IX.   VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

X.    CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

XI.   APPENDIX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
    A.    Judgment and Sentence
    B.    Opinion of Court of Criminal Appeals on Direct Appeal
    C.    State Writ of Habeas Corpus
    D.    Applicant's Proposed Findings of Fact and Conclusions of Law
    E.    State's Proposed Findings of Fact and Conclusions of Law and Order
    F.    Order of Trial Court Recommending Denial of Relief
    G.   Order of Texas Court of Criminal Appeals Denying Relief
    H.   Jack Ferrell affidavit dated 10-21-04
    I.    Trial defense attorney Callahan's court-appointed payment voucher
    J.    Jack Ferrell affidavit dated 12-15-09
    K.   Gerald Byington affidavit dated 12-10-09
    L.    Raul Gonzalez, Jr. affidavit dated 6-14-10

M.   Maria Gonzalez affidavit dated 6-13-10
N.   Corrina Garza affidavit dated 6-15-10
O.   Maria Uribe affidavit dated 6-12-10
P.   Emma Uribe affidavit dated 6-12-10
Q.   Viola Martinez affidavit dated 6-12-10
R.   Vicenta Arvizu affidavit dated 6-12-10
S.   Joann Murphey affidavit dated 6-16-10
T.   Gerald Byington affidavit dated 6-16-10
U.   Ann Matthews affidavit dated 6-17-10
V    Manuel Garza records
W.   Manuel Fernando Gonzalez records

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MANUEL GARZA, JR.,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CASE NO. SA-09-CA-528-OG** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

MANUEL GARZA, JR., the Petitioner in the above styled and numbered cause, pursuant to 28 U.S.C. § 2254, petitions this Honorable Court to issue a writ of habeas corpus ordering the Petitioner's release from confinement on the ground that the Petitioner is being denied his liberty as a result of an illegal and unconstitutional judgment of conviction for capital murder and sentence of death.

## I.

## CONFINEMENT AND RESTRAINT

The Petitioner is confined on death row at the Polunsky Unit, Texas Department of Criminal Justice, Correctional Institutions Division, Livingston, Texas.   Nathaniel Quarterman (now replaced by Rick Thaler), the Director of the Texas Department of

1

Criminal Justice, Correctional Institutions Division, is the state official responsible for the confinement of the Petitioner. The District Court of Bexar County, Texas, 399th Judicial District, in and for Bexar County, the Honorable Juanita Vasquez-Gardner presiding, entered the judgment and sentence under attack. See attached Judgment of Conviction at Exhibit A. The judgment was signed on November 1, 2002. Id. The Petitioner is confined pursuant to this judgment imposing the death penalty for the offense of capital murder in Cause No. 2001-CR-1877. Id. The Petitioner is indigent and has been indigent throughout all prior proceedings in this cause.

## II.

## HISTORY OF PRIOR STATE COURT PROCEEDINGS

### A.

### TRIAL PROCEEDINGS

The indictment alleged the complainant was murdered on February 2, 2001. (T - 15).[1] The Petitioner was arrested on February 4, 2001. (R - v.27 - 65, 72). The Petitioner was indicted for capital murder on April 11, 2001. (T - 15). The indictment alleged that Manuel committed capital murder on or about February 2, 2001 by shooting a peace officer acting in the lawful discharge of an official duty. Id. at 15.

---

[1]The clerk's record from the trial will be referred to as "T and page number." The court reporter's record from the trial will be referred to as "R and volume and page number." The court reporter's record from the state writ hearing will be referred to as "WHC and volume and page number."

The trial began with jury selection on August 30, 2002. (R - v.3 - 1, 4). After the jury was empaneled and sworn on October 15, 2002, the prosecutor read the indictment which alleged capital murder. (R - v.18 - 1, 8, 12-13). The Petitioner entered a plea of not guilty. Id. at 13. The jury returned a verdict on October 24, 2002 finding the Petitioner guilty of capital murder as charged in the indictment. (R - v.30 - 1, 73). The jury returned an affirmative answer to Special Issue Number One and a negative answer to Special Issue Number Two on October 29, 2002. (R - v.33 - 1, 111). As required by the jury's verdict, the trial judge sentenced the Petitioner to death. Id. at 113.

## B.

## DIRECT APPEAL

The Texas Court of Criminal Appeals, in an unpublished opinion, affirmed the conviction and sentence on February 16, 2005. Garza v. State, No. AP-74,467 (Tex. Crim. App., February 16, 2005). See Exhibit B. A petition for writ of certiorari was not filed.

## C.

## STATE HABEAS CORPUS PROCEEDINGS

On October 25, 2004, counsel timely filed with the 399th Judicial District Court the Applicant's Post-Conviction Application for Writ of Habeas Corpus. See Exhibit C. The writ was filed before the direct appeal was completed, so no days elapsed from the time that the direct appeal was completed until the filing of the writ.

On March 24 and 31, 2008, and April 23, 2008, hearings were held on this state writ. (WHC - v.2 - 1; WHC - v.3 - 1; WHC - v.4 - 1). In August 2008, the Petitioner filed his

Proposed Findings of Fact and Conclusions of Law.  See attached Exhibit D.  In September 2008, the State filed the State's Proposed Findings of Fact and Conclusions of Law with an Order for the signature of the trial judge which was adopted in its entirety by the trial judge on September 22, 2008.  See attached Exhibits E, F.  The trial judge simply adopted the State's proposed findings of fact and conclusions of law, recommending that relief be denied, and signed page 38 for the judge's signature which was the same page as page 38 of the State's proposed findings.  The State's Proposed Order is attached as Exhibit E and the Court's Order is attached as Exhibit F.  On December 17, 2008, the Texas Court of Criminal Appeals adopted the findings of fact and conclusions of law and recommendation of the trial judge and denied relief.  A copy of this Order is attached as Exhibit G.

As ordered by this Court, a subsequent writ was filed in state court on June 18, 2010. On October 12, 2011, the Texas Court of Criminal Appeals dismissed the subsequent writ as an abuse of the writ without considering the merits of the claims.

### III.

### PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599

On July 1, 2009, the Petitioner filed with this Court a motion for appointment of counsel pursuant to 18 U.S.C. § 3599.  This Court appointed counsel on July 8, 2009 to represent the Petitioner in this federal habeas corpus proceeding challenging the Petitioner's state criminal conviction for capital murder and sentence of death.  This Court's Order Appointing Counsel and Setting Deadlines ordered that this federal habeas corpus petition

4

be filed on or before November 20, 2009.  On September 23, 2009, this Court extended the due date for the filing of the federal habeas corpus petition to on or before December 15, 2009.  The original petition was timely filed with this court.

On December 7, 2011, this Court ordered (Doc 28) that this amended writ be filed on or before January 27, 2012.  This amended writ is therefore has been timely filed.

## IV.

## STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES

The Petitioner has now exhausted the state remedies for the claims he is presenting in this original federal habeas corpus action.  The Petitioner's original claims were made in the state habeas action, proven at the hearing on the state writ in the trial court, but denied in state court.  The trial judge recommended denial of relief which was approved by the Court of Criminal Appeals.  The amended claims were made in the subsequent state habeas and were dismissed by the Texas Court of Criminal Appeals.  The Petitioner has met the burden, pursuant to 28 U.S.C. § 2254(b)(1), that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.

## V.

## STATEMENT OF FACTS

Maria Garza is the mother of the Petitioner, Manuel Garza.  See Exhibit L.  When Maria was pregnant with Manuel, Maria used heroin and other drugs and alcohol.  Id.  As a

result, Manuel suffers from Fetal Alcohol Syndrome.  See Exhibits S, T.  When Maria was pregnant with Manuel, Maria also sold drugs along with her husband, Manuel Fernando Gonzalez (Fernie), and Maria's brothers, Pedro (who was stabbed to death in prison when he was 22 years old) and Louis.  See Exhibits L, R.  They would all break into buildings and homes to steal whatever they could find.  See Exhibit L.  The families were very poor and little emphasis was made on education so almost everyone dropped out of high school.  Id.  When Manuel was born, he was cross-eyed and this embarrassed Fernie.  See Exhibit O.  When Manuel was still a toddler, Fernie would make Manuel drink beer and on one occasion, Manuel actually fell asleep as a result of drinking beer.  See Exhibit M.  Fernie thought is was funny to give Manuel, a toddler, beer and see the effect it had on Manuel.  Id.  Fernie even took a picture of Manuel holding a beer which is attached to Maria's affidavit.  Id.  Maria believed this had an effect on Manuel.  Id.  Maria did not want Manuel to have Fernie's last name which angered Fernie and caused him to again accuse Maria of having affairs with other men including Fernie's brother, Raul.  Id.  Fernie moved the family constantly because Fernie was afraid the police would find out where he lived and arrest him.  Id.  The family never lived in the same place for more than a year.  Id.  This resulted in Manuel always going to a new school and living in a new neighborhood.  Id.

Fernie was very abusive toward Maria.  See Exhibit L.  Fernie once pushed Maria out of a moving car.  See Exhibit R.  Fernie forced Maria to stay inside their house with the windows and doors shut and locked and curtains over the windows.  See Exhibit M.  Maria was prohibited from answering the door or the telephone if Fernie was not at home.  Id.

