be considered in the same manner. See also Wesley v. Johnson, 83 F.3d 714, 719 (5th Cir. 1996)(prejudice analysis should not focus on determination of outcome but on whether error ensures that the result of the proceeding was fundamentally unfair or unreliable); Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

Thorough factual investigation is required for effective representation. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). "It is not enough to assume that defense counsel thus precipitated into the case thought that there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts." Id. at 58; See Strickland v. Washington, supra, 466 U.S. at 691. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, supra, 104 S.Ct. at 2066; see Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Counsel's failure to at least seek out an expert witness is outside the range of competent assistance. Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987). The Fifth Circuit has discussed counsel's omissions as follows:

> Whether counsel's omission served a strategic purpose is a pivotal point in Strickland and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court. For example, in

>Nealy we found counsel's performance deficient and stressed that at a post-conviction hearing, the defense counsel did not testify that such efforts would have been fruitless, nor did he claim that the decision not to investigate was part of a calculated trial strategy. He simply failed to make the effort. Counsel did not **choose**, strategically or otherwise, to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's cause.

Loyd v. Whitley, 977 F.2d 149, 158-159 (5th Cir. 1992), cert. denied, 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993), citing Nealy v. Cabana, 764 F.2d 1173, 1178 (5th Cir. 1985)(emphasis in original).

Failure to interview witnesses or discover readily available evidence is an error in trial preparation, not trial strategy. Kenly v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.), cert. denied sub nom, Delo v. Kenly, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). Any decision or judgment that flows from lack of diligence in preparation and investigation, therefore, is not protected by the presumption in favor of counsel having acted reasonably. Id. "Tactical decisions must be made in the context of a reasonable investigation, not in a vacuum. 'It is not enough to assume that counsel . . . thought there was no defense, and exercised [his] best judgment . . .'" Bouchillon v. Collins 901 F.2d 589, 597 (5th Cir. 1990), citing Powell v. Alabama, supra.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present mitigation evidence. Baxter v. Thomas, supra. When determining whether defense counsel conducted a reasonable investigation, the reviewing court looks at three factors: (1) whether a reasonable investigation should have uncovered

the mitigating evidence; (2) whether the failure to put this evidence before the jury was a tactical choice by trial counsel; and (3) if the choice was not tactical, whether there is a reasonable probability that absent the errors, the sentencing body would have concluded that the balance of the aggravating and mitigating circumstances did not warrant a sentence of death. Id. at 1513. "Our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." Id. at 1515.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to prepare and present evidence of a defendant's mental state at the time of the offense. Hill v. Lockhart, 28 F.3d 832 (8th Cir. 1994). Regarding the presentation of mitigating factors:

> In the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility. Thus, while we defer to legitimate, strategic decision-making, from the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors.

Hall v. Washington, 106 F.3d 742 (7th Cir.), cert. denied, 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997), citing Kubat v. Thierat, 867 F.2d 351, 369 (7th Cir. 1989); see Harris v. Dugger, 874 F.2d 756 (11th Cir. 1989); Osborn v. Shillinger, 861 F.2d 612 (10th Cir. 1988); Hyman v. Aiken, 824 F.2d 1405 (4th Cir. 1987); King v. Strickland, 748 F.2d 1462 (11th Cir.), cert. denied, 471 U.S. 1016 (1984); Bolder v. Armontrout, 713 F.Supp. 1558 (W.D. Mo. 1989); Mathis v. Zant, 704 F.Supp. 1062 (N.D. Ga. 1989).

A jury must be afforded the ability to consider and give effect to any relevant mitigating evidence proffered by a defendant as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

"[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Chronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In such a case, there is a presumption that the "conviction was insufficiently reliable to satisfy the Constitution." Id. at 662.

**Failure to submit veniremen to death penalty questions.**

Voir dire is critical to ensuring that a defendant's Sixth Amendment right to an impartial jury will be honored. Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). Without an adequate voir dire, it is impossible to remove veniremen who will be unable to follow the jury instructions and evaluate the evidence. Id.

During voir dire, especially in capital cases, "certain inquiries must be made to effectuate constitutional protections[.]" Morgan v. Illinois, supra, 504 U.S. at 730. This includes an inquiry into the views of the veniremen regarding the death penalty. Id., 504 U.S. at 731. "The process of voir dire is designed to cull from the venire persons who

demonstrate that they cannot be fair to <u>either</u> side of the case." <u>Id.</u>, 504 U.S. at 734 (emphasis in original). "[G]eneral fairness" and "follow the law" type questions fail to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." <u>Id.</u>, 504 U.S. at 734-735. An "inadequacy of voir dire" will lead a reviewing court to doubt that a defendant "was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment . . ." and will lead that reviewing court to conclude that the death sentence cannot stand. <u>Id.</u>, 504 U.S. at 509. Regarding this issue:

> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed <u>ipso facto</u> upon conviction of a capital offense reflects directly on that individual's inability to follow the law. [Citation omitted]. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of the law. [Citation omitted]. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on <u>voir dire</u> to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized."

<u>Id.</u>, 504 U.S. at 506-507.

