and Hillary Clinton and Jesse Jackson; (6) how she would evaluate a witness' testimony; (7) her prior hot check case that was dismissed; (8) her interest in the Simpson trial; (9) her investments; (10) her criminal justice schooling; (11) her view of lawyers; (12) her marital status and ex-husband's profession. Id. at 29-44.

The seventh juror selected was Mr. Phelps. (R - v.13 - 101-140).  He was in favor of the death penalty. Id. at 103.  Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into homes, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) this issue can be answered yes based on the facts of the capital murder alone. Id. at 122-125.  Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 125-129.  During his questioning, Callahan challenged the juror for cause for: (1) "automatic on Special Issue Number 1;" and (2) "presumption of innocence and burden of proof." Id. at 133, 136.  Callahan asked the juror about: (1) mitigating evidence lessens the blame of someone; (2) the burden of proof; (3) right not to testify; (4) his statement that "no one is entitled to take a person's life" so the juror was in favor of the death

penalty; (5) his statement that "the death penalty is appropriate in all capital murder cases;" (6) he knows about six policemen; and (7) his view of policemen. Id. at 130-140.

The eighth juror selected was Mr. Kravetz. (R - v.14 - 93-118). He stated you should be hung for murder, rape, and child molestation. Id. at 96. The defense then wanted him excused from jury service because of sleep apnea and medications, and the juror became angry at the defense for this challenge. Id. at 98, 102-103. The trial judge let him sit as a venireman. Id. at 101. He informed the state that if a person was guilty of capital murder, the death penalty would be automatic. Id. at 113. He stated that, "If it's – if there's a capital murder conviction, then I say hang 'em." Id. at 114. He stated that if you take a life, you deserve the death penalty. Id. at 114-115. The state, understandably, did not even bother with their usual questions regarding the special issues. The defense made no challenges for cause. The second chair then, incredibly, conducted his questioning as follows:

> Q:    Mr. Kravetz, I still can run faster than you.
>
> A:    Oh, I know you can run faster than me.
>
> Q:    And I'm on this side of the table, so I'm not worried.
>        That's all the questions I have.  Nothing else.

Id. at 118.

The ninth juror selected was Mr. White. (R - v.15 - 81-127).  He stated that he was in favor of the death penalty for the killing of policemen. Id. at 87.  He stated that he was "more inclined to go for a death penalty . . . if there is a possibility of parole." Id. at 89. After having heard that a life sentence for capital murder means a minimum of 40 years, he

stated he would give the death penalty 8 out of 10 times on a scale of 1 to 10. Id. at 93. Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into homes, and stealing; and (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself. Id. at 96-98. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation. Id. at 99-102. Callahan asked the juror about: (1) why he was now so ready to give the death penalty; (2) the difference between Salem witch hunts and the death penalty; (3) why he could not disregard the statement that life equals 40 years; (4) lawyers he knows; (5) the definition of probability and flipping a coin and predicting the weather; (6) whether he could give a life sentence in a capital murder case; (7) whether he would like to be the presiding juror; (8) his actions in group discussions; (9) whether he would ensure deliberations would be fair; (10) his view of self-defense; (11) why it does not bother him that Texas leads the nation in executions; (12) why he could not envision Texas without the death penalty; and (13) the ocean liner hypothetical where he said he would shoot the bomber. Id. at 113-126.

The tenth juror selected was Mr. Link. (R - v. 18 - 68-133).  He stated he was in favor of the death penalty.  Id. at 69.  Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, resisting arrest, and escape; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) the facts of the offense alone can result in an affirmative answer to this question.  Id. at 92-96.  Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation.  Id. at 98-102.  Second chair asked the juror about: (1) his military service; (2) his NRA membership; (3) his Law Enforcement Association of America membership; (4) what facts of the case he heard about; (5) his motorcycle; (6) his pistol shooting; (7) his view of lawyers; (8) his view that nobody should take a life and self-defense; and (9) his view that if you take a life, the state should take your life.

The eleventh juror selected was Ms. Martin.  (R - v.19 - 96-142).  She said she was in favor of the death penalty for intentional murder.  Id. at 103.  Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes,

breaking into cars, and stealing; and (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself. Id. at 127-130.  Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear the evidence and decide not to consider it regarding mitigation.  Id. at 131-133.  Callahan asked the juror about: (1) her schooling; (2) probability and flipping a coin; (3) maintaining fairness in the deliberation room; (4) premeditation and intent and self-defense; (5) genetics; and (6) what the death penalty says about American culture.  Id. at 134-142.

The twelfth juror selected was Mr. Pacheco.  (R - v.21 - 104-141).  Without objection, the state informed the juror about the first special issue as follows: (1) the state does not have to prove the defendant would kill again; (2) "criminal acts of violence" may include property crimes, breaking into cars, burglarizing homes, and stealing; (3) "society" includes prison but escape is also possible so it is wherever the defendant may find himself; and (4) the jury can answer this question in the affirmative based solely on the capital murder.  Id. at 124-128. Without objection, the state informed the juror about the second special issue as follows: (1) "personal moral culpability" means if the defendant was the shooter or played a lesser role such as the get away driver; (2) "sufficient mitigating circumstances" has a three step analysis - does the juror believe the evidence, is the evidence mitigating, and is the evidence sufficiently mitigating to warrant a sentence of life rather than death; and (2) a juror may hear

the evidence and decide not to consider it regarding mitigation. Id. at 130-134. Incredibly, Callahan's questioning consisted merely of, "Mr. Pacheco, Denny Callahan. You've been pretty thorough in your answers and handled yourself well in this questioning and I have no questions for you. Thank you." Id. at 137. After the juror left the room, Callahan stated that the defense requested an additional peremptory challenge because the juror's questionnaire indicated that "he's automatic on death." Id. at 138. Callahan never questioned the juror about this issue or any other issue.

Defense counsel failed to probe the jurors regarding the jurors' views on the death penalty in the case at bar - i.e., for someone convicted of murder of a police officer. Defense counsel failed to ask the jurors if such a conviction would cause the juror to automatically believe that Manuel would be a future danger regarding special issue one. Defense counsel failed to ask the jurors if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence. Defense counsel failed to ask if the jurors would be able to consider and give effect to all relevant mitigating evidence offered by Manuel. Defense counsel, in effect, failed to determine whether the jurors had dogmatic views regarding the death penalty in the case at bar which would call into question whether the jurors were truly fair and impartial. It may be that these jurors could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the jurors from being truly fair and impartial. Manuel was on trial for his life and counsel should have ascertained whether these prospective jurors functioned under such misconception. The risk that such jurors may have been empaneled in this case and infected Manuel's capital sentencing is unacceptable in light

of the ease with which that risk could have been minimized had counsel conducted a proper voir dire or been properly prepared for sentencing. Manuel should receive a new sentencing hearing.

### Failure to investigate/present mitigating evidence.

Under American Bar Association Guidelines, counsel in a capital case must conduct thorough and independent investigation. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.11, cmt. (2003), reprinted in 31 Hofstra L. Rev. 913, 926 (hereafter ABA Guidelines). The United States Supreme Court has applied these ABA Guidelines to counsel's preparation for a capital sentencing proceeding. Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). These ABA Guidelines catalogue capital counsel's long-recognized "obligations" and the parameters of attorney "diligence." Id. The Supreme Court has described these ABA Guidelines as "well-defined norms" for the performance of capital defense teams at sentencing. Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). These ABA Guidelines apply equally to trial and to post-conviction counsel in that both defense teams must conduct "an aggressive investigation of all aspects of the case." ABA Guideline 10.15.1.E(4) at 1079. In addition, "collateral counsel cannot rely on the previously [trial counsel] compiled record but must conduct a thorough, independent investigation." ABA Guideline 10.15.1 at 1085.

Capital defendants have a constitutional right to the jury considering the "unique frailties" of the defendant. Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The jury must consider "compassionate or mitigating factors

stemming from the diverse frailties of humankind." Id.; see also Skipper v. South Carolina, 476 U.S. 1, 7, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (good adjustment to prison); Jurek v. Texas, 428 U.S. 262, 267, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (history of steady employment and caring for family).   A capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence . . . which might well . . . influence[] the jury's appraisal of his moral culpability." Williams v. Taylor, supra, 529 U.S. at 393.

If trial defense counsel failed to present the total, accurate picture of mitigation at sentencing, then counsel was ineffective in violation of the Sixth Amendment of the United States Constitution. Strickland v. Washington, supra. Counsel has "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Id. Ineffective assistance of counsel under the Sixth and Fourteenth Amendments occurs when counsel acts contrary to professional norms with prejudice resulting. Id. Prejudice is established when confidence in the outcome at trial or sentencing is shaken. Id. at 694. In capital cases, it is a "well-defined norm" that defense "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence.'" Wiggins v. Smith, supra, 539 U.S. at 524, quoting ABA Guideline 11.4.1(c).

Counsel is not effective by merely submitting some mitigating evidence:

> Williams thus stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony. The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that Williams establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a

state court not to "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding." This standard clearly contemplates that even when <u>some</u> mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete. The mitigating evidence presented in the instant case was substantially incomplete.

<u>Walbey v. Quarterman</u>, No. 08-70007 (5th Cir., January 19, 2009) (unpublished), <u>citing</u>

<u>Williams v. Taylor</u>, <u>supra</u>.

The argument that no prejudice occurred "because the brutality of his crime eclipses any mitigating evidence is a non-starter." <u>Walbey v. Quarterman</u>, <u>supra</u>. If that was all that was needed to offset prejudicial legal error and convert it to harmless error, habeas relief would virtually never be available, so testing for it would amount to a hollow judicial act. <u>Id.</u> In <u>Williams v. Taylor</u>, the Court acknowledged that a thorough mitigation investigation would have revealed two-edged sword evidence – unfavorable information along with mitigating evidence about the defendant. <u>Walbey v. Quarterman</u>, <u>supra</u>. The <u>Williams</u> Court found that "the failure to introduce the comparatively voluminous amount of evidence that did speak in William's favor was not justified by a "reasonable tactical decision." <u>Id.</u> The available mitigating evidence might not have proven that <u>Williams</u> was not dangerous, but "it might well have influenced the jurors' appraisal of his moral culpability." <u>Id.</u>

Counsel in a capital case must "formulate an accurate life profile of [the] defendant." <u>Williams v. Allen</u>, 542 F.3d 1326, 1341 (11th Cir. 2008). If the theory of mitigation is that the defendant had a troubled background, no stone can go unturned. <u>Id.</u> at 1342. "Given that

counsel's sentencing case focused on establishing that Williams had a troubled background, they had every incentive to develop the strongest mitigation case possible." Id.

