evenhanded operation of the state law." Id. at 259-260.  Indeed, the Court noted that the Florida court had vacated over one-third of the death sentences that had come before it as proof that such review was meaningful. Id. at 259.  Judicial proportionality review was thus a central premise under which the constitutionality of the Florida statute was upheld.

In upholding Texas's death penalty scheme in Jurek v. Texas, supra, despite lack of a statutory requirement for comparative review, the Court found that Texas had ensured "prompt judicial review . . . in a court with statewide jurisdiction," thereby "provid[ing] a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." Id. at 276.  Again, the Court used language that implied comparison ("evenhanded" and "consistent") and emphasized that review was done in a court with "statewide jurisdiction," because only high courts can monitor the entire state "system" for arbitrariness.  Comparative review was again a necessary and central element to the Court's holding in Jurek.

### The United States Supreme Court has Engaged in Proportionality Review.

The Supreme Court itself has adopted a comparative approach in capital cases. Numerous decisions examine legislative judgments and jury decisions across jurisdictions, as well as international practices.  See Tison v. Arizona, 481 U.S. 137, 152-154, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (finding "state legislatures' judgment as to proportionality in these circumstances relevant to this constitutional inquiry" and examining the number of states authorizing the death penalty for felony murder); Gregg v. Georgia, supra (listing the

states that had enacted new death penalty statutes as the basis for its belief that "capital punishment itself has not been rejected by the elected representatives of the people" and looking to the "actions of juries in many States since Furman"); Thompson v. Oklahoma, 487 U.S. 815, 824, 831 nn. 31 & 34, 832, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (citing "complete or near unanimity among all 50 States and the District of Columbia in treating a person under 16 as a minor," referring to the fact that "thousands of juries have tried murder cases" and their verdicts lead "to the unambiguous conclusion that the imposition of the death penalty on a 15-year-old offender is now generally abhorrent to the conscience of the community," and citing international practices); Ford v. Wainwright, 477 U.S. 399, 408, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (noting that "no State in the Union permits the execution of the insane"); Coker v. Georgia, 433 U.S. 584, 595, 596 n. 10, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (emphasizing the fact that "Georgia is the sole jurisdiction in the United States at the present time that authorizes the sentence of death when the rape victim is an adult woman," which "obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty," and also citing the relative rarity of jury imposition of the death sentence as well as the fact that only three out of sixty major nations retain the death penalty for rape where death did not ensue); Enmund v. Florida, 458 U.S. 782, 794, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (noting the relevance of finding "only 6 cases out of 362 where a non-triggerman felony murderer was executed" in a survey of court decisions since 1954); Atkins v. Virginia, 536 U.S. 304, 122 S.Ct.2242, 2248-50, 122 S.Ct. 2242, 153

L.Ed.2d 335 (2002) (reviewing how state legislatures have addressed the issue of executing the mentally retarded and concluding "that a national consensus has developed against it" citing that, "It is not so much the number of these States that is significant, but the consistency of the direction of change.").

Thus, the Court itself has repeatedly engaged in comparative examinations of legislative practices (of both states and nations) and jury decisions. While Pulley's language may suggest that proportionality review is not required, the Court's actual practices speak to a belief that it is a necessary element inherent to meaningful appellate review.

### The Due Process Clause of the Fourteenth Amendment Requires that Texas Courts Conduct Proportionality Review of Death Sentences in the State.

Comparative proportionality review of death sentences handed down in Texas is also required by the Due Process Clause of the Fourteenth Amendment.  While the Court of Criminal Appeals of Texas has previously refused defendants' claims that due process requires comparative proportionality review, see, e.g., Janecka v. State, 937 S.W.2d 456 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997); Anderson v. State, 932 S.W.2d 502 (Tex. Crim. App. 1996), cert. denied, 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997); Morris v. State, 940 S.W.2d 610 (Tex. Crim. App. 1996), cert. denied, 520 U.S. 1278, 117 S.Ct. 2461, 138 L.Ed.2d 218 (1997), the Petitioner submits that those decisions rest on an erroneous reading of precedent from the United States Supreme Court.  Recent Fourteenth Amendment doctrine revises the Court's conclusion in

Pulley, that proportionality review is "constitutionally superfluous" when other safeguards exist.

> **The recent Honda and TXO cases require proportionality review in the assessment of punitive damages and, moreover, make it clear that comparative proportionality review under the Fourteenth Amendment applies to criminal as well as civil cases.**

In each of the above cases, the appellants referred to Honda Motor Co. v. Oberg, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), in which the United States Supreme Court held that the Due Process Clause requires appellate review of jury awards of punitive damages in civil cases. In each case, however, the Texas Court argued that "the Supreme Court did not say anything in Honda about what form of appellate review due process requires." Janecka v. State, supra, 937 S.W.2d at 475. Moreover, the Texas Court asserted that because Honda dealt with civil procedures, it could have little bearing on criminal proceedings. See, e.g., Anderson v. State, supra, 932 S.W.2d at 508. In fact, the Texas Court even suggested that proportionality review might not be protective enough in capital cases: "[T]he due process principles governing the imposition of a sentence of death are distinct and more onerous than those governing the imposition of a civil judgment." Id. at 509. In other words, proportionality review may be appropriate in some civil judgments but is not sufficient in capital cases. To support its point, the Texas Court referred to In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (higher standard of proof required in criminal trials by Due Process Clause), and Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (death is different). Anderson v. State, supra, 932 S.W.2d at 508.

What the Texas Court fails to recognize is that the <u>Honda</u> Court was not writing on a blank slate.  For the Texas Court to claim that <u>Honda</u> leaves "open" the issue of comparative review ignores <u>Honda</u>'s reference to the Supreme Court's previous decisions, including <u>TXO Prod. Corp. v. Alliance Res. Corp.</u>, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), as the basis for its presumption that the Due Process Clause imposes a limit on punitive damages.  <u>Honda Motor Co. v. Oberg</u>, <u>supra</u>, 512 U.S. at 420.  The <u>Honda</u> Court stated that it would address "the question of what procedures are necessary to ensure that punitive damages are not imposed in an arbitrary manner," and then noted that "<u>TXO</u> strongly emphasized the importance of the procedural component of the Due Process Clause."  <u>Id.</u> at 420.  In order to grasp the Supreme Court's understanding of procedural protection against excessive punitive damages awards in <u>Honda</u>, therefore, it is necessary to understand the Court's reasoning in <u>TXO</u>, which the Texas Court fails to mention.

The Supreme Court in <u>TXO</u> explicitly discusses comparative proportionality review in both the civil and criminal contexts. While the Texas Court may be able to claim that <u>Honda</u> makes no direct statement about proportionality review, it can make no such claim in <u>TXO</u>. In fact, the Court in <u>TXO</u> came to the exact opposite conclusion from the Texas Court of Criminal Appeals.  It hesitated on the issue of using a comparative approach to civil judgments, but found that, "It is a relatively straightforward task to draw intrajurisdictional and interjurisdictional comparisons on such matters as the definition of first-degree murder [] or the penalty imposed on nonviolent repeat offenders []."  <u>TXO Prod. Corp. v. Alliance Res. Corp.</u>, <u>supra</u>, 509 U.S. at 457.  In other words, the Supreme Court, while ambivalent in

TXO toward the use of comparative proportionality review in the civil context, found it perfectly appropriate in the criminal context. The Texas Court's suggestion that comparative proportionality review is less fitting in capital cases than it is in civil cases thus contradicts the Supreme Court's own assessment in TXO.

