UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

DEC 1 8 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
              DEPUTY CLERK

MANUEL GARZA, JR., §
TDCJ No. 999434, §
§
        Petitioner, §
§
v. §        CIVIL NO. SA-09-CA-528-OG
§
RICK THALER, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
        Respondent. §

## MEMORANDUM OPINION AND ORDER

Petitioner Manuel Garza, Jr, filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his October, 2002 Bexar County conviction for capital murder and sentence of death.  For the reasons set forth hereinafter, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Background

A.   The Offense in Petitioner's Own Words

There is no legitimate doubt as to the events of February 2, 2001 that resulted in the death of San Antonio Police Officer John "Rocky" Riojas.  Within hours of his arrest on February 4, 2001, petitioner gave a voluntary, written statement in which he gave two, slightly different, accounts of how he fatally shot

officer Riojas while violently resisting an otherwise lawful

arrest on outstanding warrants.[1]

---

[1] Petitioner's first written confession was admitted into evidence during petitioner's capital murder trial as State Exhibit no. 173. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 27, testimony of Thomas Matjeka, at p. 94.  A copy of State Exhibit 173 appears in S.F. Trial, Volume 35.  Petitioner's first written confession was read into the record in open court. *Id.*, at pp. 97-102.

In pertinent part, petitioner's first written statement provides as follows:

> I knew the cop was gonna [sic] arrest me for the warrants.  The cop told me to get on the car, like spread 'em, but I ran.  I ran towards the back of the apartments but I got tired quick.  The cop was yelling for me to stop but I didn't stop.  I didn't want to go to jail because I had the warrants.  When I got to the back of the apartments the cop was still yelling at me to stop and I stopped running.  I got the cop in a hug, I wrapped both my arms around him and I started wrestling with him.  We both fell down and the cop started grabbing my neck from behind.  I couldn't breath [sic] and then the cop let go of me for a little bit and then he tried to grab his gun out.  I was face down on the ground and the cop was holding me down trying to arrest me.  I wasn't going to go to jail. When the cop tried to get his gun out he was behind me still grabbing onto me with one hand pushing me down into the ground and he was reaching for his gun with the other hand.  I was still trying to get away because I didn't want to go to jail.  I twisted around while I was under the cop and I was able to face him and I saw he had just got his gun out of his holster.  I grabbed the cop's hand that was holding the gun and my other hand was holding the cop off me.
> *       *       *
> He was a big dude.  I grabbed the hand that he had the gun in and I was able to twist the gun away from me and it was pointed upwards where it was facing the cop and then the gun went off.  I saw blood all over my hand and the cop just fell.  I ran.  I took the cop's gun with me when I ran and I ran to Tanya's apartment.
> *       *       *
> Det. Matjeka told that when I first came in I said something different about shooting.  It did happen a

2

Two days later, on February 6, 2001, petitioner gave a second written statement concerning his fatal shooting of officer Riojas.[2]  In this second statement, in addition to furnishing additional background information, petitioner gave a third, more elaborate, account of his fatal shooting of officer Riojas which, in pertinent part, states as follows:

> After I called Gilbert, I was walking back to the apartments and I seen the cop.  The cop was in a marked car but without the lights.  The car had the San Antonio Police Department markings on it so I knew he was a cop.  I walked across the street and I saw the cop go by and I saw the cop make a U-turn.  I knew the

---

> little different than what I said.  What really happened was we were on our knees by the curb.  The officer was behind me and I was still trying to get away and the officer was still trying to get a hold of me.  I seen [sic] the officer was taking his gun out of his holster and I twisted and reached and grabbed his gun with my left hand.  I got the gun from the officer and I reached around over my right shoulder and I was trying to crawl away and I pointed the gun over my right shoulder and I pulled the trigger.  The gun had a hair trigger on it and it surprised me when it went off so quick.  I only fired one time.  The cop went down and he landed on my right side and I got up and took off running.  The cop was laying face down and he wasn't moving.  The part about going to Tanya's and then going home was true.
> The part about me throwing the gun in the river was a lie too.  I don't know why I told you that.  I gave the gun to my brother-in-law Ben as soon as I got home last night.  I don't know what he did with it.

---

[2] Petitioner's written statement of February 6, 2001 was admitted into evidence at petitioner's capital murder trial as State Exhibit no. 174. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at p.112.  A copy of State Exhibit no. 174 appears in S.F. Trial, Volume 35.  Petitioner's second written statement was read in its entirety before the jury in open court. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp. 112-19.

cop was gonna stop me because I was wearing all black.
I knew the cop was gonna arrest me because I knew I had
outstanding warrants.  I knew I had an MTR for Escape
and some other warrants for Burglary of a Vehicle and
warrants for possession of marijuana.          *     **

    The cop stopped me when he got out of his car
about two feet from his car.  The cop asked me to come
to him and he asked me if I lived there and I told him
no.  The cop asked me my name and I gave him a fake
name of Manuel Garcia.  Once I gave him the fake name I
seen the cop look towards his car, he was still
standing by his door and I thought at that point that
the cop was gonna check on me.  I knew he'd find out
about the warrants and I didn't want to go to jail so I
just ran.  Right before I ran the cop told me to put my
hands on the car.  I knew that that was it and I ran.
I never put my hands on the cop's car.  I gave the cop
the false name so he wouldn't find the warrants.  I had
my wallet but my wallet had a fake ID in it under
another name.
                    *     *     *

    As I started running the cop was telling me to
stop.  I just wanted to get away.  I knew I was gonna
go to jail and I didn't want that.  Who wants to be in
jail?  The cop was on my ass chasing me.  The cop was
close to me the whole time.  He only told me to stop
once though.  I continued to run through the apartments
until I got by some mailboxes.  I finally stopped
running because I was tired.  The cop was right there
and he grabbed my right hand and he punched me in the
mouth.  I grabbed the cop in a hug and I put both my
arms around him and we started wrestling and we both
fell to the ground.  When we fell to the ground I was
on the bottom and the cop was on top of me.  I was on
my back and the cop was on top of me his stomach to me.
We started rolling around on the ground fighting.  I
was getting the officer on the ground and the officer
was getting me on the ground.  I was fighting so hard
with the officer that the next day my whole body hurt.
I was so sore I couldn't hardly move.  I don't recall
if we were saying anything or not.

    Finally I seen the officer get his gun out.  I was
on my back on the ground and the officer was kneeling
over me and he had his hand on me holding me down and I
saw the officer pulling his gun.  When the officer
pulled his gun out.  I was able to get my hands on his
gun.  I was able to twist around and the cop fell on
his back.  I had my hand on his gun and he had his hand

4

on the gun and the gun was out in front of us.  I had
my left hand on his gun and the cop had his gun in his
right hand.  I grabbed the cop's right wrist with my
right hand and I grabbed the gun in my left hand.  I
was pulling forward with my left hand and pulling the
cops right hand back away from the gun.  The cop was
trying to hold me down but he was trying to keep his
gun too.  I had a better angle and position and I was
able to pull the gun out of the cop's hand.

I was able to crawl away a few feet and I got up
on my knees.  The cop came up behind me and he reached
around and he grabbed my arm that had the gun in it.  I
still had the gun in my left hand and the cop was still
trying to get the gun.  I wanted to get away and the
cop was holding me to where I had to reach over and the
gun was pointing his way over my right shoulder and the
gun went off as the cop was grabbing it.  When I pulled
the trigger the cop's body was against mine.  When the
gun went off I couldn't hear nothing.  My face didn't
burn but my ear hurted bad in the inside.  My ear was
ringing so bad that when the guy that took me home was
trying to talk to me I couldn't hear him.  After I shot
the cop fell right down.  I only fired one shot.  I
didn't fall but he did.  I got up and I never even
looked at the cop.  I ran back into the apartments to
where I was at before.  I think I went to Albert's
first but I know I went to Tonya's.

*     *     *

I want to say to the media and to the officer's
family and everybody out there that this wasn't
intentional and I truly think this was the cop's fault.
I don't see why he wanted to pull out his gun.  I want
to say to the judge and the jury to please do justice
and please have mercy on me and give me the benefit of
the doubt.  I don't think I should get death or life in
prison.  I think I deserve something under that.  I
need a lot of help about how to do life.  I wasn't
raised right.[3]

B.    Indictment

On April 11, 2001, a Bexar County grand jury indicted

petitioner in cause no. 2001-CR-1877 on a single Count of capital

---

[3] S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp.
113-16, 118-19.

5

murder, to wit, intentionally and knowingly causing the death of officer Riojas by shooting Riojas with a deadly weapon, i.e., a firearm, while Riojas was in the lawful discharge of an official duty and petitioner knew Riojas was a police officer.[4]

C.   Appointment of Defense Counsel

The state trial court appointed attorneys Raymond E. Fuchs and Edward Camara, Jr. as counsel for petitioner.[5]  On July 11, 2002, attorney Fuchs filed a motion to withdraw as counsel for petitioner.[6]  The state trial court granted said motion.[7]  On July 19, 2002, the trial court appointed attorney Vincent D. Callahan as counsel for petitioner.[8]

Petitioner filed both an unsuccessful objection in the trial court and an unsuccessful mandamus action in a state appellate court challenging the ex parte the substitution of attorney Fuchs with attorney Callahan.[9] *In re Manuel Garza*, 2002 WL 1856712 (Tex. App. - San Antonio, August 14, 2002).

---

[4] Transcript of pleadings, motions, and other documents filed in petitioner's trial court proceeding (henceforth "Trial Transcript"), at p. 15.

[5] Trial Transcript, at pp. 13-14.

