witness Erica Henderson, and (4) introduce petitioner's hospital records to show petitioner suffered facial injuries in his confrontation with Riojas.[74]

B.   State Court Disposition

Petitioner presented his third and fourth assertions of ineffective assistance in his third claim herein (i.e., failing to introduce petitioner's hospital records or call the defense investigator to testify), and an abridged version of his second assertion of ineffective assistance herein (i.e., inadequate mitigation investigation), to the state court in his first state habeas corpus application.[75]  In the course of its findings of fact and conclusions of law in petitioner's first state habeas corpus proceeding, the state habeas trial court concluded, in pertinent part, that (1) there was no evidence before it showing any of the injuries reflected in the medical records had been caused by Riojas,[76] (2) the evidence at trial did not raise the issue of self-defense under applicable state law,[77] (3) the hospital records showing petitioner's injuries would not have

---

[74] Amended Petition, at pp. 54-106.

[75] First State Habeas Transcript, at pp. 22-38.

[76] First State Habeas Transcript, at p. 228.

[77] *Id.*

57

been admissible at petitioner's capital murder trial,[78] (4) there was no evidence showing the defense investigator (Jeff Mitchel) was available to testify at petitioner's trial,[79] (5) Erica Henderson admitted she told one of petitioner's defense attorneys that the fatal shooting might have been accidental,[80] (6) as a result, the petitioner's defense counsel could not have introduced extrinsic evidence that she had made the same statement,[81] (7) the testimony of petitioner's paternal uncle Raul Gonzales would have added nothing of substance to the testimony furnished by petitioner's three other family members who did testify during the punishment phase of petitioner's capital murder trial,[82] (8) Raul Gonzalez's many criminal convictions would have undermined any benefit from his testimony at trial,[83] (9) there was no evidence establishing that Dr. Allen was available to testify at petitioner's capital murder trial,[84] (10) Dr. Allen's opinions expressed during the state habeas corpus hearing were based solely upon her view of record and not upon

---

[78] *Id.*

[79] *Id.*, at p. 227.

[80] *Id.*

[81] *Id.*

[82] *Id.*, at p. 230.

[83] *Id.*

[84] *Id.*, at p. 230.

any personal examination of petitioner,[85] (11) Dr. Allen's testimony strongly supported a conclusion that petitioner would engage in future violent acts,[86] and (12) Dr. Allen's testimony that petitioner was not properly diagnosed with social conduct disorder was not credible in light of the documentary evidence before the court regarding petitioner's background, including petitioner's documented misconduct while in custody.[87]  The Texas Court of Criminal Appeals adopted these findings and conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, WR 70,797-01, 2008 WL 5245545, at *1.

Petitioner presented the state habeas court with the same four ineffective assistance claims he presents in his third claim herein in his second state habeas corpus application.[88]  The Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application under state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

---

[85] *Id.*, at pp. 230-31.

[86] *Id.*, at p. 231.

[87] *Id.*, at pp. 231-32.

[88] Second State Habeas Transcript, at pp. 301-52.

C.   <u>Clearly Established Federal Law</u>

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, __, 130 S.Ct 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, 558 U.S. at ___, 130 S.Ct. at 16); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, __, 130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes*, 558 U.S. at ___, 130 S.Ct. at 386).

As was explained in Section III.C. above, the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064.

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

*Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, 558 U.S. at ___, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection

of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007), *stay denied*, 555 U.S. 1160 (2009); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

D.   <u>Procedural Default on Inadequate Voir Dire Complaint</u>

Respondent correctly points out that petitioner presented the Texas Court of Criminal Appeals with his first assertion of ineffective assistance herein, i.e., petitioner's complaint about the performance of his trial counsel during voir dire, in petitioner's second state habeas corpus application, which the state habeas court dismissed under state writ-abuse principles.

The Texas Court of Criminal Appeals' summary dismissal of petitioner's second state habeas corpus application (which included petitioner's first presentation of his initial assertion herein of ineffective assistance) on state writ-abuse principles constitutes a form of procedural default on same which bars federal habeas review of that claim. *See, e.g., Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("This court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar."), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2378, 173 L.Ed.2d 1299 (2009); *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005)(holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004)(holding the violation of the Texas writ-abuse rule

ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003(recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163 (2004).

The Supreme Court's recent holding in *Martinez v. Ryan*, ___ U.S. ___, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), affords petitioner no relief from his procedural default on his initial assertion of ineffective assistance herein.  In *Martinez*, the Supreme Court carved out of its procedural default jurisprudence a narrow exception for claims of ineffective assistance by trial counsel which were not raised in a convicted criminal defendant's first state habeas corpus proceeding because of the deficient performance of the defendant's state habeas counsel. *See Martinez v. Ryan*, ___ U.S. at ___, 132 S.Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default *of a claim of ineffective assistance at trial*).  For the reasons set forth hereinafter, there was nothing professionally deficient

64

about the failure of petitioner's first state habeas counsel to present this same complaint to the state habeas court in the course of petitioner's first state habeas corpus proceeding.

E.   Failure to Adequately Voir Dire the Jury Venire

   1.   The Complaint

Petitioner argues that his trial counsel failed to properly voir dire the jury venire regarding their views on the death penalty.[89]  For the reasons set forth herein, this Court alternatively concludes this complaint fails to satisfy either prong of *Strickland* analysis.

   2.   State Court Disposition

As explained above, however, petitioner did not present this specific complaint of ineffective assistance to the state courts until he included same in his second state habeas corpus application, which the Texas Court of Criminal Appeals summarily dismissed under state writ-abuse principles.

   3.   *De Novo* Review

Because no state court has ever addressed the merits of this aspect of petitioner's multi-faceted ineffective assistance claims herein, this Court's review of the merits of this complaint is necessarily *de novo*. *See Porter v. McCollum*, 558

---

[89] Amended Petition, at pp. 59-73.

U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

     a.  <u>No Deficient Performance</u>

Petitioner summarizes the voir dire examination of each of the twelve venire members who served as his petit jurors but does not recite any facts concerning the voir dire of the venire as a whole.  Significantly, petitioner has failed to furnish this Court with the juror questionnaires completed by the jury venire prior to the start of individual voir dire examination.  As this Court has explained previously, without access to the extensive juror questionnaires routinely employed in Bexar County capital cases, it is virtually impossible to properly evaluate the efforts of either the prosecution or criminal defense counsel to screen biased or unqualified venire members. *See Jasper v. Thaler*, 765 F.Supp.2d 783, 816 n.62 (W.D. Tex. 2011)(discussing the analytical hurdles to evaluating a *Batson* claim without access to the juror questionnaires completed by the venire

members whom the petitioner claimed had been improperly struck by the prosecution), *affirmed* 466 Fed. Appx. 425, 2012 WL 1449259 (5th Cir. April 26, 2012).  It is not an exaggeration to state that the extensive and detailed juror questionnaires routinely employed in Bexar County capital cases furnish the starting point for any objective analysis of the performance of either the prosecuting attorneys or defense counsel during voir dire in a capital case.

Petitioner's complaints about the performance of his trial counsel during voir dire do not furnish specific facts alleging objectively unreasonable conduct on the part of his trial counsel.  For instance, petitioner repeatedly complains that his trial counsel failed to object to the prosecution's explanations of the terms employed in the Texas capital sentencing special issues.[90]  Yet petitioner does not identify any legally valid objections his trial counsel could have made to the prosecution's explanations of the terms in question during voir dire examination of petitioner's jury venire.  Petitioner's trial counsel cannot reasonably be faulted for failing to make fruitless or meritless objections to the prosecution's voir dire questions. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009)(holding failure to raise a meritless objection  does not satisfy the deficient performance prong of *Strickland*), *cert.*

---

[90] Amended Petition, at pp. 62-72.

*denied*, ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2010);
*Wood v. Quarterman*, 508 F.3d 408, 413 (5th Cir. 2007)(failure to
raise futile or meritless objections is not ineffective
lawyering), *cert. denied*, 552 U.S. 1314 (2008); *Johnson v.
Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was
nothing deficient in counsel's failure to object to the admission
of psychiatric testimony that was admissible under then-existing
precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v.
Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient
regarding trial counsel's failure to seek admission of a document
the state court concluded was inadmissible), *cert. denied*, 526
U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.
1997)(failure to assert a meritless objection cannot be the
grounds for a finding of deficient performance), *cert. denied*,
525 U.S. 969 (1998).

