testimony from law enforcement officers describing (1) the damage
petitioner had done to an elementary school back stop when he
deliberately crashed a stolen vehicle into same[167] and (2) the
damage petitioner did to the football field at MacArthur High

Dettloff, at p. 35 (petitioner knocked out a window of her
vehicle while attempting to steal same); Volume 31, testimony of
Claudio Velasquez, at pp. 83-84 (his truck window was broken and
his tool box stolen from inside the truck); Volume 31, testimony
of Abel Palacios, at pp. 89-90 (back window and steering column
of his car both broken when petitioner stole same); Volume 31,
testimony of Walter Lentz, at pp. 91-92 (his vehicle's steering
column was torn loose and the vehicle had several dents in the
front and side after petitioner stole same); Volume 31, testimony
of Russell Knoebel, at pp. 111-13 (his Jeep Cherokee was found in
the middle of the MacArthur High School football field after
petitioner stole it with the backseat, ignition system and
steering column all broken and his vehicle spent six or seven
weeks at the dealer getting repaired); Volume 31, testimony of
Jorge Tablis, at pp. 118-20 (only six or seven hours after he
reported his Chevy Blazer stolen, it was found stripped of seats,
dashboard, stereo, CD's, and with a broken window and steering
column); Volume 31, testimony of Heidi Crabtree Dunlop, at pp.
124-26 (her BMW was recovered after petitioner stole same with
the driver's window removed and the wheels and tires stripped
from the vehicle); Volume 32, testimony of T.J. Barnes, at pp.
19-21 (his vehicle's front wheel was bent and his undercarriage
damaged when it was recovered after petitioner's theft of same);
Volume 32, testimony of Mercial White, at pp. 56-57 (his patio
door was broken and all drawers in his bedroom strewn around,
along with clothing after petitioner's burglary of his
residence).
      A reasonable jury could easily have concluded the level of
violence inflicted upon the residences and vehicles petitioner
burglarized went well beyond the level necessary to steal the
vehicles or to gain entrance to the residences in question.

      [167] S.F. Trial, Volume 31, testimony of Richard Cuellar, at
pp. 64-68 (petitioner observed laughing after arrest following
high speed chase which culminated in petitioner destroying an
elementary school back stop by crashing the stolen vehicle he was
driving into same); Volume 31, testimony of Lawrence Patrick
Saiz, at pp. 71-73 (suspect vehicle hopped curb and slammed into
back stop with sufficient force to jam driver's side door).

School when he trenched the field in a stolen jeep.[168]  Dr.
Allen's opinion testimony before the state habeas court was
further undermined when she testified on cross-examination that
(1) she did not consider a screwdriver to be a weapon, (2) she
disregarded evidence showing petitioner had made a sharped edged
weapon from a piece of metal while in prison, and (3) she did not
consider petitioner's gang membership, admission of early sexual
activity,  escape from a juvenile halfway house, running away
from home, or participation in multiple fights as a juvenile to
be significant to the issue of petitioner's future
dangerousness.[169]  Had Dr. Ferrell or Dr. Allen testified during
the punishment phase of petitioner's capital murder trial in the
same manner they testified during petitioner's first state habeas
corpus proceeding (i.e., by mimicking petitioner's assertion that
his fatal shooting of officer Riojas had been "accidental" and
asserting that petitioner's criminal history showed petitioner to
be non-violent offender), there is every reason to believe their
expert opinions would have been viewed as less than credible by
the petitioner's capital sentencing jury, which had already (1)
found beyond a reasonable doubt the petitioner was guilty of

_____

[168] S.F. Trial, Volume 31, testimony of Roman DeLeon, at p.
116 (Jeep petitioner stole was found in the middle of high school
football field where the jeep had made doughnuts in the middle of
the field and torn up the field).

[169] S.F. State S.F. State Habeas Hearing, Volume 3 of 5,
testimony of Katherine Allen, at pp. 55, 63-65, 70.

capital murder, (2) heard extensive testimony concerning petitioner's lengthy history of violent criminal conduct, and (3) had received petitioner's TYC file detailing petitioner's many acts of criminal violence during his middle and late teenage years.  As the state habeas trial court correctly pointed out, careful scrutiny of Dr. Allen's testimony before the state habeas court revealed strong support for a finding that petitioner would likely pose a risk of future violent criminal behavior.  There were, therefore, objectively reasonable bases for not calling either Dr. Ferrell or Dr. Allen to the stand during the punishment phase of petitioner's capital murder trial and eliciting testimony similar to the testimony they gave during petitioner's first state habeas corpus proceeding.

