mistaken when she told petitioner's trial counsel where she stopped her vehicle to look at the two men struggling.[214]

Petitioner presented this same ineffective assistance complaint as his third ground for relief in his first state habeas corpus proceeding.[215]   The state habeas trial court (1) found Jeff Mitchel had not testified before the state habeas court, (2) found there was no evidence before that court establishing that Mitchel was available to testify at petitioner's trial, (3) found Ms. Henderson admitted during her cross-examination that she had told petitioner's defense attorney that the shooting might have been accidental, (4) concluded that, under the Texas Rules of Evidence, because Ms. Henderson admitted making the statement in question, petitioner's trial counsel would not have been able to introduce extrinsic evidence of her statement, and (5) concluded petitioner's trial counsel were not ineffective for failing to attempt to introduce inadmissible evidence.[216]   The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

---

[214] *Id.*, at pp. 30-31.

[215] First State Habeas Transcript, at pp. 22-25.

[216] First State Habeas Transcript, at p. 227.

Petitioner re-presented the same complaint as his third assertion of ineffective assistance in his third claim for relief in his second state habeas corpus application.[217]  The Texas Court of Criminal Apepals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

3.   AEDPA Analysis

a.   No Deficient Performance

The Texas Court of Criminal Appeals' conclusion that Jeff Mitchel's testimony contradicting (or arguably impeaching) Ms. Henderson's trial testimony would have been inadmissible under applicable Texas rules of evidence is binding upon this Court in this federal habeas corpus proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman*, 574 F.3d at 291 (a state court's interpretation of state law binds a federal court sitting in habeas corpus); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.

_____

[217] Second State Habeas Transcript, at pp. 350-52.

2006)(holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004)("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000)(holding a federal habeas court may not review a state court's interpretation of its own law); *Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir. 1998)(holding the same), *cert. denied*, 526 U.S. 1089 (1999).

Because the state habeas court determined the testimony of Jeff Mitchel proffered through an affidavit during petitioner's first state habeas corpus proceeding was inadmissible under applicable state law rules of evidence, the failure of petitioner's trial counsel to attempt to present such testimony did not cause the performance of said counsel to fall below an objective level of reasonableness.  Counsel cannot be faulted for their failure to offer testimony which, under applicable state evidentiary rules, was inadmissible. *See Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to raise a meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman*, 508 F.3d 408, 413 (5th Cir. 2007)(failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th

Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003). "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U.S. at 656 n.19, 104 S.Ct. at 2045 n.19.

      b.   <u>No Prejudice</u>

    Likewise, the failure of petitioner's trial counsel to attempt to present the legally inadmissible testimony of Jeff Mitchel did not "prejudice" petitioner within the meaning of *Strickland. Paredes v. Quarterman*, 574 F.3d at 291; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Even if petitioner's trial counsel had called Jeff Mitchel to testify during the guilt-innocence phase of petitioner's capital murder trial, there is no reasonable probability the outcome of petitioner's trial would have been any different. *See Knowles v. Mirzayance*, 556 U.S. 111, 127-28, 129 S.Ct. 1411, 1422, 173 L.Ed.2d 251 (2009)(holding no prejudice could be shown by defendant complaining about his counsel's failure to urge an insanity defense after the same jury had ruled in favor of the prosecution after hearing the same evidence petitioner claimed should have been re-urged in support of his insanity defense).

4.   Conclusions

Petitioner's complaint about the failure of his trial counsel to attempt to introduce the testimony of court-appointed investigator Jeff Mitchel at the guilt-innocence phase of petitioner's capital murder trial satisfies neither prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this ineffective assistance complaint in the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

H.   Failure to Present Petitioner's Medical Records

1.   The Complaint

In his final assertion of ineffective assistance, petitioner argues his trial counsel should have sought to admit petitioner's hospital records, which petitioner argues would have shown petitioner was beaten during his confrontation with officer Riojas and would have supported petitioner's self-defense claim.[218]

_____

[218] Amended Petition, at pp. 105-06.

2.   <u>State Court Disposition</u>

Petitioner presented this same complaint as his fourth claim for relief in his first state habeas corpus application.[219]   The state habeas trial court concluded (1) petitioner's medical records in question would not have been admissible under applicable Texas evidentiary rules because (a) there was no evidence showing officer Riojas caused the petitioner's purported injuries reflected therein and (b) the evidence adduced at trial did not raise the issue of self-defense under applicable state law and (2) petitioner's trial counsel were not ineffective for failing to seek admission of inadmissible documents.[220]   The Texas Court of Criminal Appeals adopted the foregoing conclusions when it denied petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-presented the same complaint as his third assertion of ineffective assistance in his third claim for relief in his second state habeas corpus application.[221]   The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

---

[219] First State Habeas Transcript, at pp. 25-26.

[220] First State Habeas Transcript, at p. 228.

[221] Second State Habeas Transcript, at p. 352.

156

3.   <u>AEDPA Analysis</u>

   a.   <u>No Deficient Performance</u>

As was explained above, the Texas Court of Criminal Appeals'
conclusion that the medical records in question were not
admissible under applicable state evidentiary rules binds this
Court in this federal habeas corpus proceeding. *See Bradshaw v.
Richey*, 546 U.S. at 76, 126 S.Ct. at 604 ("We have repeatedly
held that a state court's interpretation of state law, including
one announced on direct appeal of the challenged conviction,
binds a federal court sitting in habeas corpus."); *Paredes v.
Quarterman*, 574 F.3d at 291 (a state court's interpretation of
state law binds a federal court sitting in habeas corpus); *Amador
v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court
must defer to a state court's interpretation of state law).

Because the state habeas court held that petitioner's
hospital records were inadmissible under Texas evidentiary rules,
the failure of petitioner's trial counsel to seek admission of
those same records at the guilt-innocence phase of petitioner's
trial did not cause the performance of said counsel to fall below
an objective level of reasonableness.  Counsel cannot be faulted
for their failure to offer testimony or other evidence which,
under applicable state evidentiary rules, was inadmissible. *See
Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to raise a

157

meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman*, 508 F.3d at 413 (failure to raise futile or meritless objections is not ineffective lawyering); *Johnson v. Cockrell*, 306 F.3d at 255 (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent).