6

Fernie would punch Maria with a closed fist and kick Maria with steel toed boots when Maria fell to the floor. Id. Fernie would then force Maria to have sex with him. Id. When Maria informed Fernie's father about the beatings, he replied that she probably deserved it and just laughed at Maria. Id. Maria often had black eyes and bruising as a result of the abuse by Fernie. See Exhibit L. Whenever someone came to their house, Fernie made Maria stay in her room and not talk to anyone. Id. Fernie would beat Maria in front of Manuel and the other children. Id. Fernie forced Maria, Manuel, and their other children to help Fernie sell drugs. Id. Fernie would have the kids hold the drugs when they were selling. Id. The kids watched Fernie doing drugs and selling drugs. Id. Fernie kept his pistol in Maria's purse which resulted in Maria being arrested for illegal carrying. Id. Raul's father went to check Fernie's house after the arrest to ensure no drugs were in the house for the police to find, and Manuel's sister, Corrina, told him where the drug money was hidden. Id. When Fernie was released from jail, he severely beat Corrina for telling her grandfather about the location of the money. Id. Maria and Fernie would leave the kids unsupervised for several days. Id. The kids were ten years of age and younger. Id.

Maria had no interest in what the children were doing either at home or in school. See Exhibit N. Maria never asked them what they did in school that day or if they had homework. Id. Maria never asked them if they had friends. Id. When the children would ask Maria for help or try to converse with her, Maria would just ignore them and not even respond to them. Id. It did not take the children long to learn not to ask or talk to Maria

7

about what the children had done at school or whatever.  Id.  It was worse for Manuel, however, than it was for Corrina.  Id.  Maria or Fernie would send Corrina to her room, but they would send Manuel outside the home because Maria and Fernie just wanted Manuel to be gone and out from under foot.  Id.  Maria and Fernie really did not care what Manuel did. Id.  The children would always find drug paraphernalia, such as used heroin needles, around the house.  Id.  Not once was there ever a birthday party for Manuel or Corrina.  See Exhibit O.  Fernie never talked about Manuel, never told anyone that he was proud of Manuel, and never seemed to care about Manuel.  Id.

Fernie never believed that his and Maria's child, Corrina, was his.  See Exhibit M. Fernie constantly accused Maria of getting pregnant with Corrina with another man.  Id. After Corrina was born, Fernie began cheating on Maria with other women.  Id.  Corrina eventually informed Maria that Fernie had sexually abused Corrina.  Id.  When Corrina was six or seven, Maria and Fernie fought in their bedroom and Fernie left the bedroom and entered Corrina's bedroom and got into bed with Corrina.  See Exhibit N.  Corrina is unsure if sexual intercourse occurred because she really does not like to think about that episode. Id.  Corrina does know, however, that she "was hurt and scared and dad threatened me that if I told anyone more bad things would happen to me."  Id.  Corrina was terrified that Fernie would return to the home after Fernie's last time in prison in 1994.  Id.

Fernie was very abusive toward Manuel while Manuel was young.  See Exhibit L. Fernie would make Manuel stand in the corner for hours at a time and would be rigidly strict

with Manuel and Corrina. Id. At one family gathering, Fernie forced Manuel to sit on the floor next to Fernie for hours and be perfectly quiet. Id. Fernie repeatedly beat Manuel with a belt. Id. Anything would set either Maria or Fernie off. See Exhibit N. When Maria or Fernie became angry, they would get the belt. Id. Manuel and Corrina would run or crouch in a corner attempting to protect themselves from being whipped. Id. Corrina stated that Manuel would come home from school and stay outside until dinner and then go back outside until bed time because, "It just wasn't safe in our house." Id. There was always tension in their house. See Exhibit Q. "It seemed [] that everyone was always afraid and walking on eggshells." Id. Whenever Fernie "walked through the door everyone would try to stay very quiet and we would all go to another room to play or watch T.V." Id. At home, Fernie always seemed angry, and his tone of voice was always angry. Id. Fernie "would start yelling at someone about something as soon as he came through the door." Id. Fernie never spoke to Manuel or Corrina in a reasonable tone of voice - Fernie was always yelling at them and they seemed to be afraid to approach, ask, speak, or play with Fernie. Id. Fernie never did anything with Manuel that a normal dad would do with his son. Id. Fernie never held Manuel when Manuel was little, never played with Manuel, never asked how Manuel's day went at school, or even sat and watched TV with Manuel. Id. Fernie would be heard at family gatherings telling Manuel and Corrina when they were little, "You're not mine." Id. It was obvious that Fernie had done bad things to Manuel just from the way Manuel acted whenever Fernie was present. Id.

9

Fernie would beat Manuel with a belt so hard that Fernie tore open Manuel's back and Manuel would bleed from the beatings.  See Exhibit M.  Fernie never believed that Corrina or Manuel were his children, so Fernie would beat them more severely than Fernie's other children.  Id.  It seemed to the children as if Fernie beat Maria all the time.  See Exhibit N. Yelling and fighting were constants at this house.  Id.  Manuel and Corrina spent most of their time hiding in their room afraid to draw attention to themselves since that would result in Fernie beating them.  Id.  Fernie had everyone in the house "so beat down that they were all afraid of him.  He just controlled them."  See Exhibit O.

Manuel's aunts, uncles, and parents were in and out of jail or prison when Manuel was young.  See Exhibit L.  "It seemed that everyone in the extended family was getting arrested and someone was always in jail."  See Exhibit N.  Fernie and Maria were always getting arrested - "That was also pretty normal at our house."  Id.  When Corrina was in middle school and Fernie was in jail, five of their cousins came to live with Maria and the children because both of the cousins' parents were in jail.  Id.  It was Corrina's job to ensure dinner was made, everyone was fed, and dishes were cleaned or Corrina would get in trouble.  Id.

All of the men in Fernie's and Maria's families went to prison at least once.  See Exhibit L.  Fernie would steal cars and alter the VIN number and the license plates.  Id.  He would drive the cars for awhile and then sell them before he would steal another car.  Id. This was Manuel's introduction to crime.  Id.  Manuel learned he could have nice things by stealing them.  Id.  Fernie instructed Manuel on how to burglarize houses, steal cars, and hot

wire cars.  <u>See</u> Exhibit O.  Fernie went to prison several times while Manuel was young.  <u>See</u> Exhibit L.  When Fernie was in prison, Maria would drink and use drugs and have boyfriends.  <u>Id.</u>  This was confusing to Manuel.  <u>Id.</u>  The last time Fernie was released from prison, Maria made up a story that Fernie had molested Corrina so that Fernie could not be paroled to their home.  <u>Id.</u>  Fernie was very upset about this and overdosed on heroin a few months after his release from prison.  <u>Id.</u>  After Fernie's death, Manuel began to get into trouble on a regular basis.  <u>See</u> Exhibit M.  Manuel began breaking into cars to steal stereos, was taken to juvenile detention, and eventually sent to TYC.  <u>Id.</u>  After Fernie's death, Manuel "just gave up."  <u>See</u> Exhibit N.  Manuel seemed to be getting arrested all the time then.  <u>Id.</u>

Given the environment in which Manuel was raised, Manuel did not have a choice about what he did with his life.  <u>See</u> Exhibit L.  His parents were high school dropouts, did drugs, and were involved in crime.  <u>Id.</u>  Fernie died when Manuel was only fourteen years old.  <u>Id.</u>  Manuel had to help support the family after the death of Fernie.  <u>Id.</u>  The only way Manuel knew how to get money was to steal things and sell them.  <u>Id.</u>  Manuel was never told not to commit crimes, and his family instructed Manuel how to commit crimes and to do it well.  <u>Id.</u>  Fernie would take Manuel to steal things.  <u>See</u> Exhibit N.  Fernie left Manuel a Harley Davidson motorcycle after Fernie died, but Maria had Manuel get the bike from us and Maria sold it.  <u>See</u> Exhibit L.  At Fernie's funeral, Maria discovered that Fernie had a whole different family with another woman.  <u>See</u> Exhibit R.  A woman approached Maria at the funeral and introduced herself to Maria as Fernie's wife.  <u>Id.</u>

11

The above provide extensive and graphic descriptions of the physical and emotional abuse suffered by Manuel as a child and by everyone else in the family. See Exhibit T. "Manuel's extended family is replete with individuals who were engaged in drug use and distribution as well as other criminal activity that resulted in their arrest and incarceration." Id. Only Manuel's maternal grandmother and oldest aunt have not had substance abuse and legal problems. Id. Manuel's childhood reflects a chaotic and destructive influence of substance abuse on the family's ability to care for the children in the home including the death of Manuel's father, Fernie, as a result of an overdose on heroin when Manuel was thirteen. Id. "Further contributing to the chaos and dysfunction of Manuel's family was the active involvement of his father in criminal enterprises." Id. "All of this was also nested in two families where the chaos of drugs and criminality was the norm." Id.

Manuel's family experienced hardship as a result of the frequent family relocations that occurred on an almost yearly basis. Id. Between kindergarten and ninth grade, Manuel lived in at least twelve different addresses and attended nine different schools. Id. "These relocations not only disrupted family life but, for Manuel, disrupted his educational and social life." Id. "Due to the frequent relocations he was unable to develop the normal friendships, relationships and educational goals that are so important to the normal social development of an individual." Id. "This social isolation from others also increased the impact of the dysfunction of Manuel's own family experience as without any social references he was unable to even identify the abnormal nature of his own developmental

12

experiences." Id. There was no stability within the extended family as throughout Manuel's development extended family members were being repeatedly arrested and incarcerated. Id. "The arrest and incarceration of extended family members had an immediate impact on Manuel as the make-up of the household that he lived in was constantly changing as cousins were constantly moving in and out of the household while their parents were incarcerated." Id.