A juror in a death penalty case must be able to consider mitigating evidence. <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The juror determines

the weight to be given to mitigating evidence, but the juror cannot give such evidence no weight by excluding such evidence from their consideration. Id., 455 U.S. at 114-115. "The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." Boyde v. California, 494 U.S. 370, 377-378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Mitigating evidence, such as good conduct in jail, need not relate to culpability for the crime committed, and such evidence is "'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'" Tennard v. Dretke, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

Callahan testified that he was also responsible for the jury selection, and his total lack of preparation for sentencing was reflected when he testified regarding his jury selection "strategy" as follows:

> My emphasis was to attempt to find a person who on the record would state that they were capable of answering the questions that would favor the State, but that in my opinion psychologically when it came down to it they could not. Therefore, you might call the strategy to find a ringer.

(WHC - v.4 - 8-9).

With Callahan's "strategy" in mind and the state's sentencing evidence against Manuel, jury selection began on August 30, 2002. (R - v.3 - 1). The first juror selected was Ms. Knipp. (R - v.4 - 13-50). Ms. Knipp stated she believed in the death penalty even in cases that did not result in the death of the victim, and she could participate in a process that would result in a death sentence including a capital case involving the killing of a police

officer. Id. at 15-16. Without objection, the state informed Ms. Knipp about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself. Id. at 31-33. Without objection, the state informed Ms. Knipp about the second special issue as follows: (1) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence "sufficiently mitigating to warrant basically changing my answer from death to life;" and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 36-38. Callahan asked Ms. Knipp if: (1) she presumed Manuel to be innocent; (2) "probability" means more than the flip of a coin or believing the weatherman; (3) she could follow the law on self-defense; (4) she could imagine no death penalty in Texas in 300 years; (5) she would ensure the jurors were fair during deliberations; (6) she were in Texas in the 1700's with indians looking for her and she had to prevent a baby from crying to prevent the indians from finding her, she could not kill the baby to keep it from crying and giving away her position to the indians. Id. at 43-50.

The second juror selected was Mr. Weber. (R - v.7 - 94-132). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) the jury can find the

62

defendant a future danger based on the facts of the offense alone. Id. at 105-106. Without objection, the state informed the juror about the second special issue as follows: "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death. Id. at 108-110. Second chair asked the juror: (1) where he had previously lived; (2) the occupation of his parents; (3) if he would require the defendant to testify or prove his innocence; (4) why he said too many criminals are getting out of prison too early; (5) why he said lawyers and judges are trying to further their careers and forget the truth; (6) why he said some police officers are as bad a criminals; (7) why he was irritated on the last trial in which he was a juror. Id. at 118-131.

The third juror selected was Mr. Worsham. (R - v.8 - 65-102). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 81-83. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant

a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 84-88. Callahan asked the juror if: (1) he would agree to be the foreman of the jury; (2) he would maintain fairness in the deliberation room; (3) he felt the death penalty was an effective deterrent; (4) he would like to see the death penalty no longer used in Texas; (5) he believed in mercy; (6) he was on an ocean liner that was blown up, he ended up with a gun on a raft built for two, the person who blew up the liner was also on the raft, the raft is sinking into shark infested waters because too many people were on the raft, would he throw the bomber off the raft. Id. at 90-102.

The fourth juror selected was Mr. Garza. (R - v.9 - 70-112). He was the victim of an armed robbery at his store, and the robbers went to another store and killed a person in another store. Id. at 73. He was in favor of the death penalty. Id. at 74, 77. Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 92-97. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently

mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 98-104. Callahan asked the juror if: (1) he agreed with self-defense regarding a police officer; (2) he would maintain fairness in the deliberation room; (3) he knew the definition of probability as opposed to flipping a coin; and (4) he believed in mercy. Id. at 106-112.

The fifth juror selected was Mr. Martin. (R - v.10 - 86-144). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, and weapons offenses; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 108-112. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 113-116. Second chair asked the juror about: (1) why he wanted to be a juror on this case; (2) where he was from and his occupation; (3) why he applied to be a police officer; (4) his military experience; (5) his unlawfully carrying a weapon case; (6) his voting history and about politicians; (7) magazines he reads; (8) his

NRA membership; (9) why he thought he could be fair as a juror; (10) his witnessing a shooting crime; (11) his views of the police; (12) he had items stolen from his truck; (13) his views of self-defense; (14) his conduct in group discussions; (15) his view that the laws are too lenient and there should be public punishments; (16) his view that psychiatrists are quacks; and (17) his views about lawyers and judges. Id. at 120-143.

The sixth juror selected was Ms. Frederick who eventually became the foreperson. (R - v.11 - 5-45; R - v.30 - 72; R - v.33 - 110). She stated that she was in favor of the death penalty for murder of a police officer. (R - v.11 - 5-6). Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, and weapons offenses; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 20-22. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 25-28. Second chair asked the juror about: (1) her views on violence in this country; (2) how she would react to evidence in a capital case; (3) her view of self-defense; (4) her view of police misusing their force; (5) why she dislikes Bill