The failure of counsel to meaningfully investigate and present expert mental health evidence in mitigation violated the defendant's right to effective assistance of counsel. Gray v. Branker, 529 F.3d 220 (4th Cir. 2008).  Counsel in capital cases are required to "make 'efforts to discover all reasonably available mitigating evidence.'" Id. at 234.  Counsel must give the full picture of the capital defendant including any mental or emotional disturbances or impaired capacities. Id. at 238.  "[S]cattered trial testimony" does not suffice. Id. at 233, n. 2.  Counsel must present a cohesive case in mitigation. Id. at 235.

In the case at bar, the following clearly reveals that counsel failed to present a cohesive case in mitigation. Maria Garza is the mother of the Petitioner, Manuel Garza. See Exhibit L.  When Maria was pregnant with Manuel, Maria used heroin and other drugs and alcohol. Id.  As a result, Manuel suffers from Fetal Alcohol Syndrome. See Exhibits S, T. When Maria was pregnant with Manuel, Maria also sold drugs along with her husband, Manuel Fernando Gonzalez (Fernie), and Maria's brothers, Pedro (who was stabbed to death in prison when he was 22 years old) and Louis. See Exhibits L, R.  They would all break into buildings and homes to steal whatever they could find. See Exhibit L.  The families were very poor and little emphasis was made on education so almost everyone dropped out of high school. Id.  When Manuel was born, he was cross-eyed and this embarrassed Fernie. See Exhibit O.  When Manuel was still a toddler, Fernie would make Manuel drink beer and on one occasion, Manuel actually fell asleep as a result of drinking beer. See Exhibit M. Fernie

thought is was funny to give Manuel, a toddler, beer and see the effect it had on Manuel. <u>Id.</u> Fernie even took a picture of Manuel holding a beer which is attached to Maria's affidavit. <u>Id.</u> Maria believed this had an effect on Manuel. <u>Id.</u> Maria did not want Manuel to have Fernie's last name which angered Fernie and caused him to again accuse Maria of having affairs with other men including Fernie's brother, Raul. <u>Id.</u> Fernie moved the family constantly because Fernie was afraid the police would find out where he lived and arrest him. <u>Id.</u> The family never lived in the same place for more than a year. <u>Id.</u> This resulted in Manuel always going to a new school and living in a new neighborhood. <u>Id.</u>

Fernie was very abusive toward Maria. <u>See</u> Exhibit L. Fernie once pushed Maria out of a moving car. <u>See</u> Exhibit R. Fernie forced Maria to stay inside their house with the windows and doors shut and locked and curtains over the windows. <u>See</u> Exhibit M. Maria was prohibited from answering the door or the telephone if Fernie was not at home. <u>Id.</u> Fernie would punch Maria with a closed fist and kick Maria with steel toed boots when Maria fell to the floor. <u>Id.</u> Fernie would then force Maria to have sex with him. <u>Id.</u> When Maria informed Fernie's father about the beatings, he replied that she probably deserved it and just laughed at Maria. <u>Id.</u> Maria often had black eyes and bruising as a result of the abuse by Fernie. <u>See</u> Exhibit L. Whenever someone came to their house, Fernie made Maria stay in her room and not talk to anyone. <u>Id.</u> Fernie would beat Maria in front of Manuel and the other children. <u>Id.</u> Fernie forced Maria, Manuel, and their other children to help Fernie sell drugs. <u>Id.</u> Fernie would have the kids hold the drugs when they were selling. <u>Id.</u> The kids watched Fernie doing drugs and selling drugs. <u>Id.</u> Fernie kept his pistol in Maria's

purse which resulted in Maria being arrested for illegal carrying. Id. Raul's father went to check Fernie's house after the arrest to ensure no drugs were in the house for the police to find, and Manuel's sister, Corrina, told him where the drug money was hidden. Id. When Fernie was released from jail, he severely beat Corrina for telling her grandfather about the location of the money. Id. Maria and Fernie would leave the kids unsupervised for several days. Id. The kids were ten years of age and younger. Id.

Maria had no interest in what the children were doing either at home or in school. See Exhibit N. Maria never asked them what they did in school that day or if they had homework. Id. Maria never asked them if they had friends. Id. When the children would ask Maria for help or try to converse with her, Maria would just ignore them and not even respond to them. Id. It did not take the children long to learn not to ask or talk to Maria about what the children had done at school or whatever. Id. It was worse for Manuel, however, than it was for Corrina. Id. Maria or Fernie would send Corrina to her room, but they would send Manuel outside the home because Maria and Fernie just wanted Manuel to be gone and out from under foot. Id. Maria and Fernie really did not care what Manuel did. Id. The children would always find drug paraphernalia, such as used heroin needles, around the house. Id. Not once was there ever a birthday party for Manuel or Corrina. See Exhibit O. Fernie never talked about Manuel, never told anyone that he was proud of Manuel, and never seemed to care about Manuel. Id.

Fernie never believed that his and Maria's child, Corrina, was his. See Exhibit M. Fernie constantly accused Maria of getting pregnant with Corrina with another man. Id.

After Corinna was born, Fernie began cheating on Maria with other women. Id. Corrina

eventually informed Maria that Fernie had sexually abused Corrina. Id. When Corrina was

six or seven, Maria and Fernie fought in their bedroom and Fernie left the bedroom and

entered Corrina's bedroom and got into bed with Corrina. See Exhibit N. Corrina is unsure

if sexual intercourse occurred because she really does not like to think about that episode.

Id. Corrina does know, however, that she "was hurt and scared and dad threatened me that

if I told anyone more bad things would happen to me." Id. Corrina was terrified that Fernie

would return to the home after Fernie's last time in prison in 1994. Id.

Fernie was very abusive toward Manuel while Manuel was young. See Exhibit L.

Fernie would make Manuel stand in the corner for hours at a time and would be rigidly strict

with Manuel and Corrina. Id. At one family gathering, Fernie forced Manuel to sit on the

floor next to Fernie for hours and be perfectly quiet. Id. Fernie repeatedly beat Manuel with

a belt. Id. Anything would set either Maria or Fernie off. See Exhibit N. When Maria or

Fernie became angry, they would get the belt. Id. Manuel and Corrina would run or crouch

in a corner attempting to protect themselves from being whipped. Id. Corrina stated that

Manuel would come home from school and stay outside until dinner and then go back outside

until bed time because, "It just wasn't safe in our house." Id. There was always tension in

their house. See Exhibit Q. "It seemed [] that everyone was always afraid and walking on

eggshells." Id. Whenever Fernie "walked through the door everyone would try to stay very

quiet and we would all go to another room to play or watch T.V." Id. At home, Fernie

always seemed angry, and his tone of voice was always angry. Id. Fernie "would start yelling at someone about something as soon as he came through the door." Id. Fernie never spoke to Manuel or Corrina in a reasonable tone of voice - Fernie was always yelling at them and they seemed to be afraid to approach, ask, speak, or play with Fernie. Id. Fernie never did anything with Manuel that a normal dad would do with his son. Id. Fernie never held Manuel when Manuel was little, never played with Manuel, never asked how Manuel's day went at school, or even sat and watched TV with Manuel. Id. Fernie would be heard at family gatherings telling Manuel and Corrina when they were little, "You're not mine." Id. It was obvious that Fernie had done bad things to Manuel just from the way Manuel acted whenever Fernie was present. Id.

Fernie would beat Manuel with a belt so hard that Fernie tore open Manuel's back and Manuel would bleed from the beatings. See Exhibit M. Fernie never believed that Corrina or Manuel were his children, so Fernie would beat them more severely than Fernie's other children. Id. It seemed to the children as if Fernie beat Maria all the time. See Exhibit N. Yelling and fighting were constants at this house. Id. Manuel and Corrina spent most of their time hiding in their room afraid to draw attention to themselves since that would result in Fernie beating them. Id. Fernie had everyone in the house "so beat down that they were all afraid of him. He just controlled them." See Exhibit O.

Manuel's aunts, uncles, and parents were in and out of jail or prison when Manuel was young. See Exhibit L. "It seemed that everyone in the extended family was getting arrested and someone was always in jail." See Exhibit N. Fernie and Maria were always getting

arrested - "That was also pretty normal at our house." Id.  When Corrina was in middle

school and Fernie was in jail, five of their cousins came to live with Maria and the children

because both of the cousins' parents were in jail. Id.  It was Corrina's job to ensure dinner

was made, everyone was fed, and dishes were cleaned or Corrina would get in trouble. Id.

All of the men in Fernie's and Maria's families went to prison at least once. See

Exhibit L. Fernie would steal cars and alter the VIN number and the license plates. Id. He

would drive the cars for awhile and then sell them before he would steal another car. Id.

This was Manuel's introduction to crime. Id. Manuel learned he could have nice things by

stealing them. Id. Fernie instructed Manuel on how to burglarize houses, steal cars, and hot

wire cars. See Exhibit O. Fernie went to prison several times while Manuel was young. See

Exhibit L.  When Fernie was in prison, Maria would drink and use drugs and have

boyfriends. Id. This was confusing to Manuel. Id. The last time Fernie was released from

prison, Maria made up a story that Fernie had molested Corrina so that Fernie could not be

paroled to their home. Id. Fernie was very upset about this and overdosed on heroin a few

months after his release from prison. Id. After Fernie's death, Manuel began to get into

trouble on a regular basis. See Exhibit M. Manuel began breaking into cars to steal stereos,

was taken to juvenile detention, and eventually sent to TYC. Id. After Fernie's death,

Manuel "just gave up." See Exhibit N. Manuel seemed to be getting arrested all the time

then. Id.