Finally, the Texas Court's reference to In re Winship suggests that employing proportionality review in capital cases is like employing a standard of preponderance of the evidence rather than proof beyond a reasonable doubt in criminal proceedings. Such an inference is clearly a mischaracterization. By requesting that this Court require the Texas Court to conduct a proportionality review, the Petitioner is asking for more procedural protection, not less. Similarly, the Texas Court's reference to Gardner v. Florida suggests that proportionality review would reduce, rather than heighten, procedural protection in capital cases. But no defendant would likely request that proportionality review be introduced in lieu of some other element of appellate review. Rather, proportionality review is required as an additional safeguard. Thus, the Texas Court's references to In re Winship and Gardner mischaracterize the Petitioner's request for proportionality review as reducing, rather than increasing, the level of procedural protection in capital cases.

> **Under Honda, TXO, and subsequent cases, proportionality review is no longer "superfluous," as under Pulley, but is rather an essential component of any constitutionally imposed punishment.**

When the Pulley Court characterized proportionality review as "constitutionally superfluous," it did so in the context of the "other safeguards in the Texas statute." Pulley

v. Harris, supra. Those other safeguards have failed to provide protection against arbitrary imposition of the death penalty. Two recent Supreme Court decisions again address the issue of excessive punitive damages and the Due Process Clause. These cases clearly show that proportionality review is no longer considered "superfluous," but is rather an inherent element of the Court's determination as to whether a punishment is unconstitutionally excessive or disproportionate.

In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court again addressed the issue of excessive punitive damages and the Due Process Clause and explicitly noted that the case should "help to illuminate" its previous decisions such as Honda. Id. at 568. The Court held that the punitive award assessed against BMW was grossly excessive and cited three central reasons for its decision: "the degree of reprehensibility of [BMW's] nondisclosure; the disparity between the harm . . . and [Gore's] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at 575. That is, in addition to other procedural safeguards such as mitigating circumstances (i.e., "the degree of reprehensibility") and traditional proportionality review (i.e., "the disparity between the harm . . . and [award]"), the Court adopted comparative proportionality review in making its determination. The Court then proceeded to compare the punitive damages award and the civil and criminal penalties that could have been imposed for "comparable misconduct," and found that the $2 million sanction imposed on BMW is "substantially greater" than the statutory fines available in Alabama and elsewhere for similar misfeasance. Id. at 583-584.

The Court's methodology in <u>BMW</u> thus eliminates any doubt it may have previously expressed as to the usefulness of comparative review in determining whether punitive damages are excessive or disproportionate; comparative review – even when other safeguards are present – is an essential component of its determination.

Even more recently, the Court employed comparative analysis in <u>United States v. Bajakajian</u>, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), in which the Court held that a forfeiture of the entire $357,144 that respondent was carrying when he failed to report, as required by federal law, that he was transporting more than $10,000 in currency, would violate the Eighth Amendment's Excessive Fines Clause.   In determining that such a forfeiture would be grossly disproportionate, the Court compared Bajakajian with the offenders for whom the statute was originally intended: "Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." <u>Id.</u> at 338.  In fact, the Court specifically notes that "respondent's culpability relative to other potential violators of the reporting provision . . . is small indeed." <u>Id.</u> at 339 n.14.  Comparative proportionality review has thus become fused with the Court's traditional review of proportionality of punishment to the offense.

### The prohibition against "Cruel or Unusual Punishments" in Section 13 of Article I of the Texas Constitution by its own language demands comparative proportionality review.

Whereas the Eighth Amendment of the United States Constitution prohibits cruel and unusual punishments, Article I, § 13 of the Texas Constitution prohibits cruel OR unusual

punishments. In enacting this slightly different provision, Texas deliberately chose to afford its citizens greater constitutional protections than those provided under the federal constitution. Specifically, the language of the provision requires that Texas courts examine and review punishments comparatively. Obviously, something can only be deemed "unusual" in relation to other things which are usual. The express constitutional provision of Section 13 thus requires the Court of Criminal Appeals to prohibit those death sentences that are unusual when compared with other sentences; such a requirement can only be met by conducting a proportionality review.

In upholding Florida's death penalty statute, the United States Supreme Court referred expressly to State v. Dixon, 283 So.2d 1, 10 (Fla. 1973). The Supreme Court of Florida reviews each death sentence to ensure that similar results are reached in similar cases. Profitt v. Florida, supra, 428 U.S. at 251. The Florida Supreme Court described its proportionality review process in Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990): "Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases." A year later, the Florida court laid out the state constitutional basis for proportionality review. First, the Court looks at Article I, § 17 of the Florida Constitution, which – like Article I, § 13 of the Texas Constitution – prohibits "cruel or unusual punishment." Tillman v. State, 591 So.2d 167, 169 (Fla. 1991). The Tillman court noted that the use of "or" indicates that "alternatives were intended" and concluded that an express prohibition against unusual punishments required the court to review cases to ensure

similar treatment.  Id.  The Court also cited Article I, § 9 of the Florida Constitution, providing that "no person shall be deprived of life, liberty or property without due process of law," and Porter for the proposition that death is "uniquely irrevocable" and therefore requires more judicial scrutiny than lesser penalties.  Id. at 169.  Finally, the Court referred to its own mandatory, exclusive jurisdiction over death appeals, granted by Article V, § 3(b)(l): "The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction."  Id. at 169.

Under the Texas State Constitution, the Texas Court of Criminal Appeals likewise has special jurisdiction of death penalty cases.  Tex. Const. art. V, § 5(b).  The Texas Court of Criminal Appeals should therefore establish comparative proportionality review as a practice necessary to carry out the mandate for uniform death penalty law inherent in the constitutional grant of special jurisdiction.  This Court should so direct the Court of Criminal Appeals.

Legislatures and courts in Texas' sister states therefore continue to require comparative proportionality review as an important procedural protection against arbitrariness in the imposition of the death penalty.  The Texas Court of Criminal Appeals, given the expansion in death-eligible categories and the introduction of non-statutory aggravators, should likewise introduce proportionality review as a check against arbitrariness in the Texas system.  This Court should conduct a  proportionality review in the case at bar.

## CLAIM VII

**THE STATUTORY <u>PENRY</u> SPECIAL ISSUE IN ARTICLE 37.071 FAILS TO PLACE THE BURDEN OF PROOF REGARDING AGGRAVATING EVIDENCE ON THE STATE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM VII

Effective September 1, 1991, a jury which has convicted a defendant of capital murder, in which the State is seeking the death penalty, shall be charged as follows:

> (e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>
> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury: (1) shall answer the issue "yes" or "no"; (2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree.

Tex. Code Crim. Proc. Ann. art. 37.071, Sec. 2

This statute is unconstitutional because it impermissibly shifts the burden of proof on mitigation to the defendant in violation of Article 1, Section 10 of the Texas Constitution. The statute requires the jury to consider, along with mitigating evidence, the "moral culpability of the defendant." That is, the jury that has just found the defendant had no

133

defense to the charge of capital murder and that he was guilty of that offense, beyond a reasonable doubt.

The statute then demands that the defense produce "sufficient" mitigation (while considering this same "moral culpability") to warrant a sentence of life imprisonment. The mitigating evidence must be "sufficient" to overcome "moral culpability" that has already been established in the minds of the jurors. In death penalty deliberations, "moral culpability" is not evidence, it is a finding that the jury has already made. The statute places an unfair, undue, and unconstitutional emphasis on the finding that the jury has already made. The defendant, if he is to save his life, must now offer beyond a reasonable doubt evidence that is somehow greater than the finding of moral culpability. The Petitioner claims that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) would overrule prior case law and hold that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 530 U.S. at 490; see United States v. Doggett, 230 F.3d 160 (5th Cir. 2000).