[6] Trial Transcript, at pp. 75, 83-84.

[7] Trial Transcript, at p. 76.

[8] Trial Transcript, at p. 35.

[9] Trial Transcript, at pp. 37-76, 81.

D.   Guilt-Innocence Phase of Trial

    The guilt-innocence phase of petitioner's capital murder trial commenced October 15, 2002.

    1.   The Prosecution's Case

    In addition to petitioner's statements excerpted above, the prosecution presented testimony from (1) various law enforcement personnel regarding communications officer Riojas had with other officers immediately before his fatal shooting and the evidence collected following the discovery of officer Riojas' body immediately after the fatal shooting,[10] (2) a pair of civilian

---

    [10] A San Antonio Police Department employee identified recordings of officer Riojas' communications with the department on the evening of his murder. S.F. Trial, Volume 23, testimony of Lisa Cisneros, at pp. 84-109.  Another San Antonio Police Department employee identified the recording of the 9-1-1 call alerting police to officer Riojas' fatal shooting. S.F. trial, Volume 23, testimony of Jesse Pena, at pp. 117-22.  One person who placed a 9-1-1 call testified about her and her friend's discovery of officer Riojas' body and their call to the authorities. S.F. Trial, Volume 24, testimony of Alicia Bacon, at pp. 34-45.
    Several San Antonio Police Officers and a civilian whom officer Riojas had stopped shortly before the fatal shooting testified that officer Riojas was driving a marked San Antonio Police vehicle and dressed in a San Antonio Police uniform and bulletproof vest at the time of the fatal shooting. S.F. Trial, Volume 23, testimony of George Augustus Jahant, at pp. 50, 82; Volume 23, testimony of Jose Luis Gallardo, at pp. 113-15; Volume 24, testimony of Thelma G. Self, at pp. 64-65; Volume 24, testimony of Jerry Fuller, at pp. 73-76; Volume 25, testimony of Alexander Devora, Jr., at pp. 166-80.  Officer Riojas' police Glock was not recovered at the crime scene. S.F. Trial, Volume 24, testimony of Thelma G. Self, at p. 66; Volume 25, testimony of Alexander Devora, Jr., at p. 173; Volume 25, testimony of Kelly Bender, at p. 183.
    Several San Antonio Police officers and employees testified extensively regarding their efforts to diagram, photograph, and

7

eyewitnesses to the fatal shooting,[11] (3) two acquaintances of

---

videotape the crime scene, as well as collect evidence at the crime scene. S.F. Trial, Volume 24, testimony of Marcus Wilhelm Booth, at pp. 80-98 (describing the close proximity of a stand of mail boxes to the location where officer Riojas' body was found); Volume 24, testimony of Treise Shen, at pp. 99-137 (describing various items, including necklaces, a shell casing, a green-handled screwdriver, blood samples, officer Riojas' name plate, and parts of officer Riojas' uniform belt found at the crime scene); Volume 24, testimony of Angela Salvatierra, at pp. 138-57 (describing the recovery of Riojas' uniform and clothing from the hospital following the declaration of Riojas' death); Volume 24, testimony of Tiffany Dillon Lozano, at pp. 162-73 (describing the recovery of blood samples from the crime scene); Volume 25, testimony of Kelly Bender, at pp. 181-187 (describing the recovery of Riojas' holster, radio, flashlight, and magazines).

In addition, the police also recovered petitioner's jacket, a knit cap, and numerous blood stains from an apartment near the crime scene which petitioner visited immediately after the shooting. S.F. Trial, Volume 25, testimony of Treise Shen, at pp. 147-66. A friend of the petitioner's and her boyfriend both identified the jacket and knit cap in question as petitioner's. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 50, 66-68, 99; testimony of Nosario Alvarez, Jr., at pp. 123, 133-34, 137. Ms. Dominguez also identified a silver necklace found at the crime scene at belonging to petitioner. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 70-71.

[11] Nathan Henges testified, in pertinent part, (1) he went to the balcony of an apartment to take a smoke and heard voices, including one saying "come here," coming from a neighboring apartment complex, (2) he saw two men standing apart at a distance from his vantage point of about eighty feet, (3) the taller man wore a large jacket and all black clothes, (4) he saw the two men grab each other and begin to wrestle each other, (5) the two went to the ground and were rolling around with both men attempting to mount and dominate the other, (6) he watched the two men wrestling for about thirty seconds, (7) he heard a scream and briefly turned away, (8) when he looked back, he heard a gunshot, (9) he did not see how the gunshot occurred, (10) when he looked back he saw the taller of the two men crouching then stand up, (11) he heard someone say "you bitch," before the taller man ran off, (12) he saw no movement from the other man, who was lying on the ground, (13) the gunshot awakened his girlfriend and they both called 9-1-1, (14) he identified the suspect as Hispanic, wearing a maroon jacket and dark or black

the petitioner regarding petitioner's appearance and conduct

immediately after the fatal shooting,[12] (4) the medical examiner

---

pants, (15) people were congregating near officer Riojas' body within a minute of the shooting, and (16) he went downstairs and gave police a statement when they arrived at the scene. S.F. trial, Volume 23, testimony of Nathan Maxwell Henges, at pp. 124-48, 167-80, 188. Significantly, Henges testified that it appeared to him the taller man in the maroon jacket was the aggressor during the fight and he never saw either man throw any punches at the other. *Id.*, at pp. 173, 179, 182, 188.

Erica Henderson testified, in pertinent part, that (1) she observed officer Riojas' marked vehicle as she drove into the apartment complex, (2) the police vehicle was parked at an agle with the driver's door open, (3) as she drove around the complex, she observed a San Antonio Police Officer and a suspect both on their knees struggling side by side, (4) the officer was attempting to get the suspect in a headlock, (5) the suspect had a gun in his left hand, (6) both men appeared to be struggling for the gun - with the officer attempting to get it away from the suspect, (7) the suspect appeared to be attempting to keep the gun away from the officer, (8) the suspect raised the gun up over his right shoulder and ducked his head, (9) she then heard and saw the shot, (10) the officer's hands were nowhere near the gun when the shot was fired, (11) after the shot, she saw the officer fall and the suspect got up, (12) the suspect briefly looked at the officer, put the gun in his pants, and then ran off, and (13) she called 9-1-1 after backing up her car to see which way the suspect ran. S.F. Trial, Volume 23, testimony of Erica Henderson, at pp. 198-215, 221-36, 238-40. Like Henges, Ms. Henderson saw neither of the two men throw any punches. *Id.*, at p. 233.

[12] Tanya Dominguez testified, in pertinent part, that petitioner pounded on her apartment door, barged in when the door was opened, appears to be frazzled and upset, said loudly he had been in a fight, went to the restroom, washed his hands, got the dry heaves, and asked her boyfriend for a ride home. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 50-58.

Nosario Alvaraez, Jr., testified, in pertinent part, that (1) he had seen petitioner pacing outside the apartment when he arrived at Tanya Dominguez's apartment complex that evening, (2) when petitioner entered Ms. Dominguez's apartment later, petitioner was breathing hard and appeared to have been in a struggle, (3) petitioner was briefly in the restroom, (4) petitioner said he had been in a fight and had scratch marks or wounds on his face and neck, (5) petitioner appeared very nervous

9

who performed the autopsy on Riojas' body,[13] (5) petitioner's
brother-in-law and sister regarding petitioner's disposition of
the murder weapon and petitioner's behavior and statements in the
days after the murder,[14] (6) a forensic serologist regarding the

_____

and talked very fast, (6) petitioner asked for a ride home, and
(7) as they drove away they saw a squad car in front of the
apartment complex and petitioner crouched down. S.F. Trial,
Volume 25, testimony of Nosario Alvarez, Jr., at pp. 117-27.

   [13] The medical examiner who performed the autopsy on Riojas'
body testified without contradiction that (1) Riojas died as a
result of a single, very close range, gun shot wound to the head
which moved front to back, upward, and left to right, (2) Riojas
had bruises and abrasions on his arms and knuckles, (3) the
bullet that struck Riojas' head fragmented upon impact with the
skull with a portion of the bullet entering Riojas' skull and
traveling across the top of the brain before exiting the skull on
the right side of the head, causing lacerations, bruising, and
hemorrhage, (4) the entrance wound displayed fractures radiating
out across the skull, (5) examination of the top of the skull
revealed a furrow in the brain with attendant bleeding and
bruising, (6) a portion of the fatal bullet was recovered in the
right parietal area above the right ear, (7) the gun which fired
the fatal shot was one to two inches from Riojas' head when
fired, and (8) Riojas had abrasions on his hands and contusions
on his left knee, right elbow, upper right thigh. S.F. Trial,
Volume 25, testimony of Randall Frost, at pp. 17-29, 36.