Petitioner also faults his trial counsel for failing to
specifically question many of the venire members who served as
petitioner's petit jurors regarding their views on the death
penalty.[91]  Yet petitioner's own summary of the voir dire of his
petit jurors reveals that petitioner's trial counsel did, in
fact, question many of those same individuals regarding their
views on capital punishment.  Furthermore, petitioner's summary

---

[91] *Id.*

fails to make any reference to the answers these venire members gave on their written juror questionnaires and only briefly touches on the responses these same venire members gave to the prosecution's explanations and questions regarding the Texas capital sentencing special issues.  This Court's independent evaluation of the individual voir dire examination of petitioner's petit jurors reveals the prosecuting attorneys asked each of these venire members extensive questions regarding their views on the death penalty and made numerous references to the venire members' juror questionnaire answers.[92]  It is readily apparent from this Court's independent review of the individual

---

[92] The prosecution began its voir dire examination of the venire members who became petitioner's petit jurors by inquiring, usually through reference to their questionnaire answers, as to the venire member's views on capital punishment and, after explaining the burden of proof in criminal cases, the defendant's right to remain silent, and other substantive law and procedures applicable to the guilt-innocence phase of trial (such as the law in Texas regarding self-defense), then proceeded to explain the Texas capital sentencing special issues, which had also been discussed in the juror questionnaires. *See, e.g.,* S.F. Trial, Volume 4, voir dire examination of Hazel Mattsen Knipp, at pp. 15, 28-38; S.F. Trial, Volume 7, voir dire examination of Keven Wayne Weber, at pp. 94-95, 104-11; S.F. Trial, Volume 8, voir dire examination of Waring Lewis Worsham, at pp. 65-66, 80-88; S.F. Trial, Volume 9, voir dire examination of George Diaz Garza, at pp. 74-77, 92-104; S.F. Trial, Volume 10, voir dire examination of Charles Martin, at pp. 87-88, 107-12; S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 5-6, 19-28; S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 102-03, 121-30; S.F. Trial, Volume 14, voir dire examination of Robert Kravetz, at pp. 105-08; S.F. Trial, Volume 15, voir dire examination of Terry White, at pp. 83-85, 95-105; S.F. Trial, Volume 19, voir dire examination of Helen Clark Martin, at pp. 101-07, 122-34; S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at pp. 109, 124-34.

voir dire of petitioner's petit jurors that the questionnaire the venire members received and answered inquired extensively into the venire members' views on capital punishment.  Petitioner's trial counsel cannot reasonably be faulted for failing to make inquiries that would have been repetitive of the questions asked and answered on the jurors' questionnaire and during voir dire examination by the prosecution.

If petitioner wishes to attack the performance of his trial counsel during voir dire, petitioner must furnish this Court with specific facts showing why *in the context of the voir dire of the entire jury venire, including said counsels' review of the venire members' extensive juror questionnaire answers,* his trial counsel's efforts to identify disqualifying bias were objectively unreasonable.[93]  This, petitioner has failed to do.

---

[93] To reiterate Chief Judge Biery's admonition in his published opinion in *Jasper v. Thaler*, 765 F.Supp.2d at 816 n.62, a federal habeas corpus petitioner's failure to furnish this Court with a complete set of the questionnaires answered by the petitioner's jury venire effectively deprives this Court of the ability to intelligently determine whether a prosecutor has engaged in impermissibly suggestive or biased questioning of venire members for purposes of *Batson* analysis.  As this case so emphatically illustrates, the failure of petitioner to furnish this Court with the completed questionnaires filled out by petitioner's entire jury venire effectively derives this Court of the ability to rationally evaluate the performance of petitioner's trial counsel under the dual prongs of *Strickland* analysis, particularly under the objective reasonableness standard of the first prong of *Strickland*.  The objective reasonableness of the extent to which petitioner's trial counsel chose to question individual venire members regarding their views on the death penalty and other subjects necessarily turns, in

Petitioner admits that his trial counsel did, in fact, make challenges for cause against several of the venire members who served as petit jurors.[94]   This Court's independent review of the individual voir dire confirms this fact.[95]   This Court's

---

part, upon the answers those same venire members wrote on their juror questionnaires.   In the absence of the juror questionnaires filled out by the entire jury venire, petitioner has completely failed to carry his burden of proof regarding his Sixth Amendment complaint about the performance of his trial counsel during voir dire.

[94] Amended Petition, at pp. 67, 68, 72.

[95] Petitioner raised two challenges for cause to venire member Jimmy Phelps but, when additional questioning of Mr. Phelps by the court and prosecution resulted in the denials of those challenges, petitioner's trial counsel ultimately accepted venire member Phelps as the seventh petit juror. S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 133-40.
Petitioner's trial counsel also challenged venire member Manuel Pacheco ability to answer the future dangerousness special issue impartially based upon Mr. Pacheco's answers to the state trial court's questionnaire (which petitioner failed to provide to this Court), despite not questioning Mr. Pacheco on that point but the prosecution pointed out Mr. Pacheco had identified himself as only a "five" on a scale of one to ten regarding whether he would always impose the death penalty for a capital murder conviction and the trial court denied the challenge for cause. S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at pp. 138-41.   When Mr. Pacheco returned to the courtroom, the trial judge informed him that both parties had accepted him as a juror. *Id.*, at p. 141.
Petitioner also faults the performance of his trial counsel for failing to ask Mr. Pacheco questions regarding said venire member's views as to whether a conviction for capital murder, standing alone, would justify an affirmative finding as to future dangerousness.   Yet, every time petitioner's trial counsel attempted to ask similar questions to other members of the petitioner's jury venire, the venire members' answers convinced the trial court they possessed no disqualifying bias. *See note 98, infra.*   Petitioner does not allege any specific facts showing what answers Mr. Pacheco might have given had he been questioned further on this subject (beyond the information contained in his

71

independent review of the voir dire examination of petitioner's

petit jurors also reveals that petitioner's trial counsel did,

upon occasion, ask questions clearly designed to inquire into the

possibility the venire members might possess potentially

disqualifying bias.[96]

---

juror questionnaire answers).  Furthermore, absent identification
of exactly what information was actually contained in Mr.
Pacheco's juror questionnaire answers which suggested Mr. Pacheco
was biased in connection with the future dangerousness special
issue, petitioner's complaint about his trial counsel's failure
to further question Mr. Pacheco on this subject does not satisfy
the first prong of *Strickland* analysis.  The state trial judge,
who unlike this Court had access to Mr. Pacheco's juror
questionnaire answers, was convinced by the prosecution's
argument and denied petitioner's challenge for cause to Mr.
Pacheco.

[96] For instance, petitioner's trial counsel inquired of
venire member Weber regarding his questionnaire answer addressing
a situation in which a criminal defendant chose not to testify at
trial and his questionnaire answers on the burden of proof in a
criminal case. S.F. Trial, Volume 7, voir dire examination of
Kevin Wayne Weber, at pp. 120-21, 128-29.
    Petitioner's trial counsel asked venire member, and later
juror, Worsham about questionnaire answers he gave regarding his
willingness to serve as jury foreperson and his understanding of
the Texas Penal Code's provisions regarding self-defense. S.F.
Trial, Volume 8, voir dire examination of Waring Lewis Worsham,
at p. 93.
    Petitioner's trial counsel conducted a discussion with juror
Garza regarding his understanding of the Texas capital sentencing
special issues. S.F. Trial, Volume 9, voir dire examination of
George Diaz Garza, at pp. 106-12.
    Petitioner's trial counsel questioned another juror
regarding the venire member's answers to juror questionnaire
questions about his ability to be a fair and impartial juror,
that juror's arrest on a charge of carrying a sword in his
vehicle, and the juror's views on capital punishment. S.F. Trial,
Volume 10, voir dire examination of Charles Martin, at pp. 120-
25, 129-30, 140.
    Petitioner's trial counsel questioned other venire members
who ultimately served as petit jurors as well regarding their

Petitioner does complain that his trial counsel failed to adequately inquire of the venire members (1) if someone convicted of murder of a police officer would automatically be a future danger within the meaning of the first capital sentencing special issue, (2) if a conviction for the murder of a police officer and a finding of future dangerousness would cause the person to "not consider mitigating evidence," and (3) they would be able to consider and give effect to all relevant mitigating evidence offered by petitioner.[97]

In point of fact, however, at several points during the voir dire of the venire members who ultimately served as petitioner's petit jury, petitioner's trial counsel did make voir dire inquiry regarding whether a venire member felt that a conviction for capital murder, standing alone, would justify an affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue.[98]  Absent access to the venire

---

feelings about the death penalty. S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 35-36; Volume 13, voir direc examination of Jimmy Phelps, at pp. 132-33; Volume 15, voir dire examination of Terry White, at pp. 113-14; Volume 18, voir dire examination of Joel C. Link, at pp. 116-17, 119.

[97] Amended Petition, at p. 72.

[98] S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 133-35 (petitioner's trial counsel made a challenge for cause but further questioning by the prosecution demonstrated the venire member could answer the future dangerousness special issue negatively if the evidence showed same to be the case); Volume 15, voir dire examination of Terry White, at pp. 119-20 (voir dire questioning by petitioner's trial

members' juror questionnaires, this Court cannot determine intelligently whether it was objectively unreasonable for petitioner's trial counsel to have failed to ask the same or similar questions to all other members of the petitioner's jury venire.  It is entirely possible the other venire members' answers to the trial court's questionnaire may have rendered similar voir dire questions reasonably unnecessary.  Thus, petitioner has failed to carry his burden of showing it was objectively unreasonable for petitioner's trial counsel to have failed to ask each member of petitioner's petit jury voir dire questions regarding whether they would automatically answer the future dangerousness special issue affirmatively based solely upon a verdict of guilty on a capital murder charge.

As explained above, the prosecution carefully discussed the Texas capital sentencing special issues with almost every venire member who eventually served as a petit juror at petitioner's capital murder trial, including discussing the nature of mitigating evidence from the prosecution's perspective.[99]  Thus,

---

counsel revealed the venire member did not believe a conviction for capital murder should automatically result in a finding of future dangerousness); Volume 18, voir dire examination of Joel C. Link, at pp. 117-19 (questioning by petitioner's trial counsel revealed this venire member did not believe a capital murder conviction should automatically result in an affirmative finding of future dangerousness).