In his latest wave of affidavits, petitioner and his new experts criticize petitioner's trial counsel for not presenting expert testimony establishing petitioner's chaotic, abused, and neglected childhood.  However, petitioner's lead trial counsel testified during petitioner's first state habeas corpus proceeding that he preferred to present such evidence through petitioner's family members.[170]  The state habeas trial court reasonably concluded it was objectively reasonable for petitioner's trial counsel to present their mitigating evidence

---

[170] S.F. State Habeas Hearing, Volume 4 of 5, testimony of Vincent D. Callahan, at p. 33.

through family members, rather than experts.[171]  This Court concludes the state habeas court's conclusion in this regard was eminently reasonable.  Under the circumstances of petitioner's capital murder trial, the decision to present the jury with the circumstances of petitioner's abused, chaotic, childhood through petitioner's family members, rather than through an expert witness's recitation of hearsay information, was objectively reasonable.  At least one member of petitioner's petit jury had declared during voir dire examination that he believed all mental health professionals were "quacks."[172]  It was objectively reasonable for petitioner's trial counsel to consider the possibility that other members of petitioner's jury might share similarly negative views of mental health professionals or other experts called to testify regarding petitioner's background. Furthermore, as the state habeas trial court reasonably concluded, the opinions expressed by both Dr. Ferrell and Dr. Allen during their testimony at petitioner's state habeas corpus hearing were readily subject to attack based upon the petitioner's lengthy history of criminal conduct, repeated possession of weapons during criminal offenses, and episodes of

---

[171] First State Habeas Transcript, at pp. 229 ("These witnesses [I.e., petitioner's family members] were used because the defense believed they would best be able to humanize Garza and invoke the jury's sympathy.").

[172] S.F. Trial, Volume 10, voir dire examination of Charles Martin, at p. 142.

violence which included numerous high speed chases resulting in crashed vehicles.  Under such circumstances, the decision by petitioner's trial counsel to present petitioner's life history through family members, as opposed to expert witnesses, did not cause the performance of said counsel to fall outside the broad range of objectively reasonable legal representation.

Thus, there was more than ample evidence before the state habeas court upon which to base that court's conclusions (either implicit or explicit) that (1) the petitioner's trial counsel managed to present petitioner's capital sentencing jury with all of the factual information regarding petitioner's abused childhood and deprived background petitioner offered the state habeas court during petitioner's first state habeas corpus proceeding and (2) it was objectively reasonable for petitioner's trial counsel to choose to present its mitigating evidence through petitioner's family members (and State Exhibit no. 188) than by presenting expert witnesses.  Moreover, having independently reviewed the entirety of the records from petitioner's trial, direct appeal, and first state habeas corpus proceedings, this Court agrees with the state habeas court that the performance of petitioner's trial counsel in presenting petitioner's capital sentencing jury with then-available

mitigating evidence did not fall below an objective level of reasonableness.[173]

      b.   <u>No Prejudice</u>

For similar reasons, the state habeas court reasonably concluded petitioner was not "prejudiced" within the meaning of *Strickland* by the failure of petitioner's trial counsel to call either petitioner's paternal uncle Raul Gonzales, Dr. Ferrell, or Dr. Allen to testify during the punishment phase of petitioner's capital murder trial in the same manner that they testified during petitioner's first state habeas corpus proceeding.

To satisfy the "prejudice" prong of *Strickland*, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v.*

---

[173] The focus of petitioner's *Wiggins* complaint during petitioner's first state habeas corpus proceeding was upon the alleged failure of petitioner to adequately interview petitioner's family members and investigate potentially mitigating evidence. However, as the state habeas trial court correctly pointed out, the evidence presented during the evidentiary hearing in petitioner's state habeas corpus proceeding showed that court-appointed mitigation specialist Ann Matthews had spoken with several members of petitioner's family and that petitioner's lead trial counsel had also spoken with several members of petitioner's family during breaks in the guilt-innocence phase of petitioner's capital murder trial. Furthermore, as was explained above at length in Section I.F.2., petitioner's trial counsel did present extensive mitigating evidence concerning petitioner's abusive, deprived childhood and the pernicious influence of petitioner's father's criminal behavior.

*Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

The state habeas court reasonably concluded that, during his testimony before the state habeas court, Raul Gonzales, Jr. offered no "new" mitigating evidence not already presented to the petitioner's capital sentencing jury by either State Exhibit no. 188 or the punishment phase trial testimony of petitioner's mother, sister, and uncle Louis Garza. Jr.  Having independently reviewed the records from the petitioner's trial, direct appeal, and first state habeas corpus proceeding, this Court finds that neither Dr. Ferrell nor Dr. Allen offered any "new" facts concerning petitioner's background which were not otherwise presented to petitioner's capital sentencing jury.

Insofar as Dr. Ferrell and Dr. Allen offered the state habeas court *expert opinions* suggesting petitioner would not pose a risk of future violent criminal acts, those opinions were substantially undermined, if not completely refuted, by the detailed records of petitioner's lengthy criminal history contained in State Exhibit no. 188 and by the almost sixty witnesses the prosecution presented during the punishment phase of petitioner's capital murder trial.  It is readily apparent to this Court from their testimony during petitioner's first state

125

habeas corpus proceeding that both Dr. Ferrell and Dr. Allen were unfamiliar at the time they gave their testimony in that proceeding with the petitioner's written statements or the eyewitness testimony at the guilt-innocence phase of petitioner's trial describing the fatal shooting of officer Riojas.   It is also readily apparent to this Court that, when they testified in petitioner's first state habeas corpus proceeding, neither Dr. Ferrell nor Dr. Allen were familiar with the extensive testimony regarding petitioner's criminal history given by a small army of prosecution witnesses who testified during the punishment phase of petitioner's capital murder trial.   The reason for this Court's conclusions on these points is that both Dr. Ferrell and Dr. Allen presented the state habeas court with affidavits and testimony in which they relied apparently exclusively on information which was either refuted by the evidence introduced during petitioner's trial or by the contents of petitioner's TYC file admitted into evidence as State Exhibit no. 188.