Moreover, any documentary evidence addressing alleged physical injuries petitioner sustained during his August 2, 2001 confrontation with officer Riojas would have been cumulative of the extensive testimony already before the petitioner's jury showing petitioner had sustained at least some facial and neck injuries during that confrontation.  There was no genuine dispute at the guilt innocence phase of petitioner's capital murder trial that, in the hours immediately after the petitioner's fatal confrontation with officer Riojas, petitioner appeared to several of his friends and relatives to have been in an altercation of some kind and showed obvious signs of injury.[222]  Petitioner's

---

[222] For instance, petitioner told both Tanya Dominguez and Nosario Alvarez, Jr. that he had been in a fight, a statement wholly consistent with their observations about petitioner's appearance and demeanor in the minutes after the fatal shooting. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 54, 56, 104, 107-09 (describing petitioner as looking "frazzled" and "upset," with his mouth bleeding, petitioner's neck described as red and bruised, and petitioner complained of a headache); testimony of Nosario Alvarez, Jr., at pp. 120, 122-23, 141-42

trial counsel cannot reasonably be faulted for failing to present medical records which (1) did not link any of petitioner's physical injuries to petitioner's altercation with officer Riojas and (2) would, at best, have been cumulative of the trial testimony of three prosecution witnesses.

      b.   <u>No Prejudice</u>

Petitioner presented the state habeas court with no new "hospital" records supporting this aspect of his ineffective assistance claims which petitioner complained should have been admitted during the guilt-innocence phase of his capital murder trial.  Instead, petitioner pointed to only those medical records admitted into evidence during the punishment phase of petitioner's trial, i.e., Defendant's Exhibit no. 10.[223]  Nothing

_____

(petitioner appeared to have been in a struggle, said he had been in a fight, had marks or scratches on his face and neck, was breathing hard, looked nervous, and talked very fast)
    Ben Parovel testified, in pertinent part, that, when petitioner arrived at petitioner's sister's apartment later that same night (1) petitioner's face appeared a little bloody, (2) there were scratches and bruises on petitioner's face, (3) petitioner had a busted lip and cuts on his face, and (4) petitioner had a lump on his head, a bruised arm, and a cut on his neck. S.F. Trial, Volume 26, testimony of Den David Parovel, at pp. 8-10, 40, 50.
    Thus, no less than three prosecution witnesses described petitioner as displaying obvious injuries to his face and neck shortly after the fatal confrontation with officer Riojas.

[223] Defendant's Exhibit no. 10 appears in S.F. Trial, Volume 37 and consists of BCADC medical records addressing (1) petitioner's initial health screening upon admission to that facility, (2) petitioner's routine medical treatment at that facility, as well as (3) the injuries petitioner sustained as a

in these records reflects examination or treatment for any facial or other *physical* injuries petitioner allegedly received during his August 2, 2001 confrontation with officer Riojas.  Even if petitioner had included additional evidence with these records somehow linking petitioner's complaints of claustrophobia and depression (petitioner's primary complaints in the days immediately after his arrest) with petitioner's struggle with officer Riojas, there is nothing in these records establishing petitioner voiced complaints about any such physical injuries until after his August 12, 2001 physical confrontation with several other inmates.

The state habeas court correctly found the *inadmissible* records in question did not link any of petitioner's physical injuries to his altercation with officer Riojas.  Moreover, petitioner's jury already had before it the testimony of three prosecution witnesses describing petitioner's facial and neck injuries in the hours immediately after petitioner's fatal confrontation with officer Riojas.  Even without the *inadmissible* medical records in question, petitioner's jury was already well

---

result of an altercation between petitioner and three of three other inmates on August 12, 2001.  The state habeas court correctly found that nothing in those records linked any of petitioner's physical injuries to his confrontation with officer Riojas on August 2, 2001. *See note 182, supra.*

aware of the petitioner's physical condition in the hours immediately after his fatal confrontation with officer Riojas.

Under such circumstances, there is no reasonable probability that, but for the failure of petitioner's trial counsel to seek admission of petitioner's *inadmissible* BCADC medical records during the guilt-innocence phase of petitioner's capital murder trial, the outcome of either phase of petitioner's trial would have been any different.

4.  Conclusions

Petitioner's complaint about the failure of his trial counsel to seek admission at the guilt-innocence phase of trial of petitioner's BCADC medical records fails to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this same ineffective assistance complaint in the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

161

### V. <u>Violation of Right to Confront Adverse Witnesses</u>

A.   <u>The Claim</u>

In his second claim herein, petitioner complains that his Sixth Amendment right to confront adverse witnesses was violated when the state trial court refused to permit petitioner to cross-examine prosecution witness Erica Henderson regarding her opinion as to whether the fatal shooting of officer Riojas could have been accidental.[224]   In support of this claim, petitioner argues the Texas Court of Criminal Appeals erroneously construed Rule 701 of the Texas Rules of Evidence when it denied petitioner's analogous claim in the course of petitioner's direct appeal and first state habeas corpus proceedings.

B.   <u>State Court Disposition</u>

As was explained above in Section IV.G.2., the state trial court initially refused to permit petitioner to cross-examine prosecution witness Erica Henderson concerning her opinion as to whether the fatal shooting of officer Riojas might have been accidental but, the following day, permitted petitioner's trial counsel to elicit as admission from Ms. Henderson that she had told petitioner's trial counsel she believed the shooting might have been accidental.[225]

---

[224] Amended Petition, at pp. 45-54.

[225] *See notes 207-14, supra, and accompanying text.*

Petitioner presented the same complaint as his second point of error on direct appeal, albeit as a purely state-law claim, arguing only that the trial court's ruling was an erroneous application of state evidentiary rules.[226]  The Texas Court of Criminal Appeals held that any error by the state trial court in initially excluding the cross-examination inquiries in question was rendered harmless by virtue of the petitioner's trial court's elicitation of Ms. Henderson's testimony the following day. *Garza v. State*, 2005 WL 385442, at *2-*3.

Petitioner re-urged the same complaint, this time as a Sixth Amendment Confrontation Clause claim, as his second claim for relief in petitioner's first state habeas corpus application.[227] The state habeas trial court concluded petitioner had procedurally defaulted on this complaint by failing to present it on direct appeal.[228]  The Texas Court of Criminal Appeals adopted that conclusion when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-urged the same Confrontation Clause argument as his second ground for relief in his second state habeas corpus

---

[226] Brief for Appellant, at pp. 13-19.

[227] First State Habeas Transcript, at pp. 12-22.

[228] First State Habeas Transcript, at p. 224.

application.[229]   The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.   Respondent does not, however, urge this Court to dismiss this claim on procedural default principles.[230]

C.   Clearly Established Federal Law

The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically.  "Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965).  Professor Wigmore stated:

'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' (Emphasis in original.) 5 J. Wigmore, Evidence s 1395, p. 123 (3d ed. 1940).

*Davis v. Alaska*, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

---

[229] Second State Habeas Transcript, at pp. 292-301.

[230] Respondent's Answer, at pp. 15-19.

164

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985).  Violations of the Confrontation Clause are subject to harmless error analysis. *Coy v. Iowa*, 487 U.S. 1012, 1021-22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988); *United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2012 WL 1835124 (October 29, 2012).

D.   AEDPA Analysis

Insofar as petitioner asks this Court to re-evaluate the Texas Court of Criminal Appeals' analysis and application of Rule 701 of the Texas Rules of Evidence in the course of petitioner's direct appeal and state habeas corpus proceedings, that request is *non sequitur*.  As this Court explained above, the state court's interpretation of state procedural and evidentiary rules is binding on this Court. *See Bradshaw v. Richey*, 546 U.S. at 76, 126 S.Ct. at 604 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman*, 574 F.3d at 291 (a state court's interpretation of state law binds a federal court sitting in habeas corpus); *Amador v. Quarterman*, 458 F.3d

at 412 (holding a federal habeas court must defer to a state court's interpretation of state law).