Maria and Corrina testified at the punishment hearing in Manuel's capital case. See Exhibits M, N, T. They were never, however, interviewed by counsel prior to their testimony except for a brief conversation in the hall outside the courtroom immediately prior to their testimony. Id. They had already offered much more information to the mitigation specialist pretrial, but when they testified, it seemed as if counsel was unaware of any of the information they had given the mitigation specialist. Id. The defense mitigation specialist had been appointed less than a month before the start of jury selection which was an inadequate amount of time in which to complete a thorough mitigation investigation. Id. The mitigation specialist's attempts to introduce mitigation witnesses to trial counsel were rebuffed by trial counsel. Id.

As a result of his abusive early childhood environment, Manuel endorses symptoms of a discrete and recognizable pattern of psychological problems. See Exhibit S. "His psychological discomfort seems manifested partly in a pattern of somatic complaints that may be associated with symbolic representation of psychological pain by an individual who is

13

psychologically unsophisticated, and/or by genuine physical symptoms associated with inner tension and/or affective disturbance." Id. "His affective disorder is accompanied by an apparent chronic and ingrained paranoia with possible delusional features, that would be consistent with an abusive early childhood environment." Id. "Manuel may exhibit features of fetal alcohol syndrome" as a result of his mother drinking alcohol while pregnant with Manuel. Id. Manuel's psychological testing indicated a developmental learning disorder, and this presence of a learning disability is an indicator for diagnosis of fetal alcohol syndrome. Id. Manuel has exhibited deficiencies in executive functions since at least the age of thirteen, and this is consistent with a diagnosis of fetal alcohol syndrome (FAS) since FAS cognitive symptoms include deficiencies in executive functions. Id. The emotionally intense and ambivalent relationship between Manuel and his father from early developmental years disrupted Manuel's normal cognitive development and acquisition of cognitive structure. Id. Manuel's fetal alcohol exposure damaged his neural structures necessary for development of cognitive structures and impulse control/executive functions. Id. Manuel suffered from severe mood disorder, delusional disorder, and hallucinations. Id. "Surprisingly absent from his history is any indication that he has been evaluated for medication to address behavioral issues." Id.

**None of the above mitigating evidence was cohesively introduced at trial and most of it was not introduced at all.** The following presents a very disturbing timeline at the trial level of Manuel's case and explains why this mitigating evidence was not introduced

14

at trial:

| | |
|---|---|
| 2-4-01 | Manuel arrested between 12:00 a.m. and 1:00 a.m. |
| 2-4-01 | Manuel interrogated and gives statement at 2:00 a.m. |
| 2-6-01 | Manuel gives second statement at 12:10 p.m. |
| 2-6-01 | Manuel finally able to use a form to request court-appointed attorney |
| 2-14-01 | Court-appointed attorney assigned to Manuel's case |
| 2-21-01 | Court-appointed attorney withdraws as unqualified for capital cases |
| 2-21-01 | 1st and 2nd chair attorneys appointed to represent Manuel |
| 5-8-01 | Investigator appointed but lost license and did no work on case |
| 7-11-**_02_** | 1st chair withdraws from case without notice or hearing for Manuel |
| **_7-19-02_** | **_New attorney appointed_** to represent Manuel with the 2nd chair counsel |
| 7-23-02 | Psychologist appointed to assist defense |
| 8-2-02 | Mitigation specialist appointed to assist defense |
| 8-9-02 | Psychologist meets with Manuel for 1.5 to 2 hours; counsel tells him stop work |
| 8/02 | Mitigation specialist works month on case and stops; is paid for 12.75 hours |
| 8-29-02 | Pretrial hearing on 36 motions/suppression hearing |
| **_8-30-02_** | **_Jury selection begins_** |
| 10-24-02 | Manuel is convicted of capital murder |
| 10-28-02 | Psychologist reviews records 1 hour; meets with counsel for 45 mins |
| 10-29-02 | Manuel sentenced to death after jury answers special issues |

(R - v.2 - 1, 32; R - v.3 - 1; R - v.27 - 38-39, 65, 72; R - v.30 - 1, 73; R - v.33 - 1, 111; R - v.34 - State Exhibits A, B; WHC - v.2 - 47-48, 50, 54, 65; T - 3, 5-8, 35, 76, 86, 245, 247).

_**It is undisputed that first and second chair counsel did absolutely nothing on this**_

_**case**_ until the first chair counsel was allowed to withdraw on July 11, 2002 for a vacation.

(WHC - v.2 - 63-66; T - 76, 83-84, 88).  "We – we hadn't done anything on the case up until

that point [July 11, 2002] . . . So I – I – I also panicked as well as getting mad."  (WHC - v.2

- 63-64).  Second chair counsel, on July 24, 2002, had not received official notice of the

August 30, 2002 trial date and needed a continuance to "gain more knowledge of the case

and . . . to prepare a proper defense for defendant prior to trial."  (T - 42).  Counsel needed

a continuance because "we were clearly not prepared for trial."  (WHC - v.2 - 68).  Counsel

testified:

> And then at that point **_during that period of time is when I first_**
> **_start getting a look at the district attorney's file_**.  We had had
> no discovery.  **_We hadn't even looked at the district attorney's_**
> **_file prior to that time [July 2002]_**.

Id. (emphasis added).

The investigator who had been appointed in May of 2001 had some "legal problems"
and could not work on the case and "never got around to doing anything" and "never did
investigate the case."  (WHC - v.2 - 65, 87; T - 42).  Trial counsel testified at the state writ
hearing that this "wasn't a big worry.  You know how it is when you're a lawyer, you go off
and do other things . . . you find something else to do and put it out of your mind.  So when
this crisis developed [1st chair withdrew and trial set in a little over 30 days] . . . I filed
another motion asking to have another investigator appointed . . . And we started
investigating the facts, looking for witnesses and so forth."  Id. at 65-66.

"The only thing that was done on punishment at that point [July 2002] was Callahan
[the newly appointed attorney] filed a motion to appoint Doctor Ferrell to do some kind of
psychological exam."  Id. at 66.  Second chair counsel testified that, to his knowledge,
Callahan did nothing for the preparation of sentencing or guilt/innocence, and Callahan did
not meet with Dr. Ferrell prior to trial.  Id. at 70-71.  Second chair testified that Callahan was
a friend of his, but Callahan was "pretty well not very reliable as far as putting necessary
work on a case."  Id. at 64.  Second chair testified that Callahan was not interested in
developing any mitigation evidence for trial and that "Callahan did not have any regard for
mitigation evidence, period."  Id. at 76.  Regarding mitigation and the preparation for the

sentencing phase of Manuel's trial, defense counsel testified at the state writ hearing as follows:

> This capital murder case, which I was second chair, at that point in my experience and knowledge about capital murder cases, *__mitigation wasn't a real concern__*. I had -- I had tried a lot of murder cases, I had tried a lot of cases. I had done a great deal of trial work. It was in my mind and in my experience and training, it was the *__only difference between a capital murder and a murder would be the jury selection__*. So when Callahan came onto the case, we divided the responsibility. Callahan, you do the jury selection because he had experience with capital murders before so you do the jury selection, which is in my opinion was important, and I would continue on doing all of the preparing for the guilt/innocence trial. So that's the way we went ahead.

* * *

> We divided it guilt/innocence and voir dire. *__We never talked about punishment__*. He [Callahan] says don't worry about it and filed a motion for Ferrell. That was the extent of it. The other thing I did on punishment, after getting Jeff Mitchell appointed, I had meetings with Jeff Mitchell, Jeff Mitchell was an investigator and a former DPS officer and he started – he's the one that first brought up the idea about a mitigation specialist to me. He – he suggested that to me.

* * *

> We [the mitigation specialist and second chair counsel] got crossways and finally I terminated her services. I just told her that we wouldn't need her anymore and she stopped working. At that point I did not take any steps to appoint another mitigation specialist, neither did Denny Callahan. We just let it go. And I continued on with what I was doing and *__we just kind of dropped the ball on mitigation__*.

* * *

> We had – we had to develop the – the – the evidence and – and defend against the evidence for guilt/innocence and then later at some point would get around to punishment. *__There was__*

17

*never any punishment strategy or any mitigation strategy* . . .
The only – there was no mitigating evidence.   The only
punishment evidence we presented was the sister, Manuel's
sister, his mother, and an uncle.  Or an uncle or a cousin or some
man who was one of Manuel's relatives who was – who was an
ex convict actually and didn't help a whole lot.

* * *

There wasn't any others [mitigation witnesses at trial]
because we didn't investigate any further than that.  The only
ones we knew about was the mother, the sister, and the uncle
and there may have been other family members, but there was
no other further investigation, you know, so *there wasn't any
other witnesses that we knew about because we hadn't looked
for any* . . . My investigator [appointed after the initial
investigator], referring to Jeff Mitchell, did not do any
mitigation investigation.

* * *

The only – the only investigation per se that was done on
mitigation was by the mitigation specialist . . . I was concerned
because most of our discussions during that period of time was
about her getting paid. *I couldn't get information from her on
certain occasions because she wasn't getting paid* . . . It was
only after – it was – *it was like negotiating for the reports*.
There would be a summary type report about what the sister had
said or the mother had said, that type of thing, that I received at
some point.  She would get paid.  Finally at some point after she
was terminated I wanted – in fact, I asked her on a number of
occasions, I wanted all of her notes of the interviews, not just
that summary report of so-and-so would say this or said this or
whatever.   I said give me all of your interview notes.
Everything that you've got on these people . . . *I don't even
know if I got it because we were fighting about it all the time*.
Finally we reached a point where it wasn't worth fighting about
anymore because I had to get ready for trial.  See? *So I kind of
like let it go because it's not worth the hassle* . . . To my
knowledge – to my knowledge *Callahan did not talk to those
people [defense punishment witnesses] until they showed up
for court at the punishment hearing*.