Given the environment in which Manuel was raised, Manuel did not have a choice

about what he did with his life. See Exhibit L. His parents were high school dropouts, did

drugs, and were involved in crime. Id. Fernie died when Manuel was only fourteen years old. Id. Manuel had to help support the family after the death of Fernie. Id. The only way Manuel knew how to get money was to steal things and sell them. Id. Manuel was never told not to commit crimes, and his family instructed Manuel how to commit crimes and to do it well. Id. Fernie would take Manuel to steal things. See Exhibit N. Fernie left Manuel a Harley Davidson motorcycle after Fernie died, but Maria had Manuel get the bike and Maria sold it. See Exhibit L. At Fernie's funeral, Maria discovered that Fernie had a whole different family with another woman. See Exhibit R. A woman approached Maria at the funeral and introduced herself to Maria as Fernie's wife. Id.

    The above provide extensive and graphic descriptions of the physical and emotional abuse suffered by Manuel as a child and by everyone else in the family. See Exhibit T. "Manuel's extended family is replete with individuals who were engaged in drug use and distribution as well as other criminal activity that resulted in their arrest and incarceration." Id. Only Manuel's maternal grandmother and oldest aunt have not had substance abuse and legal problems. Id. Manuel's childhood reflects a chaotic and destructive influence of substance abuse on the family's ability to care for the children in the home including the death of Manuel's father, Fernie, as a result of an overdose on heroin when Manuel was thirteen. Id. "Further contributing to the chaos and dysfunction of Manuel's family was the active involvement of his father in criminal enterprises." Id. "All of this was also nested in two families where the chaos of drugs and criminality was the norm." Id.

Manuel's family experienced hardship as a result of the frequent family relocations that occurred on an almost yearly basis. Id. Between kindergarten and ninth grade, Manuel lived in at least twelve different addresses and attended nine different schools. Id. "These relocations not only disrupted family life but, for Manuel, disrupted his educational and social life." Id. "Due to the frequent relocations he was unable to develop the normal friendships, relationships and educational goals that are so important to the normal social development of an individual." Id. "This social isolation from others also increased the impact of the dysfunction of Manuel's own family experience as without any social references he was unable to even identify the abnormal nature of his own developmental experiences." Id. There was no stability within the extended family as throughout Manuel's development extended family members were being repeatedly arrested and incarcerated. Id. "The arrest and incarceration of extended family members had an immediate impact on Manuel as the make-up of the household that he lived in was constantly changing as cousins were constantly moving in and out of the household while their parents were incarcerated." Id. The supporting documentation of the above is attached as Exhibit V - Manuel Garza's records, and Exhibit W - Manuel (Fernie) Gonzalez's records.

Maria and Corrina testified at the punishment hearing in Manuel's capital case. See Exhibits M, N, T. They were never, however, interviewed by counsel prior to their testimony except for a brief conversation in the hall outside the courtroom immediately prior to their testimony. Id. They had already offered much more information to the mitigation specialist pretrial, but when they testified, it seemed as if counsel was unaware of any of the

information they had given the mitigation specialist. Id. The defense mitigation specialist had been appointed less than a month before the start of jury selection which was an inadequate amount of time in which to complete a thorough mitigation investigation. Id. The mitigation specialist's attempts to introduce mitigation witnesses to trial counsel were rebuffed by trial counsel. Id.

As a result of his abusive early childhood environment, Manuel endorses symptoms of a discrete and recognizable pattern of psychological problems. See Exhibit S. "His psychological discomfort seems manifested partly in a pattern of somatic complaints that may be associated with symbolic representation of psychological pain by an individual who is psychologically unsophisticated, and/or by genuine physical symptoms associated with inner tension and/or affective disturbance." Id. "His affective disorder is accompanied by an apparent chronic and ingrained paranoia with possible delusional features, that would be consistent with an abusive early childhood environment." Id. "Manuel may exhibit features of fetal alcohol syndrome" as a result of his mother drinking alcohol while pregnant with Manuel. Id. Manuel's psychological testing indicated a developmental learning disorder, and this presence of a learning disability is an indicator for diagnosis of fetal alcohol syndrome. Id. Manuel has exhibited deficiencies in executive functions since at least the age of thirteen, and this is consistent with a diagnosis of fetal alcohol syndrome (FAS) since FAS cognitive symptoms include deficiencies in executive functions. Id. The emotionally intense and ambivalent relationship between Manuel and his father from early developmental years disrupted Manuel's normal cognitive development and acquisition of cognitive structure. Id.

Manuel's fetal alcohol exposure damaged his neural structures necessary for development of cognitive structures and impulse control/executive functions. Id. Manuel suffered from severe mood disorder, delusional disorder, and hallucinations. Id. "Surprisingly absent from his history is any indication that he has been evaluated for medication to address behavioral issues." Id.; see also Exhibit V.

*__None of the above mitigating evidence was cohesively presented to the jury in Manuel's case and most was not presented at all to the jury__*. From the date of Manuel's arrest on February 4, 2001 until the date first chair counsel was allowed to withdraw on July 11, 2002, counsel did *__absolutely nothing__* on this death penalty case for this period of 522 days. (WHC - v.2 - 63-66, 68; T - 76, 83-84, 88). The defense investigator appointed on May 8, 2001 had "legal problems" and "never got around to doing anything" and "never did investigate the case." (WHC - v.2 - 65, 87; T - 42). Counsel learned in July 2002 that trial was scheduled the following month for August 30, 2002, and counsel "panicked" because counsel was not prepared for trial in this capital case. (WHC - v.2 - 63-64, 68; T - 42).

Callahan was responsible for the punishment phase of the trial. (WHC - v.4 - 8-9). Second chair counsel, a friend of Callahan's, testified that to his knowledge Callahan did nothing for the preparation of sentencing. (WHC - v.2 - 64, 70-71). Callahan was not interested in developing any mitigation evidence for trial, and "Callahan did not have any regard for mitigation evidence, period." Id. at 76. Counsel's statements regarding the sentencing phase of the trial were as follows: "mitigation wasn't a real concern," "[w]e never

85

talked about punishment," "we just kind of dropped the ball on mitigation," "[t]here was never any punishment strategy or any mitigation strategy," "there wasn't any other [sentencing] witnesses that we knew about because we hadn't looked for any," and "Callahan did not talk to those people [defense punishment witnesses] until they showed up for court at the punishment hearing." Id. at 67, 69, 73-74, 92-97).

Second chair counsel, who was not responsible for punishment, had a mitigation specialist appointed, but the following troubles occurred:

> The only – the only investigation per se that was done on mitigation was by the mitigation specialist . . . I was concerned because most of our discussions during that period of time was about her getting paid. ***I couldn't get information from her on certain occasions because she wasn't getting paid*** . . . It was only after – it was – ***it was like negotiating for the reports***. There would be a summary type report about what the sister had said or the mother had said, that type of thing, that I received at some point. She would get paid. Finally at some point after she was terminated I wanted – in fact, I asked her on a number of occasions, I wanted all of her notes of the interviews, not just that summary report of so-and-so would say this or said this or whatever.   I said give me all of your interview notes. Everything that you've got on these people . . . ***I don't even know if I got it because we were fighting about it all the time***. Finally we reached a point where it wasn't worth fighting about anymore because I had to get ready for trial. See? ***So I kind of like let it go because it's not worth the hassle*** . . .

(WHC - v.2 - 93-94).

Callahan did not use a mitigation specialist or any expert regarding mitigation.  (WHC - v.4 - 9).  He claimed that he did not use the services of the mitigation specialist that had been appointed because she seemed to "be a money grubber." Id. at 18.  Callahan admitted

that the only time he spoke with Manuel's family members was during trial on October 17,

2002. Id. at 19. Callahan admitted that only three people testified at sentencing for Manuel

because "out of the other people I had spoken to those were the only ones that showed up."

Id. at 10-11. He did not "contemplate" subpoenaing other witnesses. Id. at 11. Callahan

admitted that he first interviewed his sentencing witnesses in the hallway outside the

courtroom at recesses during trial. Id. at 20. His court-appointed voucher confirms that this

is the only contact he had with potential mitigation witnesses other than his scant contact

with Dr. Ferrell. See attached Exhibit I. At sentencing, Callahan called only Manuel's uncle,

sister, and mother. (R - v.33 - 26, 41, 54). Callahan claimed that he was attempting to

humanize Manuel, show a troubled youth, try to get the jury to hold Manuel less responsible,

and try to get the jury to show mercy. (WHC - v.4 - 23). The mitigation expert, however,

stated that the defense team had no interest in obtaining or pursuing mitigation evidence. See

Exhibit U. The mitigation expert on several occassions attempted to contact Callahan, but

Callahan did not contact her until several months *after trial*. Id. The defense did not speak

to any of the mitigation witnesses located by the mitigation specialist except the mother. Id.

The mother was briefly interviewed in the hallway outside the courtroom before her

testimony. Id.

   "The only thing that was done on punishment at that point [July 2002] was Callahan

filed a motion to appoint Doctor Ferrell to do some kind of psychological exam." (WHC -

v.2 - 66). Callahan had Dr. Ferrell appointed on July 23, 2002, but Callahan did not have Dr.

Ferrell conduct any testing on Manuel, and Dr. Ferrell never told Callahan that Manuel was

87

a future danger.  See attached Exhibit J.  Dr. Ferrell has reviewed ***for the first time*** the psychological information in State Exhibit 188 and is of the opinion that significant mitigation evidence was never presented in Manuel's trial especially since no psychological testing was ever requested.  Id.  Twenty-one days before trial, Dr. Ferrell met with Manuel on August 9, 2002 for a period of about 1.5 to 2 hours.  (WHC - v.2 - 46-47, 54).  Fifteen days before trial, Dr. Ferrell informed counsel on August 15, 2002 that he had met with Manuel, and counsel instructed Dr. Ferrell not to do anything further, so Dr. Ferrell did not talk to family members or conduct any testing on Manuel.  Id. at 47, 54, 56.  Callahan did not meet with Dr. Ferrell prior to trial.  Id. at 70-71.  The day before Manuel was sentenced to death, on October 28, 2002, counsel met with Dr. Ferrell for 45 minutes with a "stack" of documents, and Dr. Ferrell was of the opinion that Manuel was not a future danger and so informed counsel.  Id. at 47-53.  Counsel, however, did not call Dr. Ferrell as a witness at sentencing.