Aside from impermissibly shifting the burden of proof to the defendant, the statute provides no other guidance to the jury that is called upon to make this life and death decision. As a result, the death penalty is imposed in a wanton and freakish manner in violation of the defendant's rights to due process and protection from cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

This impermissible shift of the burden to the defendant is made more unconscionable by the language of Article 37.071(2)(f) which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless 10 or more jurors agree. The defense, according to the instructions to the jury, must not only then offer "sufficient" mitigating evidence to not only overcome the "moral culpability" that has already been established in the eyes of the jury, but further that 10 or more of those jurors must be convinced of the sufficiency of that evidence. Manuel should receive a new sentencing hearing.

## CLAIM VIII

**THE TEXAS CAPITAL SENTENCING STATUTE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION IN THAT IT FAILS TO INFORM THE JURY THAT A SINGLE HOLDOUT JUROR ON ANY SPECIAL ISSUE RESULTS IN AN AUTOMATIC LIFE SENTENCE.**

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM VIII

Article 37.071, sec. 2(g) of the Texas Code of Criminal Procedure capital sentencing statutes provide that a deadlocked jury – even based on a single holdout juror – during the capital sentencing phase requires the trial court to automatically sentence the Defendant to life. However, the jury cannot be informed of this provision of the law. Id. at sec. 2(a). Manuel's jury was, thus, not so instructed about Texas'"one holdout juror" rule. This created an impermissible risk of arbitrary imposition of the death penalty by placing a false dilemma

135

before the jury.  Jurors should be provided with clarifying instructions with regard to the failure of jurors to agree upon answers to special issues.

### The "10-12 Rule"

Article 37.071(2)(d)(2) requires the trial court to charge the jury that it may not answer "yes" to any issue submitted under Subsection (b) of this article unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree.  The trial court is also required by Article 37.071(2)(f)(2) to charge the jury that it may not answer "no" to the issue submitted under Subsection (e) unless it agrees unanimously and it may not answer "yes" unless ten or more jurors agree.  Under Article 37.071(2)(c) and 37.07 1(2)(f)(1), the jurors "shall" answer each interrogatory either "yes" or "no."  In the event that the jury is unable to answer any issue, either because it was unable to secure unanimity for a "yes" answer or ten votes for a "no" answer pursuant to the issues submitted under Subsection (b), or because it was unable to secure unanimity for a "no" answer or ten votes for a "yes" answer pursuant to the issue submitted under Subsection (e), Article 37.07 1(2)(g) requires the Court to sentence the defendant to life in prison.  This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e).

Article 37.071(2)(a) prohibits the trial court, either attorney, and the defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence.  Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

Death is different not only in severity but also in kind from all other punishments. The Eighth and Fourteenth Amendments of the United States Constitution demand additional procedural safeguards in capital trials. <u>See</u>, <u>Furman v. Georgia</u>; <u>Gregg v. Georgia</u>; <u>both supra</u>; <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)(holding that "death is qualitatively different"). The effect of this is that legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty, and the right of each defendant to individualized sentencing. It is precisely this difficulty that caused Justice Blackmun to conclude that the entire enterprise of seeking to make the death penalty constitutionally acceptable was flawed. In his dissent from the Court's denial of a petition to grant a writ of certiorari, Blackmun declared: "From this day forward, I no longer shall tinker with the machinery of death . . . It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies." <u>Callins v. Collins</u>, 510 U.S. 1141, 1145, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J. dissenting). The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness, and denies defendants their right to individualized sentencing.

### The "10-12 Rule" Creates an Impermissible Risk of Arbitrariness

The requirement that a death sentence not be imposed arbitrarily is derived from the "Eight Amendment's heightened 'need for reliability in the determination that death is the

appropriate punishment in a specific case.'" <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), <u>quoting</u> <u>Woodson v. North Carolina, supra</u>.  It was chiefly the concern that decisions of life and death were being arbitrarily made that led the Supreme Court, in 1972, to declare the death penalty in violation of the Eighth and Fourteenth Amendments to the Constitution.  <u>Furman v. Georgia, supra</u>.

The Texas death penalty statute affirmatively creates confusion in the minds of the jurors.  Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented.  They are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another.  This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer.  The statute clearly provides that in the event of a non-answer, the defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented.  However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion, but it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

It is true that state legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some

information from jury instructions. See California v. Ramos, 463 U.S. 992, 1001, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (holding that the Court generally "defer[s] to the State's choice of substantive factors relevant to the penalty determination."). However, that discretion is bounded by the requirements of due process. See, e.g., Simmons v. South Carolina, 512 U.S. 154, 175, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 195, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (Stevens, J., dissenting); Shafer v. South Carolina, 532 U.S 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001); Kelly v. South Carolina, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002).

In Ramos, the Court permitted a jury instruction regarding the State Governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest. California v. Ramos, supra, 463 U.S. at 1001-1006. Despite being prompted to apply Ramos in the case of Caldwell v. Mississippi, the Court refused, holding that when the state argues that automatic appellate review is meant to determine whether the death penalty is appropriate in a given case, this information not only inaccurately depicts the role of the appellate court, but more importantly it serves an illegitimate state purpose by diminishing the ability of jurors to feel the gravity of their task. Caldwell v. Mississippi, supra, 472 U.S. at 336-341.

The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the three issues, this

provides an incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed. This situation is unique to capital sentencing juries. During the guilt/innocence phase of a criminal trial, it is strictly correct to inform the jury that unanimity is required for either a verdict of guilt or acquittal. Although anything short of unanimity will lead to a mistrial, and thus might lead the defendant to be released as though he were acquitted, he may still be retried and is thus unable to claim numerous basic constitutional protections such as that of double jeopardy.

Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the defendant is identical in both. See Padgett v. State, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) (holding that "a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer."). Thus, instructing the jury that ten or more of them must agree upon a "life" answer in order to sentence the defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law. So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence. The false distinction between a "life" answer of ten or more jurors and a non- answer of less than ten jurors must be removed.

This is not a case prior to 1981. Under Texas' former capital sentencing statute, if a jury failed to respond to any of the three special issues, the result was a complete mistrial requiring a new trial not just on sentencing but on guilt as well. See Eads v. State, 598 S.W.2d 304, 308 (Tex. Crim. App. 1980). Under such a scheme, setting aside the other arguments proffered here, an instruction that ten or more jurors are required for a life sentence would be just as unobjectionable as an instruction that unanimity is required for death, a finding of guilty, or an acquittal. Presumably in response to Eads and the additional costs and difficulties that such a situation would pose, the Texas legislature in 1981 amended the death penalty statute, inserting the default sentence of life in the event of a non-answer. It was at this time that the legislature also added the infirm language that is now in Article 37.071(2)(a), prohibiting jurors from being informed of this default result. It is clear that the legislature wished to change the sentencing reality of defendants without informing jurors of this change. In doing so, however, the legislative change made the old instructions inaccurate depictions of the law.

The principle behind Caldwell is that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors or upon a restrictive sentencing statute.