   [14] Petitioner's brother-in-law testified, in pertinent part,
that (1) petitioner arrived at their apartment between 10:00 and
10:15 p.m. on February 2, 2001, (2) petitioner rang the doorbell
several times and appeared panicked, (3) petitioner's face had
several scratches and was a little bit bloody, (4) petitioner
explained that he had been jumped on the west side at a party,
during the fight a gun fell out of the waistband of the person
who jumped petitioner, and petitioner picked it up, (5) the
petitioner pointed the gun at "them" and got away, (6) petitioner
had a lump on his head, a busted lip, and cuts on his face, neck,
arms, and ear, (7) petitioner changed clothes and left their
apartment about forty-five minutes later, and (8) petitioner
returned the next day around ten-to-eleven a.m. and said he
needed money to wash his clothes. S.F. Trial, Volume 26,
testimony of Ben David Parovel, at pp. 5-19, 39-41, 50 .  Parovel

presence of DNA consistent with Riojas on petitioner's clothing

and a necklace found at the crime scene,[15] (7) a firearms

_____

also testified he noticed the SAPD serial number on the side of
the gun petitioner gave him, wiped the gun down, and threw it
away in a dumpster after counting the bullets and determining one
bullet was missing. *Id.*, at pp. 22-25, 42-43.  The day after the
shooting, Parovel confronted the petitioner about Riojas' murder
and petitioner replied that "some fat dude from the west dude"
had shot Riojas. *Id.*, at pp. 26-27, 51-52.  Parovel retrieved the
gun from the dumpster, unsuccessfully attempted to sell it, and
then returned it to the dumpster. *Id.*, at pp. 29-31.
     Petitioner's sister testified (1) she was asleep when
petitioner arrived late at her apartment on February 2, 2001, (2)
petitioner knocked and rang the doorbell, (3) all she heard was
that petitioner had been jumped at a party on the west side and
had been in a fight, (4) petitioner was upset, used the bathroom,
got a change of clothes, and left, (5) she did not hear any
discussion regarding a gun, (6) while petitioner was in the
bathroom, she heard a news story about the shooting of Riojas,
(7) when she told petitioner about the story, petitioner said
nothing, (8) petitioner appeared to be acting normal when he
left, (9) she did not see petitioner when she awoke the next
morning (Saturday), (10) when she returned home from running
errands Saturday, Parovel told her about the gun, (11) she saw a
news story on Saturday night about Riojas' shooting and
recognized a jacket and a silver necklace shown in the televised
story as belonging to petitioner, (12) when petitioner returned
to her apartment Saturday night, petitioner asked Parovel about
the gun, (13) when Parovel said he had gotten rid of the gun,
petitioner said "good, good," (14) petitioner left shortly
thereafter but returned shortly before police arrived, (15) the
police arrested petitioner, and (16) petitioner told her he had
gone to a party on the west side and a group of guys tried to
jump him. S.F. Trial, Volume 26, testimony of Corinna Garza, at
pp. 56-96.

[15] A forensic serologist employed at the Bexar County
Criminal Investigation Laboratory testified Riojas could not be
excluded as a possible source of the blood found on (1) the black
leather jacket and knit cap petitioner left at Tanya Dominguez's
apartment, (2) a sliver necklace found near a pool of blood at
the crime scene, and (3) a blue towel found at Tanya Dominguez's
apartment. S.F. Trial, Volume 26, testimony of Erin Reat, at pp.
171-92.

examiner regarding the safeties and trigger pull on Riojas' Glock
police pistol,[16] (8) the San Antonio Police Detective who took
petitioner's written statements,[17] (9) a pair of San Antonio

---

[16] A firearms examiner for the Bexar County Crime Lab
testified in pertinent part that (1) Riojas' Glock contained
three safeties, all of which were operating properly, (2) normal
trigger pull for a Glock is five and one-half pounds, (3) Riojas'
Glock's trigger pull was between eight and eight and one-half
pounds, consistent with San Antonio Police Department policy, (4)
because the bullet fragment recovered from Riojas' body weighed
only 92.7 grams instead of the expected 155 grams and was
damaged, he was unable to definitively determine whether the
bullet recovered from Riojas' body had been fired from Riojas'
Glock, and (5) he was able to determine that the cartridge or
shell casing found at the crime scene had been fired by Riojas'
Glock. S.F. Trial, Volume 27, testimony of Edward William Love,
at pp. 6-33.
   A pair of San Antonio Police Officers testified regarding
the recovery of officer Riojas' Glock pistol from a dumpster at
the apartment complex where petitioner's sister Corinna lived
with Ben Parovel. S.F. Trial, Volume 26, testimony of Barney
Darrell Whitson, at pp. 97-104; Volume 26, testimony of Michelle
Morock, at pp. 121-28.

[17] San Antonio Police Detective Thomas Matjeka testified, in
pertinent part, that (1) he observed two necklaces, Riojas' name
plate, and a shell casing at the crime scene in close proximity
to where Riojas' body had been located prior to its transfer to
the hospital, (2) a green-handled screwdriver was found on a wall
near Riojas' vehicle, which was found with the driver's door open
and the engine running, (3) when he and other officers went to
the apartment of Corinna Garza and Ben Parovel to arrest
petitioner, petitioner refused to respond to officers' demands
that he show himself until petitioner's sister called out to
petitioner, at which time petitioner walked nonchalantly with a
smile on his face and informed he was being arrested for
outstanding misdemeanor warrants, (4) petitioner was given his
*Miranda* warnings before being questioned and prior to petitioner
giving and executing both of petitioner's written statements
concerning Riojas' murder, (5) during petitioner's initial
interview, petitioner was laughing and joking and petitioner
asked about Riojas' murder without any prompting or questioning
by police, (6) petitioner's neck was bruised and discolored and
petitioner had injuries to his chest, shoulder, lips inside his

Police Officers who witnessed petitioner make post-arrest threats against other officers.[18]

    2.   <u>The Defense's Case</u>

The defense called (1) a civilian employee of the San Antonio Police Department who testified, at the time petitioner executed his first written statement, the petitioner said his

---

mouth, neck, and fingers, (7) no promises or threats were made to induce either of petitioner's written statements to police, (8) initially, petitioner said he threw the gun he used to shoot Riojas into the river but later corrected that statement when informed by police they knew the weapon was in Ben Parovel's possession, (9) petitioner was permitted to visit with Parovel at the police headquarters, (10) during his second interview, petitioner indicated he wanted to change the statement "I pulled the trigger" to "the gun went off," (11) at the start of his first interview, petitioner indicated the gun had gone off accidentally, (12) during his second interview, petitioner stated for the first time that Riojas had punched petitioner in the mouth, whereas in his first interview, petitioner said he turned around and grabbed Riojas, (13) when describing the posture he assumed when he stopped running from Riojas, petitioner demonstrated a "bladed stance," which Matjeka described as a position in which someone is about to strike or attack, (14) when Matjeka informed petitioner that he knew petitioner had killed Riojas,  petitioner's demeanor became cocky and petitioner said "prove it!", (15) petitioner said his whole body hurt the day after his confrontation with Riojas, (16) petitioner never indicated he ever surrendered or attempted to surrender to Riojas, and (17) petitioner never claimed Riojas had ever pointed his weapon at petitioner. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp. 35-193.

    [18] San Antonio Police Officer testified that, while being escorted to a holding cell, shortly after arrest, petitioner displayed a cocky demeanor, smirked at officers. and announced "y'all are lucky I didn't get y'all fucking asses, too." S.F. trial, Volume 27, testimony of Joel Contreras, at pp. 201-03.
    Another officer testified petitioner stared at him in an apparent attempt to intimidate the officer and then announced "you're lucky I didn't kill your bitch ass." S.F. Trial, Volume 27, testimony of Nathan Preston, at pp. 206-08.

shooting of Riojas had been accidental,[19] (2) a trace evidence analyst regarding the absence of gunshot residue on petitioner's jacket/trench coat,[20] (3) an acquaintance of petitioner who saw petitioner the evening of the fatal shooting,[21] (4) a second trace evidence analyst regarding the presence of gunshot residue on Riojas' clothing,[22] (5) a friend of petitioner who was stopped by officer Riojas days before the fatal shooting and asked about

---

[19] S.F. Trial, Volume 28, testimony of Jesusita Perez, at p. 41.  Ms. Perez also testified petitioner's demeanor throughout the time she witnessed petitioner's execution of his statement on February 4, 2001 was remorseless, kind of cocky, or otherwise emotionless. *Id.*, at p. 44.

[20] S.F. Trial, Volume 28, testimony of Michael Martinez, at pp. 45-67.  Mr. Martinez also testified (1) he found no gun shot residue on wipes of Riojas' left hand but did find a single particle on Riojas' right hand, (2) environmental factors can influence the presence of gun shot residue on objects, (3) petitioner's black jacket/trench coat did not appear to have gunshot residue on the sleeves or upper chest, and (4) the back of petitioner's jacket was not tested for gun shot residue. *Id.*

[21] Brandy Williams testified, in pertinent part, that (1) she, Gilbert Vigilm and another person had plans to get together with petitioner on the evening of February 2, 2001 to go to the movies but petitioner did not arrive at her place until between 10:00 and 10:30 p.m., (2) earlier in the evening, Gilbert Vigil went to pick up petitioner at an apartment off Fredericksburg Road but returned without petitioner, (3) when petitioner did finally arrive at her place, petitioner looked like he had been in a fight, but was otherwise normal except that petitioner was quieter than normal, and (4) after they all watched television, Bryce Bavel took petitioner someplace. S.F. Trial, Volume 28, testimony of Brandy Williams, at pp. 68-78.

[22] A trace evidence analyst testified he found gun shot residue on the collar of Riojas' uniform shirt, indicating the collar was in close proximity to a gun being fired. S.F. Trial, Volume 28, testimony of James D. Garcia, at pp. 84-94, 102.

14

petitioner's whereabouts,[23] (6) a friend of petitioner who witnessed the beginning of the confrontation between petitioner and officer Riojas (but not the fatal shooting) and who had also been questioned by Riojas in the days before the fatal shooting regarding petitioner's whereabouts,[24] (7) a former BCADC inmate

---

[23] Anna Ortega testified, in pertinent part, that (1) she was a long time friend of petitioner and (2) she was stopped by officer Riojas in late-January or early-February, 2001 on the access road near the apartment complex of petitioner's sister while giving a ride to another of petitioner's friends, Gilbert Vigil. S.F. Trial, Volume 29, testimony of Anna Terry Ortega, at pp. 11, 27-31.