[99] *See note 92, supra.*

petitioner's trial counsel had the benefit of not only reading those venire members' juror questionnaire answers but also observing firsthand those potential jurors' demeanor and interaction with the prosecutor during the prosecutor's discussion of the nature of mitigating evidence.  Moreover, inquiries into whether a venire member would disregard the presence of mitigating evidence when answering the mitigation special issue would have had the potential to offend potential jurors by suggesting they might disregard the trial court's jury instructions foreseeable punishment-phase jury instructions and the plain language of the final capital sentencing special issue that the jury should consider "all the evidence" concerning the circumstances of the petitioner's offense and the petitioner's character, background, and personal moral culpability in answering that special issue.  Thus, there were objectively reasonable reasons why petitioner's trial counsel may have chosen not to ask potential jurors whether they would disregard mitigating evidence the defense planned to introduce at the punishment phase of trial.  Under the record currently before this Court, petitioner has failed to carry his burden of proving the failure of his trial counsel to ask either of these latter two questions during voir dire caused the performance of said counsel to fall below an objective level of reasonableness.

Finally, this Court's independent review of the voir dire examination of the petitioner's petit jurors reveals many objectively reasonable bases for most of the decisions by petitioner's trial counsel to accept those individuals as jurors. The first juror, Hazel Knipp, repeatedly described the burden of serving as a juror in a capital case as "a very serious thing," "a lot of responsibility," and "just overwhelming."[100]  Until questioned very thoroughly by the prosecution, the second juror displayed clear reluctance to participate in a process that would ultimately lead to a criminal defendant's death.[101]  The third and fourth jurors both said in response to questions by petitioner's trial counsel that they believed mercy was a part of their own personal morality.[102]  The fifth juror had a criminal conviction

---

[100] S.F. Trial, Volume 4, voir dire examination of Hazel Mattsen Knipp, at pp. 40-43.  Ms. Knipp also wept openly during her interrogation by the prosecution. *Id.*, at p. 40.  During examination by petitioner's trial counsel, Ms. Knipp insisted she would follow her own conscience during deliberations and would not allow the other jurors to sway her opinion based upon the evidence. *Id.*, at p. 48.  Petitioner's trial counsel could reasonably have believed Ms. Knipp would treat the capital murder charge against petitioner, as well as capital sentencing special issues, with great respect and would be reticent to return a verdict favorable to the prosecution absent strong evidence supporting same.

[101] S.F. Trial, Volume 7, voir dire examination of Kevin Wayne Weber, at pp. 111-16.  Mr. Weber described the death penalty as "not something I'm wild about" and agreed the capital sentencing process was "very serious." *Id.*, at pp. 112, 114-16,

[102] S.F. Trial, Volume 8, voir dire examination of Waring Lewis Worsham, at p. 100; Volume 9, voir dire examination of George Diaz Garza, at pp. 111-12.

for carrying a sword in his vehicle and insisted he could be fair and impartial in returning a verdict at both phases of a capital trial.[103]   The sixth juror was questioned extensively by both parties regarding her ability to remain fair during deliberations and base her verdict solely on the evidence but insisted she could remain fair.[104]   The seventh juror informed the prosecutor during voir dire that he did not believe either the jury or the State had the right to take a life but insisted he could follow the trial court's instructions regarding the law.[105]   The eighth juror informed the prosecutor during voir dire that he believed the legality of a police officer's conduct during an arrest was a critical aspect to a self-defense claim.[106]   The ninth juror expressed the view that the death penalty should be imposed in only the worst cases.[107]   The tenth juror, a gun owner, expressed a dislike for Glock pistols, stating he found them to be

---

[103] S.F. Trial, Volume 10, voir dire examination of Charles Martin, at pp. 88, 117-19, 124-25, 129-30.

[104] S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 5-6, 28, 35-36.

[105] S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 132, 135, 137-38.

[106] S.F. Trial, Volume 14, voir dire examination of Robert Kravetz, at pp. 105-08.  Mr. Kravetz's voir dire examination made clear he was favorably disposed to the defendant's position regarding the applicability of self-defense to the capital murder charge against petitioner. *Id.*

[107] S.F. Trial, Volume 15, voir dore examination of Terry White, at p. 83.

inaccurate weapons, and repeatedly asserted his ability to render a verdict based on the evidence, including a possible life sentence.[108]  The eleventh juror expressed a distinction in her mind between the culpability associated with a premeditated murder as opposed to a merely intentional murder.[109]  On his juror questionnaire, the twelfth juror apparently rated himself a "five" on a scale of one-to-ten regarding his willingness to always impose the death penalty.[110]  Thus, there were objectively reasonable reasons why petitioner's trial counsel chose to accept each of the foregoing venire members as jurors.

Each of the twelve persons asserted during their voir dire examination by the prosecution that they could follow the trial court's instructions regarding the Texas capital sentencing scheme's special issues and render a verdict based upon the evidence.  In such a context, this Court independently concludes the failure of petitioner's trial counsel to ask potentially offensive voir dire questions suggesting or implying that the venire member might willfully ignore the trial court's instructions or disregard the plain language of the mitigation

---

[108] S.F. Trial, Volume 19, voir dire examination of Joel C. Link, at pp. 103, 109-11, 117-19.

[109] S.F. Trial, Volume 19, voir dire examination of Helen Clark Martin, at pp. 103-05.

[110] S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at p. 139.

special issue commanding consideration of "all the evidence"
before the jury when answering the mitigation or *Penry* special
issue did not cause the performance of said counsel to fall below
an objective level of reasonableness.[111]

Having independently reviewed the voir dire examination of
all twelve members of petitioner's petit jury, and in light of
the limited record in this proceeding (i.e., the absence from the
record before this Court of the juror questionnaires completed by
all of the petitioner's venire members), this Court concludes
petitioner has failed to carry his burden of proving the
performance of his trial counsel during voir dire fell below an
objective level of reasonableness.

　　　　b.　<u>No Prejudice</u>

Petitioner alleges no specific facts showing that any of the
twelve persons who served as his petit jurors possessed any
disqualifying bias.  As this Court has explained on several

---

　　　[111] This is not to say that it would have been improper for
petitioner's trial counsel to inquire of venire members whether
they would be capable of giving consideration to different types
of potentially mitigating evidence which might be presented
during the punishment phase of a capital trial.  Such inquiries
would necessarily have had to be narrowly limited under Texas
law, however, to avoid efforts to commit a potential juror to
render a particular verdict based upon a particular set of
hypothetical facts. *See Sells v. State*, 121 S.W.3d 748, 755-757
(Tex. Crim. App.), *cert. denied*, 540 U.S. 986 (2003)
(distinguishing between permissible voir dire inquiries and
impermissible attempts to commit the juror to a particular
verdict based on particular facts).

occasions, the standard for determining the constitutional fitness of a capital sentencing juror is set forth in a series of Supreme Court opinions dating back several decades:

> In *Witherspoon v. Illinois*, 391 U.S. 510, 521-23, 88 S.Ct. 1770, 1776-77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  Rather, the Supreme Court held as follows:

>> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

> *Witherspoon v. Illinois*, 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21.

> In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

>> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.  The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

> *Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526.

> In *Adams*, the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

>> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain

80

circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *

[A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the 'guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon*.

The State could, consistently with *Witherspoon*, use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *

[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. * * * [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas*, 448 U.S. at 46-50, 100 S.Ct. at 2527-29 (citations omitted).

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852.  In *Wainwright v. Witt*, the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.*, 469 U.S. at 430-35, 105 S.Ct. at 855-58.

More recently, in *Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), the Supreme Court reviewed its *Witherspoon-Witt* line of opinions and identified the following "principles of relevance":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.  Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.  Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible.  Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. at 9, 127 S.Ct. at 2224 (*citations omitted*).

The Supreme Court emphasized the critical inquiry for *Witherspoon-Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown*, 551 U.S. at 16-17, 127 S.Ct. at 2228. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown*, 551 U.S. at 20, 127 S.Ct. at 2230 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. at 22, 127 S.Ct. at 2231.

*Bartee v. Quarterman*, 574 F.Supp.2d 624, 662-64 (W.D. Tex. 2008), *CoA denied*, 339 Fed. Appx. 429 (5th Cir. July 31, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1882, 176 L.Ed.2d 370 (2010).

Having independently reviewed the entirety of the voir dire examination of the twelve venire members who served as petitioner's petit jurors, this Court concludes none of those individuals were properly subject to challenges for cause based upon any disqualifying bias or demonstrated inability to set aside their personal opinions and render a verdict based solely upon the law and evidence. All of the jurors in question asserted they could set aside their personal views and render a verdict at both phases of petitioner's capital murder trial based solely upon the evidence and the law as defined by the trial court. The Constitution requires nothing more.