More specifically, Dr. Ferrell testified he had found nothing in petitioner's records to suggest petitioner had ever been aggressive or violent.[174]   In contrast, multiple entries existed in petitioner's TYC case file reporting petitioner's involvement in at least three fights in a single year and

---

[174] S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 48, 51-53.

petitioner's transfer to an alternative school as a result of fighting with peers.[175]  Moreover, Dr. Ferrell was forced to admit on cross-examination that he was unfamiliar with petitioner's 1998 conviction for unlawfully carrying a weapon and could not recall any of the details concerning petitioner's conviction for burglary of a habitation while carrying a screwdriver.[176]

Dr. Allen expressed opinions during petitioner's state habeas hearing that her review of petitioner's record and interviews of petitioner and petitioner's family led her to conclude petitioner had not manifested violence as an adolescent and that it was unlikely petitioner would act violently.[177]  Dr. Allen also testified, however, that (1) criminal activity was very standard on both sides of petitioner's family, (2) petitioner personally witnessed his father physically abusing his mother, (3) children mimic what they see at home, (4) petitioner was shoplifting at age thirteen, (5) after his father died, petitioner pursued the same criminal career as his father, (6) at ages fourteen to seventeen, petitioner's brain was imprinted for the rush of stealing, (7) petitioner became depressed after his

---

[175] State Exhibit no. 188, S.F. Trial, Volume 36, at pp. 193-95, 208, 296-99.

[176] S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 55-56.

[177] S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 24, 31, 34, 45.

father's death, (8) adolescent boys will "behavioralize" their depression and act out, and (9) petitioner did have many of the risk factors for future violence, including associating with peers who engage in delinquency and violence.[178]   The state habeas court also reasonably concluded Dr. Allen's disagreement with Dr. Sherman's and Dr. Furgeson's diagnoses of petitioner with conduct disorder was not credible.[179]   The state habeas court identified numerous factors which Dr. Allen either ignored or disregarded in her analysis of petitioner's background, including petitioner's documented gang membership, fighting, early sexual activity, use of weapons during criminal offenses, truancy, running away from home, escape from a juvenile halfway facility, and drug and alcohol abuse.[180]   This Court would add there was no evidence before the state habeas court suggesting Dr. Allen, a *sociologist* by training, was even qualified to second-guess the diagnoses contained in the reports of *psychologists* Dr. Sherman and Dr. Furgeson contained in petitioner's TYC file.[181]

---

[178] *Id.*, at pp. 13-20, 23, 25, 32-33.

[179] First State Habeas Transcript, at pp. 231-32.

[180] *Id.*; S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 48-65.

[181] The reports with which Dr. Allen took issue appears in State Exhibit no. 188,. S.F. Trial, Volume 36, at pp. 296-99, 304-11.

The prosecution presented extensive evidence at trial showing petitioner's lengthy history of criminal misconduct, including eyewitness testimony from law enforcement officers who observed petitioner leading police officers on multiple high speed chases, driving without lights and in a very dangerous manner, crashing stolen vehicles into other vehicles and stationary objects such as a back stop and stone fence, and violently resisting arrest following those chases.  That same evidence made clear Rocky Riojas was not the first police officer who had faced violent resistance while attempting to arrest petitioner.  Several of petitioner's burglary and auto theft victims testified regarding the extensive damage petitioner had done to their vehicles and homes.  Petitioner's TYC file documented (1) petitioner's gang membership, sexual activity, and drug and alcohol abuse from an early age, (2) petitioner's unstable, abused, and deprived, childhood, (3) petitioner's lengthy list of criminal misconduct, including truancy, running away from home, and escaping from a juvenile halfway house, (4) petitioner's frequent possession of weapons, including guns and knives, and (5) the criminal, drug-abusing, subculture in which petitioner grew up.  Several law enforcement officers testified regarding the threatening gestures and comments petitioner made to them following petitioner's arrest for capital murder. Finally, petitioner offered his capital sentencing jury very

little evidence showing sincere expression of remorse or contrition for his fatal shooting of officer Riojas.[182]   On the contrary, petitioner's second written statement to police, admitted into evidence during the guilt-innocence phase of petitioner's capital murder trial (and quoted at length above at the beginning of this memorandum opinion), concluded with petitioner's assertion that the actions of officer Riojas, and not petitioner, were the real cause of officer Riojas' murder. This represented the very antithesis of sincere contrition or remorse for officer Riojas' murder.   Petitioner's written statements to police made clear that he knew full well he was subject to a lawful arrest by officer Riojas on multiple outstanding warrants and that petitioner was determined to do whatever he felt necessary to avoid arrest.