Determining whether the exclusion of impeachment evidence is of constitutional concern depends upon the reasons for and effect of the exclusion, which typically includes an inquiry into the admissibility of the evidence under the applicable rules of evidence. *United States v. Hale*, 685 F.3d 522, 538 (5th Cir. 2012), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2012 WL 4438817 (October 29, 2012).  As was explained above, while petitioner's trial counsel were precluded from asking Ms. Henderson what her opinions were regarding whether petitioner's fatal shooting of officer Riojas was accidental, they were permitted to elicit on cross-examination that Ms. Henderson had previously told petitioner's trial counsel she believed the shooting might have been accidental.  Under such circumstances, there does not appear to have been any constitutionally erroneous restriction upon petitioner's Sixth Amendment right to confront adverse witnesses.

The jury had before it both of petitioner's written statements describing his fatal shooting of officer Riojas, neither of which genuinely contradicted Ms. Henderson's eyewitness testimony regarding the same subject.  Moreover, given the fact petitioner's trial counsel were permitted to elicit Ms. Henderson's previously stated opinion regarding the possibly

166

accidental nature of the shooting, any error in preventing her from testifying more directly about her opinions on that subject was harmless, at best.  The state trial court's initial rulings limiting the cross-examination of Ms. Henderson did not prevent petitioner's trial counsel from soliciting impeachment testimony from Ms. Henderson on this same subject. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict").  Thus, the state trial court's initial restriction on the cross-examination of Ms. Henderson did not have a substantial or injurious effect or influence on the outcome of the jury's verdict at the guilt-innocence phase of petitioner's capital murder trial.

E.   Conclusions

In view of that same court's subsequent allowance of almost identical cross-examination the following day, the state trial court's initial ruling limiting the scope of petitioner's cross-examination of Ms. Henderson did not violate the Sixth Amendment's Confrontation Clause.  Any error committed by the state trial court in initially limiting or restricting the scope of petitioner's cross-examination of prosecution witness Erica Henderson was rendered harmless by virtue of the cross-

167

examination of Ms. Henderson which the state trial court permitted the following day.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's state law and Confrontation Clause complaints about the state trial court's rulings limiting the scope of cross-examination of prosecution witness Erica Henderson during the course of petitioner's direct appeal and first state habeas corpus proceeding were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

## VI. <u>Erroneous Exclusion of Evidence of Riojas' Character</u>

A.   <u>The Claim</u>

In his fourth claim herein, petitioner argues the state trial court erred in refusing to permit petitioner to introduce evidence during the guilt-innocence phase of trial showing officer Riojas' character for violence.[231]  While phrasing this claim as a Sixth and Fourteenth Amendment claim, petitioner cites only state-law legal authorities in support of this claim.

---

[231] Amended Petition, at pp. 106-13.

B.    State Court Disposition

At trial, petitioner proffered the testimony of some nine witnesses regarding their observation of officer Riojas's alleged use of excessive force while arresting or stopping themselves or other individuals.[232]  The state trial court held a hearing on the prosecution's motion in limine and concluded petitioner had failed to present any evidence showing officer Riojas had engaged in an conduct which threatened petitioner with serious bodily injury or death and excluded the proffered testimony.[233]

Petitioner's fourth point of error on direct appeal raised a purely state-law argument that the trial court had erred when excluding proffered testimony showing officer Riojas had been aggressive or even violent while arresting or attempting to arrest other individuals.[234]  The Texas Court of Criminal Appeals concluded (1) Riojas' actions were in direct response to petitioner's attempt to resist arrest, (2) the evidence did not raise an issue as to self-defense, and (3) the trial court reasonably excluded petitioner's proffered testimony. *Garza v. State*, 2005 WL 395442, at *5-*6.

---

[232] S.F. Trial, Volume 29, at pp. 109-64.

[233] S.F. Trial, Volume 29, at pp. 3-10.

[234] Brief for Appellant, at pp. 31-36.

Petitioner re-urged this same complaint as his sixth claim for relief in his first state habeas corpus application, vaguely alluding to the Sixth and Fourteenth Amendments but once more citing only state-law legal authorities in support of his arguments.[235]  The state habeas trial court concluded (1) this claim was foreclosed from state habeas review because the Texas Court of Criminal Appeals had already rejected same on the merits in petitioner's direct appeal and (2) petitioner had procedurally defaulted on any new aspects to this same claim by failing to present same on direct appeal.[236]  The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented the same state-law claim (including only a single sentence vaguely alluding to the Sixth and Fourteenth Amendments and no citations to any federal legal authorities) as his fourth ground for relief in his second state habeas corpus application.[237]  The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*,

---

[235] First State Habeas Transcript, at pp. 39-46.

[236] First State Habeas Transcript, at pp. 232-33.

[237] Second State Habeas Transcript, at pp. 105-11.

2011 WL 4826968, at *1.  Respondent does not, however, urge this Court to dismiss this claim on procedural default principles.[238]

C.   <u>Clearly Established Federal Law</u>

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law); *Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008)("'it is not the province of a federal habeas court to reexamine state court determinations on state-law questions' such as the admissibility of evidence under state procedural rules"), *cert. denied*, ___ U.S. ___, 128 S.Ct. 1612, 173 L.Ed.2d 1000 (2009).

---

[238] Respondent's Answer, at pp. 15-19.

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874.

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144 (1986); *Goodrum v. Quarterman*, 547 F.3d at 261; *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006).

The question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005)(holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied*, 546 U.S. 900 (2005).

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler*, 643 F.3d 425, 430-31 (5th Cir. 2011) (Footnotes omitted).

D.   <u>AEDPA Analysis</u>

Insofar as petitioner complains about the manner the state appellate and state habeas courts applied Texas law during his direct appeal and first state habeas corpus proceeding, those

complaints do not furnish a basis for federal habeas corpus relief.

The Texas Court of Criminal Appeals ruled that the evidence proffered by petitioner was legally insufficient to raise the issue of self-defense under applicable Texas law and, therefore, evidence showing officer Riojas' prior physical contact with others was not admissible at petitioner's trial. *Garza v. State*, 2005 WL 395442, at *5-*6. As was explained above, this interpretation of state law is binding upon this Court in this federal habeas corpus proceeding. *Bradshaw v. Richey*, 546 U.S. at 76, 126 S.Ct. at 604; *Paredes v. Quarterman*, 574 F.3d at 291; *Amador v. Quarterman*, 458 F.3d at 412. This Court is bound by the state appellate court's conclusion that petitioner's evidence did not raise the issue of self-defense under applicable Texas law.

The issue remaining for this Court is whether the state trial court's exclusion of petitioner's proffered testimony rendered petitioner's capital murder trial fundamentally unfair. At the guilt-innocence phase of petitioner's capital murder trial, the jury had before it both of petitioner's written statements describing his fatal shooting of officer Riojas, both of which made clear petitioner vigorously resisted officer Riojas' efforts to arrest petitioner before officer Riojas allegedly employed any excessive force toward petitioner. In

174

addition, petitioner's friend Jamie Martinez testified (1) she saw officer Riojas grab petitioner, attempt to push petitioner up against a car, and attempt to place petitioner in handcuffs, (2) petitioner turned around and resisted the efforts of officer Riojas to apply handcuffs, (3) petitioner jerked away from officer Riojas, and (4) she later saw petitioner running and officer Riojas chasing petitioner.[239]   Petitioner presented the state trial court with no evidence showing petitioner ever attempted to surrender to, or submit to arrest by, officer Riojas.   Finally, petitioner presented no evidence showing he was personally aware as of August 2, 2001 of any alleged excessive force officer Riojas had ever applied toward any other person.