* * *

18

I don't think I did [review Manuel's prior records before trial started]. I don't think I did. It was – he had juvenile records, he had massive criminal property crime, extensive. There were like, you know, several – probably a score of – of misdemeanors and property – small property felonies, that type of thing. I don't know if I reviewed all those records. I tried to but I don't know if I did.

Id. at 67, 69, 73-74, 92-97 (emphasis added).

Callahan testified that he was responsible for the punishment phase of the trial. (WHC - v.4 - 8-9). Callahan testified that he did not use a mitigation specialist or any expert regarding mitigation. Id. at 9. Callahan admitted that the only time he spoke with members of Manuel's family was on October 17, 2002 which was during the guilt/innocence phase of the trial. Id. at 19. Callahan claimed that only three people testified at sentencing for Manuel because "out of the other people I had spoken to those were the only ones that showed up." Id. at 10-11. Callahan did not "contemplate" subpoenaing the other witnesses. Id. at 11. Callahan admitted that he first interviewed his sentencing witnesses at recesses during trial. Id. at 20. Callahan's voucher for his court-appointed services confirms that this is the only contact he had with potential mitigation witnesses other than his scant contact with Dr. Ferrell. See attached Exhibit I (Callahan voucher from state habeas hearing). At sentencing, Callahan called only Manuel's uncle, sister, and mother. (R - v.33 - 26, 41, 54).

Callahan claimed that he had Dr. Ferrell prepare a mental health evaluation. (WHC - v.4 - 9). Callahan thought he would have Dr. Ferrell testify regarding Manuel's "possible mental fragility or his lack of perfect understanding of his circumstance." Id. at 9-10.

19

Callahan admitted, however, that the extent of his contact with Dr. Ferrell was: a phone call for 30 minutes on July 19, 2002; a 15 minute letter to Dr. Ferrell on July 22, 2002; another letter to Dr. Ferrell during trial in October 2002; and a ½ hour conference with Dr. Ferrell during trial in October 2002. Id. at 31. Callahan claimed that he did not have Dr. Ferrell testify because Dr. Ferrell allegedly believed Manuel was a future danger after Callahan provided Dr. Ferrell with the State's 404(b) notice and his discovery notes. Id. at 10. This "testimony" is directly contradicted, however, by the affidavit submitted by Dr. Ferrell for the state habeas. See attached Exhibit H. In that affidavit, Dr. Ferrell stated that, "I would have testified at the trial that he [Manuel] did not present as a future threat or danger to himself or others, based upon my limited evaluation." Id.

Dr. Ferrell testified at the state habeas hearing. (WHC - v.2 - 44). The court appointed Dr. Ferrell on July 23, 2002 to assist the defense. (T - 88A). Dr. Ferrell went to the jail on August 9, 2002 and conducted a mental status examination and a brief social history on Manuel for 1.5 to 2 hours. (WHC - v.2 - 46-47, 54). Dr. Ferrell was not told to write a report. Id. at 47. Dr. Ferrell spoke to defense counsel on August 15, 2002 and was told not to do anything else on the case, so he did not talk to any family members. Id. at 47, 54, 56. On October 28, 2002, defense counsel met with Dr. Ferrell in a cafeteria during the sentencing phase of the trial. Id. at 48. Counsel provided Dr. Ferrell with a "stack" of documents to include school records and incarceration records. Id. at 47-53. Dr. Ferrell reviewed the records for one hour and met with counsel for 45 minutes. Id. at 50. Dr. Ferrell

was of the opinion that Manuel was not a future danger and so informed counsel. Id. at 51. Counsel, however, did not call Dr. Ferrell as a witness at sentencing.

*__Without any preparation for mitigation or sentencing, and with about only one__ __month preparation for the guilt/innocence phase of trial, counsel began jury selection__*. It was impossible, therefore, for counsel to have any theme or strategy in the questioning of the veniremen, especially regarding the special issues at sentencing. Counsel had no idea what evidence would be admitted at sentencing against Manuel or what mitigation evidence would be offered for Manuel and why. Counsel had no idea what issues should be asked of the veniremen to determine if selected jurors would be amenable to the defense at guilt/innocence or to the sentencing argument of defense counsel. Callahan testified that he was also responsible for the jury selection, and his total lack of preparation for sentencing was reflected when he testified regarding his jury selection "strategy" as follows:

> My emphasis was to attempt to find a person who on the record would state that they were capable of answering the questions that would favor the State, but that in my opinion psychologically when it came down to it they could not. Therefore, you might call the strategy to find a ringer.

(WHC - v.4 - 8-9).

Prior to jury selection, the state knew its evidence would allow it to argue the following at sentencing: (1) Manuel shouted to the complainant "you bitch" while the complainant was dying; (2) Manuel called his friends and partied after the shooting; (3) sixty-three punishment witnesses would testify against Manuel; (4) Manuel made cut throat gestures to officers in the detention area; (5) Manuel pointed a fake gun at a detective; (6)

February 1995 Manuel committed burglary of a habitation and ran from the police; (7) April 1995 Manuel stole a vehicle and was placed on juvenile probation for that offense; (8) May 1995 Manuel stole a vehicle; (9) October 1995 Manuel stole a vehicle, committed burglary of a habitation, and possessed marijuana; (10) February 1996 Manuel stole a vehicle, committed burglary of a habitation, and possessed a handgun; (11) Manuel was sent to TYC and was offered rehabilitation and did a year of boot camp; (12) Manuel is released and less than one month later is in possession of stolen property and a pistol; (13) Manuel possessed three knives at school and a screwdriver; (14) Manuel is sent to TYC and escapes from the Turman House in Austin on 12-24-97, two weeks after his arrival; (15) a 1997 report from the Turman House states that Manuel is a significant threat to public safety given his past criminal history; (16) five days after escaping, Manuel steals a car; (17) two days later, Manuel is involved in a high speed chase with the police and crashes into a school fence and resists arrest, moves his handcuffs to the front of his body, and is in possession of a handgun; (18) Manuel is placed in jail from January 1998 to November 1998 and is then placed in a maximum security facility; (19) while on parole in 1998, Manuel commits another burglary of a vehicle; (20) Manuel commits vehicle theft in March 1999 and April 1999, commits theft in May 1999, and vehicle theft in July 1999 resulting in another car chase with the police; (21) Manuel is sent to prison for one year, is released in June 2000 and commits another offense in July 2000 and escapes from a police car and moves his cuffs to the front of his body; (22) Manuel commits burglary, possession of marijuana, and DWI in October

22

2000; (23) Manuel commits two burglaries in November 2000 and asks for another chance; (24) Manuel commits burglary in January 2001 - a week before the death of the complainant. (R - v.33 - 78-79, 98-102).

The defense had no idea how it would explain this record or fit it into Manuel's mitigation case, because counsel admitted at the writ hearing that counsel had not reviewed all of Manuel's priors. Additionally, the writ record is uncontradicted that Callahan did not believe in mitigation. He did not prepare for sentencing until he interviewed a few witnesses in the hallway of the courthouse during the guilt/innocence phase of the trial.

With Callahan's "strategy" in mind and the state's sentencing evidence against Manuel, jury selection began on August 30, 2002. (R - v.3 - 1). The first juror selected was Ms. Knipp. (R - v.4 - 13-50). Ms. Knipp stated she believed in the death penalty even in cases that did not result in the death of the victim, and she could participate in a process that would result in a death sentence including a capital case involving the killing of a police officer. Id. at 15-16. Without objection, the state informed Ms. Knipp about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself. Id. at 31-33. Without objection, the state informed Ms. Knipp about the second special issue as follows: (1) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence "sufficiently mitigating to warrant basically changing my answer from death to life;" and (2)

23

a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 36-38. Callahan asked Ms. Knipp if: (1) she presumed Manuel to be innocent; (2) "probability" means more than the flip of a coin or believing the weatherman; (3) she could follow the law on self-defense; (4) she could imagine no death penalty in Texas in 300 years; (5) she would ensure the jurors were fair during deliberations; (6) she were in Texas in the 1700's with indians looking for her and she had to prevent a baby from crying to prevent the indians from finding her, she could not kill the baby to keep it from crying and giving away her position to the indians. Id. at 43-50.

The second juror selected was Mr. Weber. (R - v.7 - 94-132). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) the jury can find the defendant a future danger based on the facts of the offense alone. Id. at 105-106. Without objection, the state informed the juror about the second special issue as follows: "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death. Id. at 108-110. Second chair asked the juror: (1) where he had previously lived; (2) the occupation of his parents; (3) if he would require the defendant to testify or prove his innocence; (4) why he said too many criminals are getting out of prison

24

too early; (5) why he said lawyers and judges are trying to further their careers and forget the truth; (6) why he said some police officers are as bad a criminals; (7) why he was irritated on the last trial in which he was a juror. Id. at 118-131.

The third juror selected was Mr. Worsham. (R - v.8 - 65-102). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 81-83. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 84-88. Callahan asked the juror if: (1) he would agree to be the foreman of the jury; (2) he would maintain fairness in the deliberation room; (3) he felt the death penalty was an effective deterrent; (4) he would like to see the death penalty no longer used in Texas; (5) he believed in mercy; (6) he was on an ocean liner that was blown up, he ended up with a gun on a raft built for two, the person who blew up the liner was also on the raft, the raft is sinking into shark infested waters because too many people were on the raft, would he throw the bomber off the raft. Id. at 90-102.

The fourth juror selected was Mr. Garza. (R - v.9 - 70-112). He was the victim of an armed robbery at his store, and the robbers went to another store and killed a person in another store. Id. at 73. He was in favor of the death penalty. Id. at 74, 77. Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 92-97. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 98-104. Callahan asked the juror if: (1) he agreed with self-defense regarding a police officer; (2) he would maintain fairness in the deliberation room; (3) he knew the definition of probability as opposed to flipping a coin; and (4) he believed in mercy. Id. at 106-112.