Callahan claimed that he had Dr. Ferrell prepare a mental health evaluation.  (WHC - v.4 - 9).  Callahan thought he would have Dr. Ferrell testify regarding Manuel's "possible mental fragility or his lack of perfect understanding of his circumstance."  Id. at 9-10.  Callahan admitted, however, that the extent of his contact with Dr. Ferrell was: a phone call for 30 minutes on July 19, 2002; a 15 minute letter to Dr. Ferrell on July 22, 2002; another letter to Dr. Ferrell during trial in October 2002; and a ½ hour conference with Dr. Ferrell during trial in October 2002.  Id. at 31.  Callahan claimed that he did not have Dr. Ferrell

testify because Dr. Ferrell allegedly believed Manuel was a future danger after Callahan provided Dr. Ferrell with the State's 404(b) notice and his discovery notes. Id. at 10. This "testimony" is directly contradicted, however, by the affidavit submitted by Dr. Ferrell for the state habeas. See attached Exhibit H. In that affidavit, Dr. Ferrell stated that, "I would have testified at the trial that he [Manuel] did not present as a future threat or danger to himself or others, based upon my limited evaluation." Id.

Louis Garza, Manuel's uncle, testified during sentencing. (R - v.33 - 26-40). He testified: (1) Manuel as a child lived with him; (2) Manuel was a good student in elementary school, went to school daily, and had good grades; (3) Manuel was a happy child, had a good mother, but his father was never around; (4) Manuel's father was sent to prison when Manuel was a teenager; (5) this probably affected Manuel, and Manuel was probably sad; (6) Manuel's father was liberal; (7) Manuel did about the same in school after his father was sent to prison and after his release; (8) Manuel's father died of an overdose of drugs; (9) Manuel got into trouble as a juvenile; (10) unknown why Manuel did not stop getting into trouble or stealing cars; (11) Manuel was probably ashamed of his actions; (12) Mr. Garza heard that Manuel's father abused another member of the family; (13) as a young man, Manuel was a hard worker; (14) he loves Manuel and does not believe Manuel is a future danger. Id.

Corrina Garza, Manuel's sister, testified during sentencing. (R - v.33 - 41-54). She testified: (1) she loves Manuel, they had a good mother, and a bad father who was abusive physically to their mother; (2) the father verbally/physically/mentally abused Corrina and

Manuel; (3) the father worked construction then went to prison two times so their mother worked at McDonalds; (4) the father separated from their mother which was good since the abuse then stopped; (5) Manuel repeated seventh grade which was the year their father went to prison; (6) Manuel was a good student after seventh grade; (7) Manuel began stealing cars when he was fifteen to get money for the family; (8) it is unknown why he kept stealing cars; (9) Manuel did not have any male figures in his life when he started stealing; (10) most of his uncles went to prison; (11) Manuel took it very hard when his father overdosed; (12) in TYC, Manuel was peaceful and not a danger; (13) after TYC, Manuel went to Laurel Ridge mental hospital; (14) the police were called when a glock was found under Manuel's bed; (15) Manuel drove stolen vehicles, evaded police, crashed into cars, and went to prison; (16) the father was not allowed back into the house because Corrina accused him of sexual abuse from when she was seven; (17) Manuel was poisoned by this sexual abuse allegation.  Id.

Maria Gonzalez, Manuel's mother, testified during sentencing.  (R - v.33 - 54-61). She testified: (1) they moved once per year because Manuel's father did heroin sometimes in front of the kids, and he sold drugs; (2) the father was a bad husband because he was very abusive, would hit her every other day, and often hit Manuel; (3) the father went to prison four or five times and she told him not to come back which hurt Manuel; (4) the father died from an overdose which hurt Manuel since Manuel was trying to be close to his father; (5) Manuel lost all hope when he was twelve; (6) Manuel had a lot of anger then; (7) he repeated seventh grade because he was not going to class and was not trying; (8) Manuel was always

a good student; (9) he started stealing cars when he was fourteen, and I do not know why; (10) Manuel wanted more than she could give, had no one to turn to, and no male figure in his life; (11) Manuel is peaceful when in jail, and not a future danger; (12) she did not believe he used drugs; (13) he had a happy childhood; (14) she filed a complaint with CPS about the father sexually abusing Corrina. Id.

A stipulation regarding Manuel's report cards and school records was admitted as Defense Exhibit 9. (R - v.33 - 61-62). Manuel's hospital records from the shooting/beating were admitted as Defense Exhibit 10. Id. at 65. The State had previously admitted State Exhibit 188. (R - v.32 - 150). During trial appears to be the first time counsel saw this document, because counsel needed time for formulate an objection to the exhibit. Counsel did admit at the state writ hearing that he did not think he reviewed all of Manuel's records pretrial. (WHC - v.2 - 92-97). This exhibit included: (1) records of abuse/neglect of Manuel; (2) psychological evaluation of Manuel dated December 2, 1997; (3) TYC assessment of Manuel dated July 25, 1996; (4) a psychological evaluation of Manuel dated May and June 1996; (5) Turman House records. Id. There was no testimony from any defense witness regarding these records.

The psychological evaluation dated December 2, 1997 is contained within State Exhibit 188. In this evaluation, the psychologist stated that records indicated that Manuel's father was physically abusive toward Manuel and had a history of substance abuse and violence. Id. Manuel had been moved from juvenile detention to the Gulf Coast Crisis

91

Center to the Teen Connection to the Turman House. <u>Id.</u> Manuel was frequently truant and suspended many times for fighting and possession of drug paraphernalia. <u>Id.</u> His juvenile priors included thefts, burglary of a vehicle, and possession of marijuana. <u>Id.</u> Manuel denied that his father abused him, but records established his father did abuse him. <u>Id.</u> Manuel was depressed and was considerably saddened by his father's death. <u>Id.</u> "[H]e declined to talk about other events which caused him to be depressed." <u>Id.</u> Manuel's intellectual functioning was in the borderline to low average range. <u>Id.</u> Manuel's "family environment has been abusive, non-supportive, and rejecting." <u>Id.</u> "Mother has little tolerance for [Manuel] and prefers that he lives outside the home." <u>Id.</u> "Gang membership may be a means of satisfying his needs for affiliation which he did not experience at home." <u>Id.</u>

The TYC assessment dated July 25, 1996 was also contained within State Exhibit 188. This evaluation stated that, "Manuel grew up in chronic poverty and his probation officer noted that Manuel has had a chaotic home life that lacked supervision and discipline." <u>Id.</u> "Manuel has been involved with street gangs since he was twelve." <u>Id.</u> He has poor impulse control and a difficult time controlling his emotions. <u>Id.</u>

The psychological evaluation dated May and June 1996 was also contained within State Exhibit 188. Manuel suffered a head injury when he was in a car wreck and was briefly unconscious. <u>Id.</u> He was also shot in the head with a BB gun and has a BB in his head above his left ear. <u>Id.</u> He feels depressed once or twice per week. <u>Id.</u> He father died from a drug overdose. <u>Id.</u> Manuel feels "nothing" for himself. <u>Id.</u> Manuel "may lack coping skills and may experience difficulty meeting the demands of daily life and may experience problems

with control and in interpersonal relationships." Id. Manuel "tends to have inaccurate perceptions of himself and others, and sees himself in a less favorable light when comparing to peers." Id.

There was no mitigation investigation into the following facts elicited from the three sentencing witnesses: (1) the psychological effect on Manuel of the absence of his father: (2) why this absence affected Manuel and made him sad; (3) the effect of the father's overdose on Manuel and the father's taking heroin in front of Manuel as a child; (4) why Manuel began violating the law at this point; (5) the effect on Manuel of the father's sexual abuse of Corrina and the father's verbal/physical/mental abuse of the family; (6) why Manuel repeated seventh grade; (7) why Manuel's school grades were inconsistent; (8) why Manuel needed to steal cars to provide money for his family; (9) why Manuel kept on stealing cars and committing other crimes; (10) the effect on Manuel of no male figures in his life; (11) why Manuel was admitted into Laurel Ridge mental hospital for treatment and what affect this had on Manuel; (12) what the circumstances were of Manuel's possession of weapons at home and in school; (13) why Manuel escaped from the Turman House; (14) why Manuel was trying to become closer to his father; (15) why Manuel lost all hope when he was twelve; and (16) why Manuel wanted more than his mother could give and what were the particulars of this mind frame.

The following potential mitigation issues were not investigated, developed, or presented at trial: (1) possible consequences of maternal drug use during Manuel's gestation;

(2) history of violence, gang involvement, criminality, drug abuse, physical abuse, and sexual abuse in the family; (3) history and impact of the chaotic nature of the family and the impact of the numerous relocations of the family; (4) interviews of teachers and school personnel; (5) interviews of TYC and TDC personnel though Matthews suggested that they testify; (6) fetal alcohol spectrum disorder; (7) a developmental expert to explain how the "norms" of the family resulted in Manuel developing survival characteristics that are considered deviant by society through no fault of Manuel; and (8) an expert to explain how the deficits in Manuel's developmental relationships and environment created needs for affiliation and acceptance that were met by his gang involvement which was "normalized" by the gang involvement of multiple family members.  There was no testimony at the state writ hearing about the results of any mitigation investigation conducted post-conviction or if one was even performed.

Manuel's trial attorneys failed to investigate, prepare, and present at trial important mitigating factors in Manuel's background.  This failure actually and substantially prejudiced Manuel in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  In the case at bar, there was substantial evidence of a very troubled childhood experienced by Manuel.  Specifically, extensive criminal histories and drug abuse by almost all members of the Garza family subjected Manuel to almost no socialization of society's values and mores.  Additionally, his father, whom he was very close to, was sent to prison and within a few months of his release died of a heroin overdose which had a profound effect on Manuel.