Assuming arguendo that the Texas statute does not provide the jury with the type of inaccurate and illegitimate information prohibited by a traditional reading of Caldwell, new empirical data suggests that such a reading of Caldwell is entirely inadequate to ensure that

141

capital jurors feel the "truly awesome responsibility" placed upon them.  McGautha v. California, 402 U.S. 183, 208, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).  One recent study by the Capital Jury Project concluded that "many death penalty jurors seek, and manage to find, ways to deny their personal moral responsibility for the sentencing decision."  Joseph L. Hoffman, "Where's the Buck? – Juror Misperception of Sentencing Responsibility in Death Penalty Cases," 70 Ind. L. J. 1137, 1157 (Fall 1995).  Given that jurors hardly need to have inaccurate information provided to them in order for them to deflect responsibility, the Caldwell rule itself should be read in light of the empirically supported premise that "death penalty jurors will take advantage of any available opportunity to mislead themselves about the extent of their responsibility for the sentencing decision."  Id.  If we are to give any meaning to Justice Harlan's concern that death penalty jurors be required to individually feel this terrific weight upon their shoulders, courts must inform jurors that just as each of them is required to vote for death in order for that punishment to take place, each has the unilateral power to give the defendant life.

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them, and specific instructions that define the minimum number of votes required to give each of these answers.  Because they are told that a death sentence follows from one set of answers, and a life sentence follows from another, a reasonable juror might conclude that the only way to get either of these punishments is to answer the questions posed to them.  See

142

California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (quoting

Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (holding that

the constitutional sufficiency of capital sentencing instructions is determined by "what a

reasonable juror could have understood the charge as meaning."). This leaves jurors free to

speculate as to what would occur should they be unable to provide an answer to the issues.

While it is possible that jurors might correctly guess that the failure to agree will result

in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead

to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the

defendant.  Given that each of the jurors has already found the defendant guilty of a capital

offense, none of these options would look desirable to a juror who honestly believes that a

life sentence in warranted.  Jurors are left to deliberate with the false belief that if they are

unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an

altogether unacceptable third option will result.

In Simmons, the Court prohibited just this sort of unfairness, holding that, "The State

may not create a false dilemma by advancing generalized arguments regarding the

defendant's future dangerousness while, at the same time, preventing the jury from learning

that the defendant never will be released on parole." Simmons v. South Carolina, supra, 512

U.S. at 171.  The Texas statute instructs jurors that at least ten of them must agree in order

for a life sentence to be imposed and yet prohibits jurors from learning that only one vote is

actually required for a life sentence.  It is precisely because jurors are left to speculate when

capital juries are not informed of the consequences of a deadlock that several states have

declared the practice to be in violation of Eight Amendment protections as found in Gregg

v. Georgia, supra.  See, e.g., Louisiana v. Williams, 392 So.2d 619, 634-635 (La. 1980)

(holding that "by allowing the jurors to remain ignorant of the true consequence of their

failure to decide unanimously upon a recommendation, the trial court failed to suitably direct

and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action.");

New Jersey v. Ramseur, 106 N.J.2d 123, 314 (N.J. 1987) (stating that "the jury must be told,

in effect, that the law recognizes deadlock as a permissible result, an outcome allowed by the

statute, a legal trial verdict that by law results in imprisonment rather than death.").

While this confusion might pressure voters to change their position in order to avoid

the unknown third option, it might lead to an even more basic misunderstanding.  Because

jurors are told that each question must be answered, and voting ballots do not include an

option for non-answer, a reasonable juror following the instructions might believe that a

non-answer is not only undesirable, but is in fact impermissible.  Such a juror might believe

that because he or she is unable to secure the ten votes required to give the answer that juror

wishes the jury to give, and because some answer either way must be given, that juror is in

fact obliged to vote with the others and sentence the defendant to death.  Although the law

is clear that a death sentence may never be mandatory, and individual jurors must always be

free to vote for life, such a belief would reasonably follow from the instructions mandated

by the Texas sentencing scheme.  In fact, jurors often mistakenly believe that they are

required by law to impose death.  See generally, Garvey, Stephen P., Sheri Lynn Johnson,

and Paul Marcus, "Correcting Deadly Confusion: Responding to Jury Inquiries in Capital

Cases," 85 Cornell L. Rev. 627 (March 2000).  In addition to this mistaken belief, one study also found that "[a]bout half the jurors incorrectly believe that a mitigating factor must be proved beyond a reasonable doubt. Less than a third of jurors understand that mitigating factors need only be proved to the juror's personal satisfaction.  The great majority of jurors – in excess of sixty percent in both life and death cases – erroneously believe that jurors must agree unanimously for a mitigating circumstance to support a vote against death." Eisenberg, Theodore, and Martin T. Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L. Rev. 1 (Nov. 1993).

One study found that when jurors asked for clarification and were simply referred back to the original instructions, rather than being disavowed of their false belief they became more likely to mistakenly believe that the evidence required them to vote for death. 85 Cornell L. Rev. At 639.  This is precisely what the Texas statute would have judges do when jurors ask questions regarding the implications of a non-answer.  The Texas statutory scheme creates a set of instructions that lead jurors to have false beliefs regarding their sentencing options, prohibits them from learning their true options, and then operates in a fashion that solidifies their pro-death leanings.

Commenting on the prohibition on informing juries of the effect of a deadlock, Judge Clinton was likely correct when he stated in his dissent in <u>Sattiewhite v. State</u> that, "It seems apparent to me that the purpose . . . is to act as a kind of inverted 'dynamite' charge.  The Legislature did not want jurors to know that failure to reach a punishment verdict – a hung jury – would <u>not</u> result in the State incurring the additional expense of a retrial." <u>Sattiewhite</u>

145

v. State, 786 S.W.2d 271, 292 (Tex. Crim. App. 1989) (Clinton, J., dissenting) (emphasis in original). The converse of this is that the Texas legislature did want to foster the false belief of jurors that a non-answer would require the additional expense of a retrial. Even when it is true that a hung jury will result in a costly retrial, the Constitution does not permit judges to refer to the additional expenses when they urge deadlocked juries to try to come to a verdict. See United States v. Taylor, 530 F.2d 49, 52 (5th Cir. 1976). In the event that such costs do not in fact exist, as is the case under the Texas statute, it is all the more clear that the Constitution cannot permit the legislature to benefit from that misperception by prohibiting judges and lawyers from correcting the mistaken beliefs of jurors.

The inaccurate and illegitimate instructions provided to Texas capital sentencing juries creates an unacceptable risk that decisions are being made arbitrarily or by mistake. While it is true that uncertainty about the consequences of a non-answer might lead a lone holdout for a life sentence to join the other jurors voting for death, it is equally true that this confusion might lead at least one of the three holdouts for death to join the nine other jurors voting for life. See, e.g., Jones v. United States, 527 U.S. 373, 394, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (stating that the petitioner could not demonstrate prejudice because "[i]t is just as likely that the jurors, loathe to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence.").

With regard to the Texas statute, while this point might be correct, it fails to prevent serious constitutional infirmities for two reasons. First, because the statute provides defendants with the exact same sentence regardless of whether they receive one vote for life

or ten, the state itself is not prejudiced when votes for death are changed into votes for life for the sake of obtaining the ten vote minimum.   The defendant, however, suffers a tremendous wrong when holdouts for life switch their votes to death out of confusion or a feeling of obligation.  Thus, only the defendant, and not the state, could suffer harm from such confusion.  Even if the State did have an interest in keeping life sentences that derive from a verdict distinct from life sentences that derive by default, that interest is vastly overshadowed by the defendant's interest.  See Lowenfield v. Phelps, 484 U.S. 231, 252, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (Marshall, J., dissenting) (stating that when the substantive outcome of a deadlock is identical to that of a life verdict, "the State's interest in a verdict . . . [is] relatively weak, whereas the defendant's interest in preserving the integrity of a dissenting vote [is] correspondingly strong.").  Stated simply, while the defendant never needs to have a voter change his or her vote out of confusion, the state, because death may only be imposed through a unanimous verdict, does.  Thus, while it might be true that it would be difficult to determine whether a particular defendant was prejudiced, it is beyond dispute that the system as a whole can only prejudice the defendant.