[24] Jamie Martinez testified (1) her family and petitioner's families knew each other, (2) on February 2, 2001, she and Gilbert Vigil drove to an apartment complex off Fredericksburg Road to pick up petitioner, (3) when they entered the complex, they saw a cop in a car talking with someone near the front of the complex, (4) the cop got out of his car and Vigil was about to park the vehicle in which they were driving when they saw the cop grab petitioner and put petitioner up against the police vehicle, (5) the cop was trying to put handcuffs on petitioner but petitioner kept turning around, (6) the cop was pushing petitioner, (7) they drove past slowly, (8) she looked back and didn't see petitioner or the cop, (9) when she looked again, she saw petitioner run and the cop chase after petitioner, and (10) she recognized Riojas as the cop because, a few days prior to that date, Riojas had pulled over a vehicle in which she and Gilbert Vigil were riding and questioned them about petitioner's whereabouts. S.F. Trial, Volume 29, testimony of Jamie Martinez, at pp. 36-48.
    On cross-examination, Ms. Martinez admitted she had given police a statement in which she (1) failed to mention she ever saw Riojas push petitioner, (2) failed to mention she had been a passenger in a vehicle stopped by officer Riojas, (3) admitted she recognized Riojas as a police officer on February 2, 2001 by his uniform, and (4) told police she saw Riojas talking with petitioner for a minute before the two men began their confrontation. *Id.*, at pp. 49-61. Ms. Martinez also admitted she saw petitioner the day after the fatal shooting and the petitioner was acting normally. *Id.*, at pp. 86-87.

who once overheard petitioner screaming "help me, help me," while both were in custody.[25]

### 3.   The Verdict

On October 24, 2002, after deliberating less than three hours, petitioner's jury returned its verdict, finding petitioner guilty beyond a reasonable doubt of capital murder.[26]

## E.   Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on October 25, 2002.

### 1.   The Prosecution's Evidence

The prosecution presented police officers and lay witnesses who testified regarding a wide variety of crimes committed by petitioner, both as a juvenile and adult, including (1) the February 20, 1995 attempted burglary of an apartment,[27] (2) the

---

[25] Mark Trevino testified (1) he was housed in the Bexar County Adult Detention Center near petitioner in February, 2001, (2) on one occasion, he heard petitioner screaming "help me, help mem" and (3) he believed the petitioner was crazy. S.F. Trial, Volume 29, testimony of Mark Trevino, at pp. 96-101.

[26] Trial Transcript, at p. 213; S.F. Trial, Volume 30, at pp. 72-73.

[27] An apartment resident returning home observed two young men attempting to break into a rear window of her apartment, drove to a neighbor's apartment, and called police. S.F. Trial Volume 32, testimony of Danielle Whitfield, at pp. 8-12.  Police arrived, searched the location, arrested one of the two suspects, and collected fingerprints. S.F. Trial, Volume 32, testimony of Mike P. Carrillo, at pp. 12-14; testimony of Monty Fox, at pp. 15-18.  Fingerprints found at the scene matched those of petitioner. S.F. Trial, Volume 32, testimony of Melvin Lleras, at p. 158.

April 2, 1995 theft of a motor vehicle and an ensuring vehicle chase,[28] (3) the May 6, 1995 attempted burglary of a vehicle,[29] (4) the October 19, 1995 theft of a motor vehicle,[30] (5) the November 9, 1995 burglary of a habitation,[31] (6) the November 18,

---

[28] A Cadillac owner reported his vehicle stolen from his driveway and, when police spotted the vehicle, petitioner led officers on a high speed chase, during which the occupants of the stolen Cadillac drove erratically and ran multiple stop signs. S.F. Trial, Volume 32, testimony of T.J. Barnes, at pp. 18-21; testimony of Chris Meehan, at pp. 21-28.  Another stolen vehicle, a Chevy Cavalier, was found parked at the location from which the Cadillac was stolen. S.F. Trial, Volume 32, testimony of Chris Meehan, at pp. 22-23.  Fingerprints lifted off the Cadillac matched petitioner's. S.F. trial, Volume 32, testimony of Chris Meehan, at pp. 25, 27; testimony of Melvin Lleras, at pp. 158-59.

[29] The owner of a vehicle leaving early for work that morning found petitioner had broken out a window of her car, had moved her car, and was attempting to drive away in the vehicle. S.F. Trial, Volume 31, testimony of Linda Dettloff, at pp. 33-35. When the owner threatened to let her dog loose on him, petitioner fled the scene on foot and was arrested two blocks away by police after a brief chase. S.F. Trial, Volume 31, testimony of Linda Dettloff, at pp. 33-38; testimony of Scott Schmitz, at pp. 42-47. A fingerprint found on the vehicle petitioner attempted to steal matched petitioner's. S.F. Trial, Volume 31, testimony of Kevin Potz, at pp. 49-51; Volume 32, testimony of Vernon Ginn, at pp. 214-15.

[30] A Cadillac was stolen from the residence of its owner that date, abandoned, and recovered by police later that same date with the rear window and steering column broken. S.F. Trial, Volume 31, testimony of Abel Palacios, at pp. 88-90; testimony of Robert McCaskill, at pp. 94-98.  Fingerprints found on the interior of the vehicle matched those of petitioner. S.F. Trial, Volume 31, testimony of Robert McCaskill, at p. 96; Volume 32, testimony of Vernon Ginn, at p. 215.

[31] When a child care worker notified police that she had observed a pair of young men (petitioner and a black male) attempting to burglarize a home across the street from where she was working, police arrived at the scene and chased the burglars. S.F. Trial, Volume 32, testimony of Sabrina Broz, at pp. 40-44;

17

1995 theft of a motor vehicle,[32] (7) the February 21, 1996 theft of a motor vehicle,[33] (8) the February 29, 1996 burglary of a habitation,[34] (9) the October 10, 1997 arrest of petitioner on a youth commission warrant, at which time petitioner was found on school property in the possession of three knives and a

---

testimony of Charles Jackson, at pp. 45-50; testimony of Jeff Crab, at pp. 50-54.   Police arrested petitioner about two blocks away in possession of a screwdriver and a checkbook belonging to the owners of the burglarized residence. S.F. Trial, Volume 32, testimony of Charles Jackson, at pp. 47-48; testimony of Jeff Crab, at pp. 52-53, testimony of Mercial White, at pp. 55-57. Fingerprints found inside the residence matched petitioner's. S.F. Trial, Volume 32, testimony of Jeff Crab, at p. 53; testimony of Melvin Lleras, at p. 157-58.

[32] A San Antonio Police Officer observed petitioner and another youth pushing an apparently broken vehicle along the side of a road, stopped to investigate, determined the vehicle was stolen, and arrested both youths. S.F. Trial, Volume 32, testimony of Phillip Wang, at pp. 29-32.   The vehicle in question was later linked to a burglary and marijuana was found in petitioner's pants pocket at the time of his arrest. *Id.*, at pp. 31-32.

[33] The owner of an Oldsmobile Cutlass reported his vehicle stolen on that date and was informed shortly thereafter his vehicle was in the city pound. S.F. Trial, Volume 31, testimony of Walter Lentz, at pp. 91-93.   The vehicle's steering column had been torn loose and there were dents in the front and side. *Id.*, at p. 93.   Fingerprints found on the vehicle matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 216.

[34] Petitioner and two other burglars were arrested inside a residence on that date and a revolver, which the homeowner had never seen before, was found in the water bed behind which petitioner was hiding at the time of his apprehension. S.F. Trial, Volume 31, testimony of Ken Tuttle, at pp. 6-15; testimony of Jeff Crabb, at pp. 15-25; testimony of Cecil Wright, at pp. 25-32,

screwdriver,[35] (10) the October 20, 1997 search of petitioner's bedroom at his uncle and aunt's home during which search police found a wealth of stolen property and a Glock pistol and two loaded magazines,[36] (11) petitioner's December 24, 1997 escape from a juvenile halfway house,[37] (12) petitioner's December 29, 1997 theft and burglary of a motor vehicle,[38] (13) petitioner's December 31, 1997 to January 1, 1998 theft of a motor vehicle and

---

[35] S.F. Trial, Volume 32, testimony of Ramiro Sanchez, at pp. 114-17.

[36] Petitioner's aunt and uncle became worried about petitioner's conduct and notified law enforcement personnel, who conducted a consent search of the bedroom at petitioner's aunt and uncle's residence where petitioner had been staying and found a Glock pistol, two thirteen-round magazines, a Canon camera, numerous CD's and pieces of stereo equipment, and several stereo speakers. S.F. Trial, Volume 32, testimony of Jeffrey Cole Hastings, at pp. 106-14.

[37] Petitioner's juvenile probation officer testified extensively concerning petitioner's juvenile criminal records, various juvenile justice and mental health facilities where authorities attempted to rehabilitate petitioner, and petitioner's Christmas Eve escape from the Truman House. S.F. Trial, Voume 32, testimony of Juan Antonio DeLeon, at pp. 118-45. Mr. DeLeon testified, in pertinent part that petitioner was sent to the Truman House to complete a six-to-eight month program but petitioner left that facility without permission. *Id.*, at pp. 133-35.