83

Furthermore, the evidence presented by the prosecution at the guilt-innocence phase of petitioner's capital murder trial was more than compelling, it was overwhelming.  Petitioner confessed in writing to fatally shooting officer Riojas while engaging in conduct which can most charitably be called a violent attempt to avoid apprehension.  At no point in his written statements did petitioner indicate he had made any attempt to surrender to officer Riojas.  On the contrary, petitioner's written statements are filled with petitioner's firm assertions that he did not want to be arrested despite petitioner's actual knowledge that warrants for his arrest were outstanding.  None of the eyewitnesses to the confrontation between petitioner and officer Riojas, including petitioner's long time friend Jamie Martinez, claimed to have seen Riojas strike petitioner in the face as petitioner claimed.  None of the relatives and friends with whom petitioner stayed in the days immediately after Riojas' fatal shooting heard petitioner claim that he shot Riojas in self-defense.  Finally, there is absolutely no evidence showing that, immediately after the shooting of Riojas, petitioner made any effort to obtain assistance for Riojas or to treat Riojas' injuries himself.  Thus, there is no reasonable probability a rational juror would have ever accepted petitioner's claim that his fatal shooting of Riojas was accidental.  Under such circumstances, there is no reasonable probability that, but for

any act or omission by petitioner's trial counsel during voir dire, the outcome of the guilt-innocence phase of petitioner's capital murder trial would have been any different.

All of petitioner's jurors indicated they understood the Texas capital sentencing special issues, could follow the trial court's instructions regarding same, and render a verdict based upon the evidence.[112]  The prosecution's evidence during the punishment phase of petitioner's capital murder trial included compelling evidence linking petitioner with no less than two dozen serious criminal offenses, both as a juvenile and adult, including multiple instances in which petitioner committed felonies while armed with a handgun and multiple episodes in which petitioner drove stolen vehicles in a reckless manner, showing a deliberate disregard for the safety of others on the road.  Petitioner's second written statement attempted to assign blame to officer Riojas for his own fatal shooting (despite petitioner's repeated insistence in his same written statements that he was determined not to permit officer Riojas to arrest him).  Thus, at no point in his written statements did petitioner express genuine contrition or remorse for his fatal shooting of officer Riojas.  On the contrary, several San Antonio Police officers testified without contradiction that, in the hours immediately following his arrest, petitioner made threats and

---

[112] *See note 92, supra.*

threatening gestures toward officers. Under such circumstances, there is no reasonable probability that, but for any act or omission by petitioner's trial counsel during voir dire, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

4. Conclusions

Petitioner procedurally defaulted on this aspect of his multi-faceted ineffective assistance claim herein by failing to present this same complaint about the performance of his trial counsel during voir dire to the state courts until petitioner's second state habeas corpus proceeding.

Alternatively, after an independent, *de novo*, review, this Court concludes petitioner's complaints about the performance of his trial counsel during voir dire all fail to satisfy either prong of *Strickland* analysis. Petitioner's complaints about the performance of his trial counsel during voir dire do not warrant federal habeas corpus relief.

F. Failure to Investigate and Present Mitigating Evidence

1. The Complaint

Petitioner argues that his trial counsel failed to adequately investigate petitioner's abused and neglected childhood and to present then-available mitigating evidence showing, among other things, that (1) petitioner suffers from

86

Fetal Alcohol Syndrome as a result of his mother's heroin abuse and drinking alcohol during her pregnancy with petitioner, (2) petitioner's father was physically and emotionally abusive toward petitioner and petitioner's mother, (3) petitioner's father sexually assaulted petitioner's sister when she was six or seven, (4) petitioner's father (as well as virtually every other male relative of the petitioner) went to jail or prison when petitioner was young, (5) petitioner's childhood was chaotic and filled with destructive influences in the form of drug abuse and criminal activities by his relatives, (6) petitioner suffers from "affective disorder" accompanied by "an apparent chronic and ingrained paranoia and possible delusional features," (7) petitioner suffers from deficiencies in executive functions, severe mood disorder, delusional disorder, and hallucinations, (8) petitioner was a good student in elementary school, (9) petitioner began stealing cars when he was fifteen, after his father died of a heroin overdose, to get money for his family, (10) petitioner had a lot of anger in him after his father died, (11) petitioner's intellectual functioning was in the low average to borderline range, (12) petitioner has been involved with street gangs since age twelve, (13) petitioner has poor impulse control and a difficult time controlling his emotions, and (14) petitioner may lack coping skills and experience difficulty

87

meeting the demands of daily life as well as problems with interpersonal relationships.[113]

2.   State Court Disposition

Petitioner presented most of these same complaints during his first state habeas corpus proceeding.[114]   More specifically, petitioner presented the state habeas court with (1) numerous juvenile probation reports and psychological evaluations documenting (a) petitioner's abused, neglected, and impoverished, childhood, (b) the difficulties petitioner experienced adjusting following the death of his father, and (c) petitioner's unstable family situation,[115] (2) an affidavit dated October 21, 2004 from psychologist Dr. Jack Ferrell based upon a review of petitioner's criminal justice records, school records, and a clinical evaluation in which Dr. Ferrell opined that petitioner's history did not reflect a history of violence or a tendency toward a violent nature,[116] (3) an affidavit dated October 19, 2004 from psychologist Dr. Susana A. Rosin, in which she stated, in part, that her clinical interview of petitioner and review of petitioner's records led her to conclude petitioner possesses

---

[113] Amended Petition, at pp. 73-103.

[114] First State Habeas Transcript, at pp. 26-38, 117-86.

[115] First State Habeas Transcript, at pp. 117-59.

[116] First State Habeas Transcript, at p. 160.

average intellectual ability, petitioner's fatal shooting of
officer Riojas was accidental, petitioner had no prior history of
violent crimes, and petitioner had adjusted very well to the
structure and routine of death row,[117] (4) an un-executed
affidavit dated October 19, 2004 from sociologist Dr. Kate Allen
(a) detailing petitioner's abusive, criminal, father's violent
treatment of petitioner, petitioner's mother, and petitioner's
sister Corinna, (b) concluding that petitioner derived a "rush"
from engaging in high risk behaviors such as auto theft,
burglary, and high-speed chases which "imprinted" petitioner's
nervous system, (c) inexplicably concluding there was no violence
in petitioner's family, criminal, or relationship history
(apparently disregarding the same evaluation's detailed history
of physical abuse and violence wrought upon petitioner's family
by petitioner's father), (d) concluding petitioner grew up in a
subculture at the intersection of poverty, racism, and the
frailty of masculinity, (e) concluding petitioner "managed to
become an essentially non-violent, even 'decent' criminal who
specialized in stealing others' property in the place of working
a legitimate job, as he was striving to find his way into
adulthood," and (f) concluding petitioner "is not the type of
criminal for which the death penalty was designed,"[118] (5) an

---

[117] First State Habeas Transcript, at pp. 162-67.

[118] First State Habeas Transcript, at pp. 170-81.

affidavit dated October 22, 2004 from petitioner's paternal uncle Raul Gonzales, Jr., stating, in part, that (a) he witnessed petitioner's father physically abusing petitioner, (b) petitioner's father also physically abused petitioner's mother, (c) the accusation that petitioner's father sexually abused petitioner's sister was a lie, (d) petitioner's mother was unable to protect petitioner from his father and used drugs and had other boyfriends when petitioner's father was in jail or prison, (e) the only way the petitioner could help his mother and family financially was by stealing, (f) he was in prison himself several times during petitioner's childhood, and (g) he spoke with petitioner's trial counsel's mitigation specialist regarding petitioner's family background the foregoing subjects but was never called to testify at petitioner's trial,[119] (6) an affidavit dated October 20, 2004 from petitioner's mitigation specialist at trial, Ann Matthews, and unsigned copies of purported correspondence with petitioner's trial counsel, stating, in part, that (a) she urged petitioner's trial counsel to interview and present petitioner's uncle Raul Gonzales, petitioner's mother, petitioner's sister, and mental health and TDCJ experts as witnesses at trial but (b) she was discharged by petitioner's trial counsel over disagreements as to how mitigation was to

---

[119] First State Habeas Transcript, at pp. 183-86.

proceed,[120] and (7) an affidavit dated October 20, 2004 from former Texas Department of Criminal Justice ("TDCJ") employee discussing TDCJ procedures for classifying capital offenders.[121]

   During the evidentiary hearing held in petitioner's first state habeas corpus proceeding, petitioner also presented live testimony from (1) petitioner's paternal uncle Raul Gonzales, Jr describing (a) the severe physical and emotional abuse of petitioner and petitioner's mother he witnessed at the hands of petitioner's father and (b) the criminal history and drug abuse of petitioner's father,[122] (2) psychologist Dr. Jack Ferrell describing (a) his clinical and mental status evaluation of petitioner prior to trial, (b) his meeting with petitioner's trial counsel to discuss same on October 28, 2002, during which he explained that he did not believe petitioner's records showed a propensity for violence or significant disturbance, and (c) his professional opinion that petitioner did not have a history of

---

[120] First State Habeas Transcript, at pp. 188-94.

[121] First State Habeas Transcript, at pp. 196-98.

[122] Statement of Facts from petitioner's first state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), Volume 2 of 5, proceedings March 24, 2008, testimony of Raul Gonzales, Jr., at pp. 20-44.
   Mr. Gonzales also discussed (1) his own criminal history, which he admitted included seven or eight convictions for theft and drug offenses, (2) his conversations about petitioner with petitioner's mitigation specialist, and (3) his knowledge of petitioner's history of multiple auto thefts. *Id.*, at pp. 31-33, 36, 42.

violence or a tendency to act in a violent manner in the future,[123] (3) petitioner's second-chair counsel at trial, attorney Ed Camara, who testified, in part, that (a) he had done no discovery or trial preparation by the time attorney Ray Fuchs was permitted to withdraw from petitioner's case, (b) he never discussed trial preparation for the punishment phase of trial with attorney Callahan (who replaced Fuchs), (c) he did not discuss Jack Ferrell with Callahan and did not recall Ferrell being present during trial, (d) the court-appointed investigator (Jeff Mitchel) suggested obtaining the services of a mitigation specialist (Ann Matthews), (e) he became upset with Matthews and terminated her services when she filed vouchers with the trial court instead of waiting until after the completion of the trial to seek payment, and (f) attorney Callahan did no preparation whatsoever for the punishment phase of trial,[124] and (4)

---

[123] S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 42-61.
   Dr. Ferrell admitted on cross-examination that he was unaware of petitioner's 1998 conviction for unlawfully carrying a weapon and petitioner's conviction for burglary of a habitation in which petitioner employed a screwdriver. *Id.*, at pp. 54-56.