---

[182] Defendant's Exhibit no. 10, admitted into evidence during the punishment phase of petitioner's capital murder trial included petitioner's BCADC medical records covering, among other periods, the days immediately after petitioner's arrest.   This voluminous exhibit appears in S.F. Trial, Volume 37, at pp. 125-229.   Among the observations of BCADC medical personnel recorded therein are entries on February 4, 2001 (petitioner described as "sad/tearful") [at p. 127], February 5, 2001 (petitioner complained of being anxious and depressed since his arrest, that other inmates were taunting him that he was going to die, and his complaints of insomnia) [at p. 127], February 6, 2001 (petitioner crying uncontrollably, complaining of insomnia and loss of appetite, and complaining that he is being haunted by the deceased officer whose presence petitioner felt) [at p. 129], and an entry on February 6, 2001 in which petitioner is recorded having repeatedly told a BCADC medical staffer how sorry he was and how it was an accident and in which petitioner was described as "crying, very emotional, shaking, depressed, polite, appears very remorseful" [at p. 130].

Under such circumstances, this Court independently concludes there was no reasonable probability that, but for the failure of petitioner's trial counsel to present any of the testimony of Raul Gonzales, Jr., Dr. Ferrell, or Dr. Allen given during petitioner's first state habeas corpus proceeding, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.  The state habeas court's conclusion on this same point was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

  c.  Conclusions

The *Wiggins* claim petitioner presented to the state habeas court in his first state habeas corpus proceeding fails to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Wiggins* claim during the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence

presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

### 5. De Novo Review of Supplemented *Wiggins* Claim

Absent some showing that a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland*. *See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002)(recognizing that, in evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003); *Gutierrez v. Dretke*, 392 F.Supp.2d 802, 875-76 (W.D. Tex. 2005)(recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were *objectively*

unreasonable), *CoA denied,* 201 Fed. Appx. 196 (5th Cir. September 21, 2006), *cert. denied,* 549 U.S. 1227 (2007).

    a.  <u>No Deficient Performance</u>

In his second state habeas corpus proceeding, and in his Amended Petition herein, petitioner presents the same allegations and evidence he presented in support of his *Wiggins* claim in his first state habeas corpus proceeding but supplements that evidence with numerous new affidavits and documents.[183]  As was explained above, however, with the exception of the new allegation that petitioner's mother abused alcohol and possibly drugs during her pregnancy with petitioner (and the suggestions of petitioner's new experts that petitioner should have been evaluated by petitioner's trial defense team for Fetal Alcohol Syndrome), the voluminous additional documents petitioner presents to supplement his original *Wiggins* claim offer no truly "new" evidence regarding petitioner's childhood, family background, character, or criminal history that was not otherwise presented to petitioner's capital sentencing jury during the punishment phase of petitioner's trial.

While the new affidavits furnished by petitioner's family members and experts offer additional details concerning the abused and neglected circumstances in which petitioner grew up,

---

[183] *See notes 140-54, supra, and accompanying text.*

petitioner neither alleges any facts nor furnishes this Court with any evidence showing that his trial counsel were unaware of these additional details at the time of petitioner's trial. Petitioner's co-counsel at trial, attorney Ed Camara, testified without contradiction during petitioner's first state habeas corpus proceeding that (1) he interviewed petitioner and found petitioner's account of the fatal shooting of officer Riojas consistent with petitioner's statements to police, (2) the defense's mitigation specialist, Ann Matthews, interviewed four or five members of petitioner's family, including petitioner's mother, sister, and uncle, (3) he and Ann Matthews met with Dr. Ferrell prior to trial, (4) *he personally spoke with both petitioner's mother and sister*, (5) he had access to petitioner's juvenile and extensive criminal records, and (6) nothing the prosecution developed during the punishment phase of trial came as a surprise to him.[184]   Petitioner's lead trial counsel, attorney Vincent D. Callahan, testified in the same state habeas corpus proceeding that (1) he spoke with five members of petitioner's family during breaks in the guilt-innocence phase of trial about their possibly testifying during the punishment phase of trial, (2) *petitioner's capital sentencing jury heard everything he was told by petitioner's family members*, (3) he

---

[184] S.F. State Habeas Hearing, Volume 2 of 5, testimony of Ed Camara, at pp. 85-86, 88, 90-92, 93-97.