The evidence before the jury at the guilt-innocence phase of trial tended to show (1) petitioner was well aware that he was lawfully subject to arrest on August 2, 2001 because of outstanding warrants, (2) he recognized officer Riojas as a law enforcement officer, (3) he was determined not to be arrested, (4) he not only gave officer Riojas a false name when asked but actively resisted the efforts of officer Riojas to place him in handcuffs, (5) he fled from officer Riojas, ignored a cry from officer Riojas to halt, and only stopped when he became fatigued, (6) he assumed a stance Detective Matjeka described as a fighting

---

[239] S.F. Trial, Volume 29, testimony of Jamie Martinez, at pp. 44-45, 54-55, 85.

stance, and (7) when officer Riojas reached him, petitioner engaged in a physical confrontation which culminated in petitioner grabbing officer Riojas handgun and fatally shooting officer Riojas.

Since the affirmative defense of self-defense was not raised by the evidence presented or proffered during the guilt-innocence phase of petitioner's trial, the only purported justification presented by petitioner in his Amended petition for introducing evidence showing officer Riojas' alleged character for violence has no basis in reality.[240]  Petitioner's inability to present character evidence relevant exclusively to an affirmative defense which was not raised by the other evidence before the state trial court did not render petitioner's capital murder trial fundamentally unfair.  Nothing in the Constitution mandates permitting a murder defendant to attack the character of his victim when the victim's character has no relevance under applicable law to the issues properly before the jury.

E.   Conclusions

The exclusion of petitioner's proffered character evidence did not render petitioner's capital murder trial fundamentally unfair.  The other evidence before the jury at the guilt-

---

[240] Amended Petition, at p. 112 ("Manuel's entire defense was that he acted in self-defense from the complainant who was the violent aggressor in this instance, and had been a violent aggressor with prior suspects who fled from the complainant.").

innocence phase of petitioner's capital murder trial did not
raise the defense of self-defense under applicable Texas law.
The Texas Court of Criminal Appeals' rejections on the merits of
petitioner's complaints about the exclusion of petitioner's
proffered character evidence during petitioner's direct appeal
and first state habeas corpus proceedings were neither contrary
to, nor involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of
the United States, nor based upon an unreasonable determination
of the facts in light of the evidence presented in the
petitioner's trial, direct appeal, and first state habeas corpus
proceedings.

### VII. <u>Challenges to the Texas Capital Sentencing Scheme</u>

A.   <u>Overview of the Claims</u>

In his fifth through ninth claims herein, petitioner argues
(1) several terms included in the Texas capital sentencing
special issues are unconstitutionally vague,[241] (2) constitutional
notions of due process require proportionality review of
petitioner's death sentence,[242] (3) the Texas capital sentencing
statute unconstitutionally fails to assign the burden of proof on
the mitigation special issue to the prosecution,[243] (4) the Texas

---

[241] Amended Petition, at pp. 113-15.

[242] Amended Petition, at pp. 116-32.

[243] Amended Petition, at pp. 133-35.

capital sentencing statute unconstitutionally fails to inform the jury of the effect of a single holdout juror,[244] and (5) the Texas capital sentencing scheme is unconstitutional because juries are incapable of accurately predicting future dangerousness.[245]

B.    Clearly Established Federal Law: A Brief History of Eighth
      Amendment Jurisprudence

      Until fairly recently, the Supreme Court's opinions addressing capital punishment offered a wide array of rather ambiguous analytical approaches to resolving Eighth Amendment claims, none of which claimed adherence from a clear majority of the Supreme Court.  For instance, in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Supreme Court addressed the issue of a former soldier sanctioned for desertion with loss of his citizenship.  In the course of an opinion that reflected little more than his own views on the subject, Chief Justice Earl Warren wrote as follows:

          The exact scope of the constitutional phrase
      'cruel and unusual' has not been detailed by this
      Court. But the basic policy reflected in these words is
      firmly established in the Anglo-American tradition of
      criminal justice.  The phrase in our Constitution was
      taken directly from the English Declaration of Rights
      of 1688, and the principle it represents can be traced
      back to the Magna Carta.  The basic concept underlying
      the Eighth Amendment is nothing less than the dignity
      of man. While the State has the power to punish, the
      Amendment stands to assure that this power be exercised
      within the limits of civilized standards.  Fines,

---

[244] Amended Petition, at pp. 135-59.

[245] Amended Petition, at pp. 160-64.

imprisonment and even execution may be imposed
depending upon the enormity of the crime, but any
technique outside the bounds of these traditional
penalties is constitutionally suspect.  This Court has
had little occasion to give precise content to the
Eighth Amendment, and, in an enlightened democracy such
as ours, this is not surprising.  But when the Court
was confronted with a punishment of 12 years in irons
at hard and painful labor imposed for the crime of
falsifying public records, it did not hesitate to
declare that the penalty was cruel in its excessiveness
and unusual in its character. *Weems v. United States*,
217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. The Court
recognized in that case that the words of the Amendment
are not precise, and that their scope is not static.
The Amendment must draw its meaning from the evolving
standards of decency that mark the progress of a
maturing society.

*Trop v. Dulles*, 356 U.S. at 99-101, 78 S.Ct. at 597-98 *(Footnotes
omitted)*.

Though often cited in subsequent Supreme Court opinions,

Chief Judge Warren's "evolving standards of decency" Eighth

Amendment test proved to be as difficult to apply consistently as

Justice Stewart's classic definition of obscenity ("I know it

when I see it") from his famous concurring opinion in *Jacobellis*

*v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12

L.Ed.2d 793 (1964).  For example, in *Furman v. Georgia*, 408 U.S.

238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a bare majority of the

Supreme Court struck down capital sentencing schemes in several

southern States but failed to reach any degree of consensus in

terms of an analytical approach to the Eighth Amendment.  The

result was nine separate opinions issued from the Supreme Court

in *Furman*, each reflecting a different analytical approach to the

Eighth Amendment claims presented therein.

179

The situation changed little when, four years later, a less than cohesive majority of the Supreme Court upheld the new capital scheme adopted by the Texas Legislature in response to *Furman*. *See Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976)(holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription of "cruel and unusual punishment" in an opinion issued by Justice Stevens writing for himself and Justices Powell and Stewart with Chief Justice Burger and Justices White and Rehnquist concurring separately).  During the same term, the Court was equally divided when it upheld Georgia's effort to re-institute capital punishment in that jurisdiction following *Furman*. *See Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976)(distinguishing the role of judicial review of capital punishment from that of legislative prerogative in an opinion issued by Justice Stewart for himself and Justices Powell and Stevens with Chief Justice Burger and Justices White and Rehnquist concurring separately).

The lack of Supreme Court consensus on an analytical approach to the Eighth Amendment continued for more than a decade thereafter, including a case rejecting an "as applied" challenge to the Texas capital sentencing scheme. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988)(holding there is no constitutional right to have a capital

sentencing jury consider "residual doubts" as to the defendant's guilt in an opinion by Justice White for himself, Chief Justice Burger, and Justices Scalia and Kennedy, with Justices O'Connor and Blackmun concurring separately).

A degree of consensus did begin to appear within the Supreme Court early the following decade when five Justices finally agreed on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.
>
> *Boyde v. California*, 494 U.S. 370, 380-381, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)(*Footnotes omitted*).