The fifth juror selected was Mr. Martin. (R - v.10 - 86-144). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, and weapons offenses; (3) "society" includes prison but escape is also possible so it

26

is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 108-112. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 113-116. Second chair asked the juror about: (1) why he wanted to be a juror on this case; (2) where he was from and his occupation; (3) why he applied to be a police officer; (4) his military experience; (5) his unlawfully carrying a weapon case; (6) his voting history and about politicians; (7) magazines he reads; (8) his NRA membership; (9) why he thought he could be fair as a juror; (10) his witnessing a shooting crime; (11) his views of the police; (12) he had items stolen from his truck; (13) his views of self-defense; (14) his conduct in group discussions; (15) his view that the laws are too lenient and there should be public punishments; (16) his view that psychiatrists are quacks; and (17) his views about lawyers and judges. Id. at 120-143.

The sixth juror selected was Ms. Frederick who eventually became the foreperson. (R - v.11 - 5-45; R - v.30 - 72; R - v.33 - 110). She stated that she was in favor of the death penalty for murder of a police officer. (R - v.11 - 5-6). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes,

breaking into cars, and weapons offenses; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 20-22. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 25-28. Second chair asked the juror about: (1) her views on violence in this country; (2) how she would react to evidence in a capital case; (3) her view of self-defense; (4) her view of police misusing their force; (5) why she dislikes Bill and Hillary Clinton and Jesse Jackson; (6) how she would evaluate a witness' testimony; (7) her prior hot check case that was dismissed; (8) her interest in the Simpson trial; (9) her investments; (10) her criminal justice schooling; (11) her view of lawyers; (12) her marital status and ex-husband's profession. Id. at 29-44.

The seventh juror selected was Mr. Phelps. (R - v.13 - 101-140). He was in favor of the death penalty. Id. at 103. Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into homes, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the

28

capital murder alone. Id. at 122-125. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 125-129. During his questioning, Callahan challenged the juror for cause for: (1) "automatic on Special Issue Number 1;" and (2) "presumption of innocence and burden of proof." Id. at 133, 136. Callahan asked the juror about: (1) mitigating evidence lessens the blame of someone; (2) the burden of proof; (3) right not to testify; (4) his statement that "no one is entitled to take a person's life" so the juror was in favor of the death penalty; (5) his statement that "the death penalty is appropriate in all capital murder cases;" (6) he knows about six policemen; and (7) his view of policemen. Id. at 130-140.

The eighth juror selected was Mr. Kravetz. (R - v.14 - 93-118). He stated you should be hung for murder, rape, and child molestation. Id. at 96. The defense then wanted him excused from jury service because of sleep apnea and medications, and the juror became angry at the defense for this challenge. Id. at 98, 102-103. The trial judge let him sit as a venireman. Id. at 101. He informed the state that if a person was guilty of capital murder, the death penalty would be automatic. Id. at 113. He stated that, "If it's – if there's a capital murder conviction, then I say hang 'em." Id. at 114. He stated that if you take a life, you deserve the death penalty. Id. at 114-115. The state, understandably, did not even bother

with their usual questions regarding the special issues.  The defense made no challenges for

cause.  The second chair then, incredibly, conducted his questioning as follows:

> Q:  Mr. Kravetz, I still can run faster than you.
>
> A:  Oh, I know you can run faster than me.
>
> Q:  And I'm on this side of the table, so I'm not worried.
>     That's all the questions I have.  Nothing else.

Id. at 118.

The ninth juror selected was Mr. White.  (R - v.15 - 81-127).  He stated that he was

in favor of the death penalty for the killing of policemen.  Id. at 87.  He stated that he was

"more inclined to go for a death penalty . . . if there is a possibility of parole."  Id. at 89.

After having heard that a life sentence for capital murder means a minimum of 40 years, he

stated he would give the death penalty 8 out of 10 times on a scale of 1 to 10.  Id. at 93.

Without objection, the state informed the juror about the first special issue as follows: (1) the

state does not have to prove the defendant would kill again; (2) "criminal acts of violence"

may include property crimes, breaking into homes, and stealing; and (3) "society" includes

prison but escape is also possible so it is wherever the defendant may find himself.  Id. at 96-

98.  Without objection, the state informed the juror about the second special issue as follows:

(1) "personal moral culpability" means if the defendant was the shooter or played a lesser

role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step

analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence

sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear

the evidence and decide not to consider it regarding mitigation.  Id. at 99-102.  Callahan

asked the juror about: (1) why he was now so ready to give the death penalty; (2) the

difference between Salem witch hunts and the death penalty; (3) why he could not disregard

the statement that life equals 40 years; (4) lawyers he knows; (5) the definition of probability

and flipping a coin and predicting the weather; (6) whether he could give a life sentence in

a capital murder case; (7) whether he would like to be the presiding juror; (8) his actions in

group discussions; (9) whether he would ensure deliberations would be fair; (10) his view

of self-defense; (11) why it does not bother him that Texas leads the nation in executions;

(12) why he could not envision Texas without the death penalty; and (13) the ocean liner

hypothetical where he said he would shoot the bomber.  Id. at 113-126.

The tenth juror selected was Mr. Link.  (R - v. 18 - 68-133).  He stated he was in favor

of the death penalty.  Id. at 69.  Without objection, the state informed the juror about the first

special issue as follows: (1) the state does not have to prove the defendant would kill again;

(2) "criminal acts of violence" may include property crimes, resisting arrest, and escape; (3)

"society" includes prison but escape is also possible so it is wherever the defendant may find

himself; and (4) the facts of the offense alone can result in an affirmative answer to this

question.  Id. at 92-96.  Without objection, the state informed the juror about the second

special issue as follows: (1) "personal moral culpability" means if the defendant was the

shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating

circumstances" has a three step analysis - does the juror believe the evidence, is the evidence

mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than

31

death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 98-102. Second chair asked the juror about: (1) his military service; (2) his NRA membership; (3) his Law Enforcement Association of America membership; (4) what facts of the case he heard about; (5) his motorcycle; (6) his pistol shooting; (7) his view of lawyers; (8) his view that nobody should take a life and self-defense; and (9) his view that if you take a life, the state should take your life.

The eleventh juror selected was Ms. Martin. (R - v.19 - 96-142). She said she was in favor of the death penalty for intentional murder. Id. at 103. Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; and (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself. Id. at 127-130. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 131-133. Callahan asked the juror about: (1) her schooling; (2) probability and flipping a coin; (3) maintaining fairness in the deliberation room; (4) premeditation and intent and self-defense; (5) genetics; and (6) what the death penalty says about American culture. Id. at 134-142.

The twelfth juror selected was Mr. Pacheco. (R - v.21 - 104-141). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, burglarizing homes, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) the jury can answer this question in the affirmative based solely on the capital murder. Id. at 124-128. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 130-134. Incredibly, Callahan's questioning consisted merely of, "Mr. Pacheco, Denny Callahan. You've been pretty thorough in your answers and handled yourself well in this questioning and I have no questions for you. Thank you." Id. at 137. After the juror left the room, Callahan stated that the defense requested an additional peremptory challenge because the juror's questionnaire indicated that "he's automatic on death." Id. at 138. Callahan never questioned the juror about this issue or any other issue.

Defense counsel failed to probe the jurors regarding the jurors' views on the death penalty in the case at bar - i.e., for someone convicted of murder of a police officer. Defense counsel failed to ask the jurors if such a conviction would cause the juror to automatically

believe that Manuel would be a future danger regarding special issue one. Defense counsel failed to ask the jurors if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence. Defense counsel failed to ask if the jurors would be able to consider and give effect to all relevant mitigating evidence offered by Manuel. Defense counsel, in effect, failed to determine whether the jurors had dogmatic views regarding the death penalty in the case at bar which would call into question whether the jurors were truly fair and impartial. It may be that these jurors could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the jurors from being truly fair and impartial. Manuel was on trial for his life and counsel should have ascertained whether these prospective jurors functioned under such misconception. The risk that such jurors may have been empaneled in this case and infected Manuel's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire or been properly prepared for sentencing.

During closing arguments at sentencing, the state reiterated what it laid out in jury selection. The prosecutor stated that "criminal acts of violence . . . does not require the State to show the Defendant would kill again." (R - v.33 - 76). He stated that "criminal acts of violence" include resisting arrest (which is what the Defendant did to Officers Mahl, Sais, and Lopez), property crimes, breaking into homes, and stealing. Id. at 76-77. The prosecutor stated that "personal moral culpability" could be considered by the jury because "there is nobody to blame for this crime but him [the Defendant]." Id. at 79.

34

The court began reading the court's punishment instructions to the jury at approximately 1:30 p.m. on October 29, 2002. (R - v.33 - 1, 69, 70). After closing arguments, the jury deliberated until 5:33 p.m., and Manuel was then sentenced to death. Id. at 110, 113. The trial of this case resulted in a complete lack of a requirement that the sentencer consider in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. Given the lack of preparation by defense counsel and the woefully inadequate jury selection, there existed no chance that the sentencer considered the fact that Manuel, whose acts stemmed from a disadvantaged background, or from emotional and mental problems, may be less culpable than defendants who have no such excuse. Without a mitigation investigation in this case, this consideration was not possible.