Manuel's counsel chose not to enter this into the record or call any of the different mental health experts who performed the different psychiatric tests on Manuel. Neither did defense counsel choose to call their own designated appointed psychiatrist - Dr. Ferrell. Dr. Ferrell had visited with Manuel and had formed an expert opinion as to Manuel's lack of future dangerousness. See attached Exhibit C, State Habeas at Exhibit D - Affidavit of Dr. Ferrell. There was some concern by defense counsel that they did not want Dr. Ferrell testifying about issues contained within the school records. However, the school records were admitted into evidence by Manuel's defense counsel. (R - v.33 - 61, 62; DX 9). Even if defense counsel had not introduced the school records, the psychiatric testing performed on Manuel, as a juvenile, contained none of this "school" information, but instead discussed the impact of Manuel's troubled childhood on his behavior. See attached Exhibit C, State Habeas - Exhibit C - Juvenile Psychiatric testing documents; Exhibit D - Affidavit of Dr. Jack Ferrell; Exhibit E - Current Psychological Evaluation and Testing, with background information, by Dr. Susana Rosin and Exhibit F - report prepared by Dr. Kate Allen.

This need for mitigating evidence is particularly true in a capital case, because "there is a significant constitutional difference between the death penalty and lesser punishments." Beck v. Alabama, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Although the effectiveness of counsel must be determined on a case-by case basis, Strickland v. Washington, supra, courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case. Thus, this Court is entitled to refer to guidelines such as the ABA Standards

for Criminal Justice to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial. As the Supreme Court stated in <u>Strickland</u>:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in the American Bar Association Standards and the like, e.g. ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guidelines to determining what is reasonable . . .

<u>Id.</u>, 466 U.S. at 688.

In <u>Wiggins v. Smith</u>, <u>supra</u>, the Supreme Court held that the decision of the trial counsel not to expand their investigation of petitioner's life history for mitigating evidence beyond the pre-sentence investigation (PSI) report and the Department of Social Services Records fell short of prevailing professional standards, and the inadequate investigation by counsel prejudiced the petitioner. In the case at bar, the trial counsel for Manuel were in possession of information much more extensive than a mere PSI investigation, that is, the Juvenile Psychological Evaluation - Exhibit C of State habeas, and the information in possession of Dr. Ferrell pursuant to his evaluation of Manuel. Nothing was presented for the jury's consideration. As in the case at bar, in <u>Wiggins</u>, counsel abandoned their investigation of the petitioner's background after having acquired only a rudimentary knowledge of his history from a narrow set of sources.

In <u>Wiggins</u>, the argument was made that the attorneys had made a strategic decision to focus, at punishment, on retrying the factual case and disputing Wiggins' direct responsibility for the murder. The trial court denied the petition, and the state court of

appeals affirmed, concluding that trial counsel had made a reasoned choice to proceed with what they considered their best defense. Subsequently, the federal district court granted Wiggins relief on his federal habeas petition holding that the Maryland courts' rejection of his ineffective assistance claim involved an unreasonable application of clearly established federal law. In reversing, the Fourth Circuit Court of Appeals found the trial counsel's strategic decision to focus on Wiggins' direct responsibility to be reasonable. However, the United States Supreme Court held that the performance of Wiggins' attorneys at sentencing violated his Sixth Amendment right to effective assistance of counsel. Wiggins v. Smith, supra, 539 U.S. at 511.

In Wiggins, as in Strickland v. Washington, counsel claimed that their limited investigation into the applicant's background reflected a tactical judgment not to present mitigating evidence and to pursue an alternative strategy instead. In evaluating the applicant's claim, the court's principal concern was not whether counsel should have presented a mitigation case, but whether the investigation supporting their decision not to introduce mitigating evidence was itself reasonable. The reviewing court thus conducts an objective review of their performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time of that conduct. Strickland v. Washington, supra, 466 U.S. at 689, 104 S.Ct. at 2534-2536.

Defense counsels' conduct in the case at bar similarly fell short of the American Bar Association's capital defense work standards. Moreover, in light of the information

contained in the juvenile psychological evaluation of Manuel, counsel's decision to not introduce the above mitigation evidence was unreasonable. Any reasonably competent attorney would have realized that preparing this information was necessary, particularly given the apparent absence of aggravating factors from Manuel's background. In the case at bar, Manuel did have prior criminal offenses. However, none of the offenses included actual assaultive crimes. The juvenile records clearly indicate that Manuel, when confronted, removed himself from the situation. See attached Exhibit C, State Habeas - Exhibit C - Juvenile Psychological Evaluation and Exhibit F - report prepared by Dr. Kate Allen. His crimes were clearly property crimes. Therefore, the capital murder was the first time that Manuel engaged in any allegedly assaultive behavior.

During the sentencing process itself, counsel did seem to focus on the lack of assaultive tendencies in Manuel's prior criminal history. Linda Detloff stated that while Manuel was attempting to steal her car, she told him to get away from her and he politely did so. (R - v.31 - 33). The record of the sentencing proceedings underscores the unreasonableness of counsels' conduct by suggesting that their failure to investigate thoroughly stemmed from inattention, not strategic judgment. Additionally, the court appointed mitigation expert - Ann Matthews - had interviewed Raul Gonzales, a family member with extensive personal knowledge of the troubled childhood experienced by Manuel. See attached Exhibit C, State Habeas - Exhibit G - Affidavit of Raul Gonzales. Ms. Matthews informed defense counsel of this potentially important testimony in the form of

personal conversations but also in the form of a letter.  <u>See</u> attached Exhibit C, State Habeas

- Exhibit H, I, J - Affidavit of Ann Matthews with Copies of Letter Sent to Defense Counsel.

Defense counsel never called Mr. Gonzales to the stand.  Defense counsel did call

Corrina Garza, Manuel's sister, Maria Gonzalez, Manuel's mother, and Louis Garza,

Manuel's maternal uncle, to testify.  (R - v.33 - 26, 41, 56).  They did testify as to some of

the abuse that was endured, however, on a very superficial basis.  Mr. Gonzales' information

was much more in depth and poignant.  Without the help of a psychological expert, coupled

with the unheard testimony of Mr. Gonzales, the jury only heard, cursorily, that Manuel had

a troubled childhood.  Taking this information into a psychological context with Mr.

Gonzales and the other witnesses would have been of great help to the jury in determining

the answers to the special issues.

Ultimately, United States Supreme Court decisions that counsel's investigation was

inadequate does not mean that <u>Strickland</u> requires counsel to investigate every conceivable

line of mitigating evidence no matter how unlikely the effort would be to assist the defendant

at sentencing.  Nor does <u>Strickland</u> require counsel to present such evidence at sentencing

in every case.  Rather, the conclusion is based on the much more limited principle that

"strategic choices made after less than complete investigation are reasonable" only to the

extent that "reasonable professional judgments support the limitations on investigation."

<u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. 690-691.

Defense counsel prejudiced Manuel's ability to defend himself against the imposition

of the death penalty.  As has been repeatedly stated, to establish prejudice, a defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different.  Strickland v. Washington, supra, 466 U.S. at 694.  The reviewing court assesses prejudice by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings.  Williams v. Taylor, supra.

A Williams v. Taylor analysis varies dramatically on a case by case basis depending upon whether the applicant made a sufficient showing that he was prejudiced by his counsel's ineffectiveness.  The trial court, and the district court, found that Williams had been prejudiced by his attorney's failure to investigate certain matters because had his trial counsel done so, he would have discovered, and likely introduced, the available mitigating evidence that would tend to argue for a sentence less than death.  These two courts went on to conclude that prejudice had been shown because "but for" the above failure, there was a probability the result of Williams' sentencing hearing would have been different.  Had Manuel's defense counsel directed Dr. Ferrell, or used the services of Dr. Murphey and a mitigation expert, to prepare a report and evaluation of Manuel, they would have discovered all the above described important mitigating evidence, as it related to Manuel's background and the incident leading to the capital murder charge.

Ultimately, the Williams Court concluded both that Williams had been denied effective assistance of counsel and that the Virginia Supreme Court's decision denying relief on this claim was an "unreasonable application" of established federal law as determined by

100

the Supreme Court of the United States. Id. at 398-399. Accordingly, the <u>Williams</u> Court

concluded that Williams received ineffective assistance of counsel. In the case at bar, the

mitigating evidence counsel failed to develop and present was powerful. Manuel suffered

from fetal alcohol syndrome and had experienced a severe deprivation of socialization with

the majority of his role models being ex-convicts. There was a clear family history of

physical, drug and alcohol abuse having already claimed Manuel by the time he was in 7th

grade. Therefore, Manuel's troubled history and psychological conditions are relevant to

assessing a defendant's moral culpability. <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319, 109 S.Ct.

2934, 106 L.Ed.2d 256 (1989).

Given the nature and extent of this lack of socialization, there is a reasonable

probability that a competent attorney, aware of this history, applied through the expert eyes

of a psychologist to the current situation, would have introduced it at sentencing, and that a

jury confronted with such mitigating evidence would have returned with a different sentence.

As in the case at bar, Wiggins had no record of violent conduct that the state could have

introduced to offset this powerful mitigating narrative. Thus, the available mitigating

evidence, taken as a whole, might well have influenced the jury's appraisal of the applicant's

moral culpability.

In <u>Horton v. Zant</u>, the court found that:

> Mitigating evidence, when available, is appropriate in every case
> where the defendant is placed in jeopardy of receiving the death
> penalty. To fail to do any investigation because of the mistaken
> notion that mitigating evidence is inappropriate is indisputably

101

below reasonable professional norms.  Second, our case law
rejects the notion that a "strategic" decision can be reasonable
when the attorney has failed to investigate his options and made
a reasonable choice between them.  See King v. Strickland, 748
F.2d 1462, 1464 (11th Cir. 1984).

Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991).

Based upon this finding, the court determined, "We, therefore, cannot conclude, as
the state urges us, that Horton's attorneys failed to introduce mitigating evidence because
they believed that the evidence was too weak; his attorneys never investigated or evaluated
the evidence." Id.  The court in Horton then held that, "Horton's trial attorneys' performance
during the sentencing phase of the trial was unreasonable in light of prevailing professional
norms.  We find their performance unreasonable because they failed to investigate and
present mitigating evidence." Id. at 1463.