Additionally, it is eminently clear that when confusion regarding the outcome of a deadlock leads jurors to change their votes in either direction simply for the sake of a verdict, those decisions regarding life and death are being made arbitrarily.  In cases in which the jury does not quickly, and without dispute, come to agreement on the appropriate punishment, the two most important factors remaining for a decision are the general confusion of the jurors caused by misinformation and the initial disposition of the jury regarding whether or not to

impose death.  If nine jurors find sufficient mitigation to warrant a life sentence, at least one of the three jurors holding out for death will be likely to switch over solely out of uncertainty regarding the consequences of a non- answer or due to a mistaken belief that an answer must be reached at all costs.  If eleven jurors vote for death and one finds that the mitigating evidence warrants life, that juror might be swayed to vote for death for identical reasons. When jury instructions misinform jurors and purposefully prevent clarification, and verdicts are rendered out of such confusion, it is clear that those instructions "introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." Beck v. Alabama, 447 U.S. 625, 643, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

### The "10-12 Rule" Denies the Defendant's Right to Individualized Sentencing

The Constitution requires that States balance the obligation to minimize the risk of arbitrariness with the need for individualized sentencing.  ". . . [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment [] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, supra, 428 U.S. at 304 (citation omitted). In furtherance of this demand, the Court held in Lockett that, "[T]he sentencer . . . [can] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).  More importantly, the Court has unequivocally held, and the Texas

148

statute clearly states under Article 37.071(2)(f)(3), that a single juror must be permitted to consider and weigh mitigating evidence unilaterally, regardless of whether any other jurors accept the evidence as mitigation. See McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990); Mills v. Maryland, 486 U.S. 367, 374-375, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

Although the capital sentencing jury resembles juries that sit in the guilt/innocence phase of capital and non-capital trials, its role is distinct. All juries have historically been expected "to secure unanimity by comparison of views, and by arguments among the jurors themselves." Jones v. United States, supra, 527 U.S. at 382, quoting Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The capital sentencing jury, however, is charged more precisely with the duty to "express the conscience of the community on the ultimate question of life or death." Lowenfield v. Phelps, supra, 484 U.S. at 238. Because extraordinary protections are constitutionally required to ensure against unwarranted impositions of death, the Texas sentencing scheme, like the Louisiana statute, creates "a situation unique to the capital trial that a single juror, by persisting in a sentencing recommendation at variance with all of his fellow jurors, may alone cause imposition of a life sentence." Louisiana v. Loyd, 459 So.2d 498, 503 (La. 1984). The requirement of individualized sentencing in capital trials means not simply that defendants must be judged based upon their own character, but that they must be judged as such by individual jurors charged with considering the evidence and asked to make determinations of life and death. This clearly follows from the Court's demands that each individual juror be capable of

149

considering mitigating evidence that juror alone finds to exist simply by a preponderance of the evidence.

Members of a capital sentencing jury sit through the court's instructions, take an oath, and pass through the extraordinary process of death qualification. More than any other jury that sits in a courtroom, we can be confident in our presumption that such jurors are unbiased, impartial, and capable of deliberation. It cannot be correct, therefore, to say that informing jurors of the effects of a deadlock would act as "an open invitation for the jury to avoid its responsibility and to disagree." Davis v. State, 782 S.W.2d 211, 221 (Tex. Crim. App. 1989), quoting Justus v. Commonwealth, 266 S.E.2d 87, 92 (Va. 1980). Rather, when a juror decides that sufficient mitigation exists to warrant a life sentence, and wishes to stick to that position despite the fact that it will prevent the jury from reaching a verdict, he does not violate some abstract duty to "secure unanimity" or to not "disagree."

It is true that under the Texas sentencing statute, a juror would be abdicating his or her responsibility were he or she to not answer one of the questions. "The issues are framed in a manner which permits them to be answered either affirmatively or negatively, and it is the purpose of the deliberative process to resolve juror vacillation." Nobles v. State, 843 S.W.2d 503, 510 (Tex. Crim. App. 1992). Once deliberation has taken place, vacillation has been resolved. Since each juror has then settled upon his or her answer to the three special issues, surely the failure of those votes to meet the numerical requirements of the "10-12 Rule" cannot be considered a violation of the jury's duty. On the contrary, as the Supreme Court of New Jersey held in Ramseur, and as is equally true under Texas's statutory scheme,

"A capital jury does not 'avoid its responsibility' by disagreeing – genuine disagreement is a statutorily permissible conclusion of its deliberations." New Jersey v. Ramseur, supra, 106 N.J. at 311.

Indeed, McKoy and Mills together stand for the principle that setting up bafflers to prevent the jury from disagreeing can itself be constitutionally prohibited. This is precisely the case with the "10-12 Rule," the substantive effect of which is that it prohibits individual jurors from having a "meaningful opportunity" to judge the defendant on the basis of mitigation by creating the appearance that while each juror may introduce and weigh mitigating evidence unilaterally, a minimum of ten jurors are required to pass judgment on such factors. In Roberts v. Louisiana, the Supreme Court invalidated Louisiana's mandatory death penalty scheme on the grounds that it "afford[ed] no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." Roberts v. Louisiana, 428 U.S. 325, 333-334, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). That the sentencer must have a "meaningful opportunity" to consider mitigating factors suggests that not only may legislatures not actively prohibit such consideration, but they also must also take positive steps to foster it when necessary.

This was exactly what the Court was concerned about in McKoy when it held that "Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." McKoy v. North Carolina, supra, 494 U.S. at 442-443. It is not enough for Texas to inform the jury that

they "need not agree on what particular evidence supports an affirmative finding on the issue [of mitigation]," Article 37.071(2)(f)(3), if the effect of the entire instruction is that ten or more jurors must agree upon an affirmative finding in order to give effect to the finding of any one juror.  Each juror must be capable of giving effect to mitigating evidence when determining the appropriate punishment, and thus only one juror, not ten, must be sufficient under Article 37.071(2)(f)(2) to answer "yes" to the mitigation issue presented by 37.071(2)(e)(1).  By instructing the jury that ten jurors are required in order to give a "yes" answer, the Texas statute violates the principles underlying <u>Mills</u> and <u>McKoy</u> by preventing individual jurors from having a meaningful opportunity to consider mitigating factors.

### The "10-12 Rule" Denies the Defendant's Right to a Fair and Impartial Jury

As discussed above, the "10-12 Rule" operates by necessarily creating confusion in the minds of the jurors, and then prohibiting them from having their confusion clarified.  This was earlier discussed within the context of the additional Eighth Amendment safeguards required to reduce the risk of arbitrary and unreliable sentences.  An additional problem created by such confusion is that it permits jurors with misconceptions about the law formed prior to the trial and outside of the courtroom to introduce such ideas into deliberations.

It is beyond dispute that capital juries are often dominated by misconceptions regarding the state of the law, their role as jurors, and the definition of key concepts such as mitigation.  As discussed above, a reasonable juror who conscientiously attempts to understand the Texas sentencing statute might be led to believe that just as a sentence of death may not be imposed unless the jury is unanimous with regard to all three special issues,

a sentence of life may not be imposed unless at least ten jurors agree with respect to at least one of the three special issues. Not only does this mistaken belief raise an Eighth Amendment problem with regard to arbitrariness and reliability, but the possibility that jurors might draw upon their preconceived notions to resolve such a situation raises Sixth Amendment concerns.