[38] A Chevy Blazer reported stolen on that date was recovered six-to-seven hours later stripped of its seats, dashboard, stereo, DC's, with a broken window and steering column, and with numerous items of stolen property inside. S.F. Trial, Volume 31, testimony of Jorge Tablis, at pp. 118-20; testimony of Nobel Ozment, at pp. 120-23. Fingerprints found on the vehicle were identified as petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 216.

the ensuing high speed chase and crash of the stolen vehicle,[39]

(14) petitioner's January 29, 1999 theft of a vehicle and

---

[39] A trio of San Antonio Police Officers testified regarding the events of the night of December 31, 1997 into the early morning hours of January 1, 1998 during which they engaged in a high speed pursuit of a stolen vehicle driven by petitioner which did not end until petitioner drove the stolen vehicle into the backstop at an elementary school, destroying the backstop and petitioner was arrested attempting to flee the scene.  More specifically, one officer testified (1) he spotted an '86 Olds driven by two kids who did not appear old enough to be driving, (2) when he ran the plates, he learned the vehicle had been reported stolen, (3) when he stopped the vehicle and exited his patrol car, the suspect vehicle sped off and a high speed chase ensured involving multiple police vehicles, (4) the petitioner drove the suspect vehicle at speeds of between eight and one hundred miles per hour, without its lights on, and nearly collided with another vehicle when petitioner drove through an intersection without stopping, and (5) the chase did not end until petitioner drove the stolen vehicle into an elementary school backstop. S.F. Trial, Volume 31, testimony of Michael F. Helle, at pp. 51-61.  Another officer testified (1) he observed the petitioner driving the suspect vehicle without any lights around midnight and screeching tires as the vehicle made turns, (2) petitioner swerved in and out of traffic dangerously, (3) at one point, petitioner slowed the suspect vehicle suddenly in an apparent effort to get the police vehicle behind him to make contact and deploy the police vehicle's air bags, a maneuver used by sophisticated car thieves to avoid pursuit, (4) the suspect vehicle destroyed the backstop into which petitioner drove it, and (5) when arrested, petitioner was laughing and displayed an arrogant demeanor. S.F. Trial, Volume 31, testimony of Richard Cuellar, at pp. 62-68.  The officer who arrested petitioner following the high speed chase testified (1) petitioner drove the suspect vehicle without lights at a high rate of speed, swerving dangerously in and out of traffic, (2) he dove into and tackled petitioner as petitioner exited the suspect vehicle after it crashed into a backstop, (3) petitioner struck him several times but he punched back and eventually managed to place petitioner in handcuffs, (4) after being placed in the back of a patrol car, petitioner managed to pull his hands out from behind him, (5) he re-cuffed petitioner, and (6) when he patted petitioner down, he found a .38 caliber pistol in petitioner's right front pocket. S.F. Trial, Volume 31, testimony of Lawrence Patrick Saiz, at pp. 69-81.

destruction of the football field at petitioner's former high

school,[40] (15) petitioner's January 30, 1999 burglary of a

vehicle,[41] (16) petitioner's theft and burglary of a vehicle on

March 5, 1999,[42] (17) petitioner's theft and burglary of a

---

[40] The owner of a Jeep Cherokee testified (1) he reported
same missing on that date, (2) his vehicle was found the
following date in the middle of football field at MacArthur High
School with the back seat, steering column, and ignition broken,
(3) his vehicle spent six or seven weeks at the dealer being
repaired. S.F. Trial, Volume 31, testimony of Russell Knoebel, at
pp. 110-14.  A San Antonio Police Officer testified he was
dispatched to MacArthur High School where he observed the jeep
had been used to make doughnuts in the middle of the football
field, tearing up the field in the process. S.F. Trial, Volume
31, testimony of Roman DeLeon, at pp. 114-17.  Fingerprints on
the stolen vehicle matched petitioner's. S.F. Trial, Volume 32,
testimony of Vernon Ginn, at pp. 217-18.

[41] The owner of a pickup truck reported on that date that
his vehicle's window had been broken and a tool box stolen from
inside his vehicle. S.F. Trial, Volume 31, testimony of Claudio
Velasquez, at pp. 82-84.  Fingerprints were lifted from both the
exterior and interior of the burglarized vehicle. S.F. Trial,
Volume 31, testimony of Michelle Morock, at pp. 85-88.  Those
fingerprints matched petitioner's. S.F. Trial, Volume 32,
testimony of Vernon Ginn, at p. 217.

[42] The owner of a Pontiac Grand Prix testified his vehicle
was stolen that date and, when later recovered by police, was
missing its stereo, speakers, and amplifier and the steering
wheel was broken. S.F. Trial, Volume 31, testimony of Arturo
Vasquez, at pp. 98-101.  A San Antonio Police Officer testified
(1) he observed the stolen vehicle in question traveling without
its lights around 10:30 p.m., (2) when he took up pursuit, the
stolen vehicle took off, (3) when he finally caught up with the
stolen vehicle, it was sitting vacant on the shoulder of a road
with its engine running, and (4) the vehicle was processed by an
evidence technician. S.F. Trial, Volume 31, testimony of Dennis
Kifer, at pp. 102-06.  A San Antonio Police Detective testified a
screwdriver, hammer, and lug wrench were found inside the front
seat of the stolen vehicle and, while no fingerprints were found
on the tools, fingerprints were lifted from inside the top of the
passenger window. S.F. Trial, Volume 31, testimony of Steve

vehicle on April 15, 1999,[43] (18) petitioner's May 5, 1999 theft

of a pair of expensive tennis shoes from a department store,[44]

---

Holson, at pp. 106-10.  The fingerprints lifted from the vehicle
in question were petitioner's. S.F. Trial, Volume 32, testimony
of Vernon Ginn, at p. 218.

[43] The owner of a BMW testified (1) her vehicle, which
contained two expensive cameras, was stolen on that date and
recovered four days later and (2) one of the cameras was missing,
along with the ties and wheels off the vehicle. S.F. Trial,
Volume 31, testimony of Heidi Crabtree Dunlop, at pp. 123-29.  A
San Antonio Police evidence technician lifted latent fingerprints
from the exterior of the stolen vehicle, which was missing its
stereo. S.F. Trial, Volume 31, testimony of Robert Rackley, at
pp. 129-32.  A San Antonio Police Sergeant testified one of the
cameras stolen from the vehicle in question was pawned and (2)
after obtaining a consent to search from petitioner's mother, he
recovered other items stolen from the vehicle in question, along
with many other stolen items from petitioner's bedroom. S.F.
Trial, Volume 31, testimony of Glen Patrick Michaels, at pp. 132-
41.  Petitioner did not have permission to pawn the stolen
camera, which was valued at between six thousand and sixty-five
hundred dollars. S.F. Trial, Volume 31, testimony of Robert L.
Bridgman, at pp. 141-45.  The employee of the pawn shop where
petitioner pawned the stolen camera for forty dollars identified
petitioner as the person who pawned the specialized camera on
April 17, 1999. S.F. Trial, Volume 31, testimony of Manuel
Martinez, at pp. 145-50.  The pawn ticket issued to petitioner
for the camera contained petitioner's Texas driver's license
number. S.F. Trial, Volume 31, testimony of Brad Yuchinski, at
pp. 151-53.  The fingerprints found on the stolen vehicle matched
petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at
pp. 218-19.

[44] A pair of loss prevention employees of J.C. Penney at
Ingram Park Mall testified (1) regarding their observation of
facts which led them to suspect petitioner's theft of a seventy-
five dollar pair of tennis shoes, (2) they followed petitioner
outside the Mall and approached petitioner, (3) when they asked
petitioner to return the merchandise, petitioner threw the stolen
tennis shoes down and attempted to run off, but (4) they managed
to detain petitioner until police arrived to arrest petitioner.
S.F. Trial, Volume 32, testimony of Clint Frerich, at pp. 57-61;
testimony of Harry Riffle, at pp. 61-65.

(19) petitioner's July 1, 1999 unauthorized use of a motor

vehicle and the ensuing high speed chase through a residential

community,[45] (20) petitioner's July 6, 2000 escape from custody

following arrest and the extensive search leading to petitioner's

re-arrest on outstanding warrants,[46] (21) petitioner's burglary

of a vehicle on October 16, 2000,[47] (22) petitioner's October 31,

---

[45] Two San Antonio Police Officers testified regarding (1) their unsuccessful efforts to stop a stolen vehicle driven by petitioner as the petitioner raced through stop signs in a residential neighborhood at speeds of forty to fifty miles per hour, (2) petitioner's crashing into another occupied vehicle during the chase, (3) petitioner's wrecking the stolen vehicle by driving it into a rock wall, and (4) the subsequent foot chase that resulted in petitioner's arrest. S.F. Trial, Volume 31, testimony of Lloyd Lopez, at pp. 153-61; testimony of Ramiro Escamilla, at pp. 162-67.

[46] Two San Antonio Police Officers testified regarding (1) petitioner's arrest on that date on outstanding warrants, (2) petitioner's efforts to resist that initial arrest, (3) the discovery of a CD player and many country western CD's wrapped in a pair of jeans under the car seat near where petitioner had been sitting prior to his arrest, (4) petitioner's haughty demeanor when he presented the officer with a TDCJ identity card, (5) petitioner's escape from the back seat of a patrol car, (6) the helicopter and police canine search that ensued and resulted in petitioner's apprehension in a stairwell of a nearby apartment complex. S.F. Trial, Volume 32, testimony of Kenneth Mahl, at pp. 83-100; testimony of James Fiste, at pp. 101-06.