[124] S.F. State Habeas Hearing, Volume 2 of 5, testimony of Ed Camara, at pp. 62-100.
   On cross-examination, attorney Camara also testified (1) he had only one capital murder trial prior to being appointed to help handle petitioner's case, (2) petitioner's comments to him about the fatal shooting of officer Riojas were consistent with petitioner's written statements to police, (3) Ann Matthews interview four or five members of petitioner's family, (4) Ms. Matthews reported what these witnesses said but he did not recall her making any recommendations, (5) he was unaware of any

sociologist, Dr. Katherine Allen, who testified, in part, that
(a) petitioner's parents were teenagers who very quickly had two
children, (b) criminal activity was "very standard" on both sides
of petitioner's family, (c) petitioner's father was very abusive
and extremely controlling of his wife and children, (d)
petitioner's father molested petitioner's sister, (e)
petitioner's father was involved in criminal activity, drug
abuse, and selling drugs, (f) children tend to mimic the
behaviors they see in their home, (g) "stealing and drug use and
abuse and selling was normalized in the family," (h) petitioner
began shoplifting at age thirteen, prior to his father's death,
(i) after his father's death, petitioner pursued the same
criminal activities as his father, (j) petitioner's friend Ronald
taught petitioner how to steal cars, (k) from ages fourteen to
seventeen, petitioner's brain became "imprinted or entrained" for
the rush petitioner received from stealing, (l) petitioner was
not a violent youth and very non-confrontational in his crimes,
(m) aside from stealing, petitioner did not act out, (n)
petitioner did have a number of family risk factors for future
violence by youthful offenders, including a family history of

---

additional punishment phase witnesses, (6) Jeff Mitchel did not
do any punishment phase investigation, (7) Ann Matthews did
tender reports but he could not get additional information from
her because she was not getting paid, (8) he spoke with
petitioner's mother and sister but not about mitigation subjects,
and (9) he had access to petitioner's extensive juvenile and
criminal records. *Id.*, at pp. 83-99.

criminal behavior, substance abuse, family management problems, family conflict, and parental attitudes favorable toward crime and substance abuse, and (o) petitioner had the following risk factors from age six to adolescence: economic deprivation, community disorganization and low neighborhood attachment, family conflict, and parental attitudes favorable toward crime and substance abuse.[125]

The state called petitioner's former first-chair trial counsel, attorney Vincent D. Callahan, who testified, in part, that (1) he prepared for petitioner's trial by reading the state's file, going to the scene of the offense, talking with petitioner's former lead trial counsel, and interviewing

---

[125] S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 7-84.
    On cross-examination, Dr. Allen testified (1) she had not read any of the police reports concerning petitioner's capital offense, (2) petitioner was, in her opinion, a "fleer" not a fighter, (3) she believed it was unlikely petitioner would again engage in violence, (4) she disagreed with the diagnosis of petitioner with a conduct disorder, (5) it is common for students with conduct disorders to develop antisocial personality disorder as adults, (6) many adolescents with conduct disorder later outgrow it, (7) she did not consider the screwdriver with which petitioner was arrested on one occasion to be a weapon, (8) she disagreed somewhat with the diagnosis of Dr. Sherman of conduct disorder because she does not consider the fights identified by Dr. Sherman as serious because they were juvenile fights and she places little value on petitioner's early onset drug and alcohol abuse, (9) she does not believe petitioner has a history of threatening or assaultive behavior, (10) petitioner has not been aggressive toward people or animals in her opinion, (11) she disregards petitioner's gang affiliation because petitioner has no gang tattoos and joined at age thirteen, (12) petitioner gets a rush like a runner's high from engaging in risky behavior, and (13) petitioner is not mentally retarded. *Id.*, at pp. 38-76.

petitioner, (2) petitioner told him that he (petitioner) shot officer Riojas, (3) attorney Camara took the lead with regard to guilt-innocence phase of trial while he (attorney Callahan) took the lead with regard to the punishment phase of trial, pretrial motions, and petitioner's motion to suppress, (4) the two defense attorneys split responsibilities with regard to voir dire, (5) his voir dire strategy was to find a juror who would not vote in favor of the prosecution, (6) he asked Dr. Ferrell to prepare a mental health evaluation of petitioner and sent Dr. Ferrell the state's Rule 404(b) notice and a copy of his own discovery notes, (7) he believed Dr. Ferrell, if called to testify at trial, would say petitioner was a future danger, (8) the three members of petitioner's family who testified at the punishment phase of petitioner's capital murder trial were the only members of petitioner's family who showed up for trial, (9) he did not consider subpoenaing other members of petitioner's family because he believed forcing people to testify makes them "angry," reluctant witnesses who might hurt the party who issued the subpoena, (10) Ann Matthews seemed to be a money grubber whose letters all seemed to focus on her getting paid, (11) he spoke with five members of petitioner's family during lunch breaks at trial, (12) only three family members showed up for the punishment phase of petitioner's capital murder trial, (13) the jury heard everything he had been told by petitioner's family

members regarding petitioner's troubled youth, (14) he hoped to convince the jury that petitioner had learned his criminal behavior from his family and the jury would hold petitioner less responsible for same, (15) he believed he conferred sufficiently with Dr. Ferrell and that Ferrell had communicated an opinion that petitioner was a future danger, (16) attorney Camara was upset that he was not the first chair trial counsel and unhappy with attorney Callahan's "punishment phase-oriented" voir dire, (17) Camara wanted a more "guilt-innocence phase-oriented" voir dire, (18) based upon his conversations with petitioner, however, attorney Callahan believed there was no chance of obtaining an acquittal, and (19) he did not feel it was necessary to have an expert witness develop the circumstances of petitioner's family history.[126]

The parties also agreed to the admission of extensive school and TDCJ records relating to petitioner.[127]

The state habeas trial court made the following findings and conclusions regarding this aspect of petitioner's ineffective

---

[126] S.F. State Habeas Hearing, Volume 4 of 5, testimony of Vincent D. Callahan, at pp. 5-38.

[127] These documents are found in S.F. State Habeas Hearing. Volume 5 of 5.   The documents in question include (1) petitioner's academic records from the Northeast I.S.D., (2) petitioner's TDCJ disciplinary records covering the years 2003-07, and (3) attorney Callahan's billing invoices for petitioner's case.

assistance claims: (1) petitioner demonstrated four of the seven
risk factors for future violence by youthful offenders during the
period from conception to age six,[128] (2) petitioner demonstrated
ten of the fifteen risk factors from ages six to adolescence,[129]
(3) petitioner's history did not evidence many of the preventive
factors which tend to prevent an individual from having a
delinquent or violent future,[130] (4) Dr. Allen's analysis of
petitioner's propensity for future violence did not factor in
petitioner's murder of officer Riojas and was dismissive with
regard to the weapons petitioner had been found to possess, both
inside prison and in the course of his criminal offenses,[131] (4)
Dr. Allen's disagreement with Dr. Sherman's diagnosis of conduct
disorder was based, in part, upon Dr. Allen's rejection of a
number of factors relied upon by Dr. Sherman, including
petitioner's possession of weapons during several offenses,
petitioner's early sexual activity, petitioner's episodes of
running away from home and running away from a halfway house,
petitioner's involvement with gangs, and petitioner's involvement
in fights as a juvenile,[132] (5) Raul Gonzales's testimony at the

---

[128] First State Habeas Transcript, at p. 216.

[129] *Id.*

[130] *Id.*

[131] *Id.*, at pp. 217-18.

[132] *Id.*, at pp. 218-19.

state habeas corpus hearing did not add anything substantive regarding petitioner's background to the trial testimony of petitioner's mother. sister, and uncle,[133] (6) Gonzales's lengthy criminal record undermined any benefit his testimony might have had at trial,[134] (7) there was no evidence Dr. Allen was available to testify during petitioner's trial,[135] (8) Dr. Allen's testimony during the state habeas corpus hearing strongly supported a conclusion that petitioner would engage in future violent acts,[136] (9) sociologist Dr. Allen's opinion that petitioner had been improperly diagnosed by psychologist Dr. Sherman with social conduct disorder was not credible because Dr. Allen ignored several pieces of undisputed evidence, including evidence showing petitioner had run away from home and escaped from a juvenile halfway house, petitioner's early on-set sexual activity and drug and alcohol abuse, petitioner's possession of weapons on campus and during the commission of multiple crimes, petitioner's documented fighting, and petitioner's gang membership,[137] and (10) had Dr. Allen testified at petitioner's trial, the prosecution could have rebutted her testimony with that of Dr. Sherman and

---

[133] *Id.*, at p. 230.