attempted to develop evidence showing petitioner's troubled youth

through the punishment phase testimony of petitioner's sister,

(4) he hoped to show the jury that petitioner had learned his

criminal behavior from his family and hoped the jury would hold

petitioner less responsible for his criminal conduct, and (5) he

had a meeting with Dr. Ferrell during the guilt-innocence phase

of petitioner's trial on October 24, 2002 before deciding not to

call Dr. Ferrell as a punishment-phase witness.[185]   Petitioner's

---

[185] S.F. State Habeas Hearing, Volume 4 of 5, testimony of
Vincent D. Callahan, at pp. 19-23, 25-26, 31, 33, 36-37.
    Petitioner spends considerable energy pointing out the
discrepancy between attorney Callahan's state habeas testimony,
in which attorney Callahan testified he chose not to call Dr.
Ferrell to testify at trial because he believed Dr. Ferrell would
testify petitioner posed a danger of future violence (*Id.*, at pp.
9-10, 22-24) and with Dr. Ferrell's testimony during the same
state habeas corpus proceeding that he was prepared to testify at
trial that petitioner would not pose a risk of future violence
(S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack
Ferrell, at p. 51).   It is unnecessary to resolve this apparent
conflicting testimony because, for the reasons set forth at
length in Section IV.F.4.a. above, there were valid, rational,
objectively reasonable reasons why attorney Callahan's decision
not to call Dr. Ferrell to testify during the punishment phase of
petitioner's capital murder trial was itself objectively
reasonable.   More specifically, as was explained at length above,
the opinions regarding petitioner's future dangerousness Dr.
Ferrell was prepared to express at trial would have been subject
to a potentially devastating cross-examination based upon the
information contained in petitioner's TYC case file and the
extensive testimonial evidence the prosecution presented during
the punishment phase of petitioner's trial.   Thus, even if
attorney Callahan misunderstood the opinions regarding
petitioner's future dangerousness expressed by Dr. Ferrell during
their meeting on October 24, 2002, that mistake on attorney
Callahan's part did not render his subsequent decision not to
call Dr. Ferrell to testify during the punishment phase of
petitioner's trial objectively unreasonable.

trial counsel had access to petitioner's Texas Youth Commission file prior to trial and interviewed petitioner's sister Corinna, mother, and uncle Louis Garza, Jr., all three of whom testified during the punishment phase of petitioner's trial regarding petitioner's father's criminal behavior and physically abusive treatment of petitioner and his mother, as well as petitioner's father's drug abuse and sexual assault upon petitioner's sister. In her latest affidavit now before this Court, dated June 15, 2010, petitioner's sister Corinna furnishes a lengthy description of all the abuse and neglect which petitioner suffered as a child but makes clear she informed petitioner's trial counsel of all this information *prior to trial*.[186]

Turning to the one truly "new" factual allegation presented in support of petitioner's "supplemented" *Wiggins* claim, i.e., the allegation petitioner's mother abused alcohol and drugs during her pregnancy with petitioner, the fundamental problem with this supplemented *Wiggins* claim is that petitioner has not provided this Court with any fact-specific allegations, much less any evidence, establishing that petitioner's trial counsel was ever made aware of this "new" allegation *prior to petitioner's*

---

[186] Second State Habeas transcript, at pp. 856-60. Petitioner attached another copy of this same affidavit as Exhibit N to his Amended Petition herein.

*trial.*[187]   On the contrary, that assertion only appears clear in
the record now before this Court for the first time in the
affidavits of Raul Gonzales, Jr. and petitioner's mother, both
executed in June 13, 2010.[188]   In neither of these affidavits,
however, do either of these affidavits claim they ever
specifically informed petitioner's trial counsel *prior to trial*
of petitioner's mother's alleged alcohol and drug abuse while
pregnant with petitioner.   Nor do they assert they informed
petitioner's defense team *prior to trial* of any other information
which would reasonably have put said counsel on notice of the

---

[187] A letter dated October 16, 2002 from Ann Matthews to
petitioner's co-counsel, attorney Ed Camara, and copies of Ms.
Matthews' interview notes appear among the documents presented to
state habeas court in petitioner's second state habeas corpus
proceeding. Second State Habeas Transcript, at pp. 826-39.   A
pair of lines appear in Ms. Matthews' interview notes from an
August 28 (presumably 2002) interview of petitioner's aunt Sonia
Gonzales which read as follows "Maria currently using Cocaine"
and "Possible prenatal drug use." *Id.*, at p. 837.

[188] Second State Habeas Transcript, at p. 841 (affidavit of
Raul Gonzales, Jr.) and at p. 849 (affidavit of Maria Gonzalez).
The new affidavits of Raul Gonzales, Jr. and Maria Gonzalez also
appear as exhibits L and M to petitioner's Amended Petition
herein.
    The October 19, 2004 report of Dr. Katherine Allen which was
presented to the state habeas court during petitioner's first
state habeas corpus proceeding does include a mention of
petitioner and his sister having witnessed "consistent drug use
by their parents and friends of their parents in the home." First
State Habeas Transcript, at p. 171.   However, nothing in Dr.
Allen's lengthy report suggests petitioner's mother abused
alcohol or drugs while pregnant with petitioner. *Id.*, at pp. 169-
81.

possible benefits of investigating whether petitioner suffers from Fetal Alcohol Syndrome.

Furthermore, these eleventh hour accusations of alleged alcohol and drug abuse by petitioner's mother while she was pregnant with petitioner must be viewed in the context of the other information which was available to petitioner's trial counsel *prior to and at the time of petitioner's trial*. Petitioner's Texas Youth Commission case file, which was available to petitioner's trial counsel, included (1) psychological evaluations by Dr. Ben Ferguson and Dr. Roger Sherman, and a separate evaluation by a master's level psychologist, none of which mentioned any alleged alcohol or drug abuse by petitioner's mother (during her pregnancy with petitioner or otherwise)[189]; and (2) a Bexar County Juvenile Probation Department report on petitioner dated June 20, 1996 which included a statement that petitioner's mother reported petitioner's "birth and development were normal" but no mention of any alleged alcohol or drug abuse by petitioner's mother.[190] At petitioner's trial, petitioner's sister Corinna, petitioner's mother, and petitioner's uncle Louis Garza, Jr., all testified

---

[189] State Exhibit no. 188, S.F. Trial, Volume 36, at pp. 296-311.