181

True consensus on an overarching analytical approach to Eighth Amendment claims did not appear, however, until eight Supreme Court Justices agreed in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), on the principle that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971, 114 S.Ct. at 2634 (Justice Kennedy writing for himself, Chief Justice Rehnquist, and Justices O'Connor, Scalia, Souter, and Thomas, with Justices Stevens and Ginsburg concurring separately but not rejecting the analytical approach offered by Justice Kennedy).  The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.  To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase.  The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both).  As we have explained, the aggravating circumstance must meet two requirements.  First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, the aggravating circumstance may not be unconstitutionally vague.   * * *
> We have imposed a separate requirement for the selection decision, where the sentencer determines

whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.
*Tuilaepa*, 512 U.S. at 971-73, 114 S.Ct. at 2634-35 (citations omitted).

In *Tuilaepa*, the Supreme Court clearly declared its view that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court also concluded, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to

183

others found guilty of murder.'"   Some schemes
accomplish that narrowing by requiring that the
sentencer find at least one aggravating circumstance.
The narrowing may also be achieved, however, in the
definition of the capital offense, in which
circumstance the requirement that the sentencer "find
the existence of the aggravating circumstance in
addition is no part of the constitutionally required
narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).

The Supreme Court subsequently elaborated on the distinction

between the narrowing function or "eligibility decision" and the

"selection phase" of a capital sentencing proceeding in *Buchanan*

*v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998):

> Petitioner initially recognizes, as he must, that
> our cases have distinguished between two different
> aspects of the capital sentencing process, the
> eligibility phase and the selection phase. *Tuilaepa v.
> California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634,
> 129 L.Ed.2d 750 (1994).  In the eligibility phase, the
> jury narrows the class of defendants eligible for the
> death penalty, often through consideration of
> aggravating circumstances. *Ibid*. In the selection
> phase, the jury determines whether to impose a death
> sentence on an eligible defendant. *Id.*, at 972, 114
> S.Ct., at 2634-2635.  Petitioner concedes that it is
> only the selection phase that is at stake in his case.
> He argues, however, that our decisions indicate that
> the jury at the selection phase must both have
> discretion to make an individualized determination and
> have that discretion limited and channeled. See, *e.g.,*
> *Gregg v. Georgia*, 428 U.S. 153, 206-207, 96 S.Ct. 2909,
> 2940-2941, 49 L.Ed.2d 859 (1976).  He further argues
> that the Eighth Amendment therefore requires the court
> to instruct the jury on its obligation and authority to
> consider mitigating evidence, and on particular
> mitigating factors deemed relevant by the State.
> No such rule has ever been adopted by this Court.
> While petitioner appropriately recognizes the
> distinction between the eligibility and selection
> phases, he fails to distinguish the differing
> constitutional treatment we have accorded those two

184

aspects of capital sentencing.  It is in regard to the
eligibility phase that we have stressed the need for
channeling and limiting the jury's discretion to ensure
that the death penalty is a proportionate punishment
and therefore not arbitrary or capricious in its
imposition.  In contrast, in the selection phase, we
have emphasized the need for a broad inquiry into all
relevant mitigating evidence to allow an individualized
determination. *Tuilaepa, supra,* at 971-973, 114 S.Ct.,
at 2634-2636; *Romano v. Oklahoma,* 512 U.S. 1, 6-7, 114
S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); *McCleskey
v. Kemp,* 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-
1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878-
879, 103 S.Ct., at 2743-2744.

In the selection phase, our cases have established
that the sentencer may not be precluded from
considering, and may not refuse to consider, any
constitutionally relevant mitigating evidence. *Penry v.
Lynaugh,* 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-
2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455
U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1
(1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct.
2954, 2964-2965, 57 L.Ed.2d 973 (1978).  However, the
state may shape and structure the jury's consideration
of mitigation so long as it does not preclude the jury
from giving effect to any relevant mitigating evidence.
*Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658,
2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109
S.Ct., at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181,
108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988).  Our
consistent concern has been that restrictions on the
jury's sentencing determination not preclude the jury
from being able to give effect to mitigating evidence.
Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct.
1190, 108 L.Ed.2d 316 (1990), we held that the standard
for determining whether jury instructions satisfy these
principles was "whether there is a reasonable
likelihood that the jury has applied the challenged
instruction in a way that prevents the consideration of
constitutionally relevant evidence." *Id.,* at 380, 110
S.Ct., at 1198; see also *Johnson, supra,* at 367-368,
113 S.Ct., at 2669.

But we have never gone further and held that the
state must affirmatively structure in a particular way
the manner in which juries consider mitigating
evidence.  And indeed, our decisions suggest that
complete jury discretion is constitutionally

permissible. See *Tuilaepa, supra,* at 978-979, 114
S.Ct., at 2638-2639 (noting that at the selection
phase, the state is not confined to submitting specific
propositional questions to the jury and may indeed
allow the jury unbridled discretion); *Stephens,* supra,
at 875, 103 S.Ct., at 2741-2742 (rejecting the argument
that a scheme permitting the jury to exercise
"unbridled discretion" in determining whether to impose
the death penalty after it has found the defendant
eligible is unconstitutional, and noting that accepting
that argument would require the Court to overrule
*Gregg, supra*).

*Buchanan v. Angelone,* 522 U.S. at 275-277, 118 S.Ct. at 761-62.

With these principles in mind, the Court now turns to
petitioner's attacks upon the Texas capital sentencing scheme.

C.    Vague "Aggravating Factors" Complaint

    1.    The Claim

Petitioner argues in his fifth claim herein that the Texas
capital sentencing scheme is constitutionally defective because
several key terms employed in the Texas capital sentencing
special issue are unconstitutionally vague, i.e., undefined.[246]

    2.    State Court Disposition

Petitioner presented these same arguments in his sixth point
of error on direct appeal.[247]  The Texas Court of Criminal Appeals
rejected these arguments on the merits. *Garza v. State,* 2005 WL
395442, at *8.

Petitioner re-urged the same arguments as his seventh ground
for relief in his first state habeas corpus application.  The

---

[246] Amended Petition, at pp. 113-15.

[247] Brief for Appellant, at pp. 36-38.

state habeas trial court concluded (1) this claim was foreclosed from state habeas review because the Texas Court of Criminal Appeals had already rejected same on the merits in petitioner's direct appeal and (2) petitioner had procedurally defaulted on any new aspects to this same claim by failing to present same on direct appeal.[248]  The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented the same arguments a third time as his fifth ground for relief in his second state habeas corpus application.[249]  The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

3.  <u>AEDPA Review</u>

The fundamental problem with petitioner's fifth claim herein is that various terms the Texas capital special issues which petitioner identifies as unconstitutionally vague "aggravating terms" are not, in fact "aggravating terms" at all.  Texas is not a "weighing jurisdiction" where capital sentencing jurors must balance "aggravating" versus "mitigating" factors before

---

[248] First State Habeas Transcript, at pp. 233-34.

[249] Second State Habeas Transcript, at pp. 360-62.