Unfortunately, Manuel's lack of proper representation did not end here. Manuel was sentenced to death on October 29, 2002. The state habeas was filed on October 25, 2004, almost two years later. During that two-year period of time, habeas counsel never met with Manuel. At the state habeas hearing, the following occurred:

> DEFENDANT: I filed a grievance to the state bar on behalf of myself because as you know this is the most important stage of the appeal process and I felt that she should have at least, you know, done some investigation with me prior to her filing anything in my writ. ***She contacted me after the fact that she filed the writ*** and et cetera, et cetera. ***I've written several letters to this -- this attorney and she never responded.*** So I wanted to let it be known for the record that this is what she did. And I want -- I want -- ***I need other issues preserved, you know.*** It's not -- it's not her life, it's my life, you know.

35

* * *

DEFENDANT: Like I said, I mean, it was like she did what she wanted to do. I mean, I need -- ***I need to have at least my say so, you know, in the writ***. I mean, like certain things, I don't know if you remember, during deliberations you called me out for – because the jury wanted to see some certain paper and I believe that they based – I believe that they were – they sentenced me to death just because of that paper because TYC thought I was a threat to society. You know what I'm saying? Stuff like that. Issues like that.

* * *

DEFENDANT: Well, I never – I never said she didn't, but from what I know, they -- the bar rules, I mean, they have certain guidelines and, you know, ***in representing a client, they've got to contact them and et cetera, et cetera. I mean, I don't feel that she did any of that***. And she didn't. I mean –

MS. KRAMER: ***I did contact him via the mail and explained a lot of things through the mail***. Absolutely.

THE DEFENDANT: She wrote -- I don't know if you -- I don't know if I filed this right, but I wrote you a motion to dismiss counsel on Ms. Kramer. Did you receive that?

THE COURT: I did. That was sometime back. Right?
THE DEFENDANT: Right. Right. And this was after -- ***this was right after I found out she was my attorney and she filed my writ***. And I stated in there, you know, the problem. I don't know if that was overlooked or just thrown away or what. I also filed --

MS. KRAMER: He --

THE DEFENDANT: -- a pro se issue that, you know, things that I wanted to look -- look into. I gave a copy to -- I sent a copy to y'all, I gave a copy to my -- directly to the attorney Mr. Gross which he said that he gave to her, I asked her last night and she said she never got that.

36

MS. KRAMER:  I don't have anything in my file.  It doesn't mean that he didn't send it to me, but I don't have anything.  I keep Manuel's things in a big box and I don't have that . . .

(WHC - v.2 - 4, 7-8, 11-12).

State habeas counsel alleged 12 grounds in the state habeas.  Ground Three alleged ineffective assistance of counsel for failing to call the defense investigator as a trial witness to contradict an eyewitness regarding the death of the complainant being an accident.  See attached Exhibit C at 22.  At the habeas hearing, however, the investigator was not called as a witness, so the trial judge denied this ground.  See attached Exhibit F at 27.  Ground Five alleged ineffective assistance of counsel for failing to adequately investigate and present mitigating evidence.  See attached Exhibit C at 26.  State habeas counsel attached, in part, a report from Dr. Rosin regarding current psychological evaluations and testing and background information.  Id. at 28.  State habeas counsel also attached an affidavit from the trial mitigation specialist, Ms. Matthews.  Id. at 33.  Counsel failed, however, to call either Dr. Rosin or Ms. Matthews as witnesses at the habeas hearing, so the trial judge held that since only Dr. Allen and Raul Gonzales testified at the habeas hearing, "To the extent that Garza contends other mitigation evidence was available from other sources that did not testify at the hearing on his application, this court concludes that Garza has not met his burden . . ."  See attached Exhibit F at 29.  Inexplicably, no new mitigation was offered at the habeas hearing.

The Texas Court of Criminal Appeals denied relief on the state habeas on December 17, 2008.  See attached Exhibit G.  State habeas counsel abandoned Manuel and did not pursue his case any further.  On June 26, 2009, over six months into the AEDPA one-year

limitations period, Manuel contacted the undersigned since the undersigned represented Manuel on his direct appeal.  Manuel was concerned that he was not represented by habeas counsel and was unable to locate an attorney to handle his federal habeas.  This is understandable since the state habeas attorney had been found in contempt of court by the Texas Court of Criminal Appeals for failing to file death penalty writs in several death penalty cases.  See e.g., Ex parte Luna, No. WR-70,511-01 (Tex. Crim. App., October 1, 2008).  In that case, state habeas counsel was appointed on March 9, 2006 to file a death penalty state habeas.  Id.  As of August 2008, no writ had been filed.  Id.  State habeas counsel claimed that "she misunderstood the law, and that her misunderstanding resulted in the current situation."  Id.  The Court of Criminal Appeals found "that the magnitude of counsel's misunderstanding is inexcusable and does not show good cause."  Id.  This is the same habeas counsel who filed Manuel's writ on October 25, 2004, litigated the habeas hearing in 2008, and failed to call key witnesses at the habeas hearing to substantiate the failure to investigate mitigation claims.

## VI.

## CLAIMS FOR RELIEF

### CLAIM I

**THE PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL, GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, WERE VIOLATED WHEN THE TRIAL JUDGE REMOVED THE PETITIONER'S**

38

**FIRST CHAIR COURT APPOINTED ATTORNEY
IMMEDIATELY BEFORE TRIAL COMMENCED.**

**ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM I**

The complainant, a police officer, was shot and died on February 2, 2001. (R - v.27 - 38-39). The Appellant was arrested for capital murder on February 4, 2001. Id. at 65, 72. The Appellant requested court-appointed counsel on February 6, 2001. (T - 3). Counsel was appointed on February 14, 2001, but was allowed to withdraw on February 21, 2001 since she was unqualified to handle a capital murder case. Id. at 5-8.

First chair and second chair counsel were appointed on February 21, 2001 to represent the Appellant. Id. at 13-14. The Appellant was indicted on April 11, 2001. Id. at 15. Pretrial hearings were scheduled for August 29, 2002, and trial was scheduled for September 3, 2002. Id. at 75, 85. On July 11, 2002, the first chair counsel filed a Motion to Withdraw as Counsel. Id. at 83-84. In the motion, counsel merely stated that counsel had "a scheduling conflict that can only be resolved by the court permitting counsel to withdraw as counsel in this cause." Id. at 83. Without any notice to the Appellant and without a hearing, the trial judge granted the motion to withdraw the same day the motion was filed, on July 11, 2002. Id. at 76. New counsel was appointed on July 11, 2002. Id. at 35.

On July 15, 2002, second chair counsel learned that the trial judge had relieved the first chair counsel from his duties in this cause. Id. at 41. On July 24, 2002, the second chair counsel filed Defendant's Objections to Ex Parte Removal of Court Appointed Counsel. Id. at 41-48. The second chair counsel objected to the removal of counsel by the trial judge. Id.

The trial judge advised the second chair counsel that trial would proceed on August 30, 2002 as previously scheduled.  Id.  Second chair counsel requested a continuance so the newly appointed attorney could properly prepare for the case, but the trial judge denied this request. Id. at 16, 42, 47.

By letter dated July 22, 2002 attached to the Defendant's Objections to Ex Parte Removal of Court Appointed Counsel, the Appellant objected to the trial judge's ex parte removal of first chair counsel from this cause.  Id. at 48.  The Appellant stated that he was relaxed and confident with his attorneys but the trial judge then removed the first chair attorney without the Appellant's knowledge or consent.  Id.  He expressed his concerns about now receiving a fair trial.  Id.

Article 26.04 of the Texas Code of Criminal Procedure states, in pertinent part, that:

> Whenever a court . . . determines that a defendant charged with a felony or a misdemeanor punishable by confinement is indigent or that the interests of justice require representation of a defendant in a criminal proceeding, the court . . . shall appoint one or more practicing attorneys to defend the defendant . . . An attorney appointed under this article shall . . . represent the defendant until charges are dismissed, the defendant is acquitted, appeals are exhausted, or the attorney is relieved of his duties by the court or replaced by other counsel after a finding of good cause is entered on the record.

The right of an accused to counsel at trial is fundamental.  Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).  Article 26.04 authorizes a trial judge to relieve an appointed attorney of his duties in some circumstances, but "the circumstances under which a trial judge may replace appointed trial counsel are narrowly circumscribed by

40

the state and federal constitutions." <u>Buntion v. Harmon</u>, 827 S.W.2d 945, 948 (Tex. Crim. App. 1992); <u>Stearnes v. Clinton</u>, 780 S.W.2d 216 (Tex. Crim. App. 1989). "Having appointed counsel, a criminal defendant should not be subjected to a trial . . . process without the counsel he had grown to accept and gain confidence in." <u>Buntion v. Harmon</u>, <u>supra</u>, 827 S.W.2d at 948 <u>citing</u> <u>Stearnes v. Clinton</u>, <u>supra</u>, 780 S.W.2d at 225. "Although an indigent defendant does not have the right to counsel of his own choosing, once counsel is appointed, the trial judge is obliged to respect the attorney-client relationship created through the appointment." <u>Buntion v. Harmon</u>, <u>supra</u>, 827 S.W.2d at 949 <u>citing</u> <u>Stearnes v. Clinton</u>, <u>supra</u>, 780 S.W.2d at 221.