Any deference that courts must afford trial counsel under Strickland, in judging
whether such failures were constitutionally deficient, as opposed to tactical or strategic trial
decisions, presupposes that an attorney's trial decisions are fully informed and reasonable
exercises of professional judgment.  "Judges wisely defer to true tactical choices – that is so
say, to choices between alternatives that each have the potential for both benefit and loss."
Proffitt v. Waldren, 831 F.2d 1245, 1249 (5th Cir. 1987).  Moreover, "this measure of
deference . . . must not be watered down into a disguised form of acquiescence." Bouchillon
v. Collins, supra, 907 F.2d at 595.

Thus, the performance of counsel in a capital case requires that counsel undertake an
independent investigation to unearth any potential mitigating circumstances or mitigating

102

evidence that may be offered during the sentencing trial. Reviewing courts must review counsel's performance in light of the ABA Standards for Criminal Justice and by reference to relevant case law. Based upon either standard, trial counsel's performance in the case at bar fell below that of a reasonably competent attorney defending a capital case during the penalty phase of trial. This decision and omission to not conduct a mitigation investigation, not present the above described mitigation evidence, and not call Dr. Ferrell to testify that Manuel was not a future danger, was therefore, not a strategic or tactical decision, nor was it a reasonable one. Manuel should receive a new sentencing hearing.

### Failure to call investigator as witness.

In the case at bar, defense counsel and the investigator interviewed Erika Henderson. The conclusions that she testified to at trial were in opposition to the statements she gave to the defense counsel and the investigator. The defense counsel failed to call the investigator to the stand in an attempt to impeach, or at the very least, contradict, the testimony of Erika Henderson. See attached Exhibit C, State Habeas - Affidavit of Jeff Mitchel - defense private investigator Exhibit B.

In Everage v. State, 893 S.W.2d 219, 222 (Tex. App. – Houston [1st Dist.] 1995, pet. ref'd), it was held that the failure to call a witness who would have corroborated the defendant's testimony that he was not the primary actor was not permissible trial strategy. By comparison, in the case at bar, the failure to call a witness who could have contradicted the state's key eyewitness was also not permissible trial strategy. It is well acknowledged that the constitutional right to counsel does not mean errorless counsel or counsel whose

103

competency is judged by hindsight. <u>Doherty v. State</u>, 781 S.W.2d 439, 441 (Tex. App. –

Houston [1st Dist.] 1989, no pet.). Rather, the right means counsel reasonably likely to

render reasonable assistance. <u>Id.</u> A reviewing court must presume adequate assistance and

that all significant decisions were made in the exercise of reasonable professional judgment.

<u>Strickland v. Washington</u>, <u>supra</u>; <u>Roberson v. State</u>, 852 S.W.2d 508, 512 (Tex. Crim. App.

1993); <u>Everage v. State</u>, <u>supra</u>.

  Thus, to obtain a reversal on ineffective assistance of counsel, a defendant must show

that: (1) counsel's performance was so deficient that he was not functioning as the counsel

guaranteed by the Sixth Amendment; and (2) there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

<u>Strickland v. Washington</u>, <u>supra</u>. This standard does not require that the defendant be found

not guilty or assessed a lenient punishment absent counsel's errors. Rather, according to

<u>Strickland</u>, there must be a reasonable probability of a different result; that is, a probability

sufficient to undermine confidence in the outcome. <u>Id.</u>

  The failure to call witnesses, especially ones who can contradict key testimony, may

show ineffective assistance of counsel. <u>Butler v. State</u>, 716 S.W.2d 48, 55 (Tex. Crim. App.

1986). However, counsel's failure to call such witnesses is irrelevant absent a showing that

the witnesses were available and would benefit the defense. <u>Everage v. State</u>, <u>supra</u>; <u>Simms</u>

<u>v. State</u>, 848 S.W.2d 754, 758 (Tex. App. – Houston [1st Dist.] 1993, pet. ref'd). In the case

at bar, the witness was the defense's own private investigator and was available to give

testimony. <u>See</u> attached Exhibit C, State Habeas - Affidavit of Jeff Mitchel - defense private

investigator Exhibit B. There can be little argument to the contrary that, whether or not it can be predicted who the jury would have chosen to believe, it would have had a bearing on their deliberations and could have caused a different result. Erika Henderson was a key component in the story the state laid out against Manuel at trial, being the main eyewitness, allegedly observing the entire incident. For the jury to convict Manuel on the charge of capital murder, they would have to believe that the shooting was intentional. Therefore, it was vital to cast a shadow on the credibility of this testimony. The defense counsel could have called the investigator for the purpose of impeaching Ms. Henderson's testimony as a prior inconsistent statement with the story she told him, i.e. - that she believed it could have been an accident. (R - v.24 - 3-10- B/E).

Because trial counsel failed to call the defense investigator, the jury did not hear this contradictory testimony. If they had heard this testimony, the jury might not have believed that the crime was intentional, but accidental, and could have acquitted Manuel of capital murder, possibly opting for a lesser included offense. Concurrently, they could also have chosen to believe the self defense argument, having more credibility in light of this testimony, and could have acquitted him altogether. Thus, Manuel has met the second prong of <u>Strickland</u>. Therefore, Manuel should receive a new trial.

### Failure to introduce hospital records into evidence.

The University Medical Records, which indicated that Manuel did, indeed, take a beating, lending validity to his claim of self defense, were not introduced by the defense

counsels at guilt innocence, only being introduced at the punishment phase of the trial. (R -
v.33 - 65; DX 10). Considering that the trial court erroneously prevented the defense counsel
from cross examining Erika Henderson, this medical evidence became essential, as Manuel
was increasingly not being allowed to adequately establish his evidence of an accidental
shooting during the course of self defense. Manuel should receive a new trial.

## CLAIM IV

**THE PETITIONER'S RIGHT TO DUE PROCESS, AS
GUARANTEED BY THE SIXTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES
CONSTITUTION, WAS VIOLATED WHEN THE TRIAL
JUDGE REVERSIBLY ERRED IN REFUSING TO
ALLOW THE APPELLANT TO INTRODUCE
EVIDENCE OF THE COMPLAINANT'S CHARACTER
FOR VIOLENCE.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM IV

In its opening statement to the jury, defense counsel stated that the complainant, a
police officer, confronted Manuel in an apartment complex parking lot. (R - v.23 - 25-26).
The complainant jumped out of the police car and confronted Manuel. Id. Manuel fled from
the complainant and, once he reaches the back of the complex, surrenders to the complainant.
Id. at 26-27. The complainant then grabbed Manuel's wrist and punched Manuel in the
mouth, knocking down Manuel. Id. at 27. As the complainant again came at Manuel,
Manuel defended himself and started wrestling with the complainant. Id. The complainant
choked Manuel, ripped a necklace of Manuel's neck, cut Manuel's lip and face, and

106

scratched Manuel's face. Id. The complainant was on top of Manuel and drew his weapon and pointed it at Manuel while holding down Manuel. Id. at 27-28. Manuel, thinking he was going to be shot, grabbed the gun and, during the course of the struggle, the gun is fired and the complainant is shot. Id. at 28. Defense counsel told the jury that the complainant "utilized methods that were outside the scope of what a police officer should have been doing . . ." Id. at 35.

After the prosecution rested its case at the guilt-innocence phase of the trial, the prosecution renewed its motion in limine to prevent the defense from going into the specific acts from the complainant's internal affairs files and disciplinary files. (R - v.27 - 215; R - v.28 - 9). The defense responded that the complainant's previous misconduct and aggressive attacks on other people as a police officer was relevant to the case, was admissible under Rule 404(a)(2) of the Texas Rules of Evidence, was admissible for Manuel to present his defense, was admissible to prove the theory of the defense that the complainant started the fight and has such a tendency in the past, was admissible to show the intent of the complainant, and was admissible to show lack of criminal intent by Manuel. Id. at 9-11.

In a proffer to the trial judge, the defense stated that there were nine separate incidents in which the complainant initiated attacks on people as a police officer. Id. at 12. On December 7, 1999, the complainant chased a suspect, Johnny Parker, and when the suspect surrendered, the complainant beat the suspect unconscious resulting in the hospitalization of the suspect. Id. On March 5, 1999, the complainant chased a suspect, Mark Trevino, and

tackled the suspect and beat the suspect with a flashlight resulting in the hospitalization of the suspect. Id. at 12-13. On March 11, 1997, the complainant shot and chased a suspect, James Softly, and when the suspect surrendered, the complainant beat the suspect and stepped on the gun shot wound on the suspect. Id. at 13. On August 23, 1995, the complainant chased a suspect, Bill Gonzalez, and when the suspect surrendered, the complainant beat the suspect resulting in the hospitalization of the suspect and the further beating of the suspect by the complainant at the hospital. Id. at 13-14. On October 19, 1993, the complainant chased a suspect, Rudy Lopez, and when the suspect surrendered, the complainant beat the suspect with a flashlight or radio resulting in the hospitalization of the suspect. Id. at 14-15. In the Spring of 1993, the complainant accused a suspect, Charles Kimble, of fleeing from the complainant so the complainant beat the suspect. Id. at 15-16. On November 26, 1992, the complainant confronted a suspect, Eric Vestal, and beat the suspect with a flashlight. Id. at 16-17. In September 1991, the complainant confronted a suspect, Rudy Mendiola, and the complainant beat the suspect. Id. at 17. On December 9, 1989, the complainant confronted a suspect, Wayne Robinson, and hit the suspect and ripped off the suspect's colostomy bag and threw it at the suspect. Id. at 17-18. The above witnesses, or witnesses to the beatings by the complainant, all testified during the bill of exception. (R - v.29 - 109-165).

The trial judge initially ruled that these specific acts of the complainant were admissible. (R - v.28 - 33). Later in the trial, before the admission of these specific acts of

108

the complainant, the prosecution reurged its motion in limine to prevent the admissibility of these specific acts. Id. at 79. The trial judge took the matter under advisement and instructed the defense to not call these witnesses until the following day. Id. at 80. The following day, the trial judge sustained the prosecution's objection to this evidence. (R - v.29 - 8). The jury did not hear evidence regarding these specific acts of the complainant.