The right to an impartial jury has long been recognized as fundamental. See, e.g., Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). To protect this right, courts are obliged to take reasonable steps to ensure the impartiality of a jury. It is for this reason that voir dire is made available to both parties, the judge is equipped with the power to strike jurors for cause, each party is granted a certain number of peremptory challenges, and jury instructions are fashioned to clarify the jury's role and impress upon them the importance of their task and the oath to which they have sworn.

By manufacturing confusion in the minds of the jury and preventing the court or the attorneys from correcting it, the "10-12 Rule" creates fertile ground for jurors to draw upon their own biases and preconceived notions when arriving at a verdict. This is particularly dangerous when jurors are confused about their sentencing options and the results of their sentencing decisions. The concept of a hung jury is widely understood to be a disfavored result. In most trials, a hung jury leads to a mistrial, and most people understand that a mistrial will either lead to a costly retrial or to the dropping of charges. While neither of these undesirable outcomes will result in the case of capital sentencing under the Texas

statute, jurors are required to be kept in the dark with regard to that materially relevant fact. The "10-12 Rule" effectively forces the jury to wonder what would happen were they are unable to answer the special issues, possibly leads them to believe that an unacceptable third alternative other than life and death would follow, and then leaves them to draw upon their own preconceived notions in coming to a verdict. While the concept of a mistrial might be distasteful to a holdout, and is certainly disfavored by the court, during the guilt/innocence phase of a criminal trial, it is surely all the more unacceptable to a juror in a capital sentencing proceeding who has already found the defendant guilty of a capital offense. The risk that jurors will enter the courtroom with that misconception is too great to allow them to continue deliberating in the dark.

To ensure that capital juries do not rely upon their biases regarding hung juries during deliberations, jurors must either have their misperceptions corrected, or they must be examined for bias during voir dire. Because of the additional Eighth Amendment problems with forcing jurors to deliberate using false information, this Court should declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury of the effects of a deadlock. The Court should protect the right to a fair and impartial jury by informing the jury that if they are unable to reach the minimum number of votes required to give an answer to any one of the special issues, they are permitted to return the ballot without any answer. In the event that the jury is unable to answer any of the three special issues, the court will sentence the defendant to life imprisonment as if he had been sentenced by the jury itself.

Should this Court not wish to protect the defendant's right to a fair and impartial jury by invalidating Article 37.071(2)(a), the Court should permit the attorneys, at voir dire, to discover what potential jurors believe would happen in the event of a non-answer. See Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (holding that, "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."). Not only is such questioning permitted by the Texas statute on the grounds that it would not involve informing prospective jurors of the actual consequences of a non-answer, but it is clearly in line with the central holding in Turner v. Murray that the risk of juror bias must be considered "in light of the ease with which that risk could have been. minimized." Turner v. Murray, 476 U.S. 28, 36, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). In Turner, the Court held that because of the complete finality of the death penalty, and the risk that racial prejudice would infect jury deliberations, the trial judge failed to protect the defendant's right to an impartial jury by not permitting the lawyers to question prospective jurors on their racial prejudice. Id.

Similarly, because of the finality of the death penalty, and the risk that preconceived notions regarding the effects of a hung jury will improperly infiltrate jury deliberations, the right to an impartial jury must be protected at the very least by granting attorneys the right to question jurors about their beliefs. While defendants may not have an absolute right to voir dire potential jurors regarding their beliefs about deadlocked juries, when the legislature has barred all other means of bringing such biases to light and correcting them, it becomes

imperative that defendants be equipped with the tools to confront those who sit in judgment upon them.

### The "10-12 Rule" Prevents the Defendant from Receiving Effective Assistance of Counsel

It is a fundamental principle in death penalty jurisprudence that, "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." Gregg v. Georgia, supra, 428 U.S. at 190. This is so clear that the Fifth Circuit in Burley v. Cabana declared that it was ineffective assistance of counsel in violation of the Sixth Amendment for the trial lawyer to not "inform the trial court of sentencing alternatives . . ." Burley v. Cabana, 818 F.2d 414, 418 (5th Cir. 1987).

If it is ineffective assistance of counsel to not inform the judge of his sentencing alternatives, it would surely be ineffective assistance of counsel to not inform a sentencing jury of its sentencing alternatives. Yet this is precisely what the "10-12 Rule" does by preventing attorneys from informing the jury of the true state of the law. A reasonable defense attorney would surely inform each juror that not only is it that juror's right, but it is in fact that juror's duty, to individually weigh the evidence presented and make a determination for life or death on the basis of that individual's conscience. Such a statement

156

would accurately describe the role of the capital juror and would provide the jury with information materially relevant to their sentencing responsibilities. Preventing an attorney from informing the jury of the true state of the law when such information is essential to the capital juror's role is to deny the defendant his right to adequate counsel. This is equally true when counsel is prevented from conducting voir dire in order to intelligently utilize counsel's peremptory strikes to remove prospective jurors harboring devastating misunderstandings of the consequences of deadlock under the Texas death penalty.

Under the Texas sentencing statute, the societal cost justification for pressuring juries to return a verdict is similarly absent. Thus, the only possible state interest that could balance against the strong state and private interests that jurors not be coerced, that defendants be tried by a fair and impartial jury, and that determinations of punishment be reliable and non-arbitrary is that capital juries are meant to speak to the conscience of the community.

While it is true that capital juries are meant to represent the community, two reasons exist for why this value cannot outweigh the risk of coercion, bias and arbitrariness that is created by not informing the jury that they have the option to not answer a question, and the effect of a non-answer is a life sentence. First, in order for the jury to enter a verdict of death under the Texas scheme, all twelve members of the jury must agree on all three special issues. Thus, while the purpose of the jury is to express the collective conscience of the community, just as each community is made up of individuals each jury is made up of individuals. What we are really looking for is not a jury that as a unit is asked to speak the

157

singular voice of the community, but rather we are asking twelve representative individuals to each speak his or her own voice, and through that we hope to discern the collective conscience of the community.

This statement of representativeness should not be taken to be an admission that capital juries are representative of the community. The process of death qualification leads to the removal for cause of conscientious objectors to the death penalty despite the fact that they are no less members of the community than anyone else, as well as individuals with qualms about the death penalty who are stricken through the use of peremptory challenges. Numerous studies have shown that those individuals who remain are more prone to support the death penalty than the average member of society, and are also more likely to convict the defendant either because of their personal beliefs or because the extremely time-intensive process of death qualification focuses jurors not upon the guilt or innocence of the defendant, but rather upon what penalty he deserves once his guilt has been reached.

It is a mistake, therefore, to consider that the state's interest in having the jury speak the conscience of the community conflicts with the state's interests in not coercing the jury, providing a fair and impartial jury, and limiting the risk for arbitrary and unreliable decisions. Those interests are one and the same, for if any member of the jury feels undue pressure to change his vote in order for the jury to come to a verdict, the state's interest in having the jury speak the conscience of the community is frustrated. It is only when each member of the jury is left entirely free to weigh the evidence presented, is permitted to unilaterally

introduce and consider mitigation, and is fully informed of the individual, awesome responsibility that he or she bears in making this decision between life and death, that the conscience of the community will be expressed.  The Court must allow for the very real possibility that a non-verdict is itself an expression of the community's truly divided conscience with respect to the issue of whether an individual should live or die.