[47] The owner of a car parked in the Sunflower apartment complex testified (1) his vehicle was burglarized that date, along with several others in the same complex, (2) his car stereo was torn out, and (3) a pair of his sunglasses was also taken. S.F. Trial, Volume 32, testimony of Michael Ortega, at pp. 33-36. A San Antonio Police evidence technician testified she lifted latent fingerprints off the vehicle from which the items in question were stolen. S.F. Trial, Volume 32, testimony of Sandra Mahoney Rangel, at pp. 36-39.  The fingerprints in question matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 219.

2000 arrest on charges of driving while under the influence,
without a valid driver's license or proof of insurance, and
possession of marijuana,[48] (23) petitioner's burglaries, with
others, of several vehicles in the same apartment complex on
November 29, 2000 and the ensuing high speed chase that led to
petitioner's arrest and subsequent written confession that he had
burglarized three vehicles,[49] (24) petitioner's January 9, 2001

---

[48] A pair of Alamo Heights Police Officers testified
regarding (1) a traffic stop of a vehicle driven by petitioner
for speeding and having no tail lights, (2) the discovery of a
distinct odor of alcohol on petitioner's breath, (3) petitioner's
failure of a field sobriety test, (4) petitioner's arrest and the
discovery of a bag of marijuana in petitioner's pocket, and (5)
petitioner's assertion during his booking that he was a member of
the Spanish Gangsters street gang. S.F. Trial, Volume 32,
testimony of Cindy Pruitt, at pp. 71-80; testimony of James
Mosman, at pp. 80-83.

[49] The owners of several vehicles at the Deerfield apartment
complex testified regarding the burglary of their vehicles on
that date. S.F. Trial, Volume 32, testimony of Carlos Garza, at
pp. 160-73; testimony of Robert Harris, at pp. 192-97; testimony
of Kelly Joseph Mann, at pp. 206-09.  One of the victims also
testified he followed the suspect vehicle in which he had seen
the car burglars depart the apartment complex and the burglars'
vehicle reached speeds of eight miles per hour before he was able
to flag down a Castle Hills Police Officer who later stopped the
suspect vehicle. S.F. Trial, Volume 32, testimony of Carlos
Garza, at pp. 162-70.  A Castle Hills Police Officer and San
Antonio Police Officer each testified petitioner gave a false
name when arrested and that much property was found inside the
suspect vehicle. S.F. Trial, Volume 32, testimony of Russell
King, at pp. 180-86; testimony of Christopher Lutton, at pp. 187-
91.  A San Antonio Police Detective testified the petitioner gave
a written statement in connection with the November 29, 2000 car
burglaries, which was admitted into evidence at petitioner's
trial as State Exhibit no. 189, in which petitioner confessed to
having broken into three of the vehicles. S.F. Trial, Volume 32,
testimony of Elizabeth Greiner, at pp. 197-203.

burglary of a vehicle,[50] and (25) petitioner's second burglary on January 24, 2001 of one of the same vehicles he had burglarized on November 29, 2000.[51]

The prosecution also presented documentary evidence establishing the petitioner had been convicted on separate occasions of multiple charges of unauthorized use of a motor vehicle, as well as charges of theft, escape, evading arrest, theft, criminal mischief, resisting arrest, and unlawfully carrying a weapon.[52]   A copy of petitioner's juvenile conviction

---

[50] The father of the owner of a vehicle testified (1) his son's vehicle was burglarized on that date and a car stereo and clothing bag were taken and (2) his son's vehicle was fingerprinted. S.F. Trial, Volume 32, testimony of Alfredo Uballe, at pp. 65-68.   A San Antonio Police evidence technician testified he lifted latent fingerprints from the vehicle in question. S.F. trial, Volume 32, testimony of Scott Coonradt, at pp. 68-70.   A fingerprint examiner testified the prints were petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 219.

[51] The same black Plymouth petitioner burglarized on November 29, 2000 was again burglarized on January 24, 2001 and fingerprints were left in the vehicle, from which the same two items were stolen, i.e., a car stereo speaker box and amplifier. S.F. Trial, Volume 32, testimony of Kelly Joseph Mann, at pp. 210-11.   A San Antonio Police Detective testified he lifted latent fingerprints from the driver's door of the vehicle following the January 24, 2001 burglary. S.F. Trial, Volume 32, testimony of Richard Sanchez, at pp. 203-06.   A fingerprint examiner testified the latent prints matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 220.

[52] S.F. Trial, Volume 32, testimony of Vernon Ginn, at pp. 222-26; and State Exhibit nos. 190-98 (found in S.F. Trial, Volume 37).

records was also admitted into evidence, along with a complete

copy of petitioner's Texas Youth Commission file.[53]

_____

[53] S.F. Trial, Volume 33, at p. 66 (admitted as State
Exhibit no. 200).
     Petitioner's Texas Youth Commission file was admitted into
evidence as State Exhibit no. 188 and is found in S.F. Trial,
Volume 36.  Among the significant documents in this voluminous
trial exhibit are (1) a report prepared in December, 1997 by the
program administrator at the Turman House suggesting petitioner
remains a significant threat to public safety, (2) a June, 1996
report noting petitioner's history of abuse by his father,
petitioner's gang involvement, and petitioner's estrangement from
his mother, (3) a June, 1996 report by a Bexar County juvenile
probation officer which includes a detailed educational and
family history for petitioner, a lengthy list of petitioner's
juvenile criminal behavior, and concludes petitioner can be
adequately handled within the juvenile justice system, (4) a
July, 1996 individual case plan assessment which reports that
petitioner has had authority problems with teachers, "was often
in trouble for fighting with peers," has been involved with
street gangs, and reported that "money and prestige motivated him
to engage in criminal activity," (5) documents from a November,
1997 TYC hearing at which petitioner was adjudged guilty of two
counts of possession of a weapon, (6) a report detailing
petitioner's October, 1997 arrest for possession of three knives
and a screwdriver while on a high school campus, (7) a December,
1997 psychological evaluation prepared by a Dr. Ben Furgeson
which (a) describes petitioner's father as physically abusive
toward both petitioner and his mother, (b) describes petitioner's
family environment as "abusive, non-supporting, and rejecting,"
(c) describes petitioner as negative toward authority, having
difficulty internalizing society's norms and values, impulsive,
unfriendly, antisocial, and not very industrious, and (d)
attributes petitioner's antisocial behavior to petitioner's gang
involvement and conduct disorder, adolescent onset, and (8) a
June, 1996 psychological evaluation performed by Dr. Roger
Sherman which states, in part, that (a) petitioner reported his
father abused petitioner when petitioner's father was on drugs,
(b) petitioner's intellectual functioning is in the high end of
the low average range, (c) petitioner's psychological profile was
consistent with that of a person who "is likely to have ongoing,
serious problems with norm violations," (d) suggests petitioner
would benefit from gaining an increased sense of responsibility
for his behavior, (d) petitioner exhibits little interest in
others, may lack coping skills, may have difficulty meeting the

A San Antonio Police Officer testified that, following petitioner's arrest on February 4, 2001, he observed petitioner displaying a cocky demeanor and saw petitioner make a slashing gesture across his neck and flashing gang signs.[54]

2.   The Defense's Evidence

Petitioner's uncle (the brother of petitioner's mother) testified, in pertinent part, that (1) he was close to petitioner while petitioner was young, (2) petitioner was a good student in elementary school, (3) petitioner's mother was "always a good mother," (4) petitioner's father was sent to prison and was never around when petitioner was growing up, (5) petitioner continued to do well in school even after his father went to prison, (6) petitioner's father died from an overdose of heroin after being released from prison, (7) he never saw petitioner's father use drugs in front of petitioner or the other children, (8) petitioner was not trying to impress people or imitate his father by stealing cars, (9) he heard a little bit about abuse by petitioner's father, (10) petitioner's mother was a good person who raised her children correctly, made sure her children had

---

demands of daily life, and may have problems with control and in interpersonal relationships, and (e) once again gives a diagnosis of conduct disorder, adolescent onset. S.F. Trial, Volume 36, State Exhibit no. 188, at pp. 5, 45-57, 60-65, 163-64, 193-95, 208, 296-99, 304-11.

[54] S.F. Trial, Volume 31, testimony of Joel Contreras, at pp. 168-70.

food when they were hungry and a roof over their heads, (11)
petitioner had "every advantage from his mother that a child
could have," (12) he was proud of his sister's efforts to raise
her children, and (13) he had been to prison himself but was the
only adult male in petitioner's life other than petitioner's
father.[55]

Petitioner's older sister testified, in pertinent part, that
(1) their mother was good but their father was not good, (2)
their father was very abusive toward their mother, (3) their
father was verbally and physically abusive toward her and
petitioner, (4) their father sexually abused her when she was
seven years old and the petitioner was "poisoned" when she told
petitioner what their father had done to her, (5) their father
went to prison twice when they were growing up and did not live
with their family after he was released the second time, (6)
petitioner had to repeat the seventh grade but was a good
student, (7) petitioner had no adult male role models, (8) two or
three relatives of their mother went to prison, all of their
father's brothers went to prison, but their mother has never been
to prison, (9) their father died of a drug overdose and
petitioner took his death very hard, (10) petitioner was very
peaceful when in custody in the Texas Youth Commission and in

---

[55] S.F. Trial, Volume 33, testimony of Louis Garza, at pp.
26-40.

state prison, (11) petitioner knows the difference between right and wrong and would not be a danger to society if given a sentence of life imprisonment, and (12) she had no knowledge regarding the details of petitioner's criminal record.[56]

Petitioner's mother testified, in pertinent part, that (1) she was eighteen when petitioner was born, (2) their family moved at least once a year because petitioner's father was using drugs, (3) petitioner's father did drugs (heroin) in front of their children, (4) petitioner's father was not a good provider or a good husband and was physically abusive toward their children, striking petitioner often, (5) petitioner's father wnet to prison four or five times, (6) petitioner was hurt when his father was released from prison but did not live with their family, (7) petitioner had to repeat the seventh grade but was a good student, (8) petitioner began acting out and hurting himself when his father died, (9) petitioner wanted more than she could furnish or provide, (10) petitioner was peaceful when incarcerated and would not be a danger to society if imprisoned, (11) petitioner attended a lot of elementary schools, (12) she had no knowledge of petitioner using drugs, and (13) she filed a

---

[56] S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41-54.