[134] *Id.*

[135] *Id.*

[136] *Id.*, at p. 231.

[137] *Id.*

the jury would likely have learned the social disorder with which petitioner was diagnosed as a juvenile often develops into full=blown antisocial personality disorder.[138]   Based upon the foregoing findings and conclusions, the state trial court recommended denial of petitioner's complaint about petitioner's ineffective assistance claim premised upon petitioner's trial counsels' alleged failure to adequately investigate and present mitigating evidence.[139]   The Texas Court of Criminal Appeals expressly adopted the foregoing findings and conclusions when it denied petitioner's first state habeas corpus application. *Ex parte Manuel Garza*, WR 70,797-01, 2008 WL 5245545, at *1.

In his second state habeas corpus proceeding, petitioner re-presented all of the allegations, affidavits, and other documents he had presented to the state habeas court during his first state habeas corpus proceeding.[140]   In addition, petitioner also presented the state habeas court with a plethora of new affidavits and documents purportedly supporting this aspect of his ineffective assistance claim, including (1) an affidavit dated December 15, 2009, in which clinical psychologist Dr. Jack Ferrell (a) summarizes various juvenile records of petitioner which Dr. Ferrell states he had not seen at the time of

---

[138] *Id.*, at pp. 231-32.

[139] *Id.*, at p. 232.

[140] Second State Habeas Transcript, at pp. 432-793.

petitioner's trial, (b) identifies a number of factors which negatively influenced petitioner during childhood (including petitioner's abusive father, petitioner's father's sexual abuse of petitioner's sister, and petitioner's "abusive, non-supportive, and rejecting" family environment), (c) recites findings from earlier psychological evaluations stating petitioner had engaged in a pattern of antisocial behavior, displayed poor impulse control, and had difficulty controlling his emotions, and (d) criticizes petitioner's trial counsel for failing to further explore these subjects and obtain expert testimony regarding same[141]; (2) an affidavit dated December 10, 2009 from clinical social worker Gerald L. Byington in which he (a) criticizes the extent of pretrial investigation by Ann Matthews and petitioner's trial counsel into petitioner's family background, (b) identifies additional areas of investigation for mitigating evidence which he claims petitioner's defense team failed to adequately explore, (c) criticizes the investigation into petitioner's background done by petitioner's first state habeas counsel ("no evidence was presented at the writ hearing about what information and individual testimony could have been made available to the trial jury had someone bothered to look"), (d) claims that a minimum of one hundred hours of investigation is necessary in every mitigation investigation, (e) claims that

---

[141] Second State Habeas Transcript, at pp. 795-98.

between 150 and 200 hours of mitigation investigation was
necessary in petitioner's case (at a rate of $100 per hour), (f)
asserts without citation to any specific evidence in the record
that petitioner's mother might have used alcohol or drugs during
her pregnancy with petitioner and petitioner suffers from IQ
deficits, (g) discusses the head injuries petitioner suffered as
a child which were mentioned in various juvenile psychological
evaluations, (h) argues neuropsychological testing should have
been performed on petitioner, and (i) argues developmental and
gang experts should have been involved in the investigation of
petitioner's background[142]; (3) an affidavit dated June 14, 2010
from petitioner's paternal uncle Raul Gonzales, Jr. in which he
(a) asserts he gave Ann Matthews all of the information he knew
about petitioner's background, (b) repeats most of the
information about the criminal and abusive behavior of
petitioner's father to which he testified during petitioner's
first state habeas corpus proceeding, (c) asserts petitioner's
mother used heroin during her pregnancy with petitioner, (d)
asserts petitioner, petitioner's sister, and petitioner's mother
all helped petitioner's father sell drugs, (e) asserts petitioner
and his sister observed petitioner's father using and selling

---

[142] Second State Habeas Transcript, at pp. 800-07.  Attached
to Mr. Byington's affidavit are unverified copies of what he
represents to be Ann Matthews' investigative notes and reports.
*Id.*, at pp. 808-39.

drugs, (f) asserts all of the men in petitioner's family have been to prison, some multiple times, (g) once again claims the allegations of petitioner sexually abusing petitioner's sister were "a complete lie," (h) complains that petitioner's mother sold a motorcycle petitioner's father left to petitioner, and (i) admits all of the men in his family "were more interested in getting money to buy things than they were in continuing to go to school"[143]; (4) an affidavit dated June 13, 2010 from petitioner's mother Maria Gonzales in which, in part, she (a) states she spoke with Ann Matthews prior to petitioner's trial but had only brief telephone conversations with petitioner's trial counsel, (b) states Raul Gonzales, Jr. used and sold drugs with her late husband, (c) identifies most members of her and her late husband's families as high school dropouts who used drugs and committed criminal offenses, (d) states that shortly after their first child, Corinna, was born, her late husband was selling marijuana and other drugs and stealing cars to support their family, (e) describes petitioner's father as unfaithful, frequently absent (due to his numerous incarcerations and arrests), physically abusive, and very controlling toward her, (f) admits she drank alcohol while pregnant with petitioner,

---

[143] Second State Habeas Transcript, at pp. 841-45.
Whoever typed the affidavit in question apparently misspelled Mr. Gonzales' name with a "z." The signature on this affidavit appears to show his last name ends with an "s." *Id.*, at p. 845.

sometimes to excess, (g) petitioner's father often gave petitioner beer to drink when petitioner was a toddler, (h) there were no problems with petitioner's pregnancy and petitioner's delivery went fine, (i) describes petitioner's father as physically abusive toward their children, (j) describes petitioner's paternal grandfather as unsympathetic to her and her children when petitioner's father beat them, (k) asserts petitioner never had any problems growing up and did fine in elementary school, and (l) states petitioner earned his GED while in the custody of the Texas Youth Commission[144]; (5) an affidavit dated June 15, 2010 from petitioner's sister Corinna Garza in which she states, in part, that (a) her father was physically abusive, forced their family to move frequently when she was growing up, and kept her mother and the rest of their family isolated from the rest of the world, (b) their parents showed little interest in petitioner when he was growing up, (c) their father used drugs in their presence and left drug paraphernalia lying around their house, (d) their parents frequently argued violently, (e) as he grew up, petitioner spent more time with their father and frequently came home with stories about how he and his father had stolen things and gotten into fights, (f) their home was not safe due to their father's violent temper, (g) when their father was in jail the last time, their mother let

---

[144] Second State Habeas Transcript, at pp. 847-53.

petitioner run wild, and practically abandoned their family, (h) when she was six or seven her father sexually assaulted her, (i) petitioner was angry with her when she reported their father's sexual assault upon her to their mother, (j) there was no family support for petitioner during times when petitioner attempted to turn his life around, and (k) *prior to petitioner's trial, she spoke with both Ann Matthews and petitioner's attorney and gave them all of the foregoing information*[145]; (6) a quartet of affidavits, all dated June 12, 2010, from petitioner's maternal aunts Maria Francisca Uribe, petitioner's maternal cousin Emma Uribe, petitioner's maternal cousin Viola Martinez, and petitioner's maternal aunt Vicenta G. Arvizu, which collectively (a) reiterate the statements of petitioner's mother and sister describing the controlling and physically, verbally, and emotionally abusive behavior of petitioner's father toward petitioner, petitioner's mother, and petitioner's sister, (b) describe the drug use of petitioner's father, (c) describe the detrimental impact of petitioner's father's conduct on the emotional well-being of petitioner's mother, (d) admit all of the men and some of the women in their family had problems with criminal conduct, usually arising from their involvement with drugs, (e) describe petitioner's family as suffering financially to the point they lacked essential food at times because of the

---

[145] Second State Habeas Transcript, at pp. 856-60.

cavalier attitude of petitioner's father toward the rest of his family, (f) described how petitioner's mother learned, after petitioner's father died of a drug overdose, that petitioner's father had a second family, (g) state that petitioner's father taught petitioner how to sell drugs, burglarize houses, and steal cars, (h) state that petitioner's father introduced petitioner's mother to cocaine abuse, (i) state that, after petitioner's father died, petitioner's mother could not control petitioner, (j) describe the tension inside petitioner's household when petitioner was growing up - which resulted from the violent temper and drug abuse of petitioner's father, and (k) describe petitioner as abusive toward his mother after his father's death[146]; (7) a lengthy affidavit dated June 16, 2010 from clinical psychologist Dr. Joann Murphey which, in part, (a) reiterates the same history of physical, emotional, and verbal abuse of petitioner by petitioner's father recited by petitioner's mother and sister at petitioner's trial, albeit in more detail than most previous reports in the record, (b) states petitioner became sexually active at fifteen, (c) states petitioner reported leaving a number of legitimate jobs during the time period 1997-2001 to "hustle/steal," (d) states petitioner reported he did not intentionally kill officer Riojas

---

[146] Second State Habeas Transcript, at pp. 862-65, 867-68, 870-74, 876-81.

but, rather, the gun discharged when he struggled with officer
Riojas, (e) summarizes extensive educational, TDCJ, and medical
records of petitioner, the autopsy records of petitioner's
father, petitioner's juvenile criminal records, and petitioner's
IQ and academic achievement test results, all of which Dr.
Murphey reviewed,[147] (f) reiterates the assertion that
petitioner's mother abused alcohol during petitioner's pregnancy,
(g) identifies a learning disability in math and other adaptive
behavior deficits (including executive functioning and impulse
control) consistent with Fetal Alcohol Syndrome displayed by
petitioner, (h) suggests additional evaluation of petitioner for
Fetal Alcohol Syndrome is warranted, as is evaluation of
petitioner for possible medication, (i) concludes petitioner "has
not experienced more than a few months without some criminal
justice involvement," (j) describes petitioner as "functioning
well in custody," functioning "appropriately in custody where
external structure is available," and having a history which
"does not include a pattern of criminal violence before the
capital offense for which he is awaiting execution," (k) states
petitioner "is factually unable to plan and carry out even minor
crimes effectively, but  he does not have a history of violent
conduct," (l) describes petitioner as "a chronic offender" but

_____

[147] There is no indication in her report/affidavit that Dr.
Murphey ever reviewed the testimony or other evidence presented
during either phase of petitioner's capital murder trial.