[190] *Id.*, at pp. 61-65.
Another copy of the same report appears herein at First State Habeas Transcript, at pp. 123-28.

extensively regarding petitioner's childhood but none mentioned any alleged alcohol or drug abuse by petitioner's mother.  On the contrary, all three of these witnesses described petitioner's mother as caring and having done her best to raise petitioner in spite of the pernicious influence of petitioner's father.[191]

During his first state habeas corpus proceeding, petitioner furnished the state habeas court with (1) a psychological evaluation by Dr. Susana A. Rosin dated October 19, 2004,[192] (2) a lengthy mitigation affidavit by sociologist Dr. Kate Allen dated October 19, 2004,[193] (3) an affidavit dated October 22, 2004 from

---

[191] More specifically, petitioner's maternal uncle testified at petitioner's trial, in pertinent part, that (1) petitioner's mother was a good person who raised her children correctly, (2) petitioner had every advantage his mother could furnish him, (3) he was proud of his sister's efforts to raise petitioner and her other children, and (4) petitioner and his siblings always had a roof over their head and were never hungry. S.F. Trial, Volume 33, testimony of Louis Garza. Jr., at pp. 36-37.
     Petitioner's sister testified at petitioner's trial that (1) their mother was a good mother, (2) in contrast to most of her relatives, their mother had never been to prison, and (3) their mother taught her and petitioner right from wrong. S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41, 47-48.
     Petitioner's mother testified during the punishment phase of petitioner's capital murder trial, in pertinent part, that (1) petitioner was a happy child who had done very well in school until his father died, (2) she was unaware petitioner had ever used drugs, and (3) petitioner began acting out after his father died. S.F. Trial, Volume 33, testimony of Maria Gonzalez, at pp. 57-60,

[192] First State Habeas Transcript, at pp. 162-67.

[193] *Id.*, at pp. 169-81.

139

petitioner's paternal uncle Raul Gonzales, Jr.,[194] and (4) an affidavit dated October 20, 2004 from Ann Matthews with accompanying correspondence,[195] none of which specifically accused petitioner's mother of abusing alcohol or drugs while pregnant with petitioner.  Petitioner also presented live testimony during his first state habeas corpus proceeding from his paternal uncle Raul Gonzales, Jr., Dr. Ferrell, Dr. Allen, and petitioner's co-counsel at trial, attorney Ed Camara, none of whom made any specific accusation during their testimony that petitioner's mother had abused alcohol or drugs while pregnant with petitioner.

Thus, other than a single line in one of Ann Matthews' interview notes apparently transmitted to petitioner's co-counsel on or about October 16, 2002 (i.e, after the commencement of the guilt-innocence phase of petitioner's capital murder trial),[196] there does not appear to be any evidence in the record now before this Court suggesting petitioner's trial counsel were ever

---

[194] *Id.*, at pp. 183-86.  Mr. Gonzales' affidavit does include the following passage: "Manuel's mother was young when they started having children; she was unable to protect Manuel from his father.  She too was using drugs and when Fernie [petitioner's father] was not in the home she would have other boyfriends.  I think this confused Manuel." *Id.*, at p. 184. Nonetheless, these statements do not specifically accuse petitioner's mother of abusing alcohol or drugs *while she was pregnant with petitioner*.

[195] First State Habeas Transcript, at pp. 188-94.

[196] Second State Habeas Transcript, at p. 837.

alerted *prior to the punishment phase of petitioner's capital murder trial* to the possibility that petitioner's mother might have abused drugs or alcohol while pregnant with petitioner.

Moreover, as this Court has recently noted in another capital habeas case, as of the date of petitioner's capital murder trial, i.e., 2002, "fetal alcohol syndrome" and "fetal alcohol effects" were terms only just beginning to find acceptance among the mainstream within the mental health community. *Sells v. Thaler*, 2012 WL 2562666, *59 (W.D. Tex. June 28, 2012). Neither term appears in the 2000 edition of the DSM-IV-TR.[197] Moreover, in her report and affidavit, Dr. Murphey states "[p]hysical features associated with severe manifestations of this condition are uncertain."[198] Thus, it is far from clear how petitioner's trial counsel can be faulted for failing to themselves identify any signs of Fetal Alcohol Syndrome or Fetal Alcohol Effects which petitioner might have allegedly displayed prior to trial.

Petitioner's complaint is further undermined by the absence of any fact-specific allegations, much less any evidence, in the

---

[197] **American Psychiatric Association**, *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM-IV-TR)(2000), at pp. 143-46, 168-70, 177-80, 212-23, 338-43, 405-09, 479-83, 562-65, 655-61.