187

rendering a verdict at the punishment phase of a capital trial. *See Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir. 1999)(holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction), *cert. denied*, 528 U.S. 1145 (2000).  Rather, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47, 108 S.Ct. 546, 554-55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. at 268-75, 96 S.Ct. at 2955-57 (*plurality opinion* recognizing the Texas capital sentencing

188

scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).  The Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied*, 552 U.S. 948 (2007).

Both this Court and the Fifth Circuit have repeatedly rejected the exact same arguments raised by petitioner in his fifth claim herein regarding the purported necessity for

189

definitions of the terms in question as utterly lacking in any arguable merit. *See, e.g., Paredes v. Quarterman*, 574 F.3d at 294 (holding the terms "probability, "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir.) (rejecting claims the terms "probability, "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S. 1193 (2007); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005)(listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability, "criminal acts of violence," and "continuing threat to society"), *cert. denied*, 547 U.S. 1073 (2006); *Jasper v. Thaler*, 765 F.Supp.2d 783, 835 (W.D. Tex. 2011)(holding none of the terms included in the Texas capital sentencing special issues identified by petitioner herein required definitions), *affirmed*, 466 Fed. Appx. 429, 2012 WL 1449259 (5th Cir. April 26, 2012), *cert. filed September 4, 2012, no. 12-6160*; *Bartee v. Quarterman*, 574 F.Supp.2d at 694-94 (citing numerous Fifth Circuit opinions and opinions of this Court rejecting the same arguments contained in petitioner's fifth claim herein); *Moore v. Quarterman,* 526 F.Supp.2d 654, 720-

21 (W.D.Tex. 2007)(discussing the long line of Fifth Circuit opinions, as well as numerous opinions from this Court, rejecting the same arguments raised by petitioner's fifth claim herein), *CoA denied*, 534 F.3d 454 (5th Cir. 2008).

The allegedly vague terms in the Texas capital sentencing special issues identified by petitioner in his fifth claim herein all contain a common sense core of meaning which do not require further definition. *See James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.)("To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system....  The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean."), *cert. denied*, 509 U.S. 947 (1993)(*quoting Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984), *cert. denied*, 471 U.S. 1030 (1995)).

4.   Conclusions

Petitioner's arguments supporting his fifth claim herein have repeatedly been rejected by both the Fifth Circuit and this Court.  The Supreme Court's opinion in *Kansas v. Marsh, supra*, implicitly rejected these same arguments as well.

The Texas Court of Criminal Appeals' rejections in the course of petitioner's direct appeal and first state habeas corpus proceedings of petitioner's Eighth Amendment complaints

191

about the lack of definitions of key terms in the Texas capital sentencing special issues were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.  Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

D.    Proportionality Review

      1.    The Claim

      In his sixth claim herein, petitioner argues the Texas Constitution and the Due Process Clause of the Fourteenth Amendment mandate judicial proportionality review of all capital sentences.[250]  More specifically, petitioner argues he possesses a constitutional right to proportionality review of his capital sentence analogous to the type of review mandated in civil cases for punitive damages awards by the Supreme Court's opinion in *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

      2.    State Court Disposition

      Petitioner presented the same arguments as his eighth ground for relief in his first state habeas corpus application.[251]  The

_____

[250] Amended Petition, at pp. 116-32.

[251] First State Habeas Transcript, at pp. 49-66.

192

state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[252]   The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-urged the same arguments as his sixth claim for relief in his second state habeas corpus application.[253]   The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1. Respondent does not, however, urge this Court to dismiss this claim on procedural default principles.[254]

    3.   <u>*Teague* Foreclosure</u>

No federal court has ever held the Constitution mandates judicial proportionality review of a Texas capital sentence. Thus, adopting the rule advocated by petitioner in his sixth claim herein would constitute adoption of a new rule of constitutional criminal procedure.

---

[252] First State Habeas Transcript, at p. 234.

[253] Second State Habeas Transcript, at pp. 363-79.

[254] Respondent's Answer, at pp. 15-19.

The non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), forecloses adoption of the new principles advocated by petitioner in his sixth claim herein.  Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).  A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final").  Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would

have felt compelled by existing precedent to conclude that the
rule he seeks was required by the Constitution; and third, if the
rule advocated by the petitioner is a new rule, the court must
determine whether the rule falls within one of the two narrow
exceptions to the non-retroactivity principle. *Caspari v. Bohlen*,
510 U.S. at 390, 114 S.Ct. at 953.

The only two exceptions to the *Teague* non-retroactivity
doctrine are reserved for (1) new rules forbidding criminal
punishment of certain primary conduct and rules prohibiting a
certain category of punishment for a class of defendants because
of their status or offense and (2) "watershed" rules of criminal
procedure implicating the fundamental fairness and accuracy of
the criminal proceeding, i.e., a small core of rules requiring
observance of those procedures that are implicit in the concept
of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157, 117
S.Ct. at 1973.   A conviction becomes final for *Teague* purposes
when either the United States Supreme Court denies a certiorari
petition on the defendant's direct appeal or the time period for
filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S.
at 390, 114 S.Ct. at 953.

Petitioner's conviction became final for *Teague* purposes no
later than May 18, 2005, i.e., the ninety-first day after the
Texas Court of Criminal Appeals affirmed petitioner's conviction
and sentence on direct appeal and the date the deadline for the

195

filing of petitioner's petition for writ of certiorari with the
United States Supreme Court expired. *See Beard v. Banks*, 542 U.S.
406, 411-12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004)
(recognizing a state criminal conviction ordinarily becomes final
for *Teague* purposes when the availability of direct appeal to the
state courts has been exhausted and the time for filing a
petition for writ of certiorari has elapsed or a timely filed
petition for certiorari has been denied); *Caspari v. Bohlen*, 510
U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence
become final for purposes of retroactivity analysis when the
availability of direct appeal to the state courts has been
exhausted and the time for filing a petition for a writ of
certiorari has elapsed or a timely filed petition has been
finally denied."); 21 U.S.C. §2101(d)(the deadline for filing a
certiorari petition from a state criminal conviction shall be
established by Supreme Court rule); Sup. Ct. Rule 13.1 (setting
the deadline for the filing of a certiorari petition at 90 days
from the date of the state court judgment for which review is
sought).

　　*Teague* remains applicable after the passage of the AEDPA.
*See Horn v. Banks*, 536 U.S. 266, 268-72, 122 S.Ct. 2147, 2148-51,
153 L.Ed.2d 301 (2002)(applying *Teague* in an AEDPA context);
*Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir.
2003)(recognizing the continued vitality of the *Teague* non-

196

retroactivity doctrine under the AEDPA), *cert. denied*, 539 U.S. 979 (2003).

As of the date petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas criminal defendant was entitled to have his capital sentence judicially reviewed for proportionality. The Supreme Court has never mandated such review of capital sentences. Nor was such a constitutional requirement arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's sixth claim herein is foreclosed by the non-retroactivity doctrine of *Teague*. The new rule proposed by petitioner in his sixth claim herein falls within neither of the recognized exceptions to the *Teague* doctrine. Even assuming the Supreme Court might one day rule a constitutional duty exists on state appellate judges to review all capital sentences for proportionality, that day has not yet arrived.