"Once the attorney-client relationship is established, any potential disruption of the relationship is subject to careful scrutiny." <u>Buntion v. Harmon</u>, <u>supra</u>, 827 S.W.2d at 949, n.3. "Thus, it is well-settled that the attorney-client relationship may not be severed by either the attorney or the client without justifying the severance to the trial court." <u>Id.</u>, <u>citing</u> <u>Ward v. State</u>, 740 S.W.2d 794, 797 (Tex. Crim. App. 1977) (attorney-client relationship must be maintained if so doing will protect defendant's rights); <u>Thomas v. State</u>, 550 S.W.2d 64 (Tex. Crim. App. 1977)(defendant may not sever existing relationship unless he is able to demonstrate adequate cause); <u>Solis v. State</u>, 792 S.W.2d 95 (Tex. Crim. App. 1990)(attorney may not withdraw simply on the grounds of personality conflicts or disagreements); <u>Steel v. State</u>, 453 S.W.2d 486, 487 (Tex. Crim. App. 1970)(allowing attorney to bow out whenever he chooses would frustrate the accused's right to adequate representation); <u>Viges v. State</u>, 508 S.W.2d 76 (Tex. Crim. App. 1974)(even if appointed attorney wishes to withdraw and

client refuses to cooperate with attorney, denial of motion to withdraw is not error if client is provided adequate representation).

A trial judge should not relieve counsel unless all reasonable alternatives, such as the granting of a continuance, have been exhausted and unless the trial judge exercises great circumspection. Stearnes v. Clinton, supra, 780 S.W.2d at 220 citing Smith v. Superior Court of Los Angeles County, 440 P.2d 65 (1968). The failure of a trial judge to observe these standards "will compel a reversal of the ensuing judgment . . . regardless of whether the defendant's substituted counsel was competent or whether the defendant received a 'fair trial' with respect to the guilt-determining process." Id. "The value in issue . . . is 'the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command.'" Id.

The denial of counsel at a critical stage of trial, during the final preparation before the commencement of trial, creates a presumption of prejudice under United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Manuel alleges that he was constructively denied the effective assistance of his appointed trial counsel. "The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage." Id. In the case at bar, the first chair counsel was appointed immediately prior to the commencement of trial. Because the development and preparation of issues at a capital murder trial are complicated, two lawyers are required to adequately and effectively represent the rights of a defendant. Under such

circumstances, "[n]o specific showing of prejudice [is] required," because "the adversary process itself [is] presumptively unreliable." Id.  Because of this error, trial counsel was inadequately prepared to subject the prosecution's case to meaningful adversarial testing, resulting in a denial of Sixth Amendment rights, making the adversary process presumptively unreliable.  Therefore, no specific showing of prejudice is required. Id.  In Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the applicant had been "denied the right of effective cross-examination" which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."  United States v. Cronic, supra, 466 U.S. at 659, citing Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

The United States Supreme Court has uniformly found constitutional error without any showing of prejudice when counsel was prevented from assisting the accused during a critical stage of the proceeding.  See, e.g., Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); Brooks v. Tennessee, 406 U.S. 605, 612-613, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972); Hamilton v. Alabama, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); White v. Maryland, 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963) (per curiam); Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); Williams v. Kaiser, 323 U.S. 471, 475-476, 65 S.Ct. 363, 366, 89 L.Ed. 398 (1945).  Automatic reversal, without conducting a harmless error analysis, is appropriate when the Sixth

43

Amendment violation "pervade[s] the entire proceeding," <u>Satterwhite v. Texas</u>, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), as it did in the case at bar.

In the case at bar, the first chair counsel represented Manuel for almost 1½ years up to the month before trial began in this capital murder death penalty case. Without notice to either the second chair counsel or Manuel, the trial judge granted the first chair counsel's motion to withdraw based merely upon scheduling difficulties. The trial judge relieved counsel before all reasonable alternatives, such as the granting of a continuance, had been exhausted. The trial judge failed to exercise the required "great circumspection." Additionally, there was no finding of good cause on the record by the trial judge as required by Article 26.04 of the Texas Code of Criminal Procedure. Manuel and the second chair counsel objected to this ex parte removal of the first chair counsel by the trial judge. Manuel expressed his concern that he should not be subjected to a trial without the counsel in which he had grown to accept and gain confidence. The trial judge was obliged to respect the attorney-client relationship created through this appointment. The trial judge reversibly erred in allowing the first chair counsel to sever the attorney-client relationship without justifying the severance. The failure of the trial judge to observe the above standards compels a reversal of the ensuing judgment regardless of whether Manuel's substituted counsel was competent or whether the defendant received a fair trial with respect to the guilt-determining process or the punishment phase of the trial. Manuel should be granted a new trial.

44

## CLAIM II

**THE PETITIONER'S RIGHT TO CROSS-EXAMINATION, GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE REFUSED TO ALLOW A WITNESS TO TESTIFY THAT THE SHOOTING IN THIS CASE WAS AN ACCIDENT.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM II

The prosecution called Erica Henderson as a witness during the guilt-innocence phase of the trial. (R - v.23 - 195). Before she testified, the prosecution requested the trial judge prohibit the defense from eliciting testimony from the witness that the shooting in this case was an accident. Id. at 192. Defense counsel replied that such testimony would be a shorthand rendition of facts. Id. at 193. The trial judge reserved ruling on this issue. Id.

The witness, Ms. Henderson, testified that she was living in an apartment complex on February 2, 2001. Id. She was returning to her apartment in her car at 9:45 p.m. and entered the complex from the front entrance. Id. at 196. She noticed a police car parked at an angle in the complex with the driver's door open. Id. at 198. As she continued to drive to her apartment, she saw the uniformed officer and a suspect struggling with each other. Id. at 201. The officer attempted to get the suspect in a head lock. Id. at 202. A gun was in the suspect's left hand. Id. Both the officer and the suspect were kneeling and the suspect was on the left side of the officer. Id. at 203. Both people had their backs to the witness and they were ten feet away from the witness. Id. at 203-204. The officer attempted to get the gun

45

away from the suspect. Id. at 205.  The suspect raised the gun up over him and his head

ducked away from the gun and then there was a shot. Id. at 207-208.  The suspect then ran

away. Id. at 209.    On  cross-examination,  the defense asked the witness about the

discussion the witness had with defense counsel and the defense investigator at the scene

pretrial. Id. at 218-233.  Defense counsel then asked the witness if the shooting was

unintentional. Id. at 233.  The prosecution objected that this invades the province of the jury

and the trial judge sustained the objection. Id.  Defense counsel offered this testimony

pursuant to Texas Rules of Evidence 701 and 704. Id.  The trial judge sustained the

objection. Id.  The witness testified that the officer was trying to get the gun out of the

suspect's hand and the suspect's arm went up and the shot went off. Id. at 234.  Defense

counsel asked if the witness told defense counsel that this appeared to be an accident. Id.

The prosecution objected this invades the province of the jury and the trial judge sustained

the objection. Id.  The trial judge allowed counsel to make a bill of exception. Id.  During

the bill of exception, outside the presence of the judge and jury, the witness admitted that she

told defense counsel that the shooting appeared to have been an accident. (R - v.24 - 3).

Rule 701 of the Texas Rules of Evidence states:

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited to
> those opinions or inferences which are (a) rationally based on
> the  perception  of  the  witness  and  (b)  helpful  to  a  clear
> understanding of the witness' testimony or the determination of
> a fact in issue.

Rule 704 of the Texas Rules of Evidence states:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

If a jury concludes that a defendant did not act intentionally in causing the death of a person, a defendant cannot be convicted of capital murder since that crime requires the death be caused intentionally. Fairow v. State, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Whether or not a defendant acted intentionally, therefore, is vital to a conviction. Id. A lay witness opinion, pursuant to Rule 701, is rationally based on the perception of the witness if the witness has personal knowledge of the events from which the opinion is drawn, and the opinion drawn is rationally based on that knowledge. Id. A lay witness opinion cannot communicate the actual subjective mental state of an actor since such an opinion cannot be based on personal knowledge, and a lay witness opinion cannot be an opinion of guilt or innocence. Id. at 899. "All Rule 701 opinions regarding culpable mental state, however, need not be automatically excluded for want of personal knowledge. Id.

"An opinion will satisfy the personal knowledge requirement if it is an interpretation of the witness' objective perception of events (i.e., his own senses or experience)." Id. A good case to illustrate the distinction between personal knowledge of a person's mental state and personal knowledge of perceived events is Doyle v. State, 875 S.W.2d 21 (Tex. App. - Tyler 1994, no pet.). Two prison guards witnessed a prisoner strike another guard and the witnesses testified that the blows were intentional. Id. at 22. It was proper under Rule 701

47

for the prison guards, in explaining what they saw, to give an opinion regarding whether the blows were intentional or accidental. Id. at 23.  The guards witnessed the attack and were therefore qualified to give an opinion based on their perception of the event. Fairow v. State, supra at 899.  Once a lay witness establishes personal knowledge of the facts underlying the opinion, the witness has satisfied the perception requirement of Rule 701 and may give an opinion regarding the culpable mental state. Id.

The second requirement for admissibility under Rule 701 is that the opinion be helpful to the jury to either understand the witness' testimony or to determine a fact in issue. Id. at 900.  Where a witness testifies that he witnessed a fight, saw a defendant repeatedly strike a victim, and as the victim fell from a blow to the head, the defendant aimed and shot the victim in the chest while the victim was falling on the ground, such a witness could not testify that the shooting was an accident. Id.  Where a witness, however, testifies that he witnessed a fight and saw the actors exchanging blows, such a witness can testify, pursuant to Rule 701, that the blows were intentionally directed at the victim. Doyle v. State, supra, 875 S.W.2d at 23.  When a witness has difficulty describing the events witnessed by the witness, an opinion is likely to be helpful as a shorthand rendition of the facts. Fairow v. State, supra, 943 S.W.2d at 900 citing Jackson v. State, 822 S.W.2d 18, 29 (Tex. Crim. App. 1990)(allowing a police officer to testify that a defendant gave his confession voluntarily because it was no more than a short rendition of the facts); May v. State, 618 S.W.2d 333, 341 (Tex. Crim. App. 1981)(pre-rules case allowing police officer to give an opinion

concerning an accused's mental attitude because it was merely a shorthand rendition of the facts).