Rule 404(a) of the Texas Rules of Evidence states that evidence of a person's character or character trait is not admissible to prove action in conformity therewith on a particular occasion except for character of accused and character of victim and character of witness. Rule 404(a)(2) of the Texas Rules of Evidence states:

> Character of victim. In a criminal case and subject to Rule 412, evidence of a pertinent character trait of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of peaceable character of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor . . .

Under the Dempsey rule, specific acts of violence by the complainant which show his violent character are admissible in a homicide case where there is evidence of some act of aggression by the deceased which gives rise to a claim of self defense or defense of a third person. Tate v. State, 981 S.W.2d 189, 193 (Tex. Crim. App. 1998); Lowe v. State, 612 S.W.2d 579, 580 (Tex. Crim. App. 1981); Beecham v. State, 580 S.W.2d 588 (Tex. Crim. App. 1979); Nichols v. State, 504 S.W.2d 439 (Tex. Crim. App. 1974); Lewis v. State, 463 S.W.2d 186 (Tex. Crim. App. 1971); Wood v. State, 486 S.W.2d 359 (Tex. Crim. App. 1972); Dempsey v. State, 266 S.W.2d 875 (Tex. Crim. App. 1954). If evidence of the

109

deceased's violent character is offered to show the reasonableness of the defendant's claim of apprehension of danger, it must be shown that the acts of violence were known to the accused at the time of the homicide. <u>Lowe v. State</u>, <u>supra</u>, 612 S.W.2d at 581. If offered to show that the deceased was in fact the aggressor, the witness must know, but the defendant need not have knowledge of the violent acts at the time of the homicide. <u>Id.</u>, <u>citing</u> <u>Beecham v. State</u>, supra; <u>Lewis v. State</u>, supra.

Rule 404(b) allows for the admissibility of these specific acts since such acts are not offered to prove the complainant's character, but rather to prove the complainant's intent or motive to cause harm to the defendant. <u>Tate v. State</u>, <u>supra</u>, 981 S.W.2d at 193. A reasonable jury can use such evidence to determine the complainant's state of mind at the time of the fight with the defendant. <u>Id.</u> Such evidence is probative of whether the complainant was, in fact, the aggressor, and therefore is admissible for other purposes besides demonstrating character and actions in conformity therewith. <u>Id.</u> A trial judge abuses its discretion in excluding such evidence. <u>Id.</u>

Prior to the enactment of the Texas Rules of Evidence, before such evidence was admissible, there must have been evidence that the victim acted in a way sufficient to raise an issue of self-defense. <u>Dempsey v. State</u>, <u>supra</u>, 266 S.W.2d at 878. This requirement, however, has not been included in Rule 404(a)(2). The trial judge in the case at bar believed that some evidence raised the issue of self-defense, however, since the trial judge instructed the jury as to self-defense even though Manuel did not testify. (R - v.29 - 180; R - v.30 - 10-13, 14).

In <u>Torres v. State</u>, 71 S.W.3d 758 (Tex. Crim. App. 2002), it was held that evidence of a victim's previous violent acts was admissible to show that he was the first aggressor. As was previously discussed, under <u>Tate v. State</u>, <u>supra</u>, a defendant claiming self-defense may introduce a deceased's specific acts to show that the deceased was the first aggressor, but the specific acts must be relevant apart from their tendency to show character conformity. In <u>Torres</u>, it was held that the evidence had relevance apart from character conformity.  In the case at bar, it is clear that the evidence had relevance apartment from character conformity; it clearly went to show that under the circumstances that existed at the time, from Manuel's perspective, the victim was the first aggressor.  <u>See</u> <u>Thompson v. State</u>, 659 S.W.2d 649, 653 (Tex. Crim. App. 1983).  Pursuant to Texas Rules of Evidence 404(a)(2) and 405(a), a defendant may offer opinion or reputation testimony to prove the deceased acted in conformity with his violent nature.  <u>Tate v. State</u>, <u>supra</u>.  Specific, violent acts of misconduct may be admitted to show the reasonableness of the defendant's fear of danger, or to show that the deceased was the first aggressor.  <u>Id.</u>; <u>Mozon v. State</u>, 991 S.W.2d 841, 845-846 (Tex. Crim. App. 1999); <u>Tate v. State</u>, <u>supra</u>.

In the context of proving the deceased was the first aggressor, the Court of Criminal Appeals has held that specific, violent acts are relevant apart from showing character conformity by demonstrating the deceased's intent, motive, or state of mind.  <u>Torres v. State</u>, <u>supra</u>, 71 S.W.3d at 761, <u>citing</u> <u>Tate v. State</u>, <u>supra</u>, 981 S.W.2d at 193; 1 Steven Goode, Olin Guy Wellborn, III, & M. Michael Sharlot, Texas Practice: Guide to the Texas Rules of

111

Evidence: Civil and Criminal, § 404.4 at 157 (2d ed. 1993 & Supp. 2001) (noting specific, violent acts are admissible to show that the deceased had a motive or intent to be the first aggressor). "Because [generally] the key issue here is the state of mind of the deceased, 'the witness must know but it need not be shown that the defendant had knowledge of the acts of violence of the deceased at the time of the homicide.'" Torres v. State, supra, citing Lewis v. State, supra, 463 S.W.2d at 188.

The trial court denied Manuel his due process and constitutional rights to a fair trial by denying him the right to present evidence in support of his defense in violation of the Sixth and Fourteenth Amendments of the United States Constitution. In the case at bar, Manuel's entire defense was that he acted in self defense from the complainant who was the violent aggressor in this instance, and had been a violent aggressor with prior suspects who fled from the complainant. It was crucial, therefore, for Manuel to provide evidence to the jury of specific acts of the complainant where the complainant was violently aggressive with suspects who fled from the complainant and therefore was violently aggressive with Manuel when he fled from the complainant. Manuel needed to establish the complainant was the aggressor and Manuel merely acted in self defense when the complainant was shot. Manuel was not required to have had knowledge of the prior acts at the time of the homicide, although there was some evidence that Manuel had been previously made aware of the complainant's violent propensities. Had the jury heard the above evidence about the prior nine incidents where the complainant was the aggressor with other suspects, the jury would

112

have had evidence of the complainant's intent or motive to cause harm to Manuel on the day in question. These nine prior incidents were probative of whether the complainant was the aggressor. The trial judge abused her discretion in excluding this evidence. Manuel was harmed since the jury did not hear any evidence regarding the aggressiveness of the complainant and this severely hampered Manuel's claim of self defense. Manuel should receive a new trial.

## CLAIM V

**THE AGGRAVATING FACTORS EMPLOYED IN THE TEXAS CAPITAL SENTENCING SCHEME ARE VAGUE AND DO NOT PROPERLY CHANNEL THE JURY'S DISCRETION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM V

During the pretrial motions hearing, the defense requested the trial judge rule Article 37.071 of the Texas Code of Criminal Procedure unconstitutionally vague and ambiguous under the Eighth and Fourteenth Amendments to the United States Constitution. (R - v.2 - 95-97). The defense argued that the phrases "personal moral culpability of the Defendant" and "sufficient mitigating circumstances" are vague and ambiguous and incapable of an objective definition thereby allowing the jury unfettered discretion. Id. The trial judge denied this motion. Id. at 97.

In the case at bar, the trial judge instructed the jury to, "State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's

113

character and background, and the personal moral culpability of the defendant, there is a

sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that

a sentence of life imprisonment rather than a death sentence be imposed." (T - 222).

A capital punishment statute is unconstitutional if it permits the arbitrary and

capricious infliction of the death penalty. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726,

33 L.Ed.2d 346 (1972). "A vague aggravating factor employed for the purpose of

determining whether a defendant is eligible for the death penalty fails to channel the

sentencer's discretion." Stringer v. Black, 503 U.S. 222, 235, 112 S.Ct. 1130, 117 L.Ed.2d

367 (1992). An aggravator which asks whether a defendant "exhibited utter disregard for

human life" barely passes constitutional muster if it includes a limiting instruction that it was

the action of a "cold-blooded, pitiless slayer." Arave v. Creech, 507 U.S. 463, 113 S.Ct.

1534, 123 L.Ed.2d 188 (1993). Cold-blooded and pitiless are not subjective, but instead

describe a defendant's state of mind which is ascertainable from the surrounding facts. Id.

In Texas, there is no limiting instruction and there is no definition of the terms

"personal moral culpability" and "sufficient mitigating circumstances." See, e.g., Patrick v.

State, 906 S.W.2d 481, 494 (Tex. Crim. App. 1995); Chambers v. State, 903 S.W.2d 21, 35

(Tex. Crim. App. 1995); Clark v. State, 881 S.W.2d 682, 698-699 (Tex. Crim. App. 1994).

This leaves Texas juries to guess at the meaning of these terms and thus at the meaning of

this special issue. The wording in this special issue is unconstitutionally vague and

overbroad under the Eighth, and Fourteenth Amendments to the United States Constitution.

This is why the Texas scheme is unconstitutional. A statute which permits jurors to return

a death sentence based on anything they want to believe is arbitrary and capricious and therefore unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution. The aggravator found in the first special issue fails to channel the sentencer's discretion, in violation of the Eighth and Fourteenth Amendments.

The present Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the Defendant's moral blameworthiness." Article 37.071, sec. 2(f)(4) and 37.0711, Sec. 3(f)(3). The Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates to a capital Defendant's moral culpability or blameworthiness for the crime, but also includes any mitigating evidence relevant to a Defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. See e.g., Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness – such as a history of positive character traits. Although the statutory "Penry" special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," Article 37.071, Sec. 2(e), the statute's separate definition of "mitigating evidence" limits jurors' consideration of such evidence to those mitigating factors that specifically implicate the defendant's moral blameworthiness. Therefore, the statute's limited definition of "mitigating evidence" violates the Eighth and Fourteenth Amendments to the United States Constitution. Manuel should receive a new sentencing hearing.