Even if the state's interest in a verdict does stand in opposition to the other interests that the state and the individual defendant might hold, the entire body of capital punishment jurisprudence speaks to the overriding nature of our need to protect against unwarranted impositions of death.  The state always has an interest in reaching a verdict and having the jury speak the voice of the community.  That interest has not been allowed to supercede the defendant's right to a fair and impartial jury, to not be subjected to cruel and unusual punishment, or to not receive the equal protection of the law.  Article 37.071, sec. 2(a) violates the Eighth and Fourteenth Amendments to the United States Constitution.  See Louisiana v. Williams, supra; New Jersey v. Ramseur, supra; Kubat v. Thieret, 867 F.2d 351, 369-373 (7th Cir.), cert. denied, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); Andres v. United States, 333 U.S. 740, 752, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) (federal capital case); Caldwell v. Mississippi, supra (Eighth Amendment violation if capital sentencing jury not informed of relevant state sentencing law); Dugger v. Adams, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) ("To establish a Caldwell violation, the defendant necessarily must show that the [instructions] to the jury improperly described . . . local law.").  Manuel should receive a new sentencing hearing.

## CLAIM IX

## JUROR'S INABILITY TO PREDICT FUTURE DANGEROUSNESS.

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM IX

Art. 37.071(2)(b)(1) of the Texas Code of Criminal Procedure requires a jury during the penalty phase of a capital trial to answer the following question: Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The ability to accurately predict whether or not a person would commit criminal acts of violence is not commonly found within the ability of the lay people on the jury. The probability that a person will commit future violence is not a prediction that even the psychiatric community can make, particularly in the long run.

The unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession. See, e.g., American Psychiatric Association, Clinical Aspects of the Violent Individual 27-28 (1974); Cocozza & Steadman, The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence, 29 Rutgers L. Rev. 1084, 1094-1101 (1976); Diamond, The Psychiatric Prediction of Dangerousness, 123 U. Pa. L. Rev. 439 (1974); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins In the Courtroom, 62 Calif. L. Rev. 693 (1974); Schlesinger, The Prediction of Dangerousness in Juveniles: A Replication, 24 Crime & Delinquency 40, 47 (1978); Steadman & Cocozza, Psychiatry, Dangerousness and the Repetitively Violent Offender, 69 J. Crim. L. & C. 226, 229-231 (1978); Wenk, Robison, & Smith, Can Violence Be

160

Predicted?, 18 Crime & Delinquency 393, 401 (1972); Preventive Detention: An Empirical Analysis, 6 Harv. Civ. Rights – Civ. Lib. L. Rev. 289 (1971); Amicus Brief of the American Psychiatric Association (APA) in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). The APA, in its brief, said that the primary finding of the task force was that judgments concerning the long-run potential for future violence and the dangerousness of a given individual are "fundamentally of very low reliability," adding that the state of the art regarding predictions of violence is very unsatisfactory.

The unreliability of long term predictions of future dangerousness is acknowledged even today by those who take the position that there is some ability to predict dangerousness. "Using modem assessment tools, however, there is a growing body of data to suggest that psychiatrists can, in fact, predict violence more accurately than many believe – at least in the short term." Ken Hausman, "Predicting Violence Risk Possible but Complex" Psychiatric News, Vol. 36, Number 13 (2001). These predictions of violence, even if more accurate than in the past, come in a civil setting where a determination is made about possible civil commitment, not in the context of a capital murder case where the issue is whether someone is going to live or die, not will their civil liberties be limited for a short period of time. "Despite the pervasiveness of violence risk assessment in mental health law, research continues to indicate that the unaided abilities of mental health professionals to perform this task are modest at best." MacArthur Research Network on Mental Health and the Law, "Executive Summary," at 1 (April 2001).

161

The consideration for the jury must necessarily be a long-term consideration as a defendant who is given a life sentence, depending on the date of the offense, will not be eligible for parole for 40 calendar years. The ability to make such long-term predictions is rendered more unreliable by the propensity of a person to commit violence to "age out" as he grows older. The state will often make the argument that the defendant is a "future danger" to prison society because he has an anti-social personality. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) states: at page 648:

> Anti-social Personality Disorder has a chrome course but may become less evident or remit as the individual grows older, particularly by the fourth decade of life. Although this remission tends to be particularly evident with respect to engaging in criminal behavior, three is likely to be a decrease in the full spectrum of antisocial behaviors and substance abuse.

DSM-IV at 648.

The jurors are not instructed to consider either the unreliability of long-term predictions nor the "aging-out" effect noted by the DSM-IV. This makes the application of the Texas Death Penalty statute both arbitrary and capricious. It further denies this Petitioner a fair trial and due process of law.

The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact-finding than would be true in a noncapital case. Gilmore v. Taylor, 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); Woodson v. North Carolina, supra. This Court and the Court of Criminal Appeals is bound by the law to make certain that a death sentence is not wantonly or freakishly imposed and that the valid purposes of Art. 37.071 are

constitutionally accomplished. <u>Ellason v. State</u>, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991).

The Eighth Amendment's prohibition of "cruel and unusual punishment" must be interpreted in light of "evolving standards of decency." <u>Atkins v. Virginia</u>, <u>supra</u>. It is settled law that the Fifth Amendment's broad guarantee of "due process" must be interpreted in light of evolving standards of fairness and ordered liberty. <u>See, e.g.</u>, <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 846-851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); <u>Rochin v. California</u>, 342 U.S. 165, 171-172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

As has been previously discussed, Art. 37.071 of the Texas Code of Criminal Procedure sets out a sentencing scheme that is incomprehensible to the jury in violation of the guarantees of due process contained in the Fifth Amendment of the United States Constitution and made applicable to the States by the Fourteenth Amendment of the United States Constitution. It also fails to adequately narrow the class of persons eligible for the death penalty in violation of the Eighth Amendment of the United States Constitution that bans the imposition of cruel and unusual punishment. It arbitrarily allows for the introduction of non-statutory aggravating offenses (extraneous, unadjudicated offenses) utilizing relaxed standards and procedures all in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. It fails to require that the indictment allege all of the elements of a capital offense when the state is seeking the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United

States Constitution.  Further, it allows the jury to consider those non-statutory aggravating offenses that permit the arbitrary and capricious imposition of a sentence of death.

The Texas Death Penalty scheme denies basic protections to defendants in capital trials in Texas.  This denial and its impact on fairness and due process is magnified by the extent to which the state will go to "win" a death verdict.  Tactics that are customarily used include the offering to the court and jury "predictions" by witnesses who's own ". . . scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific."  Flores v. Johnson, 210 F.3d 456, 463 (2000) (Garza, J., concurring).  Manuel should receive a new sentencing hearing.

## VII.

## THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e) SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT.

28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) state as follows:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .
>
>     (2)    resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a **determination of a factual issue** made by a State court shall be presumed to be

164

correct.  The applicant shall have the burden of rebutting
the presumption of correctness by clear and convincing
evidence.

(emphasis added).

2254(d)(2) provides for habeas relief if the state court's determination of the facts was

**unreasonable** in light of the evidence presented in the state court proceeding.  If the state

court's determination of the facts was reasonable, then 2254(e)(1) comes into play and

presumes the court's **reasonable** determination to be correct unless the petitioner rebuts this

presumption by clear and convincing evidence.  A petitioner is entitled to an evidentiary

hearing to present this rebuttal evidence. Demosthenes v. Baal, 495 U.S. 731, 735, 110 S.Ct.