29

formal complaint with Child Protective Services after she learned her husband had sexually abused their daughter.[57]

3.   The Verdict

On October 29, 2002, after deliberating just over two and a half hours, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all the evidence, including the circumstances of the offense and the petitioner's character and personal moral culpability, there were not sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[58]   The state trial court imposed sentence in accordance with the verdict.[59]

---

[57] S.F. Trial, Volume 33, testimony of Maria Gonzalez, at pp. 54-61.

[58] S.F. Trial, Volume 33, at pp. 110-11; Trial Transcript, at pp. 225-26.  The petitioner's jury began its punishment phase deliberations at approximately 2:51 p.m. and returned its verdict at approximately 5:33 p.m. that same date. S.F. trial, Volume 33, at pp. 107-10.

[59] S.F. Trial, Volume 33, at p. 113.

F.   Direct Appeal

Petitioner appealed his conviction and sentence, asserting

six points of error.[60]   The Texas Court of Criminal Appeals

affirmed petitioner's conviction and sentence in an unpublished

opinion. *Garza v. State*, AP 74,467, 2005 WL 395442 (Tex. Crim.

App. February 16, 2005).   Petitioner did not thereafter seek

certiorari review of his conviction or sentence from the United

States Supreme Court.

G.   First State Habeas Corpus Proceeding

On October 25, 2004, petitioner filed his first state habeas

corpus application, urging thirteen claims therein.[61]

_____

[60] Petitioner's appellant's brief included points of error
arguing that (1) the trial court erred in relieving petitioner's
first lead trial counsel on the eve of voir dire, (2) the trial
court erred in refusing to permit prosecution witness Erica
Henderson to testify that she believed the shooting may have been
accidental, (3) the trial court erred in admitting gruesome
photographs taken during Riojas' autopsy, (4) the trial court
erred in excluding petitioner's proffered testimony regarding
previous acts of violence by Riojas, (5) the trial court erred in
failing to instruct the jury regarding the lesser-included
offense of manslaughter, and (6) the aggravating factors
contained in the Texas capital sentencing scheme are
unconstitutionally vague.   Attorney Michael C. Gross signed
petitioner's appellant's brief.

[61] As grounds for relief in his first state habeas corpus
application, petitioner argued (1) the state trial court
erroneously removed petitioner's first lead trial counsel, (2)
the trial court erred in refusing to permit petitioner to cross-
examine prosecution witness Erica Henderson regarding her opinion
as to whether petitioner's fatal shooting of Riojas might have
been accidental, (3) the trial court erred in refusing to permit
petitioner to introduce evidence showing Riojas' character for
violence, (4) petitioner's trial counsel rendered ineffective
assistance by failing to (a) call a defense investigator to

31

The state habeas trial court held an evidentiary hearing in petitioner's first state habeas corpus proceeding on March 24, 2008, March 31, 2008, and April 23, 2008 during which the parties presented the testimony of petitioner's paternal uncle Raul Gonzales, Jr., clinical psychologist Dr. Jack Ferrell, petitioner's co-counsel at trial - attorney Ed Camara,

---

contradict the trial testimony of Erica Henderson, (b) introduce petitioner's medical records, and (c) adequately investigate petitioner's background and introduce mitigating evidence of petitioner's troubled childhood, (5) the Texas capital sentencing scheme contains vague aggravating factors, (6) proportionality review of all capital sentences is constitutionally required, (7) the Texas capital sentencing scheme unconstitutionally fails to assign a burden of proof to the mitigating evidence special issue, (8) the Texas capital sentencing scheme unconstitutionally fails to advise sentencing jurors regarding the effect of a single holdout juror, (9) the inability of juries to accurately predict future dangerousness renders the Texas capital sentencing scheme's future dangerousness special issue unconstitutional, and (10) the death penalty as currently administered in Texas violates the Eighth Amendment. First State Habeas Transcript, at pp. 1-108.

Petitioner attached to his first state habeas corpus application copies of (1) the final judgment from his state criminal proceeding, (2) an affidavit from Jeffrey S. Mitchel (former court-appointed investigator), (3) a psychological evaluation performed on petitioner around age fifteen dated June 19, 1996, (4) a series of probation reports on petitioner dated June 20, 1996, July 11, 1994, September 20, 1995, and September 3, 1997, (5) an affidavit from a clinical psychologist, Dr. Jack Ferrell, dated October 21, 2004, (6) an affidavit by another clinical psychologist (Dr. Susana A. Rosin) dated October 19, 2004, (7) a report from Dr. Katherine Allen, a sociologist, dated October 19, 2004, (8) an affidavit and accompanying correspondence from petitioner's trial counsel's mitigation expert (Ann Matthews), (9) an affidavit from one of petitioner's paternal uncles (Raul Gonzales, Jr.), and (10) affidavit from a retired TDCJ official (Larry Fitzgerald). First State Habeas Transcript, at pp. 111-198.

Attorney Suzanne Kramer signed petitioner's first state habeas corpus application.

32

sociologist Dr. Katherine Allen, and petitioner's lead trial counsel - attorney Vincent D. Callahan.

In an Order issued September 22, 2008, the state habeas trial court issued its findings of fact and conclusions of law and recommended that petitioner's first state habeas corpus application be denied.[62]

The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied state habeas relief in an unpublished order. *Ex parte Manuel Garza*, WR-70,797-01, 2008 WL 5245545 (Tex. Crim. App. December 17, 2008).

H.   <u>Initial Proceedings in this Court</u>

On December 16, 2009, petitioner filed his original petition for federal habeas corpus relief in this Court, along with a voluminous set of exhibits thereto. *Docket entry nos. 11-12*.

On January 7, 2010, petitioner filed a motion to stay, requesting abeyance of proceedings in this Court to permit petitioner to return to state court and exhaust state habeas corpus remedies on a variety of new claims and new evidence never previously presented to any state court. *Docket entry no. 13*. This Court granted that request in an Order issued February 18, 2010. *Docket entry no. 17*.

---

[62] First State Habeas Transcript, at pp. 201-38.

I.    <u>Second State Habeas Corpus Proceeding</u>

On June 17, 2010, petitioner filed his second state habeas corpus application.[63]

The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application "as an abuse of the writ without considering the merits of the claims." *Ex parte Manuel*

---

[63] As grounds for relief in his second state habeas corpus proceeding, this time represented by attorney Michael C. Gross, petitioner argued (1) the removal of petitioner's original lead trial counsel deprived petitioner of due process, (2) petitioner was denied the right to cross-examine prosecution witness Erica Henderson regarding her opinion as to whether the petitioner's fatal shooting of Riojas might have been accidental, (3) petitioner's trial counsel rendered ineffective assistance by failing to (a) adequately voir dire the jury venire regarding the death penalty, (b) adequately investigate and present mitigating evidence showing petitioner suffers from fetal alcohol syndrome arising from his mother's heroin use, (c) call investigator Jeff Mitchel to contradict Erica Henderson, and (d) introduce hospital records showing that petitioner sustained injuries, (4) the trial court erred in refusing to permit the defense to present evidence showing Riojas' character for violence, (5) the Texas capital sentencing scheme's aggravating factors fail to channel the jury's discretion because they lack definitions, (6) due process requires proportionality review of capital sentences, (7) the absence of an assigned burden of proof on the mitigating evidence special issue renders the Texas capital sentencing scheme unconstitutional, (8) the failure of the Texas capital sentencing scheme to advise jurors of the impact of a single holdout juror violates the Constitution, and (9) juries are incapable of predicting future dangerousness. Second State Habeas Transcript, at pp. 244-413.
Petitioner attached to his second state habeas corpus application a voluminous set of exhibits, including a new affidavit from clinical psychologist Dr. Jack Ferrell, a new affidavit from mitigation specialist Gerald Byington, and a host of new affidavits from various members of petitioner's family which had not previously been presented to any state court. Second State Habeas Transcript, at pp. 782-1811.

*Garza*, WR 70,797-02, 2011 WL 4826968 (Tex. Crim. App. October 12, 2011).