"not a chronically violent offender," (m) describes petitioner as possessing "impaired cognitive function, specifically impaired executive functions, originating in the developmental period and prenatally.  He is severely impaired in adaptive functioning and historically has never functioned successfully in any capacity in adaptive functioning outside of custodial settings," and (n) concludes as follows: "circumstances of Manuel's abusive childhood environment and lack of appropriate paternal guidance, the absence of prior significant violence in his pattern of conduct since the onset of criminal behaviors, and the presence of evident adaptive behavior deficits beyond his control, suggest mitigation of his current sentence."[148]; (8) an affidavit dated June 16, 2010 from social worker Gerald L. Byington which (a) details the extensive history of drug abuse and criminal misconduct on the part of members of petitioner's paternal and maternal families, (b) repeats suggestions of Dr. Murphey that petitioner should be evaluated for the presence of Fetal Alcohol Syndrome, and (c) criticizes the failure of petitioner's mitigation specialist and trial counsel to develop evidence showing the extensive drug abuse and criminal misconduct engaged in by petitioner's family members and the disruptive circumstances of petitioner's childhood[149]; (9) an affidavit dated

---

[148] Second State Habeas Transcript, at pp. 883-923.

[149] Second State Habeas Transcript, at pp. 931-37.

107

June 17, 2010 from Ann Matthews again criticizing the efforts of petitioner's trial counsel to investigate and develop mitigating evidence and repeating hearsay statements allegedly made to her by others, including petitioner's mother, regarding their pretrial contact with petitioner's trial counsel[150]; and (10) voluminous educational records, juvenile and adult criminal records, along with numerous affidavits from records custodians,[151] which collectively emphasize, among other things (a) the multiple occasions on which petitioner was arrested while in possession of guns, knives, and other weapons,[152] (b) the petitioner's low average to borderline intellectual functioning did not prevent petitioner from performing adequately academically while in custody of the Texas Youth Commission,[153] and (c) petitioner was diagnosed as a juvenile with ongoing, serious, problems with violations of institutional norms and in need of anger management therapy.[154]

The Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application pursuant to

---

[150] Second State Habeas Transcript, at pp. 939-40.

[151] Second State Habeas Transcript, at pp. 942-1930.

[152] Second State Habeas Transcript, at pp. 1647, 1649, 1656, 1663-64.

[153] *Id.*, at pp. 1676, 1698, 1708.

[154] *Id.*, at pp. 1703, 1709.

state writ-abuse principles. *Ex parte Manuel Garza*, WR 70,797-02. 2011 WL 4826968, at *1.

    3.    Shifting Standards of Review

Despite the voluminous additional documentation and new affidavits petitioner furnished to the state habeas court in support of this aspect of his multi-faceted ineffective assistance claim during petitioner's second state habeas corpus proceeding (which transformed the petitioner's *Wiggins* claim raised in his first state habeas corpus proceeding into an altogether different complaint), respondent does not request dismissal of this portion of petitioner's supplemented ineffective assistance claim on procedural default grounds.[155]

As the foregoing summary demonstrates, this Court has carefully reviewed the voluminous new material petitioner presented to the state habeas court during petitioner's second state habeas corpus proceeding and concludes that, with the exception of evidence showing petitioner's mother drank alcohol and may have ingested narcotics during her pregnancy with petitioner (and Dr. Murphey's opinion that further investigation into whether petitioner may suffer from Fetal Alcohol Syndrome is warranted), petitioner's "new" purported mitigating evidence offers very little more than the same information about (1) the

_____

    [155] Respondent's Answer, filed March 26, 2012, docket entry no. 31, at pp. 25-30.

109

abusive, criminal, misconduct of the petitioner's father, (2) the rampant criminal and drug-related behavior of petitioner's family, and (3) the abused, neglected, and chaotic nature of the petitioner's childhood detailed in either State Exhibit no. 188 (i.e., petitioner's TYC file) or in the testimony of petitioner's mother and sister during the punishment phase of petitioner's capital murder trial.[156]  Likewise, other than suggesting the need for further inquiry into whether petitioner suffers from Fetal Alcohol Syndrome, petitioner's "new" expert opinions (i.e., those expressed in the June 16, 2010 affidavit of Dr. Murphey and Dr. Ferrell's December 15, 2009 affidavit) offer very little truly "new" substantive material beyond those expert opinions expressed by Dr. Ferrell and Dr. Allen during their testimony in petitioner's first state habeas corpus proceeding.[157]

Because no state court has ever addressed the merits of an ineffective assistance claim arguing the failure of petitioner's trial counsel to investigate whether petitioner suffers from Fetal Alcohol Syndrome rose to the level of ineffective

---

[156] The punishment phase trial testimony of petitioner's mother and sister Corinna is found at S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41-54; testimony of Maria Gonzalez, at pp. 54-61.  This testimony was summarized in Section I.E.2. above. *See notes 56-57, supra, and accompanying text.*

[157] The testimony of Dr. Jack Ferrell and Dr. Katherine Allen during petitioner's first state habeas corpus proceeding appears at S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 42-61, and S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 7-84.

assistance, this Court must address the latest version of
petitioner's *Wiggins* claim *de novo*.   *See Porter v. McCollum*, 558
U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the
allegedly deficient performance of petitioner's trial counsel was
necessary because the state courts had failed to address this
prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at
390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice
prong of *Strickland* required where the state courts rested their
rejection of an ineffective assistance claim on the deficient
performance prong and never addressed the issue of prejudice);
*Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the
same).

Petitioner has presented this Court with a *Wiggins* claim
that petitioner presented to the state courts in two, entirely
separate, state habeas corpus proceedings.  In the first of those
state habeas proceedings, the state habeas court rejected
petitioner's claim on the merits.  Petitioner then supplemented
his original *Wiggins* claim in his second state habeas corpus
application with voluminous documents and new evidence (regarding
his mother's abuse of alcohol and possibly drugs while she was
pregnant with petitioner) which rendered that claim significantly
different from the claim petitioner had presented in his first
state habeas proceeding.  With regard to the state habeas court's
denial on the merits of petitioner's initial *Wiggins* claim during

petitioner's first state habeas corpus proceeding, the deferential standard of review set forth in the AEDPA applies. Because respondent failed to request dismissal on procedural default grounds of the "Fetal Alcohol Syndrome" version of petitioner's supplemented *Wiggins* claim contained in petitioner's Amended Petition, this Court must engage in *de novo* review of this supplemented claim.

4.   *AEDPA* Review of *Wiggins* Claim Presented in First State Habeas Corpus Proceeding

a.   No Deficient Performance

With regard to the arguments and evidence petitioner presented to the state habeas court during his first state habeas corpus proceeding, the Texas Court of Criminal Appeals' rejection on the merits of this aspect of petitioner's multi-faceted ineffective assistance claim was eminently reasonable.  As was explained above, during petitioner's first state habeas corpus proceeding, petitioner presented the state habeas court with generic arguments that petitioner's trial counsel had failed to adequately investigate petitioner's background for mitigating evidence.[158]  More specifically, petitioner argued his trial counsel failed to adequately investigate petitioner's troubled childhood and attached the affidavits of Dr. Jack Ferrell, Dr.

---

[158] First State Habeas Transcript, at pp. 26-38.

112

Katherine Allen, and Dr. Susana Rosin in support of that assertion.[159]

The initial problem with this complaint is that the affidavits in question and the testimony petitioner offered during the evidentiary hearing in his first state habeas corpus proceeding furnished no new "facts" about petitioner's background that had not already been presented to the petitioner's capital sentencing jury through either the admission into evidence of State Exhibit no. 188 (i.e., petitioner's 350-page TYC file) or the punishment phase trial testimony of petitioner's uncle, mother, and sister. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)(holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

More specifically, when called upon to present actual evidence and testimony showing what additional mitigating

_____

[159] First State Habeas Transcript, at pp. 160, 162-67, 170-81.  The affidavits in question were summarized in Section IV.F.2. above. *See notes 116-18, supra, and accompanying text.*

113

evidence or testimony could have been presented (had petitioner's trial counsel undertaken a more thorough investigation of petitioner's background), petitioner offered only (1) the testimony of his paternal uncle, Raul Gonzales, which the state habeas trial court accurately described as cumulative of the trial testimony of petitioner's three punishment phase witnesses[160] and (2) expert testimony from Dr. Ferrell and Dr. Allen suggesting they could have testified that they did not believe petitioner posed a risk of future dangerousness (which expert testimony the state habeas trial court accurately pointed out was not supported by the record of petitioner's violent criminal misconduct, including the numerous instances in which petitioner committed crimes while armed with a gun, a knife, or other weapon such as a screwdriver).  In fact, the state habeas

---

[160] Raul Gonzales, Jr.'s testimony during petitioner's first state habeas corpus proceeding appears at S.F. State Habeas Hearing, Volume 2 of 5, testimony of Raul Gonzales, Jr., at pp. 20-44.  The state habeas trial court made factual findings, which the Texas Court of Criminal Appeals adopted, that Raul Gonzales's testimony did not add anything substantive to the trial testimony of petitioner's three family members. First State Habeas Transcript, at p. 230.  Having independently reviewed the entire record from petitioner's trial and state habeas corpus proceedings, this Court concludes the state habeas trial court's factual finding on this subject was objectively reasonable and amply supported by the record then before that court.  With one exception, Raul Gonzales simply reiterated the same accusations about petitioner's father's criminal misconduct, child abuse, and drug use that petitioner's mother and sister testified to at petitioner's trial.  That one exception was Raul Gonzales's insistence that the petitioner's sister's accusations that petitioner's father had sexually assaulted her as a child were untrue.