[198] Second State Habeas Transcript, at p. 921.

record now before this Court showing that petitioner does, in fact, suffer from Fetal Alcohol Syndrome.  Petitioner's mother admits in her latest affidavit that "[t]hough I didn't drink much while I was pregnant with Manuel there were some times when I drank more than I should have."[199]  Petitioner's seven-or-eight-time convicted uncle Raul Gonzales, Jr. alleges cryptically in his latest affidavit "[w]hile they were living with her mother, Fernie [petitioner's father] and Maria started to do heroine [sic] and sell heroine [sic] and other drugs.  This was during the time that Maria was pregnant with Manuel."[200]  There is no evidence, however, now before this Court establishing with specificity either (1) the amount or frequency of Maria Gonzalez's consumption of alcohol when she was pregnant with petitioner or (2) any details concerning her alleged ingestion of heroin, cocaine, or any other drugs during her pregnancy with petitioner.

More significantly, while Dr. Ferrell's latest affidavit[201] and Dr. Joann Murphey's lengthy report and affidavit[202] both

---

[199] Second State Habeas Transcript, at p. 849.

[200] *Id.*, at p. 841.

[201] Second State Habeas Transcript, at pp. 795-98.

[202] *Id.*, at pp. 883-923.  More specifically, Dr. Murphey reported "Manuel's mother consumed alcohol during her pregnancy with Manuel.  Manuel may exhibit features of fetal alcohol syndrome." *Id.*, at p. 921.  Dr. Murphey also opined "further medical evaluation is needed to finally determine the full extent

contain criticisms (both express and implied) of petitioner's
trial counsel for their failure to investigate whether petitioner
suffers from Fetal Alcohol Syndrome, neither of those two
clinical psychologists purports to definitely diagnose petitioner
with Fetal Alcohol Syndrome or Fetal Alcohol Effects.

Even more significantly, mitigating evidence showing
petitioner actually suffers from Fetal Alcohol Syndrome or Fetal
Alcohol Effects would necessarily have been double-edged in
nature and might well have helped convince petitioner's capital
sentencing jury to answer the future dangerousness special issue
affirmatively. *See Sells v. Thaler*, 2012 WL 2562666, at 58
(discussing expert opinions associating prenatal alcohol exposure
to damaged executive functioning with attendant socially
inappropriate behavior, inability to apply consequences from past
actions (i.e., an inability to learn from one's mistakes), lack
of impulse control, rage reactions, physical aggression, high
risk behaviors, and the inability to experience or display
remorse).  Presenting a Fetal Alcohol Syndrome or Fetal Alcohol
Effects defense at the punishment phase of petitioner's capital
murder trial would, in all reasonable likelihood, have reinforced
the prosecution's arguments that petitioner was likely to pose a
risk of future dangerousness for the rest of his life. *Sells v.
Thaler*, 2012 WL 2562666, at *59-*60.

---

of any physical manifestations of FAS." *Id.*

Under these circumstances, this Court independently concludes after *de novo* review that petitioner's complaints about his trial counsel's failure to investigate whether petitioner suffers from Fetal Alcohol Syndrome and to present evidence establishing same did not cause the performance of said counsel to fall below an *objective* level of reasonableness. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).  That evidence showing petitioner's mother might have abused alcohol or drugs while pregnant with petitioner might have been available at the time of petitioner's trial did not render the failure of petitioner's trial counsel to pursue such potentially mitigating evidence professionally deficient.  The defense of a criminal case is not one in which every potentially available defensive theory must be pursued without regard to the potential downside of asserting such a defense.[203]  "The defense of a criminal case is not an

---

[203] Licensed social worker and mitigation specialist Gerald L. Byington opines in his affidavits now before this Court that (1) a minimum of 100 hours of investigation is mandatory in every capital case and (2) 150 and 200 hours of mitigation investigation were necessary in petitioner's case are unsubstantiated by any specific facts. Second State Habeas Transcript, at pp. 800-07, 931-37.  Moreover, no federal court

undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992), cert. denied, 510 U.S. 829 (1993).

> b.   No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). Wong v. Belmontes, 558 U.S. at ___, 130 S.Ct. at 386; Wiggins v. Smith, 539 U.S. at 534, 123 S.Ct. at 2542. Strickland does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. Wong v. Belmontes, 558 U.S. at ___,

---

has adopted a rule mandating a minimum number of investigation hours as necessary to avoid a finding of professionally deficient performance under the first prong of Strickland. On the contrary, the Supreme Court has made clear that the objective reasonableness of trial counsel's investigation for mitigating evidence is a highly context-driven determination, unconstrained by arbitrary concerns over specific numbers of hours of investigation. See Wiggins v. Smith, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of Strickland is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

130 S.Ct. at 390-91.   A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d at 489; *Blanton v. Quarterman*, 543 F.3d at 235); *Montoya v. Johnson*, 226 F.3d at, 408.