The Fourteenth and Eighth Amendment arguments asserted by petitioner in his sixth claim herein constitutes a proposed "new rules of criminal procedure" which the non-retroactivity rule of *Teague v. Lane* precludes this Court from recognizing or applying in a federal habeas context. *See Martinez v. Dretke*, 426 F.Supp.2d 403, 532 (W.D. Tex. 2006)(holding *Teague* foreclosure applicable to these same complaints), *CoA denied*, 270 Fed. Appx. 277, 2008 WL 698946 (5th Cir. March 17, 2008); *Cordova v.*

197

*Johnson*, 993 F.Supp. 473, 509 (W.D. Tex. 1998)(holding *Teague*

forecloses claims that the Constitution mandated proportionality

review of the jury's answers to the Texas capital sentencing

scheme's special issues), *appeal denied*, 157 F.3d 380 (5th Cir.

1998), *cert. denied*, 525 U.S. 1131 (1999).

    4.   <u>AEDPA Review</u>

    This Court has repeatedly rejected the same arguments

presented by petitioner in his sixth claim herein. *See, e.g.,*

*Jasper v. Thaler*, 765 F.Supp.2d at 837-38:

>     This claim lacks merit.  The United States Supreme
> Court has expressly rejected the argument that a state
> appellate court is required to independently re-weigh
> aggravating and mitigating evidence. *See Pulley v.*
> *Harris*, 465 U.S. 37, 50-51, 104 S.Ct. 871, 879, 79
> L.Ed.2d 29 (1984) ("There is thus no basis in our cases
> for holding that comparative proportionality review by
> an appellate court is required in every case in which
> the death sentence is imposed and the defendant
> requests it.").  Both before and after the Supreme
> Court mandated judicial proportionality review of
> punitive damage awards in civil cases, the Fifth
> Circuit has consistently held no such "proportionality
> review" of a capital sentence is constitutionally
> mandated. *See Martinez v. Johnson*, 255 F.3d 229, 241 n.
> 17 (5th Cir.2001) (recognizing there is no
> constitutional right to proportionality review), *cert.*
> *denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118
> (2002); *Hughes v. Johnson*, 191 F.3d 607, 622 (5th
> Cir.1999) (holding a state appellate court was not
> required to conduct proportionality review of a capital
> sentence), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003,
> 145 L.Ed.2d 945 (2000); *United States v. Webster*, 162
> F.3d 308, 354 (5th Cir.1998) (holding the Constitution
> does not require a comparison of the penalties imposed
> in similar criminal cases), *cert. denied*, 528 U.S. 829,
> 120 S.Ct. 83, 145 L.Ed.2d 70 (1999); *Evans v. McCotter*,
> 790 F.2d 1232, 1243 (5th Cir.) (holding there is no
> federal constitutional right to any type of

proportionality review, so long as the state's capital
punishment scheme protects against arbitrary and
capricious imposition of the death penalty), *cert.
denied,* 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300
(1986).

    This Court has rejected the same argument urged by
petitioner in his eleventh claim—the Supreme Court's
holding mandating proportionality review of punitive
damage awards in civil cases necessarily requires
similar judicial scrutiny of capital sentences. *See
Bartee v. Quarterman,* 574 F.Supp.2d at 695-98
(rejecting contention that due process mandate
proportionality review in capital criminal cases);
*Martinez v. Dretke,* 426 F.Supp.2d 403, 530-32
(W.D.Tex.2006) (holding the Supreme Court's opinion in
*Tuilaepa* permits states to adopt capital sentencing
schemes which vest the sentencing jury with virtually
unfettered discretion at the selection phase of a
capital trial), *CoA denied,* 270 Fed.Appx. 277 (5th
Cir.2008); *see Cordova v. Johnson,* 993 F.Supp. 473, 509
(W.D.Tex.1998) (then District Judge Prado wrote,
"Insofar as proportionality analysis is
constitutionally necessary with regard to the Texas
capital sentencing scheme, that analysis is
incorporated in the 'eligibility decision' described in
*Tuilaepa* and *Buchanan* and is accomplished in the Texas
capital sentencing scheme at the guilt-innocence phase
of a trial because the Texas capital murder statute
itself performs the constitutionally-mandated narrowing
function.").

    An analysis of comparing punitive damage awards in
civil cases with one another has never been applied by
the Supreme Court in the context of criminal
sentencing.  Thus, there is no clearly established
federal case law requiring proportionality review of a
state capital sentence.  Furthermore, as demonstrated
by the Federal Sentencing Guidelines' focus on the
specific aspects of an offender and his particular
offense, criminal sentencing requires careful
consideration of a host of individual characteristics
relevant to a particular defendant and a particular
criminal offense.  Contrary to the assumption
underlying petitioner's eleventh claim, neither all
capital murders nor all capital murderers can easily be
grouped into a single category for purposes of
"proportionality review."  The arguments underlying
petitioner's eleventh claim would override the long-
standing principle of individualized sentencing which

supports the Supreme Court's entire Fifth Amendment and Eighth Amendment jurisprudence. *See Cordova v. Johnson,* 993 F.Supp. at 508 ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head.").

There is no clearly established federal law mandating judicial proportionality review of capital sentences. The Fifth Circuit has specifically rejected the same Eighth and Fourteenth Amendment arguments premised upon *Honda Motors v. Oberg* underlying petitioner's sixth claim herein. *See Hughes v. Johnson,* 191 F.3d at 622-23 (emphasizing Texas is not a weighing jurisdiction which requires an appellate court or jury to "weigh" aggravating factors against mitigating ones).

Insofar as petitioner attempts to rely upon provisions of the Texas Constitution to support his sixth claim herein, that effort has no arguable merit. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire,* 502 U.S. at 67-68, 112 S.Ct. at 480 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874

(holding a federal court may not issue the writ on the basis of a perceived error of state law).

5.   <u>Conclusions</u>

Petitioner's sixth claim herein advocates adoption of a new rule of constitutional criminal procedure, a rule foreclosed by the non-retroactivity principle announced in *Teague*.   There is no clearly established federal legal authority mandating the type of judicial proportionality review requested by petitioner in his sixth claim herein.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of petitioner's request for judicial proportionality review of his capital sentence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

E.   <u>No Burden of Proof on Mitigation Special Issue</u>

1.   <u>The Claim</u>

In his seventh claim herein, petitioner argues the Supreme court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120

S.Ct. 2348, 147 L.Ed.2d 435 (2000), mandates imposition of a burden of proof on the prosecution in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue.[255]

    2.   <u>State Court Disposition</u>

    Petitioner raised this complaint for the first time as his ninth ground for relief in his first state habeas corpus application.[256]  The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[257]  The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

    Petitioner re-urged the same arguments as his seventh claim for relief in his second state habeas corpus application.[258]  The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

---

[255] Amended Petition, at pp. 133-35.

[256] First State Habeas Transcript, at pp. 66-69.

[257] First State Habeas Transcript, at pp. 234-35.

[258] Second State Habeas Transcript, at pp. 380-82.

3.   <u>AEDPA Review</u>

In *Apprendi v. New Jersey, supra,* the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S.Ct. at 2366.  The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362-63.  Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[259]  *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.  The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": [i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no

---

[259] In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595-96, 122 S.Ct. at 2435-36.

matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439.   "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439-40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359. Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.