The constitutional right of confrontation is violated when appropriate cross-examination is limited.  Hurd v. State, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987).  The scope of appropriate cross examination is necessarily broad.  A defendant is entitled to pursue all avenues of cross examination reasonably calculated to expose a motive, bias or interest in the witness' testimony.  Lewis v. State, 815 S.W.2d 560, 565 (Tex. Crim. App. 1991).  When discussing the breadth of that scope the Court of Criminal Appeals has held:

> Evidence to show bias or interest of a witness in a cause covers a wide range and the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances, which when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only.

Carroll v. State, 916 S.W.2d 494, 497-498 (Tex. Crim. App. 1996) citing Jackson v. State, 482 S.W.2d 864, 868 (Tex. Crim. App. 1972)(quoting Aetna Insurance Company v. Paddock, 301 F.2d 807, 812 (5th Cir. 1962).

The United States Supreme Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial and that "a primary interest secured by [the provisions] is the right of cross examination." Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965).  ". . . it is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the

49

Confrontation Clause." <u>California v. Green</u>, 399 U.S. 149, 157, 90 S.Ct. 1930, 26 L.Ed.2d

489 (1970).  Cross-examination is the "greatest legal engine ever invented for the discovery

of truth." <u>Id.</u>, 399 U.S. at 158, <u>citing</u> 5 Wigmore § 1367; <u>see also</u> <u>Barber v. Page</u>, 390 U.S.

719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968); <u>Dowdell v. United States</u>, 221 U.S.

325, 330, 31 S.Ct. 590, 55 L.Ed. 753 (1911); <u>Davis v. Alaska</u>, <u>supra</u>; <u>Bruton v. United States</u>,

391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed. 476 (1968); <u>Pointer v. Texas</u>, 380 U.S. 400, 406-

407,  85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).  Stating the obvious, these purposes are

interrelated since one critical goal of cross examination is to draw out discrediting demeanor

to be viewed by the fact finder.  <u>Government of Virgin Islands v. Aquino</u>, 378 F.2d 540, 548

(3d Cir. 1967).  "There are few subjects, perhaps, upon which this Court and other courts

have been more nearly unanimous than in their expressions of belief that the right of

confrontation and cross examination is an essential and fundamental requirement for the kind

of fair trial which is this country's constitutional goal." <u>Pointer v. Texas</u>, <u>supra</u>, 380 U.S. at

405; <u>Berger v. California</u>, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969);

<u>Barber v. Page</u>, <u>supra</u>, <u>Kirby v. United States</u>, 174 U.S. 47, 55-56, 19 S.Ct. 574, 577, 43

L.Ed. 890 (1899).

    The credibility of a witness may be attacked by evidence that the witness is slanting

his or her testimony against or in favor of a party as a result of personal interest or bias in the

cause.  <u>Willingham v. State</u>, 897 S.W.2d 351, 358 (Tex. Crim. App.), <u>cert. denied</u>, 516 U.S.

946, 116 S. Ct. 385, 133 L.Ed.2d 307 (1995).  Great latitude should be allowed an accused

to show a witness' bias or motive to falsify his or her testimony. <u>Hodge v. State</u>, 631 S.W.2d

754 (Tex. Crim. App. [Panel. Op.] 1982), <u>citing</u> <u>Carrillo v. State</u>, 591 S.W.2d 876 (Tex.

Crim. App. 1979); <u>Chvojka v. State</u>, 582 S.W.2d 828 (Tex. Crim. App. 1979); <u>Cloud v. State</u>,

567 S.W.2d 801 (Tex. Crim. App. 1978); <u>Blair v. State</u>, 511 S.W.2d 277 (Tex. Crim. App.

1974).

It is well acknowledged that the trial courts have great latitude in exercising their

discretion as to how and when bias may be proved. <u>Carrillo v. State</u>; <u>Chvojka v. State</u>; <u>Cloud</u>

<u>v. State</u>; <u>Hodge v. State</u>, <u>all supra</u>; Ray, Texas Law of Evidence, § 679 (1980).  The trial

judge must balance the probative value of the evidence sought to be introduced against the

risk its admission may entail.  The potential risks include the possibility of undue prejudice,

embarrassment, or harassment to either a witness or a party, the possibility of misleading or

confusing a jury and the possibility of undue delay or waste of time.  <u>Carrillo v. State</u>;

<u>Chvojka v. State</u>; <u>Cloud v. State</u>; <u>Hodge v. State</u>, <u>all supra</u>.  Manuel asserts that none of these

factors apply.  The subject matter went to the core of Manuel's defense, that the shooting was

accidental, occurring during the course of Manuel defending himself.  In any event, it could

never have been deemed as an invasion of the province of the jury:

> The motives which operate upon the mind of a witness when he
> testifies are never regarded as immaterial or collateral matters.
> The adverse party may prove declarations of a witness which
> tend to show bias, interest, prejudice, or any other mental state
> or status which fairly construed might tend to affect his
> credibility.

<u>Blair v. State</u>, <u>supra</u>, 511 S.W.2d at 279.

51

In all criminal prosecutions, State as well as Federal, the accused have a right, guaranteed by the Sixth Amendment to the United States Constitution, "to be confronted with the witnesses against him." Pointer v. Texas, supra.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of the fact." Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); Bruton v. United States, supra, 391 U.S. at 135-136; Davis v. Alaska, supra, 415 U.S. at 315-316. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Pointer v. Texas, supra.

In Barnum v. State, 7 S.W.3d 782 (Tex. App. – Amarillo 1999, pet. ref'd), it was held that the Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees the fundamental right of an accused to confront witnesses against him.  The confrontation clause of the Sixth Amendment envisions a personal examination and cross examination of the witness in which the accused has an opportunity not only to test the recollection and sift the conscience of the witness but also to compel the witness to stand face to face with the jury in order that they may look at him or her and judge by his or her demeanor whether the testimony is worthy of belief. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 1359-1360, 158 L.Ed.2d 177 (2004), citing 1 J. Stephen, History of the Criminal Law of England 326 (1883).  The absence of proper confrontation of witnesses at trial calls into question the ultimate integrity of the fact-finding process.

Confrontation at trial also operates to ensure reliability in other ways. First, "[t]he requirement of personal presence . . . undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and present at trial." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 800[01], pp. 800-810 (1979); see also Note, 54 Iowa L. Rev. 360, 365 (1968). Second, it "insures that the witness will give his statements under oath – thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." California v. Green, supra, 399 U.S. at 158; Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999); Idaho v. Wright, 497 U.S. 805, 816, 824, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973), quoting Berger v. California, supra, 393 U.S. at 315.

In the case at bar, it was crucial for the Appellant to establish that the shooting of the police officer was an accident. In no way could this line of questioning be deemed an invasion of the province of the jury since it is a juror's exact function to determine the validity and credibility of such evidence. Such evidence could have prevented the jury from convicting Manuel of intentionally causing the death of the officer. It was vital, therefore, for the defense to establish through the eyewitness, Henderson, that the shooting was, in her opinion, accidental. Her testimony about the struggle between the officer and Manuel was difficult for her to describe and was not sufficient to enable the jury to draw the proper inferences and conclusions. This case is on point with Doyle v. State, supra, in this respect.

Additionally, what the witness testified that she saw was entirely consistent with an unintentional shooting and therefore rationally based on her perception.  Henderson's shorthand rendition opinion that the shooting was an accident, therefore, would have been very helpful to the jury.  Manuel was harmed by the exclusion of this testimony since the jury was not allowed to hear the eyewitness' opinion that the shooting was an accident.  The trial judge abused her discretion in excluding this testimony.  Manuel should receive a new trial.

**CLAIM III**

**THE PETITIONER'S TRIAL COUNSEL FAILED TO
PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.**

**ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM III**

**The standard for ineffective assistance.**

Effective assistance of counsel is a right guaranteed by the Sixth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment of the United States Constitution.  State v. Thomas, 768 S.W.2d 335, 336 (Tex. App. - Houston [14th Dist.] 1989, no pet.).  The federal test for effective assistance of counsel stated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) is also the test in Texas.  State v. Thomas, supra at 336, citing Wilkerson v. State, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).  Under this test, one must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  Id.  Prejudice means there is a reasonable probability that but for counsel's acts or omissions, the outcome of the

proceeding would have been different, and a reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Strickland v. Washington</u>, <u>supra</u>. An ineffective assistance of counsel claim is a mixed question of law and fact subject to plenary review under the <u>Strickland</u> test. <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1512 (11th Cir. 1995).

The Supreme Court of the United States has recently conducted a materiality standard for a <u>Brady</u> claim which is the same showing required to demonstrate the above prejudice from counsel's deficient performance. <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Materiality does not require a defendant to demonstrate by a preponderance of the evidence that the absence of the error would have ultimately resulted in an acquittal or a life sentence. <u>Id.</u> at 1566-1567. The test is whether the error undermines confidence in the jury's sentence of death or conviction for capital murder. <u>Id.</u> at 1566. This is not a sufficiency of the evidence test - that is, the defendant is not required to demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have been insufficient evidence remaining to convict or return a sentence of death. <u>Id.</u> The reviewing court should view the favorable evidence and determine if it reasonably puts the whole case in such a different light so as to undermine confidence in the verdict. <u>Id.</u>; <u>See Lindsey v. King</u>, 769 F.2d 1032, 1042 (5thCir. 1985)(suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness' testimony). Materiality must be assessed in terms of the suppressed evidence considered as a whole, not item by item. <u>Kyles v. Whitley</u>, <u>supra</u>, 115 S.Ct. at 1567. Prejudice under <u>Strickland</u> should