## CLAIM VI

**THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION REQUIRES A REVIEWING COURT TO ENGAGE IN A PROPORTIONALITY REVIEW IN DEATH PENALTY CASES.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM VI

While the Court of Criminal Appeals of Texas has generally denied that comparative review is required to preserve the constitutionality of the Texas death penalty system, Manuel submits that its rulings fail to recognize important changes to that system.  The Court usually denies claims for proportionality review with cursory references to the United States Supreme Court's decision in <u>Pulley v. Harris</u>, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).  <u>See, e.g.,</u> <u>Cockrell v. State</u>, 933 S.W.2d 73, 92 (Tex. Crim. App. 1996); <u>Hughes v. State</u>, 897 S.W.2d 285, 294 (Tex. Crim. App. 1994); <u>East v. State</u>, 702 S.W.2d 606, 616-617 (Tex. Crim. App. 1985).

In <u>Pulley</u>, the Court held that proportionality review is not required by the Eighth Amendment.  The Court's argument is based on three previous decisions upholding death penalty statutes in Georgia, Florida, and Texas.  <u>Gregg v. Georgia</u>, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); <u>Profitt v. Florida</u>, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); <u>Jurek v. Texas</u>, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).  In particular, the <u>Pulley</u> Court noted that, "In <u>Jurek</u> we upheld a death sentence even though neither the statute, as in Georgia, nor state case law, as in Florida, provided for comparative

116

proportionality review." <u>Pulley</u>, 465 U.S. at 48. The Court then quoted from <u>Jurek</u> at length, focusing on the narrowing function of Texas's definition of capital murder. <u>Id.</u> Summing up <u>Jurek</u>, the Court concluded that "in light of the other safeguards in the Texas statute, proportionality review would have been constitutionally superfluous." <u>Id.</u> at 49. The <u>Pulley</u> Court next discussed <u>Zant v. Stephens</u>, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and again noted that proportionality review is an "additional safeguard against arbitrarily imposed death sentences," but that the <u>Zant</u> Court's emphasis was on the "constitutionally necessary narrowing function of statutory aggravating circumstances." <u>Pulley</u>, 465 U.S. at 50. In short, the <u>Pulley</u> Court did not hold that proportionality review is never constitutionally required, but rather that "other safeguards" existed in the Texas system at the time of <u>Jurek</u>. What is apparent upon closer examination of the "other safeguards" at issue in <u>Jurek</u>, however, is that those safeguards have failed to restrict the arbitrary imposition of the death penalty.

One of the "other safeguards" on which the Supreme Court relied in upholding the Texas statute in <u>Jurek</u> was the statutory narrowing of offenses for which the death penalty was available. <u>Jurek v. Texas</u>, <u>supra</u>, 428 U.S. at 270. "So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option – even potentially – for a smaller class of murders in Texas." <u>Id.</u> at 271. Since 1976, however, Texas has expanded the categories of death-eligible offenses from five to eleven. Tex. Penal Code § 19.03 (2002). In <u>Zant</u>, the Court, as in <u>Jurek</u>, held that state statutory schemes "must

genuinely narrow the class of persons eligible for the death penalty . . ." <u>Zant v. Stephens</u>, <u>supra</u>, 462 U.S. at 877 (1983) (upholding Georgia's legislative definitions of aggravating circumstances because they "circumscribe the class of persons eligible for the death penalty."). What is apparent both from the expansion of death-eligible categories and from the abnormally high numbers of persons executed and on death row in Texas, is that Texas's statutory scheme no longer sufficiently narrows the categories of offenses for which the death sentence may be imposed.

The lack of "other safeguards" in the Texas system is also apparent from the problems that have arisen with the inclusion of mitigating evidence during the penalty phase. In <u>Jurek</u>, the Supreme Court found that the constitutionality of the Texas statute turned on "whether the enumerated [special issue] questions allow consideration of particularized mitigating factors." <u>Jurek v. Texas</u>, <u>supra</u>, 428 U.S. at 272. The Court found that the question on future dangerousness would allow the jury to consider mitigating circumstances and thus found the statute constitutional. In short, the facial validity of the Texas death penalty statute was upheld on the basis of assurances that the special issues would be interpreted broadly enough to allow sentencing juries to consider all the mitigating evidence a defendant might present.

As is evident from the <u>Penry</u> cases, however, Texas courts have faced ongoing difficulty in incorporating mitigating evidence in the penalty phase. In <u>Penry v. Lynaugh</u>, 492 U.S. 302, 322-323, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (<u>Penry I</u>), the Supreme Court found that the jury had not been given appropriate instructions regarding consideration of mitigating evidence and thus was not able to fully consider Penry's mental retardation and

118

childhood abuse in rendering its decision.  In <u>Penry v. Johnson</u>, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (<u>Penry II</u>), the Supreme Court again held that jury instructions on mitigating evidence were too confusing and contradictory to allow the jury to express the "reasoned <u>moral</u> response" to the defendant's individual background, character, and crime, required by the Court.  <u>See, e.g.</u>, <u>Penry v. Lynaugh</u>, <u>supra</u>, 492 U.S. at 319, <u>quoting</u> <u>California v. Brown</u>, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring) (emphasis in original).  Instead, the supplemental instruction given in <u>Penry II</u> only served to confuse the jury.  Not only were the language and the syntax of the supplemental instruction itself confusing, but in addition, the supplemental instruction conflicted with the original verdict form instructions, thus making it "both logically and ethically impossible for a juror to follow both sets of instructions." <u>Penry v. Johnson</u>, <u>supra</u>, 532 U.S. at 799.  Indeed, the Court felt that "the jurors . . . had to answer the special issues <u>dis</u>honestly in order to give effect to Penry's mitigating evidence" and that they were "essentially instructed to return a false answer to a special issue in order to avoid a death sentence."  <u>Id.</u> at 801, 802 (emphasis in original).  The inherent conflict in the jury instructions thereby introduced "an element of capriciousness" into the jury's sentencing decision. <u>Id.</u> at 800. The <u>Penry</u> cases demonstrate the difficulty Texas courts have faced in incorporating mitigating evidence into the penalty phase of capital trials, as constitutionally required by <u>Jurek</u>.  In light of these difficulties, the Petitioner urges this Court to compel the Court of Criminal Appeals to reintroduce proportionality review in this case as a necessary safeguard.

The Court of Criminal Appeals has also recently allowed juries to consider non-statutory aggravating factors, such as victim impact testimony, during the punishment phase of a trial. See, e.g., Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998), cert. denied, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999); Ford v. State, 919 S.W.2d 107, 112-116 (Tex. Crim. App. 1996).  Yet under Article 37.071 § 2(e), the jury at this stage is supposed to be considering whether there is sufficient mitigating, not aggravating, circumstances that would allow it to grant a life sentence.  Whether jury consideration of non-statutory aggravators without subsequent proportionality review by the court meets the requirements of the Eight Amendment is highly questionable.  Ford v. State, supra, 919 S.W.2d at 120, n. 1 (Clinton, J., dissenting) (noting that "one reason the Supreme Court gave for approving consideration of non-statutory aggravators under the Georgia scheme in Zant v. Stephens was the fact that the Georgia Supreme Court is required to conduct a proportionality review of all death penalty cases on appeal."); see also Mosley v. State, supra, 983 S.W.2d at 268-273 (Meyers, J., dissenting) (arguing that admission of non-statutory aggravating evidence at punishment phase contradicts "plain language" and legislative intent of Article 37.071 § 2(e) and citing numerous cases in which the Texas Court of Criminal Appeals found that the special issue under §2(e) did not involve consideration of aggravating factors).

Given the statutory expansion of death-eligible offenses, the inconsistent inclusion of mitigating evidence during the penalty phase, and the allowance of jury consideration of

120

non-statutory aggravators during the penalty phase, this Court should direct the Court of Criminal Appeals to cease making superficial references to <u>Pulley</u>, hold that the basis for <u>Pulley</u> and <u>Jurek</u> - "other safeguards" in the Texas system - no longer holds, and should require a comparative proportionality review as a constitutionally required protection against the arbitrary imposition of death sentences.

### Comparative proportionality review has been a central element of United States Supreme Court decisions upholding death penalty statutes.

The Supreme Court has held in numerous instances that comparative review is a necessary element of meaningful appellate review. In <u>Furman v. Georgia</u>, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam), the Court found that the death penalty as applied was unconstitutional because it was applied in a "wanton and freakish" manner. Specifically, the Court focused on the arbitrary imposition across cases; the death penalty was found unconstitutional in regards to its inconsistent application as seen from a comparative perspective. Justice Douglas wrote that the Eighth Amendment requires that "judges . . . see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." <u>Id.</u> at 256 (Douglas, J., concurring). For judges to meet this requirement, they must necessarily look across cases. Justice Brennan likewise found that a "principle inherent in the [Cruel and Unusual Punishment] Clause" is that "the State must not arbitrarily inflict a severe punishment . . . the State does not respect human dignity when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others." <u>Id.</u> at 274 (Brennan, J., concurring).   Justice Marshall found the death penalty

121

unconstitutional per se in part because "capital punishment is imposed discriminatorily against certain identifiable classes of people." Id. at 364 (Marshall, J., concurring). In short, each of the concurring justices used language of arbitrariness, inconsistency, selectiveness, disparity across groups – language that necessarily requires judges to review death penalty sentences in a comparative manner, to ensure that its imposition is not arbitrary, selective, or "freakishly imposed."

In upholding the Georgia death penalty statute in Gregg v. Georgia, supra, the Court focused on procedural safeguards provided by the legislature, such as "standards to guide [the jury's] use of the information" and "statutory aggravating circumstances." Id. at 195-97. In particular, the Court focused on the automatic comparative proportionality review by the Georgia Supreme Court: "That court is required by statute to review each sentence of death and determine whether . . . the sentence is disproportionate compared to those sentences imposed in similar cases." Id. at 198. The requirements of Furman were met by a combination of statutory safeguards against "disproportionate" imposition.

In upholding Florida's death penalty scheme in Profitt v. Florida, supra, the Court noted that trial judges' decisions are "reviewed to ensure that they are consistent with other sentences imposed in similar circumstances." Id. at 253. The Florida court had, on its own, "in effect adopted the type of proportionality review mandated by the Georgia statute." Id. at 259. What the Court upheld in Profitt was the entire "system," both the statute enacted by the legislature and the comparative review conducted by the Florida Supreme Court, which "because of its statewide jurisdiction, can assure consistency, fairness, and rationality in the