2223, 109 L.Ed.2d 762 (1990); Patton v. Yount, 467 U.S. 1025, 1028, 104 S.Ct. 2885, 81

L.Ed.2d 847 (1984); Sumner v. Mata, 449 U.S. 539, 550, 101 S.Ct. 764, 66 L.Ed.2d 722

(1981).

The above language from 2254(d)(2) and (e) regarding "determination of the facts"

and "determination of a factual issue" language is identical to the language of superseded 28

U.S.C. § 2254(d).  "[I]f a word is obviously transplanted from another legal source, whether

the common law or other legislation, it brings the old soil with it." Evans v. United States,

504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).  "Determination of a factual

issue" from superseded 2254(d) refers to basic, primary, or historical facts but not to mixed

questions of fact and law, which apply a legal standard to the historical-fact determinations.

Thompson v. Keohane, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).  The

question of competency to stand trial, for example, is a mixed question of law and fact. Washington v. Johnson, 90 F.3d 945, 951 (5th Cir. 1996), cert. denied, 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997).

The language from 2254(d)(2) regarding whether the determination of the facts was unreasonable in light of the record evidence is substantially the same as the language in superseded 2254(d)(8) regarding whether the factfinding was fairly supported by the state court record.   Under superseded 2254(d)(8), a petitioner was entitled to a hearing if the factual determination by the state court was not fairly supported by the record as a whole since such an unreasonable determination of the facts is not afforded a presumption of correctness. Townsend v. Sain, 372 U.S. 293, 313, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Purkett v. Elem, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); Parker v. Dugger, 498 U.S. 308, 316-317, 320, 323-324, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); Carriger v. Stewart, 132 F.3d 463, 473-475 (9th Cir. 1997), cert. denied, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir. 1995).   A federal hearing is required if the factual determination was unreasonable in light of the evidence in the record where the record evidence strongly contradicts the state court findings of fact so that the federal court cannot rely on the state court findings of fact or where the evidence supporting the petitioner's claim is compelling. Shillinger v. Haworth, 70 F.3d 1132, 1136-1138 (10th Cir. 1995); Cola v. Reardon, 787 F.2d 681, 698 (1st Cir.), cert. denied, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986); Fitch v. Estelle, 587 F.2d 773, 777 (5th Cir.), cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 111 (1979).

In the case at bar, the claims raised in the subsequent state habeas were dismissed by the Texas Court of Criminal Appeals and were not considered by the trial judge. Neither the trial judge nor the Texas Court of Criminal Appeals considered the merits of the claims in the subsequent state writ. Additionally, regarding the original state writ, the state court clearly abdicated her fact finding responsibility to the prosecutor given the exact similarity between the State's Proposed Order and the Court's Order. See attached Exhibits E and F. This verbatim adoption by the trial judge of the prevailing party's findings of fact and conclusions of law results in the appearance that the trial judge uncritically and unconditionally accepted the prosecutor's findings without any judicial guidance.

The Supreme Court of the United States has "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties . . ." Anderson v. City of Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985). Such practice results in the appearance that the trial judge "uncritically accepted findings prepared without judicial guidance by the prevailing party." Id., 470 U.S. at 572, 105 S.Ct. at 1511. The Fifth Circuit has "consistently expressed [its] disapproval of the practice of unconditionally adopting findings submitted by one of the parties to the litigation." FMC Corporation v. Varco International, 677 F.2d 500, 502 (5th Cir. 1982), citing, Keystone Plastics, Inc. v. C&P Plastics, Inc., 506 F.2d 960, 962 (5th Cir. 1975).

"The adversarial zeal of counsel for the prevailing party too often infects what should be disinterested findings to entrust their preparation to the successful attorney." Cuthbertson v. Biggers Brothers, 702 F.2d 454, 459 (4th Cir. 1983). This practice can result in a remand

when the trial judge adopts the prevailing party's findings verbatim since an appellate court will "accord the findings less 'weight and dignity [than] . . . the unfettered and independent judgment of the trial judge.'" Id. The trial judge's duty to make formal findings exists "to evoke care on the part of the trial judge in considering and adjudicating the facts in dispute." Ramey Constr. Co. v. Apache Tribe, 616 F.2d 464, 466 (10th Cir. 1980).  When the trial judge formulates and articulates his own findings of fact and conclusions of law in the course of his consideration and determination of the case, the trial judge can "be satisfied that he has dealt fully and properly with all the issues in the case before he decides it." Id. at 467, citing Roberts v. Ross, 344 F.2d 747, 751 (3rd Cir. 1965).  The judicial function conflicts with the adversarial function.  Ramey Constr. Co. v. Apache Tribe, supra, 616 F.2d at 467.  "The parties' proposed findings are adversarial documents designed 'to present all (the attorneys') contentions in the light most favorable to their clients." Id. (citation omitted).  "Wholesale adoption of such proposals by the court cannot generally convert them into a form 'reflect[ing] impartiality and restrained, objective judicial attitude.'" Id.

The adversarial zeal of the prosecutor in this death penalty case has infected what should have been disinterested findings by the trial judge.  The findings of the trial judge in the case at bar should be accorded less weight and dignity by this Court since the findings are clearly not the unfettered and independent judgment of the trial judge.  There is no evidence, given the state of this record, that the trial judge formulated her own findings of fact and conclusions of law in the course of the trial judge's consideration and determination of the evidence in this case.  There is no evidence that the trial judge dealt fully and properly

with all the issues in this case before the trial judge signed the Court's Order.  It is undisputed that neither the trial judge nor the Texas Court of Criminal Appeals considered the merits of the claims raised in the subsequent state writ.  This is clearly a violation of due process especially given the difficulty of obtaining an evidentiary hearing in federal court after the passage in 1996 of AEDPA.  The presumption of correctness of 28 U.S.C. § 2254(e)(1), therefore, should not attach to the state court's findings of fact and conclusions of law.

## VIII.

### <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court: (1) vacate the Petitioner's conviction for capital murder and death sentence, or in the alternative, vacate the judgment affirming his conviction and death sentence on direct appeal, or in the alternative, vacate the death sentence; (2) order and conduct an evidentiary hearing at which proof may by offered and argument may be offered concerning the allegations of this Petition; (3) permit the Petitioner, because of his indigence, to proceed without prepayment of costs and fees; (4) allow the Petitioner a reasonable time in which to amend this Petition; (5) provide for discovery as requested by the Petitioner and grant the Petitioner the authority to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in this Petition; (6) grant the Petitioner sufficient funds to secure expert testimony necessary to prove the facts as alleged in this Petition; (7) enter findings of fact and conclusions of law recommending that the Petitioner's

conviction and sentence be vacated and that the Petitioner's case be remanded for a new trial or a new sentencing hearing; and (8) grant such other relief as law and justice may require.

Respectfully submitted,

Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
MANUEL GARZA, JR.

## IX.

## VERIFICATION

STATE OF TEXAS                              §
                                           §
COUNTY OF BEXAR                            §

Before me, the undersigned authority, appeared Michael C. Gross, Counsel for the Petitioner and on his behalf, on this the 23rd day of January 2012, and who being by me duly sworn did depose and say that each and every allegation of fact contained in the foregoing Petition For Writ Of Habeas Corpus is true and correct.

Michael C. Gross

SWORN AND SUBSCRIBED to on this 23rd day of January 2012.

ROSALIE OCHOA
MY COMMISSION EXPIRES
August 26, 2014

Notary Public In And For The State of Texas

170

## X.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Petition for Writ of Habeas Corpus was mailed to Tina Miranda, Assistant Attorney General, P.O. Box 12548, Austin, Texas 78711-2548 on the 24th day of January 2012.