J.   Return to this Court

On January 26, 2012, petitioner filed his amended federal habeas corpus petition together with all of the voluminous documents he had attached to his second state habeas corpus application. *Docket entry nos. 29-30.*

On March 26, 2012, respondent filed his answer to petitioner's amended petition, arguing in part that petitioner had procedurally defaulted on a portion of petitioner's ineffective assistance claims by failing to raise same in the state courts until petitioner's second state habeas corpus proceeding. *Docket entry no. 31.*

## II. Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

35

clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does

not, *per se*, establish the state court's decision is "contrary
to" clearly established federal law: "the state court need not
even be aware of our precedents, 'so long as neither the
reasoning nor the result of the state-court decisions contradicts
them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal
habeas court may grant relief if the state court identifies the
correct governing legal principle from the Supreme Court's
decisions but unreasonably applies that principle to the facts of
the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125
S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct.
2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making
the "unreasonable application" inquiry should ask whether the
state court's application of clearly established federal law was
"objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, ___,
130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas
court can only set aside a state-court decision as 'an
unreasonable application of...clearly established Federal law,' §
2254(d)(1), if the state court's application of that law is
'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-
21, 123 S.Ct. at 2535. The focus of this inquiry is on whether
the state court's application of clearly established federal law
was objectively unreasonable; an "unreasonable" application is
different from a merely "incorrect" one. *Schriro v. Landrigan*,

37

550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has recently explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state

38

court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

39

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at ___, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S.Ct. 124, 181 L.Ed.2d 46 (2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same),

41

*cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d
142, 148 (5th Cir. 2003)(holding the precise question before a
federal habeas court in reviewing a state court's rejection on
the merits of an ineffective assistance claim is whether the
state court's ultimate conclusion was objectively reasonable),
*cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d
382, 390 (5th Cir. 2003)(holding a federal habeas court reviews
only a state court's decision and not the opinion explaining that
decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en
banc*)(holding a federal court is authorized by §2254(d) to review
only a state court's decision and not the written opinion
explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. <u>Removal of Lead Trial Counsel</u>

A. <u>The Claim</u>

In his first claim for relief in his amended petition
herein, petitioner argues the state trial court's "removal" over
petitioner's objection of petitioner's original lead trial
counsel practically on the eve of voir dire violated the Sixth
and Fourteenth Amendments.[64]

---

[64] Amended Petition for Writ of Habeas Corpus by a Person in
State Custody, filed January 26, 2012, docket entry no. 29
(henceforth "Amended Petition"), at pp. 38-44.

B.   Underline State Court Disposition

Petitioner presented a primarily state-law version of this same complaint to the Texas Court of criminal Appeals as point of error number one in his direct appeal.[65]  The Texas Court of Criminal Appeals rejected this state-law argument on the merits. *Garza v. State*, 2005 WL 395442, at *1-*2.

Petitioner re-urged the same arguments, relying upon both state and federal constitutional authorities, as his first ground for relief in his first state habeas corpus application.[66]  The state habeas trial court concluded petitioner had procedurally defaulted on this new claim, to the extent this claim was different from petitioner's similar complaint on direct appeal (i.e., relied upon federal authorities), by failing to present the new legal theories underlying this claim on direct appeal.[67] The Texas Court of Criminal Appeals adopted these conclusions when it denied relief in petitioner's first state habeas corpus proceeding. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented an even more federalized version of this same complaint in his second state habeas corpus

---

[65] Brief for the Appellant, at pp. 8-13.

[66] First State Habeas Transcript, at pp. 5-11.

[67] First State Habeas Transcript, at p. 223.

43

application.[68]   The Texas Court of Criminal Appeals dismissed this application under state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

C.   Applicable Federal Law

"The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.  'A defendant may not insist on representation by an attorney he cannot afford.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989)(*quoting Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988)).  "Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of...counsel.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. at 626, 109 S.Ct. at 2652.  "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Id.*

---

[68] Second State Habeas Transcript, at pp. 296-92.

The right to counsel of choice does not extend to defendants who require counsel to be appointed for them. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151, 126 S.Ct. 2557, 2655, 165 L.Ed.2d 409 (2006).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that

45

the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, __, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009); *Strickland v. Washington*, 466 U.S. at 688-89, 104 S.Ct. at 2065.  It is strongly presumed  counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

    To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the

proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id*.

In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided the same day as *Strickland*, the Supreme Court held a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047.  As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)(defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)(no individual attorney was

47

appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U.S. at 659-61, 104 S.Ct. at 2047-48.  In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U.S. at 661 n.31, 104 S.Ct. at 2048 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697-98, 122 S.Ct. at 1851-52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).  Simply put, garden variety ineffective assistance claims of the nature

48

asserted by petitioner herein do not warrant application of the presumption of prejudice recognized in *Cronic*.

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003)("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002)(holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002)(holding the same), *cert. denied*, 537 U.S. 975 (2002); *Burdine v. Johnson*, 262 F.3d 336, 344 n.4 (5th Cir. 2001)(holding the same), *cert. denied*, 535 U.S. 1120 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000)("'A constructive denial of counsel occurs in only a very narrow

49

spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing."(*citations and footnote omitted*)).

D.    <u>AEDPA Analysis & *De Novo* Review of Federal Claims</u>

   1.    <u>The Undisputed Facts</u>

   Petitioner was represented at all times relevant to his capital murder charge by two court-appointed trial attorneys. One of those attorneys, Ed Camara, was appointed in February, 2001 and represented petitioner throughout petitioner's trial court proceedings.[69]  Attorney Raymond Fuchs, also appointed in February, 2001, was granted permission to withdraw from petitioner's representation on July 11, 2002.[70]  The state trial court appointed attorney Vincent D. Callahan to represent petitioner (and replace attorney Fuchs) on July 19, 2002.[71]

_____

   [69] Trial Transcript, at p. 14.

   [70] Trial Transcript, at pp. 13, 75-76.

   [71] Trial Transcript, at p. 35.

A *Jackson v. Denno* hearing on petitioner's motion to suppress and a hearing on other pretrial motions was held on August 29, 2002, during which both attorneys Callahan and Camara represented petitioner.[72]  General voir dire of the jury venire took place the following date, i.e., on August 30, 2002, again with both attorneys Camara and Callahan representing petitioner.[73] Individual voir dire commenced September 16, 2002 and continued thereafter, once more with both attorneys Callahan and Camara representing petitioner.  Save for the period between July 11 and July 19, 2002, petitioner was represented at all times relevant to petitioner's capital murder trial by two court-appointed attorneys.  Attorney Camara continuously represented petitioner from February, 2001 (more than six weeks prior to petitioner's indictment) throughout petitioner's capital murder trial.  Thus, at no point during the trial court capital murder proceeding against petitioner was petitioner denied legal representation.

    2.   State Law Claims Do Not Warrant Federal Habeas Relief

Insofar as petitioner's first claim herein relies upon alleged violations of petitioner's state procedural or state constitutional rights in connection with the state trial court's replacement of attorney Fuchs with attorney Callahan, that claim

------

[72] S.F. Trial, Volume 2, at pp. 3-153.

[73] S.F. Trial, Volume 3, at pp. 3-26.

51

does not present a legitimate basis for federal habeas corpus relief.  Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law).  In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874.

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

3.   <u>Federal Constitutional Claims Without Merit</u>

Insofar as petitioner complains that he was denied legal representation in violation of the principle announced in *Gideon v. Wainwright*, 372 U.S. 335, 342-45, 795-97, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)(holding Sixth Amendment was violated when state court refused to appoint counsel to represent indigent criminal defendant in a non-capital felony case), that complaint lacks any arguable merit.  As was explained above, petitioner was represented by at least one court-appointed counsel at all times throughout petitioner's capital murder proceeding and, save for an eight-day period in July, 2002, was represented by two experienced criminal defense counsel.  Petitioner's argument that he was deprived of counsel during a critical juncture in his state criminal proceeding is refuted by even a cursory review of the petitioner's trial court records and utterly without arguable merit.

Petitioner's reliance on *Cronic* is likewise unavailing.  As was explained above, the presumed prejudice principle of *Cronic* arises only in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely

could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047.

The first of these three situations clearly does not apply to petitioner.

Petitioner's complaints about the performance of his trial counsel (detailed in petitioner's third claim herein) do not rise above the garden-variety type of complaints of ineffective assistance which must be evaluated under *Strickland's* dual prongs. *See Bell v. Cone*, 535 U.S. at 697-98, 122 S.Ct. at 1851-52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding); *United States v. Griffin*, 324 F.3d at 364 ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d at 718 (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense).

Finally, petitioner has alleged no facts showing the circumstances of his capital murder trial were such as to render it impossible for his two, court-appointed, trial counsel to adequately represent petitioner within the parameters set forth in *Strickland* and *Cronic*.  Attorney Callahan replaced attorney Fuchs more than a month before the pretrial hearing in petitioner's capital murder trial and almost two months before individual voir dire began.  Under such circumstances, petitioner is not entitled to the presumption of prejudice recognized in *Cronic. Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing).

Petitioner's complaints about the substitution of attorney Fuchs by attorney Callahan do not implicate the Sixth Amendment's right to counsel of one's choosing. *United States v. Gonzalez-Lopez*, 548 U.S. at 151, 126 S.Ct. at 2655.

E.   <u>Conclusions</u>

The Texas Court of Criminal Appeals' rejection on the permits of petitioner's primarily state-law complaints about the replacement of attorney Fuchs by attorney Callahan during the course of petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

55

States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state court proceeding.

Furthermore, having examined *de novo* petitioner's federal constitutional arguments in support of his initial claim herein, which federal claims petitioner raised for the first time in his state habeas corpus proceedings and were summarily dismissed by the state habeas court, this Court concludes that because petitioner's federal constitutional complaints based upon *Gideon v. Wainwright* and *Cronic* (which the state habeas court summarily dismissed in the course of petitioner's first and second state habeas corpus proceedings) lack any arguable merit, petitioner's first ground for relief herein does not warrant federal habeas corpus relief.

## IV. <u>Ineffective Assistance Claims</u>

A.   <u>The Claims</u>

In his third ground for relief herein, petitioner argues that his trial counsel rendered ineffective assistance in violation of the Sixth Amendment by failing to (1) adequately voir dire the jury venire regarding their views on the death penalty, (2) adequately investigate petitioner's background and present available mitigating evidence, (3) call the defense team's investigator as a witness to contradict prosecution