114

trial court reasonably concluded that Dr. Allen's testimony

before the state habeas trial court strongly supported a

conclusion that petitioner would engage in future violent acts.[161]

Dr. Ferrell's testimony before the state habeas court was

undermined by his admissions that he had reviewed only a few

documents concerning petitioner's background and had performed

only a limited clinical examination of petitioner focused

primarily on ascertaining petitioner's mental status.[162]   More

---

[161] First State Habeas Transcript, at p. 231.
     Having reviewed the entirety of the record from petitioner's
trial and first state habeas corpus proceeding, this Court
concludes the state habeas trial court's conclusion in this
regard was eminently reasonable.  Dr. Allen was forced to admit
that her expert opinion regarding petitioner's non-violence was
based on an extremely circumscribed view of the nature of
petitioner's criminal conduct and disregarded several
significant, undisputed, facts, including petitioner's gang
membership, youthful sexual activity, participation in fights
while a juvenile, running away from home, and escaping from a
juvenile halfway house. *Id.*, at pp. 231-32.

[162] S.F. State Habeas Hearing, Volume 2 of 5, testimony of
Jack Ferrell, at pp. 45-48, 54-56.
     This point is brought home by Dr. Ferrell's admissions
during his testimony that he was unfamiliar with the
circumstances of petitioner's 1998 conviction for unlawfully
carrying a weapon and with the circumstances of the burglary of a
habitation for which petitioner was convicted and in which
petitioner was found to be carrying a weapon (i.e., a
screwdriver). *Id.*, at pp. 54-56.  As if to drive the same point
home even further, Dr. Ferrell's affidavit dated December 15,
2009 currently before this Court complains that he was not
furnished with copies of many documents he considered relevant to
a proper evaluation of petitioner's psychological condition
(including many documents included in petitioner's Texas Youth
Commission file which was admitted into evidence at trial as
State Exhibit no. 188 and is found at S.F. Trial, Volume 36)
until long after petitioner's 2002 capital murder trial. Second
State Habeas Transcript, at pp. 795-98.  Thus, in his latest

significantly, there was no evidence before the state habeas court establishing that either Dr. Allen or Dr. Ferrell were ever given access to most of the records from petitioner's trial (including petitioner's written confessions, the trial testimony from eyewitnesses describing the petitioner's fatal shooting of officer Riojas, or the extensive trial testimony concerning petitioner's lengthy criminal record) prior to their testimony at the petitioner's state habeas corpus hearing.[163]

---

affidavit, Dr. Ferrell has admitted he was unprepared at the time of petitioner's capital murder trial to testify or render an expert opinion upon petitioner's psychological condition based upon all of the evidence that was presented to the jury at the punishment phase of petitioner's trial.

[163] While Dr. Allen's testimony before the state habeas court did show her familiarity with a pair of psychological evaluations performed on petitioner by Dr. Furgeson and Dr. Sherman that had been included among petitioner's TYC file, Dr. Allen did not appear to be familiar with the testimony offered during either phase of petitioner's capital murder trial.  This fact is significant because, had they been called to testify during the punishment phase of petitioner's capital murder trial, Dr. Ferrell and Dr. Allen would necessarily have testified following the jury's rendition of a guilty verdict (thus negating petitioner's assertion that his shooting of officer Riojas had been accidental) and following the jury's receipt of multiple days of testimony from petitioner's victims and the law enforcement officers who arrested petitioner (in several cases after petitioner engaged in high speed chases that could not reasonably have been described as "non-violent").
Petitioner's capital sentencing jury also had before it a complete copy of petitioner's Texas Youth Commission file, including multiple psychological evaluations, which was admitted into evidence as State Exhibit no. 188. S.F. Trial, Volume 32, testimony of Juan Antonio DeLeon, at pp. 150-51.  A copy of State Exhibit no. 188 appears in S.F. Trial, Volume 36.

Perhaps because neither of them had reviewed the actual
testimony from petitioner's trial, the efficacy of the expert
opinions offered by Dr. Allen and Dr. Ferrell during petitioner's
first state habeas corpus proceeding (i.e., that petitioner was
essentially a non-violent offender who posed little risk of
future violence) quickly dissipated when both were subjected to
cross-examination.  For instance, Dr. Allen repeatedly insisted
that, because of petitioner's non-violent criminal history prior
to the murder of officer Riojas, petitioner was not likely to
engage in violence when confronted.[164]  However, numerous law
enforcement officers who had arrested petitioner had already
testified at the punishment phase of petitioner's trial about
many instances in which petitioner aggressively resisted arrest
or made violent attempts to avoid apprehension or to escape from
custody.[165]  Moreover, numerous victims of petitioner testified

---

[164] S.F. State Habeas Hearing, Volume 3 of 5, testimony of
Katherine Allen, at pp. 23-24, 29, 31-32, 34, 41, 45, 63, 70.

[165] S.F. Trial, Volume 31, testimony of Ken Tuttle, at pp. 7-
13, and testimony of Jeff Crabb, at pp. 16-23 (petitioner and his
accomplices broke into a home in February, 1996, attempted to
flee when police entered the residence, petitioner refused to
comply with directives to come out of hiding, and a handgun was
found next to the location where petitioner was arrested); Volume
31, testimony of Michael F. Helle, at pp. 53-58, testimony of
Richard Cuellar, at pp. 62-68, and testimony of Lawrence Patrick
Saiz, at pp. 69-79 (late on New Year's Eve 1998 into the early
morning hours of January 1, 1999, petitioner led police on a high
speed chase in a stolen vehicle during which petitioner drove
more than twenty miles an hour above the posted speed limit,
without any lights, and swerved dangerously in and out traffic;
petitioner finally crashed the stolen vehicle into a school back

117

regarding the extensive damage done to their homes and vehicles

done by petitioner.[166]   Finally, there was uncontradicted

---

stop and, violently resisted efforts of police to arrest him;
after his arrest, a handgun was discovered in petitioner's pants
pocket); testimony of Dennis Kifer, at pp. 103-05 (petitioner led
police on a high speed chase on March 6, 1999 and successfully
fled the stolen vehicle in question); Volume 31, testimony of
Lloyd Lopez, at pp. 154-58 and testimony of Ramiro Escamilla, at
pp. 163-66 (on July 1, 1999 petitioner led police on yet another
high speed chase, this time through a residential neighborhood,
which did not end until petitioner drove into a stone fence and
after which petitioner fled the scene on foot and had to be
wrestled to the ground by his arresting officer); Volume 32,
testimony of Chris Meehan at pp. 24-27 (on April 2, 1995
petitioner stole another vehicle and led police on another high
speed chase, during which petitioner ran stop signs and drove
erratically); Volume 32, testimony of Kenneth Mahl, at pp. 85-95
and testimony of James Fiste, at pp. 102-05 (on July 6, 2000,
petitioner escaped from a patrol car while handcuffed, led police
on a foot chase, and was not re-apprehended until a helicopter
and police canine unit located petitioner in a nearby apartment
complex); Volume 32, testimony of Jeffrey Cole Hastings, at pp.
106-14 (on October 20, 1997, after police were called to the
residence of petitioner's aunt and uncle, police conducted a
search and discovered a Glock pistol with two thirteen-round
magazines under petitioner's bed, a Smith & Wesson pistol, and
numerous items of stolen property); Volume 32, testimony of
Ramiro Sanchez, at pp. 114-17 (on October 10, 1997, petitioner
was arrested at MacArthur High School on a Texas Youth Commission
warrant and found to have three knives and a screwdriver in his
school backpack); and Volume 32, testimony of Carlos Garza, at
pp. 161-72 and testimony of Russell King, at pp. 181-86 (on
November 29, 2000, petitioner and at least three others
burglarized several vehicles in an apartment complex parking lot
before leading a civilian eyewitness and police on a high speed
chase down Blanco Road at speeds in excess of eighty miles per
hour before a Castle Hills Police officer finally pulled the
suspect vehicle over).

[166] S.F. Trial, Volume 31, testimony of Cecil Wright, at pp.
26-31 (petitioner and accomplices pried open the door from his
garage to his kitchen with a crowbar and screwdriver, went
through every closet and drawer in his house, tore apart his
televisions, ransacked the house, and left a pistol in his eight-
year-old daughter's bedroom); Volume 31, testimony of Linda