As was explained above in Section IV.F.4., the expert opinions which petitioner argued in his first state habeas corpus proceeding should have been presented at the punishment phase of petitioner's capital murder trial were premised upon views of the petitioner's capital offense and criminal record which were refuted by the prosecution's evidence actually introduced at petitioner's trial.   The same can be said for the new opinions expressed by Dr. Ferrell in his latest affidavit and by Dr. Murphey in her lengthy affidavit and report.[204]   Likewise, with the exception of the allegations regarding petitioner's mother's alcohol and drug abuse while pregnant with petitioner, the voluminous new documents petitioner presented to the state habeas court in his second state habeas corpus proceeding (and now presents to this Court as exhibits to his Amended Petition herein) present very little new potentially mitigating evidence

---

[204] Dr. Murphey expressly cautioned readers of her report at the outset as follows: "This evaluator has made no effort to independently verify the accuracy of information Mr. Garza provided in regard to his personal history and current circumstances." Second State Habeas Transcript, at p. 883.

beyond that which petitioner presented to the his capital sentencing jury at trial through his family members or State Exhibit no. 188. As was also explained above, however, petitioner has presented this Court with no specific facts, much less any evidence, showing petitioner actually does suffer from Fetal Alcohol Syndrome or Fetal Alcohol Effects. More than a decade has passed since petitioner's capital murder trial. A showing of *Strickland* prejudice requires more than speculation by Dr. Ferrell, Dr. Murphey, and Mr. Byington that additional psychological evaluation of petitioner at the time of trial might have shown petitioner suffers from Fetal Alcohol Syndrome or Fetal Alcohol Effects.

Finally, as was explained above in Section IV.F.4.b., the evidence presented at trial showed petitioner (1) had a lengthy history of criminal conduct that included numerous episodes in which he possessed weapons while committing crimes, (2) led police on multiple high speed chases resulting in crashes of stolen vehicles, (3) learned from his father how to commit crimes such as auto theft, (4) displayed little remorse or sincere contrition for officer Riojas' murder,[205] (5) escaped from a juvenile halfway facility and repeatedly failed to.fulfill requirements imposed upon him as conditions to release on juvenile probation, (6) was found in possession of weapons while

---

[205] *See note 182, supra.*

on juvenile probation and while incarcerated, (7) was active sexually, used drugs, and participated in gangs from an early age, and (8) after his arrest for fatally shooting officer Riojas, made verbal threats and threatening gestures toward other police officers.  Under such circumstances, this Court concludes after a *de novo* review there is no reasonable probability that, but for the failure of petitioner's trial counsel to further investigate petitioner's background and present the "new" mitigating evidence accompanying petitioner's Amended Petition herein (including petitioner's evidence showing that he *might* suffer from Fetal Alcohol Syndrome or Fetal Alcohol Effects), the outcome of the punishment phase of petitioner's capital murder trial would have been different.  Petitioner's *Wiggins* claim does not warrant federal habeas corpus relief.

    c.   Conclusions

Petitioner's complaint about his trial counsel's failure to more thoroughly investigate petitioner's background and to present the "new" mitigating evidence accompanying petitioner's Amended Petition herein fails to satisfy either prong of *Strickland* analysis.

148

G.   Failure to Call Defense Investigator as a Witness

1.   The Complaint

Petitioner argues his trial counsel should have called defense investigator Jeff Mitchel to impeach or contradict the trial testimony of prosecution witness Erica Henderson.[206]

2.   State Court Disposition

During her direct examination on October 15, 2002, prosecution witness Erica Henderson testified, in part, (1) when she looked back, she saw the suspect and officer struggling for the gun, (2) the officer appeared to be attempting to get the gun away from the suspect, (3) the suspect appeared to be trying to keep the gun away from the officer, (4) the suspect raised the gun up over his head, the suspect ducked his head, and she then heard and saw the gunshot, (5) the suspect ducked away from the gun before it fired, and (6) the officer's hands were nowhere near the gun when it went off.[207]   On cross-examination that same date, she reiterated that it appeared to her the suspect was attempting to keep the gun away from the officer and it appeared the officer was attempting to get the gun out of the suspect's hand.[208]   She also reiterated her description of the fatal

---

[206] Amended Petition, at pp. 103-05.

[207] S.F. Trial, Volume 23, testimony of Erica Henderson, at pp. 202-03, 205-09, 215.

[208] *Id.*, at pp. 232-34.

shooting, i.e., explained that she saw the gun in the suspect's left hand rise and the shot fired.[209]  When petitioner's trial counsel asked her whether it appeared to her the shot was fired accidentally or unintentionally, the trial court sustained the prosecution's objections to those questions.[210]  On re-direct examination, Ms. Henderson reiterated her earlier testimony that officer Riojas' hands were nowhere near the gun when it fired and that she saw the suspect pull the trigger.[211]

The following date, i.e., on October 16, 2002, Ms. Henderson returned to the witness stand and testified on redirect that (1) she was only ten feet away from the two men she watched struggling for the gun, (2) the suspect appeared to be trying to get away, (3) it appeared the suspect did not want to allow the officer to have the gun, and (4) the suspect raised the gun, ducked, and then fired.[212]  On re-cross examination, Ms. Henderson admitted (1) *she had previously told petitioner's trial counsel the shooting might have been an accident*[213] and (2) she had been

---

[209] *Id.*, at pp. 233-34.

[210] *Id.*, at pp. 233-34.

[211] *Id.*, at p. 239.

[212] S.F. Trial, Volume 24, testimony of Erica Henderson, at pp. 11-13, 16.

[213] *Id.*, at p. 22.