The essential elements of the offense of capital murder, as defined by Texas law, are set forth in Sections 19.02(b) and 19.03 of the Texas Penal Code.[260]  Capital murder, as so defined by Texas law, is punishable by a sentence of either life imprisonment or death.[261]  Applicable Texas law does not include any of the sentencing factors included in the Texas capital sentencing special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure as "essential elements" of the offense of capital murder: "In Texas, the statutory maximum for a

---

[260] Tex. Pen. Code Ann. §19.02(b) (Vernon 2003); Tex. Pen. Code Ann. §19.03 (Vernon Supp. 2010).

[261] Tex. Pen. Code Ann. §12.31(a) (Vernon Supp. 2010),

capital offense is death.  The mitigation issue does not increase the statutory minimum.  To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum." *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003), *cert. denied*, 543 U.S. 823 (2004).  The nature of petitioner's capital sentencing proceeding was vastly different from the sentencing proceedings the Supreme Court addressed in *Ring*.

In *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2ed 403 (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U.S. at 303-04, 124 S.Ct. at 2537.  In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362-63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").  In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona*, *supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. at 303, 124 S.Ct.

at 2537.  None of the foregoing legal principles were violated when petitioner's *jury* rendered its verdict during the punishment phase of petitioner's capital murder trial.

Petitioner's capital sentencing *jury* made a key factual determination at the punishment phase of petitioner's trial *beyond a reasonable doubt*; more specifically, finding a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society.[262] Petitioner's *jury* also determined, after taking into consideration all the evidence, including the circumstances of the offense, petitioner's character and background, and petitioner's personal moral culpability, there was insufficient mitigating circumstance to warrant a life sentence.[263]  Thus, the capital sentence imposed upon petitioner pursuant to Texas law was based on jury findings, unlike the judicially-imposed sentences struck down in *Apprendi*, *Ring*, *Jones*, and *Blakely*.

Moreover, the Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant.  Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-

---

[262] Trial Transcript, at p. 225.

[263] Trial Transcript, at p. 226.

mandated eligibility determination, i.e., the narrowing function. In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied*, 552 U.S. 948 (2007).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See*

*Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47, 108 S.Ct. 546, 554-55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268-75, 96 S.Ct. 2950, 2955-57, 49 L.Ed.2d 929 (1976)(*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond*

a *reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365-67.  In contrast, Ring's jury made no analogous factual findings.  Instead, Ring's Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution.  Petitioner's *jury* made that determination.  Thus, no violation of the principles set forth in *Apprendi*, *Jones*, *Ring*, or *Blakely* occurred during petitioner's trial.  Insofar as petitioner argues his jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty, that argument is foreclosed by the Supreme Court's *express* recognition the Texas capital sentencing scheme accomplishes the eligibility determination, i.e. the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial. *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666; *Jurek v. Texas*, 428 U.S. at 270-71, 96 S.Ct. at 2956.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa*, i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2524-25; *Sonnier v. Quarterman*, 476 F.3d at 365; *Garcia v. Thaler*, 2009 WL 4931069, *14 (W.D. Tex. December 14, 2009), *CoA denied*, 389 Fed. Appx. 396, 2010 WL 31195119 (5th Cir. August 9, 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1604, 179 L.Ed.2d 505 (2011). "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh*, 549 U.S. at 174-75, 126 S.Ct. at 2525 (holding, in

connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof

requirement with regard to a capital sentencing jury's

consideration of mitigating evidence when such consideration

occurs exclusively within the selection process.

> "[D]iscretion to evaluate and weigh the circumstances
> relevant to the particular defendant and the crime he
> committed" is not impermissible in the capital
> sentencing process.  "Once the jury finds that the
> defendant falls within the legislatively defined
> category of persons eligible for the death
> penalty,...the jury then is free to consider a myriad
> of factors to determine whether death is the
> appropriate punishment."  Indeed, the sentencer may be
> given "unbridled discretion in determining whether the
> death penalty should be imposed after it has been found
> that the defendant is a member of the class made
> eligible for that penalty."

*Tuilaepa*, 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

"[T]here is no constitutional requirement of unfettered

sentencing discretion in the jury, and States are free to

structure and shape consideration of mitigating evidence 'in an

effort to achieve a more rational and equitable administration of

the death penalty.'" *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct.

at 2666 (*quoting Boyde v. California*, 494 U.S. at 377, 110 S.Ct.

at 1196).  "We have never held that a specific method for

balancing mitigating and aggravating factors in a capital

sentencing proceeding is constitutionally required." *Kansas v.*

*Marsh*, 549 U.S. at 175, 126 S.Ct. at 2525 (*quoting Franklin v.*

*Lynaugh*, 487 U.S. at 179, 108 S.Ct. at 2330).

As explained above, the "eligibility" decision required by

the Eighth Amendment is satisfied under Texas law by the jury's

findings "beyond a reasonable doubt" that (1) the defendant is

guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *Sonnier v. Quarterman*, 476 F.3d at 365-67.  This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Apprendi* and *Ring*.

Consistent with the Supreme Court's holdings in *Kansas v. Marsh*, *Tuilaepa v. California*, and *Johnson v. Texas*, a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness.  Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the *selection* phase of a capital trial.[264]

---

[264] It can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to enure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particular burden of proof on this special issue permits the jury to answer the *Penry* special issue affirmatively if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue.

4.   Conclusions

Neither the Supreme Court's opinion in *Apprendi* nor any of the Supreme Court's subsequent opinions construing its holding in *Apprendi* mandate imposition of a burden of proof on the prosecution with regard to the Texas capital sentencing scheme's mitigation special issue.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of petitioner's complaint about the absence of a burden of proof in the Texas capital sentencing scheme's mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.  Petitioner's seventh claim herein does not warrant federal habeas corpus relief.

F.   No Jury Instruction on Hung Jury

1.   The Claim

In his eighth claim herein, petitioner argues the Texas capital sentencing scheme violates the Eighth and Fourteenth Amendment because it fails to inform a capital sentencing jury of the effect of a single holdout juror on any of the capital

215

sentencing special issues.[265]  More specifically, petitioner argues the Texas twelve/ten rule deprived him of individualized sentencing and his constitutional right to a fair and impartial jury.

    2.   <u>State Court Disposition</u>

    Petitioner presented these arguments for the first time as his tenth ground for relief in his first state habeas corpus application.[266]  The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[267]  The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

    Petitioner re-urged the same arguments as his eighth claim for relief in his second state habeas corpus application.[268]  The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

---

[265] Amended Petition, at pp. 135-59.

[266] First State Habeas Transcript, at pp. 70-98.

[267] First State Habeas Transcript, at pp. 235-36.

[268] Second State Habeas Transcript, at pp. 382-406.

3.   <u>AEDPA Review</u>

In a multifaceted attack, petitioner argues, in part, that the provisions of Article 37.071, Section 2(d) violate the principles set forth in the Supreme Court's opinions in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), as well as a number of opinions addressing the capital sentencing scheme employed by the state of South Carolina.  Because there is no clearly established federal legal authority mandating jury instructions advising the jury of the impact of a single holdout juror, petitioner's eighth claim herein lacks any arguable merit.

The Supreme Court has implicitly rejected petitioner's arguments underlying his eighth claim herein. *See Jones v. United States* 527 U.S. 373, 382, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370 (1999)(holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury

217